Christian T. Nygren          ID No.: 4016
MILODRAGOVICH, DALE,
STEINBRENNER & NYGREN P.C.
Attorneys at Law
620 High Park Way
P.O. Box 4947
Missoula, MT 59806-4947
Telephone: (406) 728-1455
Fax: (406) 549-7077
EMAIL: nygren@bigskylawyers.com
Attorney for GE COMMERCIAL DISTRIBUTION FINANCE CORP.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| INCREDIBLE AUTO SALES LLC, | ) | Bankruptcy No.: 06-60855-RBK-11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

MOTION TO MODIFY STAY; AND NOTICE

The Motion of GE COMMERCIAL DISTRIBUTION FINANCE CORP. ("GE

Commercial"), secured creditor herein, respectfully represents:

1.      The Debtor commenced this case by filing a voluntary petition for relief under

Chapter 11 of the Bankruptcy Code on October 17, 2006(the "Petition Date").

2.      Creditor is the holder of a secured claim against the Debtor(s), and pursuant to

Mont. LBR 4001-1, provides the following information:

> (a)  The present balance owing to Creditor, excluding any precomputed interest
> or other unearned charges, is $39,031.28.
>
> (b)  The date upon which the subject debt was incurred was October 30, 2003.
>
> (c)  Creditor holds a security interest or lien upon the following described
> property of the estate:

Certain inventory of the Debtor more specifically described as Tracker

Marine Inventory:

| Model | Serial Number |
|---|---|
| 14 AVENGER | BUJ18475J304 |
| GENERIC 1232 | BUJ22092K304 |
| GV12/V1264 | BUJ23496L304 |
| HAWK 186 SPT | BUJ28288A404 |
| 14 AVENGER | BUJ35781D404 |
| 40EL | 0T827250 |
| 9.9M | 0T924009 |
| 115E | 0T932614 |
| 25EL | 0T953777 |

(d)   The nature of Creditor's security interest, the date upon which the security interest was obtained, and the date upon which the security interest was perfected are as follows:

On or about October 30, 2003, the Debtor, for value received, entered into an Agreement for Wholesale Financing ("Security Agreement") with GE Commercial and additional amendments, program letters, agreements, and other documents executed therewith under which the Debtor, pledged, as security for the repayment of the amounts borrowed under the Security Agreement, certain inventory collateral (the "Collateral"). A copy of the GE Commercial Security Agreement is attached to and incorporated herein by reference as Exhibit A.

GE Commercial recorded UCC financing statements to perfect its interest in the Collateral: (a) with the Montana Secretary of State on November 12, 2003 as Document No. 75487162, (b) amended on October 7, 2005, as Document No. 84568879 to show GE Commercial as perfected. A copy of the GE Commercial UCC documentation is attached to and incorporated herein by reference as Exhibit B.

On or about August 10, 2005, the Debtor's primary financier Hyundai Motor Finance Company entered into an Intercreditor Agreement with GE Commercial subordinating its interest

2

R

in any inventory of the Debtor directly financed by GE Commercial. A copy of the Intercreditor

Agreement is attached to and incorporated herein by reference as Exhibit C.

(e)   A description of Creditor's collateral, including its location, is as follows:

Tracker Marine Inventory:

| Model | Serial Number |
|---|---|
| 14 AVENGER | BUJ18475J304 |
| GENERIC 1232 | BUJ22092K304 |
| GV12/V1264 | BUJ23496L304 |
| HAWK 186 SPT | BUJ28288A404 |
| 14 AVENGER | BUJ35781D404 |
| 40EL | 0T827250 |
| 9.9M | 0T924009 |
| 115E | 0T932614 |
| 25EL | 0T953777 |

Located in Debtor's possession.

(f)   The fair market value of Creditor's collateral is $29,931.44.

(g)   A description of, and the amounts due upon, any other security interests which have priority over that of Creditor are as follows:

There are no other security interests or liens which have priority over that of GE

Commercial in the subject collateral.

(h)   If the Debtor is in default, the number of defaulted installments and the total amount in default are as follows:

The Debtor sold items of GE Commercial's Collateral with a value of approximately

$7,657.64 without forwarding payment to GE Commercial or providing GE Commercial with

adequate assurances that payment would be made, a condition know in the industry as being

"Sold Out of Trust" or "SOT."

As a consequence, the Debtor was in default under the terms of the Security Agreement

by failing to make one or more payments due under the Security Agreement and for selling the

Collateral out of trust.  Additionally, the Debtor has failed to make interest payments totaling

$1,441.84

> (i)  This Motion is made under and pursuant to the following subsection of 11 U.S.C. § 362(d)(i) and (ii).
>
> (j)  Other facts which are relevant in determining whether relief should be granted are as follows:
>
> NONE

3.  Creditor further represents that in the event the Court grants this Motion, Creditor will seek foreclosure and liquidation of the above-described collateral in accordance with applicable nonbankruptcy law.  Upon disposition of such collateral, Creditor will account for all proceeds to the Court, and trustee, if applicable, and agrees to turn over any proceeds in excess of Creditor's allowed secured claim to the Court, and trustee, if applicable.

WHEREFORE, Creditor moves the Court to grant this Motion to Modify Stay, and to grant such other relief as the Court may deem appropriate.

DATED this 5 day of December, 2006.

MILODRAGOVICH, DALE,
STEINBRENNER & NYGREN P.C.


By /s/ Christian T. Nygren
Christian T. Nygren
620 High Park Way
P.O. Box 4947
Missoula, MT 59806-4947
Attorney for GE COMMERCIAL
DISTRIBUTION FINANCE CORP.

## NOTICE

If you object to the motion, you must file a written responsive pleading and request a hearing within ten (10) days of the date of the motion. The objecting party shall schedule the hearing and shall include in the caption of the responsive pleading in bold and conspicuous print the date, time and location of the hearing by inserting in the caption the following:

**NOTICE OF HEARING**
Date: _____
Time:_____
Location:_____

This contested matter shall be scheduled for hearing for the next hearing date scheduled in the division within which the case is filed. The date, time and location of the hearing can be obtained from the Clerk of Court or from the Court's website at www.mtb.uscourt.gov. In the event such scheduled hearing date is thirty (30) days beyond the filing date of the motion for relief, then a preliminary hearing within such thirty (30) day period shall be scheduled by the responding party after such party contacts the Clerk of Court to confirm the preliminary telephone hearing date and time, which shall be set forth in the response.

If you fail to file a written response to the above Motion to Modify Stay with the particularity required by Mont. LBR 4001-1(b), and request a hearing, within ten (10) days of the date of this Notice, with service on the undersigned and all parties entitled to service under all applicable rules, then your failure to respond or to request a hearing will be deemed an admission that the motion for relief should be granted without further notice or hearing.

DATED this _5_ day of December, 2006.

MILODRAGOVICH, DALE,
STEINBRENNER & NYGREN P.C.

By /s/ Christian T. Nygren
Christian T. Nygren
620 High Park Way
P.O. Box 4947
Missoula, MT 59806-4947
Attorney for GE COMMERCIAL
DISTRIBUTION FINANCE CORP.

## CERTIFICATE OF SERVICE

Under penalty of perjury, I hereby certify that on the 5 day of December, 2006, I served a true and exact copy of the foregoing by depositing the same in the U. S. Mail, first-class postage prepaid, unless otherwise indicated below:

Clarke B. Rice
2951 King Ave West
Billings, MT 59102
By ECF Notice

William L. Needler
555 Stokie Blvd Ste 500
Northbrook, IL 60062
By ECF Notice

Neal G. Jensen
Assistant U.S. Trustee
Liberty Center, Suite 204
Great Falls, MT 59401
By ECF Notice

Incredible Auto Sales LLC
1832 King Ave West
Billings, MT 59102

Scott A. Lawley
3390 Canyon Dr, Unit D3
Billings, MT 59102-7069

/s/ Christian T. Nygren

## AGREEMENT FOR WHOLESALE FINANCING
(Customer Account Link)

This Agreement for Wholesale Financing ("Agreement") is made between **GE Commercial Distribution Finance Corporation** ("CDF") and **Incredible Auto Sales, LLC** a |___| SOLE PROPRIETORSHIP, |___| PARTNERSHIP, |___| CORPORATION, |XX| LIMITED LIABILITY COMPANY (check applicable term) ("Dealer"), having its chief executive office located at <u>1832 King Avenue West, Billings, MT 59102</u>.

1. **Extension of Credit.** Subject to the terms of this Agreement, CDF may extend credit to Dealer from time to time to purchase inventory from CDF approved vendors ("Vendors") and for other purposes. CDF's decision to advance funds is discretionary, and will not be binding until the funds are actually advanced. CDF may combine all of CDF's advances to Dealer or on Dealer's behalf, whether under this Agreement or any other agreement, and whether provided by one or more of CDF's branch offices, together with all finance charges, fees and expenses related thereto, to make one debt owed by Dealer. CDF may, without notice to Dealer, elect not to finance any inventory sold by particular Vendors who are in default to CDF, or with respect to which CDF reasonably feels insecure. This Agreement concerns the extension of credit, and not the provision of goods or services.

2. **Financing Terms.** Certain financial terms of any advance which CDF makes under this Agreement are not set forth herein because such terms depend, in part, upon many variable factors, including the availability of Vendor discounts, payment terms or other incentives, and CDF's floorplanning volume with Dealer and with Vendors. Therefore, CDF and Dealer agree to set forth in this Agreement only the general terms of Dealer's financing arrangement with CDF. Upon agreeing to finance an item of Inventory for Dealer, CDF will send to Dealer a Statement of Transaction ("SOT") identifying such inventory and the applicable financial terms. Dealer's failure to notify CDF in writing of any objection to an SOT within fifteen (15) days after an SOT is mailed to Dealer shall constitute Dealer's: (a) acceptance of all terms thereof; (b) agreement that CDF is financing such inventory at Dealer's request; and (c) agreement that such SOT will be incorporated herein by reference. If Dealer objects to the terms of any SOT, Dealer will pay CDF for such inventory in accordance with the most recent terms for similar inventory to which Dealer has not objected (or, if there are no prior terms, at the lesser of 16% per annum or at the maximum lawful contract rate of interest permitted under applicable law), but CDF may then elect to terminate Dealer's financing program. Such termination will not accelerate the maturities of advances previously made, unless Dealer is otherwise in default of this Agreement.

3. **Security Interest.** To secure payment of all of Dealer's current and future debts to CDF, whether under this Agreement or any current or future guaranty or other agreement, Dealer grants CDF a security interest in all of Dealer's inventory, equipment, fixtures, accounts, chattel paper, instruments, deposit accounts, documents, general intangibles, and letter of credit rights and other supporting obligations, and all judgments, claims, insurance policies, and payments owed or made to Dealer thereon; all whether now owned or hereafter acquired, and all attachments, accessories, accessions, returns, repossessions, exchanges, substitutions and replacements thereto, and all proceeds thereof (collectively "Collateral"). All of such terms for which meanings are provided in the Uniform Commercial Code of the applicable state, as the same may be amended, are used herein with such meanings.

4. **Affirmative Warranties and Representations.** Dealer warrants and represents to CDF that: (a) Dealer has good title to all Collateral; (b) CDF's security interest in the Collateral financed by CDF is not now and will not become subordinate to the security interest or claim of any person; (c) Dealer will execute all documents CDF requests to perfect and maintain CDF's security interest in the Collateral, and will cause all third parties in possession of Collateral to provide such acknowledgment or control of CDF's security interest as CDF may require; (d) Dealer will deliver to CDF immediately upon each request, and CDF may retain, each Certificate of Title or Statement of Origin issued for Collateral financed by CDF; (e) Dealer will at all times be duly organized, existing, in good standing, qualified and licensed to do business in each jurisdiction in which the nature of its business or property so requires; (f) Dealer has the right and is duly authorized to enter into this Agreement; (g) Dealer's execution of this Agreement does not, and will not, constitute a breach of any law or agreement to which Dealer is now or hereafter becomes bound; (h) there are and will be no actions or proceedings pending or threatened against Dealer which might result in any material adverse change in Dealer's financial or business condition; (i) Dealer will maintain the Collateral in good condition; (j) Dealer has duly filed and will duly file all tax returns required by law, and will pay when due all taxes, levies, assessments and governmental charges; (k) Dealer will keep and maintain all of its books and records pertaining to the

US000115 (6/03)                                          1
EC000075 (6/03) mc

**EXHIBIT**

**A**

Collateral at its chief executive office designated in this Agreement; (I) Dealer will keep all Collateral at its chief executive office listed herein, and such other locations within the United States of America of which Dealer has notified CDF in writing or has listed on any current or future Exhibit "A" attached hereto; (m) Dealer will give CDF thirty (30) days prior written notice of any change in Dealer's identity, name, form of business organization, ownership, chief executive office, Collateral locations or other business locations; (n) Dealer will notify CDF of the commencement of material legal proceedings against Dealer or any guarantor; (o) Dealer will comply with all applicable laws; and (p) Dealer has provided CDF with a copy of Dealer's Articles of Incorporation, Articles of Organization, Articles of Formation, Partnership Agreement, or Certificate of Limited Partnership, as applicable, and will provide any subsequent amendments thereto bearing indicia of filing from the appropriate governmental authority, or such other documents verifying Dealer's true and correct legal name.

5.  **Negative Covenants.** Dealer will not at any time without CDF's prior written consent:  (a) other than in the ordinary course of its business, sell, lease, or otherwise dispose of or transfer any of its assets; (b) rent, lease, demonstrate, consign, license, or use any Collateral financed by CDF; (c) merge or consolidate with another entity; (d) move any Collateral financed by CDF out of the United States of America; or (e) store Collateral financed by CDF with any third party.

6.  **Insurance.** Dealer will immediately notify CDF of any loss, theft or damage to any Collateral. Dealer will keep the Collateral insured for its full insurable value under an "all risk" property insurance policy with a company acceptable to CDF, naming CDF as a lender loss-payee and containing standard lender's loss payable and termination provisions. Dealer will provide CDF with written evidence of such property insurance coverage and lender's loss-payee endorsement.

7.  **Financial Statements.** Dealer will deliver to CDF, in a form satisfactory to CDF:  (a) within ninety (90) days after the end of each of Dealer's fiscal years, a reasonably detailed balance sheet and income statement as of the last day of such fiscal year covering Dealer's operations for such fiscal year; (b) within forty-five (45) days after the end of each of Dealer's fiscal quarters, a reasonably detailed balance sheet and income statement as of the last day of such quarter covering Dealer's operations for such quarter; and (c) within ten (10) days after CDF's request, any other information relating to the Collateral or the financial condition of Dealer or any guarantor. Dealer represents that all financial statements and information which have been or may hereafter be delivered by Dealer or any guarantor are and will be correct and prepared in accordance with generally accepted accounting principles consistently applied, and there has been no material adverse change in the financial or business condition of Dealer or any guarantor since the submission to CDF of such financial statements, and Dealer acknowledges CDF's reliance thereon.

8.  **Reviews.** Dealer grants CDF an irrevocable license to enter Dealer's business locations during normal business hours without notice to Dealer to:  (a) account for and inspect all Collateral; and (b) examine and copy Dealer's books and records related to the Collateral.

9.  **Payment Terms.** Dealer will immediately pay CDF the principal indebtedness owed CDF on each item of Collateral financed by CDF on the earliest occurrence of any of the following events:  (a) when such Collateral is lost, stolen or damaged; (b) for Collateral financed under Pay-As-Sold ("PAS") terms, when such Collateral is sold, transferred, rented, leased, otherwise disposed of, or its payment term has matured; (c) for Collateral financed under Scheduled Payment Program ("SPP") terms in strict accordance with the installment payment schedule; (d) in strict accordance with any curtailment schedule for such Collateral; and (e) when otherwise required under the terms of any financing program agreed to in writing by the parties. The PAS, SPP and curtailment terms are set forth in the SOT. If Dealer is required to make immediate payment to CDF of any past due obligation discovered during any Collateral review, or at any other time, CDF's acceptance of such payment shall not be construed to have waived or amended the terms of its financing program. Dealer will send all payments to CDF's branch office(s) responsible for Dealer's account. CDF may apply: (i) payments to reduce finance charges first and then principal, regardless of Dealer's instructions; and (ii) principal payments to the oldest (earliest) invoice for Collateral financed by CDF, but, in any event, all principal payments will first be applied to such Collateral which is sold, lost, stolen, damaged, rented, leased, or otherwise disposed of or unaccounted for. Any third party discount, rebate, bonus or credit granted to Dealer for any Collateral will not reduce the debt Dealer owes CDF until CDF has received payment therefor in cash. Dealer will: (1) pay CDF even if any Collateral is defective or fails to conform to any warranties extended by any third party; (2) not assert against CDF any claim or defense Dealer has against any third party; and (3) indemnify and hold CDF harmless against all claims and defenses asserted by any buyer of the Collateral. Dealer waives all rights of

offset Dealer may have against CDF. Any payment hereunder which would otherwise be due on a day which is not a Business Day, shall be due on the next succeeding Business Day, with such extension of time included in any calculation of applicable finance charges. A "Business Day" shall mean any day other than a Saturday, Sunday or other days on which commercial banks are authorized or required to be closed under the laws of the United States.

10. **Calculation of Charges.** Dealer will pay finance charges to CDF on the outstanding principal debt which Dealer owes CDF for each Item of Collateral financed by CDF at the rate(s) shown on the SOT for such Collateral, unless Dealer objects thereto as provided in Section 2. CDF will calculate such finance charges by multiplying the Daily Charge by the actual number of days in the applicable billing period. Such finance charges will accrue from the invoice date of the Collateral identified on such SOT until CDF is paid in full in accordance with CDF's payment recognition policy, and CDF applies such payment to Dealer's principal debt as provided in this Agreement. The "Daily Charge" is the Daily Rate multiplied by the Average Daily Balance. The "Daily Rate" is the annual rate shown on the SOT divided by 360, or the monthly rate shown on the SOT divided by 30. The "Average Daily Balance" equals: (i) the sum of the outstanding principal debt owed CDF on each day of a billing period for each Item of Collateral identified on a SOT, divided by (ii) the actual number of days in such billing period. Dealer will pay CDF $100 (or such other amount as may be communicated pursuant to Section 11(b) below) for each check returned unpaid for insufficient funds (an "NSF check") (such $100 payment repays CDF's estimated administrative costs; it does not waive the default caused by the NSF check). The annual percentage rate of the finance charges for any Item of Collateral financed by CDF will be calculated from the invoice date of such Collateral, regardless of any period for which a third party pays a finance charge subsidy. CDF intends to strictly conform to the usury laws governing this Agreement. Regardless of any provision contained herein, in any SOT, or in any other document, CDF shall never be deemed to have contracted for, charged or be entitled to receive, collect or apply as interest, any amount in excess of the maximum amount allowed by applicable law. If CDF ever receives any amount which, if considered to be interest, would exceed the maximum amount permitted by law, CDF will apply such excess amount to the reduction of the unpaid principal balance which Dealer owes, and then will pay any remaining excess to Dealer. In determining whether the interest paid or payable exceeds the highest lawful rate, Dealer and CDF shall, to the maximum extent permitted under applicable law: (A) characterize any non-principal payment (other than payments which are expressly designated as interest payments hereunder) as an expense or fee rather than as interest; (B) exclude voluntary pre-payments and the effect thereof; and (C) spread the total amount of interest throughout the entire term of this Agreement so that the interest rate is uniform throughout such term. CDF will recognize and credit payments made by check, ACH, federal wire, or other means, according to its payment recognition policies from time to time in effect, or as otherwise agreed. Information regarding CDF payment recognition policies is available from Dealer's CDF representative, the CDF website, or will be communicated pursuant to Section 11(b) below.

11. **Billing Statement.** (a) CDF will send Dealer a monthly billing statement identifying all charges due on Dealer's account with CDF. The charges specified on each billing statement will be: (i) due and payable in full immediately on receipt; and (ii) an account stated, unless CDF receives Dealer's written objection thereto within fifteen (15) days after it is mailed to Dealer. If CDF does not receive, by the 25th day of any given month, payment of all charges accrued to Dealer's account with CDF during the immediately preceding month, Dealer will (to the extent allowed by law) pay CDF a late fee equal to the greater of $5 or 5% of the amount of such finance charges (payment of such fee does not waive the default caused by the late payment). CDF may adjust the billing statement at any time to conform to applicable law and this Agreement.

(b) From time to time, CDF may provide written notice to Dealer of new or changed fees, finance charges, policies, practices and other costs (collectively, "Fees") payable by, or applicable to, Dealer and relating to Dealer's account generally, or in connection with specific services, or events, to be effective as of the notice date, or such other future date as CDF shall advise. Such notice may be delivered by mail, courier or electronically in a separate writing or website posting, or set forth in the SOT and/or the billing statement. Dealer shall be deemed to have accepted such Fees by either: (i) making any request for financing after the effective date of such notice; or (ii) failing to notify CDF in writing of any objection to an SOT, billing statement or written notice advising of such Fee within fifteen (15) days after such notice has been sent to Dealer. If Dealer objects to any Fee, such Fee shall not be imposed, but CDF may charge or implement the last Fee to which Dealer has not objected, and may elect to terminate Dealer's financing program. Such termination will not accelerate the maturities of advances previously made, unless Dealer is otherwise in default of this Agreement, or unless otherwise provided in Dealer's agreements with CDF.

12. **Default.** Dealer will be in default under this Agreement if: (a) Dealer breaches any terms in this Agreement, or in any other agreement between CDF and Dealer; (b) Dealer fails to pay any debt to CDF when due and payable hereunder or under any other agreement between CDF and Dealer; (c) any guarantor of Dealer's debts to CDF ("Guarantor") dies, or notifies CDF of its intent to terminate, or terminates, its guaranty, or otherwise breaches any terms contained in any guaranty or other agreement between the Guarantor and CDF; (d) any representation, statement, report or certificate which Dealer or any Guarantor makes or delivers to CDF is not accurate when made; (e) Dealer abandons any Collateral; (f) Dealer or any Guarantor is or becomes in default in the payment of any debt owed to any third party, or Dealer is or becomes in default under any loan agreement; (g) an attachment, sale or seizure issues or is executed against any assets of Dealer or of any Guarantor; (h) the undersigned, any general partner, or any member of a limited liability company ("Member") dies while Dealer's business is operated as a sole proprietorship, partnership, or limited liability company respectively; (i) Dealer or any Guarantor ceases existence as a corporation, partnership, limited liability company or trust, as applicable, or ceases or suspends business; (j) Dealer, any Guarantor or any Member, as applicable, makes a general assignment for the benefit of creditors; (k) Dealer, any Guarantor or any Member, as applicable, becomes insolvent or voluntarily or involuntarily becomes subject to the Federal Bankruptcy Code, any state insolvency law or any similar law; (l) any receiver is appointed for any assets of Dealer, any Guarantor or any Member, as applicable; (m) Dealer loses, or is in default of, any franchise, license or right to deal in any Collateral which CDF finances; (n) Dealer or any Guarantor misrepresents Dealer's or such Guarantor's financial condition or organizational structure; or (o) CDF determines in good faith that it is insecure with respect to any of the Collateral or the payment of Dealer's obligation to CDF.

13. **Rights of CDF Upon Default.** In the event of a default:
   (a) CDF may at any time, without notice or demand to Dealer, do any one or more of the following: declare all or any part of the debt Dealer owes CDF immediately due and payable, together with all costs and expenses of CDF's collection activity, including all reasonable attorneys' fees; exercise any rights under applicable law; and/or cease extending any additional credit to Dealer which shall not be construed to limit the discretionary nature of this credit facility.
   (b) Dealer will segregate and keep the Collateral in trust for CDF, and will not dispose of or use any Collateral, nor further encumber any Collateral.
   (c) Upon CDF's demand, Dealer will immediately deliver the Collateral to CDF at a place specified by CDF, together with all related documents; or CDF may, without notice or demand to Dealer, take immediate possession of the Collateral together with all related documents.
   (d) CDF may, without notice, apply a default finance charge to Dealer's outstanding principal indebtedness equal to the default rate specified in Dealer's financing program with CDF, if any, or if there is none so specified, at the lesser of 3% per annum above the rate in effect immediately prior to the default, or the highest lawful contract rate of interest permitted under applicable law.

   All of CDF's rights and remedies are cumulative. CDF's failure to exercise any of its rights or remedies hereunder will not waive any of CDF's rights or remedies as to any past, current or future default.

14. **Sale of Collateral.** If CDF conducts a sale of any Collateral by requesting bids from ten (10) or more dealers or distributors in that type of Collateral, or pursuant to any internet auction or sale posting on a third party auction sale site, any sale by CDF of such Collateral in bulk or in parcels within one hundred twenty (120) days of: (a) CDF's taking possession and control of such Collateral; or (b) when CDF is otherwise authorized to sell such Collateral; whichever occurs last, to the bidder submitting the highest cash bid therefor, is a commercially reasonable sale of such Collateral under the Uniform Commercial Code. Dealer agrees that the purchase of any Collateral by a Vendor, as provided in any agreement between CDF and the Vendor, is a commercially reasonable disposition and private sale of such Collateral under the Uniform Commercial Code, and no request for bids shall be required. Dealer further agrees that seven (7) or more days prior written notice will be commercially reasonable notice of any public or private sale (including any sale to a Vendor). Dealer irrevocably waives any requirement that CDF retain possession and not dispose of any Collateral until after an arbitration hearing, arbitration award, confirmation, trial or final judgment. If CDF disposes of any Collateral other than as herein contemplated, the laws of the state governing this Agreement will determine the commercial reasonableness of such disposition. Dealer and CDF irrevocably waive all rights to claim punitive and/or exemplary damages.

15. **Power of Attorney.** Dealer grants CDF an irrevocable power of attorney to: execute or endorse on Dealer's behalf any checks, financing statements, instruments, and Certificates of Title and Statements of Origin pertaining to the Collateral, to the extent consistent with the terms of this Agreement; supply any omitted

information and correct errors in any documents between CDF and Dealer; initiate and resolve any insurance claim pertaining to the Collateral; and do anything to protect and preserve the Collateral and CDF's rights and interest therein.

16. **Information.** CDF may provide to any third party any credit, financial or other information on Dealer that CDF may at any time possess. CDF may obtain from any Vendor any credit, financial or other information regarding Dealer that such Vendor may at any time possess.

17. **Access to CDF's System.** CDF has developed a system which will allow Dealer to access CDF's computer via an Internet connection for the sole purposes of allowing Dealer to obtain certain information regarding the amount which Dealer owes to CDF with respect to its account with CDF, and to pay CDF the amounts which Dealer owes pursuant to this Agreement, which will include the amount of principal, interest, fees and charges ("System"). CDF grants to Dealer the right to use the System in the manner provided herein. Dealer may access the System at no charge during the term of this Agreement. Dealer will access information in the System via an Internet connection and by entering a user identification number and a password which CDF will provide to Dealer. Dealer may thereafter change the password which CDF provides to Dealer. Dealer will assume complete responsibility in protecting the safety and security of its user identification number, password and personal identification number ("PIN"). Dealer will be solely liable for all losses, damages or claims resulting from any unauthorized use of the user identification number, password and PIN. CDF retains the right to make any changes in the System, including, but not limited to, the scheduled hours of operation, access periods, and user identification procedures.

18. **Dealer's Account.** In order to obtain access to the System, Dealer must complete and submit to CDF an application form entitled "Customer Account Link Sign-up Form" ("Application") which may be found in CDF's internet website (www.cdfconnect.com). The terms of the Application are incorporated into this Agreement. Dealer will have the option, as indicated in the Application, to allow CDF to initiate automatic or elective ACH debit entries to Dealer's Account (as defined below) to pay any amounts which Dealer owes to CDF under this Agreement. Dealer must provide certain information as required in the Application regarding Dealer's bank and the particular account at Dealer's bank through which CDF will initiate the ACH debit entries which Dealer authorizes pursuant to this Agreement ("Account"). Dealer will immediately complete another Application and will submit such document to CDF if any information regarding the Account is changed or is inaccurate. CDF will thereupon enter such new information regarding the Account into the System. Dealer will execute such agreements which such bank requires to allow CDF to initiate ACH debit entries to the Account, and to receive payments therefor.

19. **Authorization.** Dealer may elect either of the two account options identified in subsections (a) and (b) below:

(a) **Automatic ACH Payment.** Dealer may elect in an Application to grant CDF the authority to automatically initiate ACH debit entries to the Account to pay any amounts which are due and owing under this Agreement. If Dealer makes such election, Dealer thereupon irrevocably authorizes CDF to initiate ACH debit entries to the Account on the dates that Dealer owes payment to CDF of any obligations under this Agreement. Dealer further authorizes CDF to take possession of funds in the Account, in the amount of such obligations, and apply such funds to the unpaid indebtedness which Dealer owes to CDF under this Agreement.

(b) **Elective ACH Payment.** If Dealer does not grant authority to CDF to initiate Automatic ACH Payment, the System will allow Dealer to select the payments of principal, interest, insurance, fees and other charges which Dealer elects to make to CDF. Upon selecting the particular items which Dealer elects to pay to CDF, Dealer will enter its PIN to confirm the payments which Dealer wishes to make to CDF. By entering Dealer's unique PIN number, Dealer thereupon irrevocably authorizes CDF to initiate ACH debit entries to the Account in the amount selected by Dealer, and to take possession of such funds in the Account and apply such funds to the unpaid indebtedness which Dealer owes to CDF under this Agreement.

CDF will not initiate an ACH debit entry under this Agreement except in conformity with the authorization provided by Dealer. Dealer may change or revoke its authorization by submitting a new Application to CDF, subject to the completion of any ACH debits which were authorized prior to CDF's receipt and processing of such Application, which processing shall be completed in a commercially reasonable time of CDF's receipt of the new Application.

20. **General Use Restrictions.** Dealer will not and will not cause others to: (a) reverse engineer, reverse compile, decompile, disassemble, alter, translate, convert or attempt to derive the source code of the System; (b) use the System in a manner that jeopardizes the integrity thereof or interferes with others' use of the System, or (c) use the System in any manner which violates this Agreement or any applicable laws (including, but not limited to, any laws relating to copyrights, trademarks, trade secrets or libel).

21. **Limitation of Liability for ACH Debits.** CDF will not be liable for the act or omission of any Automated Clearing House, financial institution, or any person who has obtained unauthorized access to the System. Dealer acknowledges that errors may occur in the ACH debiting process. Dealer will immediately notify CDF if the amount of any ACH debit entry which CDF initiates exceeds the amount authorized by Dealer. Dealer agrees, however, that CDF's liability for any such error will be limited to CDF's prompt credit to Dealer's Account of the amount of the entry which exceeds the amount authorized by Dealer. In no event will CDF be liable to Dealer for any consequential, special or incidental damages.

22. **Warranty.** CDF MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE SYSTEM, INCLUDING BUT NOT LIMITED TO, ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND WARRANTIES AS TO ACCURACY, COMPLETENESS OR ADEQUACY OF INFORMATION. IN NO EVENT WILL CDF BE LIABLE FOR SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES INCURRED BY DEALER AS A RESULT OF DEALER'S USE OF THE SYSTEM. CDF does not warrant that the functions contained in the System will meet Dealer's requirements, or that the System will operate on Dealer's computer system or with Dealer's Internet access provider, or that the operation of the System will be uninterrupted or error free. CDF is not responsible for any problems caused by changes in the operating characteristics of the Dealer's computer hardware or operating system which are made upon Dealer's access to the System. Dealer will have the sole responsibility for adequate protection and back-up of its data used in connection with the System. Dealer waives any right to claim against CDF for lost data, work delays or lost profits resulting from its use of the System.

23. **Confidentiality.** The System is proprietary to CDF. Dealer will use and maintain the System in confidence and will not sell, transfer, publish, disclose, or otherwise make accessible the System to any third party. Dealer will confine access to the System only to its employees who require such access in the ordinary course and scope of their employment by Dealer. Dealer will inform its employees of the confidential nature of the System before Dealer grants an employee any access to the System.

24. **Termination.** Either party may terminate this Agreement at any time by written notice received by the other party. If CDF terminates this Agreement, Dealer agrees that if Dealer is not in default hereunder, thirty (30) days prior notice of termination is reasonable and sufficient (although this provision shall not be construed to mean that shorter periods may not, in particular situations, also be reasonable and sufficient). Dealer will be obligated to CDF for CDF's advances or commitments made before the effective termination date of this Agreement. CDF will retain all of its rights, interests and remedies hereunder until Dealer has paid CDF in full. All waivers, and the agreement to arbitrate, set forth in this Agreement will survive any termination of this Agreement.

25. **Binding Effect.** Dealer cannot assign its interest in this Agreement without CDF's prior written consent. CDF may assign or participate CDF's interest, in whole or in part, without Dealer's consent. This Agreement will protect and bind CDF's and Dealer's respective heirs, representatives, successors and assigns.

26. **Notices.** Except as otherwise stated herein, all notices, arbitration claims, responses, requests and documents will be sufficiently given or served if mailed or delivered: (a) to Dealer at chief executive office specified above; and (b) to CDF at 655 Maryville Centre Drive, St. Louis, Missouri 63141-5832, Attention: General Counsel, or such other address as the parties may hereafter specify in writing.

27. **NO ORAL AGREEMENTS.** ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBTS ARE NOT ENFORCEABLE. TO PROTECT DEALER AND CDF FROM MISUNDERSTANDING OR DISAPPOINTMENT, ALL AGREEMENTS COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN THE PARTIES, EXCEPT AS SPECIFICALLY PROVIDED HEREIN OR AS THE

6

US000115 (6/03)
EC000075 (6/03) mc

PARTIES MAY LATER AGREE IN WRITING TO MODIFY IT. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

28. **Severability.** If any provision of this Agreement or its application is invalid or unenforceable, the remainder of this Agreement will not be impaired or affected and will remain binding and enforceable.

29. **Supplement.** If Dealer and CDF have previously executed other agreements pertaining to all or any part of the Collateral, this Agreement will supplement such agreement, and this Agreement will neither be deemed a novation nor a termination of such agreement, nor will execution of this Agreement be deemed a satisfaction of any obligation secured by such agreement.

30. **Receipt of Agreement.** Dealer acknowledges that it has received a true and complete copy of this Agreement. Dealer has read and understood this Agreement. Notwithstanding anything herein to the contrary, CDF may rely on any facsimile copy, electronic data transmission, or electronic data storage of: this Agreement, any SOT, billing statement, financing statement, authorization to pre-file financing statements, invoice from a Vendor, financial statements or other reports, which will be deemed an original, and the best evidence thereof for all purposes.

31. **Miscellaneous.** Time is of the essence regarding Dealer's performance of its obligations to CDF. Dealer's liability to CDF is direct and unconditional and will not be affected by the release or nonperfection of any security interest granted hereunder. CDF may refrain from or postpone enforcement of this Agreement or any other agreements between CDF and Dealer without prejudice, and the failure to strictly enforce these agreements will not create a course of dealing which waives, amends or modifies such agreements. The express terms of this Agreement will not be modified by any course of dealing, usage of trade, or custom of trade which may deviate from the terms hereof. If Dealer fails to pay any taxes, fees or other obligations which may impair CDF's interest in the Collateral, or fails to keep the Collateral insured, CDF may, but shall not be required to, pay such amounts. Such paid amounts will be: (a) an additional debt which Dealer owes to CDF, which shall be subject to finance charges as provided herein; and (b) due and payable immediately in full. Dealer will pay all of CDF's reasonable attorneys' fees and expenses which CDF incurs in enforcing CDF's rights hereunder. The Section titles used herein are for convenience only, and do not define or limit the contents of any Section.

32. **BINDING ARBITRATION.**

   32.1 **Arbitrable Claims.** Except as otherwise specified below, all actions, disputes, claims and controversies under common law, statutory law or in equity of any type or nature whatsoever, whether arising before or after the date of this Agreement, and whether directly or indirectly relating to: (a) this Agreement and/or any amendments and addenda hereto, or the breach, invalidity or termination hereof; (b) any previous or subsequent agreement between CDF and Dealer; (c) any act committed by CDF or by any parent company, subsidiary or affiliated company of CDF (the "CDF Companies"), or by any employee, agent, officer or director of a CDF Company whether or not arising within the scope and course of employment or other contractual representation of the CDF Companies provided that such act arises under a relationship, transaction or dealing between CDF and Dealer; and/or (d) any other relationship, transaction or dealing between CDF and Dealer (collectively the "Disputes"), will be subject to and resolved by binding arbitration. Notwithstanding the foregoing, the parties agree that either party may pursue claims against the other that do not exceed Fifteen Thousand Dollars ($15,000) in the aggregate in a court of competent jurisdiction. Service of arbitration claims shall be acceptable if made by U.S. mail or overnight delivery to the address for the party described herein.

   32.2 **Administrative Body.** All arbitration hereunder will be conducted in accordance with the Commercial Arbitration Rules of either: (a) The American Arbitration Association ("AAA"); or (b) United States Arbitration & Mediation ("USA&M"). The party first filing an arbitration claim shall designate which arbitration forum and rules are to be applied for all disputes between the parties. The arbitration rules are found at www.adr.org for AAA, and at www.usam-midwest.com for USA&M. AAA claims may be filed in any AAA office. Claims filed with USA&M shall be filed in their Midwest office located at 720 Olive Street, Suite 2020, St. Louis, Missouri 63101. All arbitrator(s) selected will be attorneys with at least five (5) years secured transactions experience. A panel of three arbitrators shall hear all claims exceeding One Million Dollars ($1,000,000), exclusive of interest, costs and attorneys' fees. The arbitrator(s) will decide if any inconsistency exists between the rules of the applicable arbitral forum and the arbitration provisions contained herein. If such inconsistency exists, the arbitration provisions contained herein will control and

supersede such rules. The arbitrator shall follow the terms of this agreement and the applicable law, including without limitation, the attorney-client privilege and the attorney workproduct doctrine.

32.3  **Hearings.** Each party hereby consents to a documentary hearing for all arbitration claims, by submitting the dispute to the arbitrator(s) by written briefs and affidavits, along with relevant documents. However, arbitration claims will be submitted by way of an oral hearing, if any party requests an oral hearing within forty (40) days after service of the claim, and that party remits the appropriate deposit for AAA's fees and arbitrator compensation within ten (10) days of making the request. The site of all oral arbitration hearings will be in the Division of the Federal Judicial District in which AAA or USA&M maintains a regional office that is closest to Dealer.

32.4  **Discovery.** Discovery permitted in any arbitration proceeding commenced hereunder is limited as follows. No later than forty (40) days after the filing and service of a claim for arbitration, the parties in contested cases will exchange detailed statements setting forth the facts supporting the claim(s) and all defenses to be raised during the arbitration, and a list of all exhibits and witnesses. No later than twenty-one (21) days prior to the oral arbitration hearing, the parties will exchange a final list of all exhibits and all witnesses, including any designation of any expert witness(es) together with a summary of their testimony; a copy of all documents and a detailed description of any property to be introduced at the hearing. Under no circumstances will the use of interrogatories, requests for admission, requests for the production of documents or the taking of depositions be permitted. However, in the event of the designation of any expert witness(es), the following will occur: (a) all information and documents relied upon by the expert witness(es) will be delivered to the opposing party; (b) the opposing party will be permitted to depose the expert witness(es); (c) the opposing party will be permitted to designate rebuttal expert witness(es); and (d) the arbitration hearing will be continued to the earliest possible date that enables the foregoing limited discovery to be accomplished.

32.5  **Exemplary or Punitive Damages.** The Arbitrator(s) will not have the authority to award exemplary or punitive damages.

32.6  **Confidentiality of Awards.** All arbitration proceedings, including testimony or evidence at hearings, will be kept confidential, although any award or order rendered by the arbitrator(s) pursuant to the terms of this Agreement may be confirmed as a judgment or order in any state or federal court of competent jurisdiction within the federal judicial district which includes the residence of the party against whom such award or order was entered. This Agreement concerns transactions involving commerce among the several states. The Federal Arbitration Act, Title 9 U.S.C. Sections 1 et seq., as amended ("FAA") will govern all arbitration(s) and confirmation proceedings hereunder.

32.7  **Prejudgment and Provisional Remedies.** Nothing herein will be construed to prevent CDF's or Dealer's use of bankruptcy, receivership, injunction, repossession, replevin, claim and delivery, sequestration, seizure, attachment, foreclosure, and/or any other prejudgment or provisional action or remedy relating to any Collateral for any current or future debt owed by either party to the other. Any such action or remedy will not waive CDF's or Dealer's right to compel arbitration of any Dispute.

32.8  **Attorneys' Fees.** If either Dealer or CDF brings any other action for judicial relief with respect to any Dispute (other than those set forth in Sections 32.1 or 32.7), the party bringing such action will be liable for and immediately pay all of the other party's costs and expenses (including attorneys' fees) incurred to stay or dismiss such action and remove or refer such Dispute to arbitration. If either Dealer or CDF brings or appeals an action to vacate or modify an arbitration award and such party does not prevail, such party will pay all costs and expenses, including attorneys' fees, incurred by the other party in defending such action. Additionally, if Dealer sues CDF or institutes any arbitration claim or counterclaim against CDF in which CDF is the prevailing party, Dealer will pay all costs and expenses (including attorneys' fees) incurred by CDF in the course of defending such action or proceeding.

32.9  **Limitations.** Any arbitration proceeding must be instituted: (a) with respect to any Dispute for the collection of any debt owed by either party to the other, within two (2) years after the date the last payment by or on behalf of the payor was received and applied in respect of such debt by the payee; and (b) with respect to any other Dispute, within two (2) years after the date the incident giving rise thereto occurred, whether or not any damage was sustained or capable of ascertainment or either party knew of such incident. Failure to institute an arbitration proceeding within such period will constitute an absolute bar and waiver to the institution of any proceeding, whether arbitration or a court proceeding, with respect to such Dispute.

32.10 **Survival After Termination.** The agreement to arbitrate will survive the termination of this Agreement.

33.  **INVALIDITY/UNENFORCEABILITY OF BINDING ARBITRATION. IF THIS AGREEMENT IS FOUND TO BE NOT SUBJECT TO ARBITRATION, ANY LEGAL PROCEEDING WITH RESPECT TO ANY DISPUTE WILL**

BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE WITHOUT A JURY. DEALER AND CDF WAIVE ANY RIGHT TO A JURY TRIAL IN ANY SUCH PROCEEDING.

34. **Governing Law.** This Agreement and all other agreements between Dealer and CDF have been substantially negotiated, and will be substantially performed, in the state of **Michigan**. Accordingly, all Disputes will be governed by, and construed in accordance with, the laws of such state, except to the extent inconsistent with the provisions of the FAA which shall govern all arbitration proceedings hereunder.

**THIS CONTRACT CONTAINS BINDING ARBITRATION, JURY WAIVER AND PUNITIVE DAMAGE WAIVER PROVISIONS.**

This Agreement is dated this * _3ᴰ_ day of * _October_ , 2003.

GE COMMERCIAL DISTRIBUTION FINANCE
CORPORATION

By: _____
Print Name: _Stephen Montemurri_
Title: _Documentation Mgr._

**Incredible Auto Sales, LLC**
Dealer's Name

By: * _____
Print Name: _R. Nick Gutierrez_
Title: _Member_

## SECRETARY'S CERTIFICATE OF RESOLUTION

I certify that I am the Secretary or Assistant Secretary of the corporation named below, and that the following completely and accurately sets forth certain resolutions of the Board of Directors of the corporation adopted at a special meeting thereof held on due notice (and with shareholder approval, if required by law), at which meeting there was present a quorum authorized to transact the business described below, and that the proceedings of the meeting were in accordance with the certificate of incorporation, charter and by-laws of the corporation, and that they have not been revoked, annulled or amended in any manner whatsoever.

Upon motion duly made and seconded, the following resolution was unanimously adopted after full discussion:

"RESOLVED, That the several officers, directors, and agents of this corporation, or any one or more of them, are hereby authorized and empowered on behalf of this corporation: to obtain financing from GE Commercial Distribution Finance Corporation ("CDF") in such amounts and on such terms as such officers, directors or agents deem proper; to enter into financing, security, pledge and other agreements with CDF relating to the terms upon which such financing may be obtained and security and/or other credit support is to be furnished by this corporation therefor; from time to time to supplement or amend any such agreements; and from time to time to pledge, assign, mortgage, grant security interests, and otherwise transfer, to CDF as collateral security for any obligations of this corporation to CDF, whenever and however arising, any assets of this corporation; whether now owned or hereafter acquired; the Board of Directors hereby ratifying, approving and confirming all that any of said officers, directors or agents have done or may do with respect to the foregoing."

IN WITNESS WHEREOF, I have executed and affixed the seal of the corporation on the date stated below.

Dated: _____, 2003

_____N/A_____
(Assistant) Secretary

_____
Corporate Name

(SEAL)



**Brad Johnson ▪ Montana Secretary of State ▪ Business Services Bureau**
Room 260, Capitol Building, PO Box 202801, Helena MT 59620-2801
Phone (406) 444-3665 ▪ Fax (406) 444-3976 ▪ E-mail sos@mt.gov
www.sos.mt.gov

| | | |
|---|---|---|
| Montana UCC Amendment Acknowledgment - Amendment #: | 84568879 | October 07, 2005<br>Page 1 of 1 |

| | |
|---|---|
| GE COMMERCIAL FINANCE CORPORATION<br>LIZ VERDONCK<br>5595 TRILLIUM BOULEVARD<br>HOFFMAN ESTATES IL 60192 | Filing Fee:  $5.00<br>Priority Fee:  $0.00<br>Fax fee:  $0.00<br>**$5.00** |

**Return Method: Mail**

The Montana Secretary of State's Office has received and filed your document. The information stated below reflects the data that was indexed in our system. Please review the information for accuracy. If you find a potential error, please promptly notify a UCC specialist at (406) 444-2468.

| | |
|---|---|
| Filing Type:  **UCC Lien** | Original Filing #: 75487162 |
| Amendment Type:  **Change Secured Party** | Amendment Filing #:  84568879 |
| Filing Date:  10/7/2005    Filing Time:  12:32PM | Lapse Date:  11/12/2008 |

| Party Type | Party Name and Address | Social Security/Tax ID |
|---|---|---|
| Debtor | INCREDIBLE AUTO SALES, LLC<br>1832 KING AVENUE WEST<br>Billings  MT 59102 | |
| Secured Party | GE COMMERCIAL DISTRIBUTION FINANCE<br>CORPORATION<br>P.O. BOX 1349<br>Troy  MI 48099 | |
| Secured Party | GE COMMERCIAL DISTRIBUTION FINANCE<br>CORPORATION<br>5595 TRILLIUM BLVD<br>Hoffman Estates  IL 60192 | |

Filing by the Secretary of State is not conclusive proof that all conditions for securing priority have been met. Ensuring that accurate information is on the document to be filed is the responsibility of the filing party. If the filing is challenged, the Secretary of State does not guarantee that the filing is legally sufficient to secure priority under UCC Article 9 and expressly disclaims any liability for failure of the filing party to secure priority resulting from the information contained in the filed document, or the lack of information on the filed document.

CT9899



## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
LIZ VERDONCK - 800-255-8232, EXT. 3126

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

GE COMMERCIAL DISTRIBUTION FINANCE
CORPORATION - MARINE DIVISION
5595 TRILLIUM BLVD
HOFFMAN ESTATES, IL 60192
ATTN: LIZ VERDONCK

Montana Secretary of St:
10/07/2005  12:32:00 PM
Filed: 84568379
$5    CT9899

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
75487162  FILING DATE: 11/12/03

1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☑ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7
☑ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.
☐ DELETE name: Give record name to be deleted in item 6a or 6b.
☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| GE COMMERCIAL DISTRIBUTION FINANCE CORPORATION | | | |
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| GE COMMERCIAL DISTRIBUTION FINANCE CORPORATION | | | | | |
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| | | | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5595 TRILLIUM BLVD | HOFFMAN ESTATES | IL | 60192 | |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | CORPORATION | DELAWARE | NONE | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| GE COMMERCIAL DISTRIBUTION FINANCE CORPORATION | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

10. OPTIONAL FILER REFERENCE DATA
INCREDIBLE AUTO SALES LLC - SOS-MT   132898

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

" COPY "

## INTERCREDITOR AGREEMENT

This INTERCREDITOR AGREEMENT (hereinafter "Agreement") is entered into and is effective **August 10, 2005**, by and between GE COMMERCIAL DISTRIBUTION FINANCE CORPORATION, with its principal office at 5595 Trillium Boulevard, Hoffman Estates, Illinois 60192 and a business office located at 5595 Trillium Blvd. Hoffman Estates, IL 60192 (hereinafter "CDF") and Hyundai Motor Finance Company, with an office located at 10550 Talbert Ave, Fountain Valley, CA 92728 (hereinafter "Creditor").

### RECITALS

A.       CDF may provide or is providing financial services to Incredible Auto Sales, LLC  ("Debtor") and in connection therewith Debtor has granted or may grant CDF a security interest in some or all of Debtor's property or interests in property (hereinafter, "Collateral").

B.       Creditor has or may obtain a security interest in some or all of the Collateral.

C.       CDF and Creditor desire to agree upon the priority of certain security interests in certain of the Collateral, and CDF and Creditor may extend or may continue to extend financing to Debtor in reliance on the priority of such security interests as set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the parties hereto, the parties hereto agree as follows:

1.       Subordination by Creditor. Any security interest, lien or claim Creditor may now or hereafter have or arising through or by way of any security interest, lien or claim of Creditor in the CDF Senior Collateral (as defined below) shall be subject, junior and subordinate to any security interest, lien or claim CDF now or hereafter has in such CDF Senior Collateral.

The term "CDF Senior Collateral" shall mean all of the following property and interests in the following property of Debtor, whether now or hereafter existing, owned, licensed, leased, consigned, acquired or arising and wherever located: (a) all inventory (the "Inventory") of any make or manufacture when such Inventory is financed by CDF; (b) all of Debtor's rights to any price protection payments, rebates, discounts, credits, factory holdbacks, incentive payments and other amounts which at any time are due Debtor with respect to, or in connection with, any Inventory; (c) all parts, accessions, accessories and replacements to or of any of the Inventory; (d) all accounts, general intangibles, contract rights, instruments and chattel paper representing proceeds of any of the foregoing; and (e) all other proceeds (including without limitation, insurance and cash proceeds) and products of the foregoing. All terms used and not otherwise defined herein which are defined in Article 9 of the Illinois Uniform Commercial Code shall have the meanings assigned to them in Article 9 of the Illinois Uniform Commercial Code as in effect on the date of this Agreement.

2.       Subordination by CDF. Any security interest, lien or claim CDF may now or hereafter have or arising through or by way of any security interest, lien or claim of CDF in Collateral other than the CDF Senior Collateral (the "Creditor Senior Collateral") shall be subject, junior and subordinate to any security interest, lien or claim Creditor now or hereafter has in such Creditor Senior Collateral.

3.       Extent of Subordination. The subordinations and priorities specified herein are applicable irrespective of the time, manner or order of creation, attachment or perfection of any security interests, liens or other claims, or the time or order of filing of any financing statements, or the giving or failure to give notice of the acquisition or expected acquisition of any purchase money security interests or other security interests; provided, however, that if, for any reason, a security interest, lien or claim of a party to which a security interest, lien or claim of the other party is hereby subordinated is not perfected or is avoidable, then the subordination of such security interest, lien or claim of such other party shall not be effective as to the particular collateral which is the subject of the unperfected or avoidable security interest, lien or claim.

4.       Continuing Agreement. This Agreement shall constitute a continuing agreement of subordination and each party may, without notice to the other party, lend money, extend credit and provide other financial services to or on behalf of Debtor on the basis of this Agreement. This Agreement shall constitute the entire agreement between the parties with respect to the subject matter hereof and shall not be amended except with the written consent of both CDF and Creditor. The subordinations and priorities specified herein shall remain in full force and effect, regardless of whether either party rescinds, amends, waives any provision of, terminates or reforms, by litigation or otherwise, its respective financing agreement or agreements or any other agreement with Debtor.

5.       Waivers. No delay on the part of CDF or Creditor in exercising any right, power or privilege granted hereunder shall operate as a waiver thereof, and no purported waiver of any default, breach or violation of any term or provision contained herein shall be deemed to be a waiver of such term or provision unless the waiver is in writing and signed by the waiving party. No such waiver shall in any event be deemed a waiver of any subsequent or other default, breach or violation. The rights or remedies herein expressly specified are cumulative and not exclusive of any other rights and remedies which the parties would otherwise have.

6.       Termination. This Agreement may be terminated upon at least thirty (30) days prior written notice by one party to the other. No termination, however, shall impair the rights or priorities created or acquired hereunder by either of the parties prior to the effective day of termination. Notice of termination and other notices given in connection with this Agreement shall be deemed to have been given when deposited in the United States mail, postage prepaid, addressed, as to CDF, to CDF at both its principal office and business office set forth above (in each case to the attention of Credit Department), and, as to Creditor, at its office set forth above, or to such other address designated by such party by notice to the other.

7.       Independent Investigation. Neither Creditor nor CDF shall be responsible to the other  for Debtor's solvency or condition (financial or otherwise), statements, representations or warranties of Debtor (whether oral or written), the validity, sufficiency or



enforceability of the documents executed by Debtor or the validity, sufficiency, enforceability or priority of any security interests granted by Debtor in connection therewith.

8. Successors and Assigns; Assignment. This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns. References herein to each party shall be deemed to refer to such party and its successors and assigns. No other person shall have or obtain any right, benefit, priority or interest under this Agreement. Creditor represents that it has not assigned any security interest, lien or claim in any CDF Senior Collateral or any financing statement covering the same and CDF represents that it has not assigned any security interest, lien or claim in any Creditor Senior Collateral or any financing statement covering the same. Any assignment by either party of any security interest, lien or claim in any Collateral or any financing statement covering the same shall be subject to this Agreement.

9. Attorneys' Fees and Costs. In the event of any dispute between the parties arising in relation to this Agreement, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and costs, in addition to all other sums to which it may be entitled.

10. Miscellaneous. This Agreement may be validly executed and delivered by fax or other electronic transmission and in one or more counterpart signature pages. This Agreement shall be construed without presumption for or against the party who drafted all or any portion of this Agreement. The Recitals to this Agreement are an integral part of this Agreement. Pronouns used herein such as "it" may refer to a natural person or an entity.

11. JURY TRIAL WAIVER; CONSENT TO JURISDICTION; PUNITIVE DAMAGE WAIVER. Creditor hereby consents to the jurisdiction of any local, state or federal court located within Illinois and waives any objection which Creditor may have based on improper venue or forum non conveniens to the conduct of any action or proceeding in any such court and waives personal service of any and all process upon it, and consents that all such service of process be made by mail or messenger directed to it at its notice address listed above, and that service so made shall be deemed to be completed upon the earlier of actual receipt or three days after the same shall have been posted to Creditor. Nothing contained in this Section shall affect the right of CDF to serve legal process in any other manner permitted by law or affect the right of CDF to bring any action or proceeding against Creditor or its property in the courts of any other jurisdiction. Creditor waives, to the extent permitted by law, any bond or surety or security upon such bond which might, but for this waiver, be required of CDF. CREDITOR HEREBY WAIVES ANY RIGHT TO EXEMPLARY, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND AGAINST CDF IN ANY PROCEEDING OR AWARD, WHETHER IN ARBITRATION OR LITIGATION. TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO EACH WAIVE ANY RIGHT TO A TRIAL BY JURY ON ANY CLAIM, DEMAND, ACTION, CAUSE OF ACTION OR COUNTERCLAIM ARISING UNDER OR IN ANY WAY RELATED TO THIS AGREEMENT, AND UNDER ANY THEORY OF LAW OR EQUITY, WHETHER NOW EXISTING OR HEREAFTER ARISING.

12. GOVERNING LAW. THIS AGREEMENT SHALL BE CONSTRUED IN ALL RESPECTS IN ACCORDANCE WITH, AND GOVERNED BY THE INTERNAL LAWS (AS OPPOSED TO CONFLICTS OF LAW PROVISIONS) OF THE STATE OF ILLINOIS.

THIS AGREEMENT CONTAINS JURY WAIVER, CONSENT TO JURSIDICTION AND PUNITIVE DAMAGE WAIVER PROVISIONS.

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto.

Hyundai Motor Finance Company
(CREDITOR)

By: _____

Print Name: Brian P. Fallon

Title: National Manger, Commercial Credit

GE COMMERCIAL DISTRIBUTION FINANCE CORPORATION

By: _____

Print Name: Steven Madeja

Title: Sr. Credit Analyst