SHEET 1    PAGE 1                                    1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

IN RE:                          Cause No. 06-60855

INCREDIBLE AUTO SALES, LLC

        Debtor.

DEPOSITION
OF
STEVE MARKS

Taken at the law offices of
PATTEN, PETERMAN, BEKKEDAHL,
& GREEN
2817 Second Avenue North, Suite 300
Billings, Montana
December 7, 2006 - 9:00 a.m.

APPEARANCES:

For the Mr. Marks:      James A. Patten
                        PATTEN, PETERMAN,
                        & GREEN, PLLC
                        Attorneys at Law
                        2817 Second Avenue North, Suite 300
                        Billings, Montana 59101

For the Hyundai Motor   SHANE COLEMAN
Finance Company:        HOLLAND & HART
                        Attorneys at Law
                        PO Box 639
                        Billings, Montana 59103

JAN BARRY COURT REPORTING   * * *   406.259.8111

---

PAGE 2                                              2

CONTENTS
                                            Page
Deponent's Certificate..........................  80
Reporter's Certificate..........................  81

Examination by Mr. Patten.......................   3
Examination by Mr. Coleman......................  46
Re-Examination by Mr. Patten....................  77
Re-Examination by Mr. Coleman...................  79

INDEX TO EXHIBITS

Exhibit No.                              Identified
1   (AZ Certificate of Title - '04 Chevy Cavalier)   27
2   (ND Certificate of Title - '07 Dodge)........   31
3   (MT Certificate of Title - '03 Dodge)........   32
4   (AZ Certificate of Title - '05 Kia).........   35
5   (AZ Certificate of Title - '02 Mercury)......   37
6   (MT Certificate of Title - '06 Pontiac)......   39
7   (AZ Certificate of Title - '05 Suzuki).......   40
8   (MT Certificate of Title - '05 Chrysler).....   40

JAN BARRY COURT REPORTING   * * *   406.259.8111

---

PAGE 3                                              3

1                       PROCEEDINGS
2                       STEVE MARKS,
3   having been called for examination by counsel for
4   Mr. Marks, having been first duly sworn to testify to the
5   truth, the whole truth, and nothing but
6   the truth, testified on his oath as follows:
7                       EXAMINATION
8   BY MR. PATTEN:
9       Q.   Please state your name.
10      A.   Steve Marks, M-a-r-k-s.
11      Q.   Steve, are you familiar with a company called
12  Steve's Auto Sales?
13      A.   Yes, I am.
14      Q.   Are you involved in Steve's Auto Sales?
15      A.   I am.  I am the president of it.
16      Q.   You own stock in Steve's Auto Sales?
17      A.   I do.
18           (Marks Deposition Exhibit Nos. 1 through 8
19  marked for identification)
20  BY MR. PATTEN:
21      Q.   Steve, I'm handing you what's been marked as
22  Exhibits 1 through 8 --
23           MR. PATTEN:  And, Shane, these are all the
24  exhibits that we filed.  Did you get Exhibit No. 8?
25           MR. COLEMAN:  Yeah.
            JAN BARRY COURT REPORTING
                 406.259.8111

---

PAGE 4                                              4

1   BY MR. PATTEN:
2       Q.   Steve, you are familiar with the car business?
3       A.   Yes, I am.
4       Q.   How long have you been in the car business?
5       A.   Approximately 26 years.
6       Q.   And in what capacity have you been in the car
7   business in those 26 years?
8       A.   Wholesale, retail both.
9       Q.   How many of those 26 years have been here in
10  Billings, Montana?
11      A.   All of them.
12      Q.   Describe briefly, if you can, the difference in
13  your mind between the wholesale and retail car business.
14      A.   Between wholesale and retail -- wholesale is
15  basically selling to other dealers and selling through
16  auction -- the difference between wholesale and retail is
17  one is strictly to other dealerships that have dealer's
18  licenses, of course, that's the wholesale basis; the
19  retail is to the average public that comes on the lot.
20  There is a difference of probably 25 percent between
21  wholesale and retail basis for price wise.
22      Q.   Does Steve's Auto Sale have a retail lot at
23  this time?
24      A.   Yes, we do.
25      Q.   Where is it located?
            JAN BARRY COURT REPORTING
                 406.259.8111

SHEET 2   PAGE 5

5

1    A.    1717 First Avenue North, Billings, Montana.
2    Q.    And how long has Steve's Auto had that retail
3 lot?
4    A.    That location, probably six years.
5    Q.    How long has Steve's Auto Sales been in
6 existence -- the corporation?
7    A.    The corporation, probably 16 years.
8    Q.    Has Steve's Auto Sales, since its incorporation
9 16 years ago, always had a retail lot?
10    A.    No, it has not. The first two years, it was
11 just a wholesale operation.
12    Q.    So at least for the last 14 years, Steve's Auto
13 Sales has maintained a retail lot?
14    A.    Correct.
15    Q.    And during the last -- since the incorporation
16 of Steve's Auto Sales, has Steve's Auto Sales also
17 engaged in wholesale transactions of cars?
18    A.    Yes, we have.
19    Q.    Do you still currently engage in wholesale and
20 retail transactions of cars?
21    A.    Yes.
22    Q.    Now, you mentioned that part of the wholesale
23 transaction would be to purchase cars at an auto auction.
24    A.    Correct.
25    Q.    How many auto auctions do you traditionally go
JAN BARRY COURT REPORTING
406.259.8111

PAGE 6

6

1 to on behalf of Steve's Auto Sales?
2    A.    In a year's time, probably six different auto
3 auctions, but one every week.
4    Q.    And there's one in Billings?
5    A.    Correct.
6    Q.    Do you go to every -- does the one in Billings
7 have regularly-scheduled auctions?
8    A.    Yes, they do.
9    Q.    Do you go to every one of those?
10    A.    Except -- I go to every one except if I'm at a
11 different sale in a different city.
12    Q.    What other cities do you go to to auto
13 auctions?
14    A.    Phoenix, Arizona; Las Vegas, Nevada; Denver,
15 Colorado; Boise, Idaho.
16    Q.    Typically, then, you are at an auto auction at
17 least once a week?
18    A.    Typically, yes.
19    Q.    Can you estimate over the past year how many
20 cars you've purchased at an auto auction?
21    A.    I would probably say between 6 and 700.
22    Q.    And approximately what number or what
23 percentage of those cars would have been purchased at the
24 auto action here in Billings?
25    A.    Probably 50 percent at least.
JAN BARRY COURT REPORTING
406.259.8111

PAGE 7

7

1    Q.    When you buy a car at the auto auction, then,
2 do you put it on your retail lot?
3    A.    That's the first purpose, correct.
4    Q.    Do you sell cars through the auto auction?
5    A.    Yes, I do.
6    Q.    How frequently do you sell cars through the
7 auto auction?
8    A.    Every week.
9    Q.    Are there particular cars that you sell through
10 the auto auction -- that was a bad question, but do you
11 sell a car through the auto action after it's sat on your
12 retail lot for a certain time without selling?
13    A.    Usually I try to do 60 days, but, you know,
14 I've sold cars through the auto auction as frequent as
15 having something for one day.
16    Q.    Why do you do that?
17    A.    If I feel there's a profit structure there
18 that's quick and -- it's cash flow, mainly.
19    Q.    So if you've been able to acquire it for less
20 money than you think you can sell it through the auto
21 auction, then --
22    A.    Of course, yes.
23    Q.    -- then you might immediately take it to the
24 auto auction?
25    A.    Yes, sir.
JAN BARRY COURT REPORTING
406.259.8111

PAGE 8

8

1    Q.    Are there a lot of cars that will never see
2 your retail lot, but that you will buy and sell without
3 ever it getting to your retail lot?
4    A.    Yes.
5    Q.    Can you estimate generally what percentage of
6 your gross annual sales of Steve's Auto Auction would
7 involve cars that have never been on the retail lot?
8    A.    Probably 70 percent.
9    Q.    Okay. And would those cars that don't go onto
10 your retail lot, would they have been purchased at an
11 auto auction or would they have been purchased -- would
12 you purchase them from other dealers and then run them
13 through the auto auction?
14    A.    It would be both.
15    Q.    If you find a car, whether it's at an auto
16 auction or another dealer's lot or wherever else that you
17 think you can make money on by running it through the
18 auction, that would be something that you would do?
19    A.    Yes, it would.
20    Q.    Where is the Billings Auto Auction physically
21 located?
22    A.    I don't know their exact address, to be honest
23 with you.
24    Q.    Okay.
25    A.    West end of Billings. It's on -- I think it's
JAN BARRY COURT REPORTING
406.259.8111

SHEET 3  PAGE 9

9

1  King Avenue East.
2      Q.   And it's right off of the South Billings
3  Boulevard with the interchange; is that correct?
4      A.   Correct.
5      Q.   Do you have financing that you utilize when you
6  buy automobiles?
7      A.   Yes, I do.
8      Q.   Do you get financing on an automobile by
9  automobile basis or do you have a flooring financing
10  arrangement?
11      A.   I have a flooring financing arrangement.
12      Q.   Who is your flooring financing arrangement
13  with?
14      A.   I have two separate companies -- I have
15  Automotive Finance Corporation which is AFC, and Dealers
16  Services Corporation which is DSC.
17      Q.   Do either AFC or DSC maintain an office or
18  presence in Billings?
19      A.   Yes, they do.
20      Q.   Do you know where their -- do they have an
21  office in Billings?
22      A.   Yes, they do.
23      Q.   Do you know where the offices are?
24      A.   They are located in the auto auction.
25      Q.   Okay.  Is there a -- when you sell a car or buy

JAN BARRY COURT REPORTING
406.259.8111

PAGE 10

10

1  a car from the auto auction, is there a -- in Billings,
2  is there a regular procedure that is followed with
3  respect to the payment of the purchase price and the
4  receipt of the title work for the car that is purchased?
5      A.   There is, and it's actually at every auto
6  auction.
7      Q.   Is it the same?
8      A.   Yes.
9      Q.   So it would be the same in Phoenix, Vegas,
10  Denver, and Boise as it is in Billings?
11      A.   Correct.
12      Q.   If you buy a car at an auto auction, can you
13  take it back if you decide you don't want it?
14      A.   If there's a problem that occurs to the
15  vehicle, yes.
16      Q.   What kind of problem are we talking about?
17      A.   If there's a problem -- arbitration problem --
18  if there's a mileage discrepancy, if there's a
19  miscellaneous announcement that wasn't announced, like,
20  for instance, frame damage or flood damage or any
21  problems or issues the car may have that was not
22  announced in the sale room.
23      Q.   When you buy a car at the auto auction, do you
24  go take it for a test drive before you bid on it?
25      A.   Occasionally, yes.

JAN BARRY COURT REPORTING
406.259.8111

PAGE 11

11

1      Q.   Is that commonplace for buyers to test drive
2  the cars?
3      A.   It is.
4      Q.   And it must be allowed, then, that you have all
5  opportunity to inspect the car that you are interested in
6  buying.
7      A.   Yes.
8      Q.   How many cars go through the Billings Auto
9  Auction typically -- it has a sale once a week?
10      A.   It does.
11      Q.   On the same day every week?
12      A.   Same day every week.
13      Q.   Which day is that?
14      A.   Wednesday.
15      Q.   How many cars go through the auto auction
16  typically on Wednesday?
17      A.   Typically probably 6 to 700.
18      Q.   And does the auto auction like clear out all of
19  its cars and then within the next week gets another 6 to
20  700?
21      A.   Not typically, you know, they probably range
22  about a 50 to a 60 percent sale average so the excess
23  40 percent, we will call it, will either be took back to
24  the consignor or will stay there for the next following
25  week so typically you will probably get an average of 3

JAN BARRY COURT REPORTING
406.259.8111

PAGE 12

12

1  to 350 new cars per week.
2      Q.   And if there is some misrepresentation, I will
3  say, about the mileage or damage to the car, things like
4  that, then you can return the car?
5      A.   Yes, within a period of 14 days.
6      Q.   When you buy a car at the auto auction, then,
7  are you required to immediately present payment for that
8  car?
9      A.   Yes, you are.
10      Q.   And do you get the title work immediately when
11  you present payment?
12      A.   Typically, if the title is there, you do, but
13  occasionally the dealer may not have the title on the
14  auction premises -- you know, there is a lot of
15  out-of-state dealers, a lot of out-of-state companies so
16  they will typically send the title that day or the
17  following day.
18      Q.   Okay.  And do they send the title to the buyer
19  or do they send the title to the auction company?
20      A.   Auction company.
21      Q.   What does the auction company do with the
22  title, then?
23      A.   They either will call the dealer that bought
24  the vehicle and tell you can either come and pick up
25  the title, or if it's a finance company, like in my case,

JAN BARRY COURT REPORTING
406.259.8111

SHEET 4   PAGE 13

13

1 they just turn the title over to the finance company
2 that's there on premises or wherever it may be -- GMAC or
3 Ford Motor Credit or whoever it may be.
4    Q.    Okay. Are you familiar with how the Billings
5 Auto Auction administers the money that's paid at the
6 auction?
7    A.    Meaning?
8    Q.    The auto auction must charge a fee of some kind
9 per car or, you know, for auction services.
10   A.    They do, yes.
11   Q.    Is it a flat fee or is it a percentage fee?
12   A.    It's basically a scale on a percentage fee.
13   Q.    What is that percentage?
14   A.    I don't know right offhand, to be honest with
15 you.
16   Q.    And is that taken out of the purchase price?
17   A.    It's taken out of the proceeds that's delivered
18 to the seller.
19   Q.    Okay. So a buyer at the auto auction pays the
20 auction company?
21   A.    Correct.
22   Q.    The auto auction company then keeps its auction
23 fee --
24   A.    Correct.
25   Q.    -- and then remits the balance to the seller?

JAN BARRY COURT REPORTING
406.259.8111

PAGE 14

14

1    A.    Correct.
2    Q.    Will the auto auction remit the balance to the
3 seller before the title is delivered to the auto auction?
4    A.    No, sir.
5    Q.    Will the auto auction deliver the title to the
6 buyer before the sales proceeds are paid?
7    A.    No, sir.
8    Q.    Is the auto auction like an intermediary that
9 makes sure that the money and the title matches before
10 the money and the title goes to the other parties in the
11 transaction?
12   A.    Yes, sir. For most people that don't
13 understand the automobile industry, it's kind of like the
14 real estate industry, you have a title company which is a
15 broker that makes sure before you take place of your real
16 estate there's a clear and a free title at purchase
17 before any money is exchanged from the buyer and the
18 seller -- they are a broker in the middle to make sure
19 everything is clear and free of any liens or any
20 obligations to anyone that no one knows.
21   Q.    And the auto auction provides the same or
22 similar function?
23   A.    Provides the same service.
24   Q.    Do you know Nick Gutierrez?
25   A.    I do.

JAN BARRY COURT REPORTING
406.259.8111

PAGE 15

15

1    Q.    How long have you know Mr. Gutierrez?
2    A.    Probably over six years, I suppose.
3    Q.    And has he been with Incredible Auto Sales that
4 whole entire time?
5    A.    He was with the Chrysler dealership here which
6 was owned by Bob Anderson for a short period of time, and
7 then was with New Beginnings, and then Incredible Kia.
8    Q.    Are you social friends with Mr. Gutierrez?
9    A.    We were.
10   Q.    Have you ever sold cars to Mr. Gutierrez or to
11 one of the companies that he owned before?
12   A.    Many times, yes.
13   Q.    And when you sold the cars, did you sell it on
14 a retail basis or a wholesale basis?
15   A.    A wholesale basis.
16   Q.    And did you sell the cars directly to whatever
17 entity he was involved in at the time?
18   A.    Yes.
19   Q.    Have you ever -- has he ever purchased at
20 auction cars that you were selling at auction?
21   A.    Yes.
22   Q.    How many times, if you can estimate, did he buy
23 cars at the auction over the years?
24   A.    It would just be a pure estimation, but I would
25 say probably, without looking back, at least a hundred

JAN BARRY COURT REPORTING
406.259.8111

PAGE 16

16

1 times -- I will use a round number -- in the six years.
2    Q.    Did Mr. Gutierrez approach you this summer or
3 fall about purchasing cars?
4    A.    Yes.
5    Q.    When was it that he approached you, to the best
6 that you can remember?
7    A.    To go into the whole situation, the first time
8 I spoke to Mr. Gutierrez in 4 or 5 months at least or
9 probably 6 months was we both go to the same church, and
10 it just happened on May 22nd of 2006, we had a
11 granddaughter that passed away, she was 4 months old; and
12 it was about September 23rd or 24th, we were in church --
13 me and my wife was -- and like anyone, we were sobbing
14 consistently, and Mr. Gutierrez and his wife sit at
15 the -- in the balcony, and they could oversee us -- we
16 were sitting on the floor -- and after services was done,
17 we walked to the foyer to our car, and Mr. Gutierrez and
18 his wife, Zsaneece, came out and gave my wife a hug and
19 gave me a hug and told us how sorry they were, and she
20 was at the funeral -- Mrs. Gutierrez was -- and he
21 apologized for not being at the funeral and said, "Lets
22 get together tomorrow," he says, "I would like to talk to
23 you." And I said sure. He says, "I will pick you up for
24 lunch tomorrow," he said, "I would just like to talk to
25 you for a little while." I said sure.

JAN BARRY COURT REPORTING
406.259.8111

SHEET 5  PAGE 17

17

1   So the following Monday, he came to my office,
2   and it was 5 minutes to noon, and he said, "Are you
3   ready?" I said, "I will be in about 10 minutes." You
4   know, and I took care of whatever I needed to take care
5   of and we went and had lunch.
6   At that point in time, he just -- we talked
7   about the whole family, so on and so forth, an hour, hour
8   and a half went by, and it was really comforting, because
9   I have no one really to talk to about situations like
10  that -- family wise.
11  As he was dropping me back off to the car lot,
12  he pulled in and pulled around my car lot and we were
13  walking back to my office, and he said, "I need to
14  purchase some cars, I need to buy some cars, I'm low on
15  inventory." It's not uncommon for a dealer to come to my
16  dealership to buy vehicles. I said sure. He says,
17  "Well, if you have a list, give me a list and I will pick
18  out the ones I want." I said, "I don't have any list."
19  I says, "My list is basically in my head, I can tell you
20  what I have or you can see what I have on the car lot."
21  And he said fine, so he walked around and had a few cars
22  picked out, and he said, "You have to have more new cars
23  than this." And I says, "I do, but they are not all" --
24  Q.   Let me back up, Steve. How many lots do you
25  have?

JAN BARRY COURT REPORTING
406.259.8111

PAGE 18

18

1   A.   I have one retail lot, a wholesale warehouse,
2   and then just everything else gets distributed through
3   vendors in town.
4   Q.   So you have another location where you'll keep
5   cars that your intention is to wholesale only?
6   A.   Wholesale only or have storage to get them
7   ready for wholesale for different vendors in town, body
8   shops, detail shops.
9   Q.   Where is your storage or your shop for your
10  wholesale?
11  A.   1009 Second Avenue North.
12  Q.   Which must be adjacent or close to your retail?
13  A.   Within nine blocks. Going back to how we came
14  about this deal, Mr. Gutierrez had four vehicles picked
15  out that I had on the lot, he said, "I need to buy more
16  cars." I said, "I don't have any ready yet. I've got
17  some that are going to be ready this week or the
18  following week." He said, "What are they?" So I told
19  him what they were, and he says, "Get me a list
20  prepared." I said, "Well, they need body work and paint
21  work." He said, "That's fine, just get me a list ready."
22  So the following day was Tuesday, I got the
23  vehicles prepared for the auction on Wednesday, I kind of
24  dropped the ball on getting him a list ready. The very
25  next day at 12:05, he was back at my office, he said, "Do

JAN BARRY COURT REPORTING
406.259.8111

PAGE 19

19

1   you have time for lunch today?" I said, "Yes, I do." So
2   we went and had lunch again, small talk, family, so on
3   and so forth, and we got back to my office, he said, "Is
4   that list ready?" I said, "List?" He said, "List of
5   cars that I want to buy." I said, "No, I haven't
6   prepared anything yet." He said, "Well, I really need
7   that list, I need to buy automobiles." I said, "Okay, I
8   will prepare one.
9   Low and behold that afternoon I was busy with
10  the auction vehicles, never prepared a list. The very
11  next day which was Wednesday, I usually attend the sale
12  between 8:45 and 9:15, I was running late, I got to the
13  auction, and basically Wednesday I didn't even think
14  about a list for Mr. Gutierrez because I got busy with
15  other business at the auction.
16  Thursday morning, he calls me, he said, "Is my
17  list ready?" I said, "Nick, I haven't got anything ready
18  for you yet, I was busy with the auction on Wednesday."
19  He said, "Well, I will be up there around 2:00, get me a
20  list ready, so that's what I did, by 2:00 I had a list of
21  cars ready; and on the list was 11 vehicles -- 11 that I
22  thought he would purchase.
23  When we went to look -- I told him, "I need you
24  to see these cars for what you are buying." He said,
25  "okay, let's take a look." And we went to different body

JAN BARRY COURT REPORTING
406.259.8111

PAGE 20

20

1   shops where the vehicles were, and while we were there,
2   he would ask is that yours or is that yours, and I would
3   acknowledge that that is or this isn't, and the ones that
4   were mine, he would write down and say, well, what do you
5   want for that, and I would give him a price, and he said
6   okay, so throughout that day he bought 14 cars from me,
7   and basically that's how it was structured.
8   Q.   Okay. Now, so he picked out cars?
9   A.   Correct.
10  Q.   And you told him the price of the car?
11  A.   Correct.
12  Q.   And he would either agree or say, no, I won't
13  buy that, then or --
14  A.   Correct.
15  Q.   So he looked at more than 14 cars and didn't
16  come to an agreement or he didn't accept the price or
17  whatever, is that?
18  A.   A few of them were either mileage was too high
19  or the year wasn't comparable to where he could make it
20  work for his dealership.
21  Q.   Okay. So this would have been on the Thursday
22  after the auction?
23  A.   Correct.
24  Q.   Okay. And at that point, how many of the 14
25  cars were in body shops?

JAN BARRY COURT REPORTING
406.259.8111

SHEET 6   PAGE 21
21

1      A.    I would say probably -- without going back and
2  looking at notes, probably between eight and nine.
3      Q.    And then the rest of them were either on your
4  lot or in your warehouse?
5      A.    Either on my lot, I think there was one in the
6  warehouse, and a couple at like different service areas
7  -- tire places, glass.
8      Q.    Okay.  Were any of those cars subject to your
9  financing -- and when I say "your financing", I will say
10 your flooring lender?
11     A.    Yes.
12     Q.    How many of them?
13     A.    Thirteen out of the fourteen that he purchased.
14     Q.    Did you have the original title work in your
15 possession on that day?
16     A.    At my dealership?
17     Q.    Yes.
18     A.    No.
19     Q.    Where was the original title work?
20     A.    The original title work is at the lenders,
21 always has been.
22     Q.    Okay.  Did you deliver the cars to Nick or did
23 Nick come and retrieve the cars from you?
24     A.    There was a few that we delivered, and there
25 was some that he retrieved.
JAN BARRY COURT REPORTING
406.259.8111

PAGE 22
22

1      Q.    And when did you deliver them to him?
2      A.    It was probably the following Saturday and
3  Monday.
4      Q.    Okay.  Now the auto auction is involved in this
5  transaction somehow.
6      A.    Correct.
7      Q.    But the cars weren't sold through the Wednesday
8  auto auction.
9      A.    They did not run through the arena, correct.
10     Q.    How was the auto auction involved?
11     A.    The auto auction was involved for -- Nick
12 called me when we came to an agreement on the vehicles
13 and said, "I would like to buy these through the auto
14 auction," basically for comfort of not having any
15 problems with titles and so on and so forth, I would
16 imagine, and that's fine with me because I do a lot of
17 business with the auto auction in situations just like
18 this, it's not the first time I've ever sold cars that
19 didn't go through the auto auction to a dealer that the
20 auction took care of paperwork for us.
21     Q.    Now, you've said before that the auto auction
22 is like a real estate closing company?
23     A.    Closing company, same thing.
24     Q.    And you would be using the auto auction for
25 those services --
JAN BARRY COURT REPORTING
406.259.8111

PAGE 23
23

1      A.    Correct.
2      Q.    -- when they weren't necessarily going through
3  the arena, as you said.
4      A.    Correct.
5      Q.    The auto auction never had physical possession
6  of these cars between Nick, I will say?
7      A.    Not that I'm aware of.
8      Q.    Who at the auto auction did you arrange to have
9  the auto action act as the escrow or whatever?
10     A.    No, I did not arrange it; Nick did all that.  I
11 never even talked to the auto auction.  I was not
12 informed until Nick called me and told me the auction was
13 going to be taking care of it, and a young man from the
14 auction called me and said, "We are going to take care of
15 the paperwork for you and Nick on this set of vehicles."
16     Q.    When was that conversation?
17     A.    Friday.
18     Q.    Was this Friday before possession of the cars
19 was taken by Nick?
20     A.    Correct.
21     Q.    So before he even took possession of the cars,
22 it was determined that they would go through the auction?
23     A.    Correct.
24     Q.    Do you remember the young man's name that
25 called you?
JAN BARRY COURT REPORTING
406.259.8111

PAGE 24
24

1      A.    Jake.
2      Q.    Jake.  And is that somebody that you've dealt
3  with before?
4      A.    Many times, yes.
5      Q.    And what exactly did Jake tell you?
6      A.    He just said he spoke to Nick, they came to an
7  agreement on commissions, and for me to bring VIN
8  numbers, colors, makes and models of the vehicles and he
9  will do the paperwork on them -- in lieu of me doing the
10 paperwork on them, they will do the paperwork on them and
11 give the buy-sells to Nick.
12     Q.    Was there an invoice, then, that was prepared
13 for each vehicle?
14     A.    There was.
15     Q.    And was it prepared by the auto auction?
16     A.    It was.
17     Q.    Then to your knowledge, did Nick present
18 payment for the vehicles?
19     A.    At that point in time, I had no knowledge --
20 now, I do, but it's not something I get involved in
21 because it's not -- it's the auction's business to
22 collect, not mine.
23     Q.    Did you tell either AFC or DSC that particular
24 vehicles were going to be sold to Nick or Incredible
25 Auto?
JAN BARRY COURT REPORTING
406.259.8111

SHEET 7  PAGE 25

25

1    A.    Yes.
2    Q.    Knowing what you know now, did Nick present
3  payment or did Incredible Auto Sales present payment for
4  the vehicles?
5    A.    No.
6    Q.    Did he present payment for any of the vehicles?
7    A.    Yes.
8    Q.    How many of them?
9    A.    Three, is what I understand.
10   Q.    And to your knowledge, was the title work for
11  the three vehicles delivered to Nick or Incredible Auto
12  Sales?
13   A.    I understand he does have title work, yes.
14   Q.    Did Nick present payment on any of the other
15  vehicles?
16   A.    Not to my knowledge.
17   Q.    Do you know if the payment that Nick presented
18  on the three, if the funds cleared through Nick's bank?
19   A.    I know this now, no, they did not.
20   Q.    You though -- and I mean Steve's Auto Sales --
21  received payment from the auto auction for the three that
22  Nick presented the payment on.
23   A.    Yes.
24   Q.    So with regard to the other vehicles, payment
25  was not presented by Incredible Auto Sales; correct?
JAN BARRY COURT REPORTING
406.259.8111

PAGE 26

26

1    A.    Correct.
2    Q.    And do you know where the title work for those
3  vehicles is at this time?
4    A.    I have eight titles in possession. I'm not
5  sure how many the auction has in its possession, I do
6  know they have at least one, and they may have more in
7  their possession. The auto auction paid me for six
8  vehicles.
9    Q.    When you say you have eight titles in your
10  possession, do you physically possess the titles?
11   A.    No, my lending company -- AFC or DSC has the
12  titles -- they are two separate companies.
13   Q.    Now, I've put before you, Steve, Exhibits 1
14  through 8, okay, are you familiar with these documents?
15   A.    Very much so.
16   Q.    What is Exhibit No. 1?
17   A.    It is the title -- Arizona Certificate of Title
18  on an '04 Chevy Cavalier.
19   Q.    Now, this title shows that the owner is Arizona
20  Federal Credit Union; correct?
21   A.    Correct.
22   Q.    Do you own this car or do you think you own
23  this car?
24   A.    Well, I know I own it, I owe money on it.
25   Q.    Why isn't the title in your name -- and when I
JAN BARRY COURT REPORTING
406.259.8111

PAGE 27

27

1  say "you", I'm talking about Steve's Auto Sales?
2    A.    There's reassignments -- dealer reassignments
3  on the back that states give dealers an opportunity for a
4  wholesale portion of it to reassign it to another dealer
5  on the back side without having to put the title --
6  reassigned to a dealer who purchases it from them so they
7  don't have to apply for a new title in their name.
8    Q.    You say that you go to auctions in Phoenix,
9  would this be a vehicle that you would have purchased at
10  the auction in Phoenix?
11   A.    It was one, yes.
12   Q.    Based on the original of Exhibit 1, could you
13  then convey -- transfer the title to somebody who
14  purchased the vehicle from you?
15   A.    Yes, I could.
16   Q.    Without having to go get a whole new title?
17   A.    Correct.
18   Q.    And how would you do that?
19   A.    In the dealer's section -- it says "Dealer
20  Reassignment" --
21   Q.    Yeah.
22   A.    -- I sign off where the dealer -- it says
23  dealership name which is the seller which would be me,
24  and I sign off on it -- and in this case, it's my title
25  clerk which is Martha Bradley signed off on it -- and
JAN BARRY COURT REPORTING
406.259.8111

PAGE 28

28

1  puts the new registered dealer on it where it says
2  "Buyer".
3    Q.    So if I was to buy this car from you, then my
4  name would appear about half way down under the "Dealer
5  Reassignment" line?
6    A.    Your name as a retail customer or as a
7  prospective dealer?
8    Q.    Well, how about if I'm a retail customer?
9    A.    Retail customer? Your name would go on the
10  bottom of this. This would be -- along with the bottom,
11  it would have another form which is called an MV1 form, a
12  retail form, that we would have to attach to this.
13   Q.    And if I'm a dealer --
14   A.    Then it would just go right to the next
15  available reassignment, it doesn't have to be
16  particularly in the middle -- see, if another dealer
17  comes into here (indicating), they get wholesaled
18  again -- there is four reassignments on back of the title
19  so it could be transferred four times without having a
20  new title put in that dealership's name.
21   Q.    Now, the current location -- physical location
22  of the original of Exhibit 1 is with either AFC or DSC?
23   A.    It's with DSC.
24   Q.    DSC, okay. Did you ever tender Exhibit No. 1
25  to Incredible Auto Sales?
JAN BARRY COURT REPORTING
406.259.8111

SHEET 8    PAGE 29

29

1    A.    No.
2    Q.    Why not?
3    A.    Because I was never paid for it.
4    Q.    Okay.  Is the -- did you have an agreement with
5    Incredible Auto Sales as to when you would give them the
6    title relative to when payment would be made?
7    A.    No.
8    Q.    Well, did you have an agreement with them that
9    you would give them the title and they would pay you
10   later?
11   A.    Well, first of all, I never give title to
12   Incredible because the title has to go to the Billings
13   Auto Auction, that's where they were sold through.
14   Q.    So was the agreement, then, with Incredible
15   Auto Sales that when Incredible Auto Sales tendered
16   payment, then the auto auction would obtain the title
17   from DSC?
18   A.    I would imagine so, yes.
19   Q.    Well, you imagine so or was that the
20   arrangement?
21   A.    We had no per se arrangement saying that this
22   title had to be delivered here or then.  As I had titles,
23   it would be tendered to the auto auction to receive
24   payment, and as long as the vehicles were completed out
25   of the body shop -- the vehicles at this point in time

JAN BARRY COURT REPORTING
406.259.8111

PAGE 30

30

1    were still in the body shop, and, you know, various
2    services around the city.
3    Q.    Okay.  Well, was this particular vehicle in the
4    body shop at the time?
5    A.    I don't recall, to be honest with you -- I
6    don't think it was.
7    Q.    Well, what was the arrangement in terms of the
8    delivery of the title work to Incredible Auto Sales?
9    A.    The arrangement is I deliver title, I get a
10   check, I get paid for it.
11   Q.    It would be a contemporaneous exchange of money
12   for the title?
13   A.    Correct.
14   Q.    And that would all be administered by the auto
15   auction?
16   A.    Correct.
17   Q.    And that was the -- is that the standard
18   practice with -- at the auto auction?
19   A.    Yes, it is.
20   Q.    And is that the standard practice at the other
21   auto auctions that you go to?
22   A.    Definitely so.
23   Q.    Is that the way the business is done in the
24   industry?
25   A.    It is.

JAN BARRY COURT REPORTING
406.259.8111

PAGE 31

31

1    Q.    Look at Exhibit No. 2, do you recognize that?
2    A.    I do.
3    Q.    Is this also for a vehicle that was involved in
4    the transaction with Incredible?
5    A.    Yes, it is.
6    Q.    Do you know if this vehicle was in a body shop?
7    A.    Yes, it was.
8    Q.    Do you know where the original of the title
9    that Exhibit 2 is a copy of is located?
10   A.    Automotive Finance Corporation -- AFC.
11   Q.    AFC.  Did Incredible Auto Sales ever tender the
12   purchase price for this vehicle?
13   A.    Not that I'm aware of, no.
14   Q.    Now, again, this title shows that the owner of
15   the car is Enterprise Rent a Car of Montana, Wyoming.
16   A.    Correct.
17   Q.    What about -- where in this document would it
18   indicate that Steve's Auto Sales is the owner of the car?
19   A.    Right on the front where it says, "Part 1.
20   Seller Agreement and Warranty of Title (Deliver to Buyer
21   within 15 days from the date of sale), and, see, it says
22   Steve's Auto Sales, Incorporated.
23   Q.    As the buyer.  And then under this form of
24   title, can you transfer it to a subsequent buyer without
25   having to get a new title?

JAN BARRY COURT REPORTING
406.259.8111

PAGE 32

32

1    A.    Yes, we can.  On the back side of the title, it
2    says, "First dealer Assignment with Warranty of Title",
3    and "Deliver to the Buyer within 15 days from date of
4    sale."
5    Q.    And then you can do another reassignment,
6    correct, with this title?
7    A.    Correct.
8    Q.    Look at Exhibit No. 3, if you would, do you
9    recognize that?
10   A.    I do.
11   Q.    Do you know where the original that 3 is a copy
12   of is located?
13   A.    Pardon me?
14   Q.    Do you know where the location of the original
15   title that No. 3 is a copy of is located?
16   A.    Yes, I do.
17   Q.    Where is that?
18   A.    Denny Menholt Frontier Chevrolet.
19   Q.    Now, why is it at Denny Menholt Chevrolet?
20   A.    That's where I purchased it from, and they did
21   not have a lien release from Wells Fargo Financial on
22   this, and it just -- they were waiting for a lien release
23   to come back to them so they haven't delivered title to
24   me.
25   Q.    Now, let me back up, the car that is on title

JAN BARRY COURT REPORTING
406.259.8111

SHEET 9    PAGE 33

33

1   No. 1 -- Exhibit No. 1, the 2004 Chevy Cavalier, you have
2   possession of that car now?
3       A.    No.
4       Q.    You don't?
5       A.    No, I do not.
6       Q.    Where is it?
7       A.    That car, to our information, has been retailed
8   by Nick or Incredible Auto Sales.
9       Q.    Do you know, Steve, if Incredible Auto Sales
10  could arrange a transfer of this title to its buyer?
11      A.    There's no possible way they can without having
12  a physical title.
13      Q.    Can they get a duplicate title from Arizona?
14      A.    They can fraudulently.
15      Q.    If they got a duplicate title, would,
16  presumably, they have to get Arizona Federal Credit Union
17  to sign it?
18      A.    Presumably.
19      Q.    Are you aware if states will allow you to
20  transfer ownership by faxed copies of titles?
21      A.    No.
22      Q.    Steve look at Exhibit No. 2, do you know where
23  that vehicle is?
24      A.    Yes, I do.
25      Q.    Where is it?

JAN BARRY COURT REPORTING
406.259.8111

PAGE 34

34

1       A.    It's at my location.
2       Q.    Now, the court gave you permission on Tuesday
3   to take possession of the vehicles; is this one of them
4   that you took possession of pursuant to the court's
5   order?
6       A.    Yes.
7       Q.    Vehicle No. 3, do you know where that car is
8   located now?
9       A.    It's in my possession.
10      Q.    And did you take possession of this car also
11  pursuant to the court order?
12      A.    I had it in my possession before the court
13  order.
14      Q.    Was possession of this car ever provided to
15  Incredible Auto Sales?
16      A.    No.
17      Q.    Why not?
18      A.    It is a vehicle that needed work, and we were
19  working on it.
20      Q.    When you say "we were working on it", does that
21  mean that Steve's Auto was working on it?
22      A.    We did a few things ourselves, and we had other
23  service shops do some reconditioning to it.
24      Q.    Okay. So at the time Incredible wanted to
25  purchase the car, there was still physical work to be

JAN BARRY COURT REPORTING
406.259.8111

PAGE 35

35

1   done to the car?
2       A.    Yes, on quite a few of the vehicles.
3       Q.    And whose responsibility was it to accomplish
4   that physical work?
5       A.    It was mine.
6       Q.    Okay. And your cost; correct?
7       A.    Correct.
8       Q.    So you were to deliver a repaired car to
9   Incredible?
10      A.    Correct.
11      Q.    And because this car was under repair of some
12  kind, it never went to Incredible?
13      A.    Correct.
14      Q.    Showing you Exhibit No. 4, do you recognize
15  this document?
16      A.    Yes, I do.
17      Q.    Now, this is another Arizona title.
18      A.    Yes, sir.
19      Q.    Do you know where the original copy of this
20  Arizona title is?
21      A.    I do.
22      Q.    Where is that?
23      A.    At my finance corporation -- I'm pretty sure
24  it's DSC.
25      Q.    Now, the one that the title is at Menholt

JAN BARRY COURT REPORTING
406.259.8111

PAGE 36

36

1   Chevrolet, is this vehicle financed on -- your
2   acquisition of this vehicle financed?
3       A.    Not as I've collected anything from any of the
4   finance companies on it, no.
5       Q.    Okay. So there's no flooring lien from your
6   flooring company on this vehicle?
7       A.    Not at this time.
8       Q.    Going back to No. 4, where on Exhibit No. 4
9   would it show that you're the owner of the vehicle?
10      A.    On the back side of the title in the first
11  reassignment, it shows that Arizona State Savings and
12  Credit Union signed off to Steve's Auto Sales.
13      Q.    Do you know where the 2005 Kia is physically
14  located?
15      A.    Yes.
16      Q.    Where?
17      A.    It's in my possession.
18      Q.    How long has it been in your possession?
19      A.    Since the day that I purchased it.
20      Q.    Why was this not delivered to Incredible Auto
21  Sales?
22      A.    It was having work done to it -- body work done
23  to it and never got delivered.
24      Q.    So this would be in the same situation as the
25  2003 Dodge Stratus?

JAN BARRY COURT REPORTING
406.259.8111

SHEET 10  PAGE 37

37

1    A.   Correct.
2    Q.   Did Incredible Auto Sales tender payment for
3 the vehicle -- for the 2005 Kia?
4    A.   Not to me, they haven't, or to my knowledge the
5 auction, no.
6    Q.   Has Incredible Auto tendered payment to either
7 you or the auction for the 2003 Dodge Stratus?
8    A.   No, sir.
9    Q.   I don't know if I've asked you, but have they
10 tendered payment for the 2006 Dodge --
11    A.   2007.
12    Q.   2006 Dodge Caliber? And have they tendered
13 payment on the 2004 Chevy Cavalier?
14    A.   No.
15    Q.   Look at Exhibit No. 5, do you know where the
16 original title that 5 is a copy of is located?
17    A.   Yes, I do.
18    Q.   Where?
19    A.   DSC -- Dealer Services Corporation.
20    Q.   Here in Billings?
21    A.   Here in Billings. My flooring company.
22    Q.   Where on Exhibit 5 would it indicate that
23 Steve's Auto is the owner?
24    A.   On the back side of the title in the first
25 reassignment.

JAN BARRY COURT REPORTING
406.259.8111

PAGE 38

38

1    Q.   Have you been tendered payment on the 2002
2 Mercury Sable?
3    A.   No, I have not.
4    Q.   Do you know where the location of the 2002
5 Mercury Sable is?
6    A.   It's in my possession.
7    Q.   And is this one of the vehicles you obtained
8 possession of pursuant to the judge's order?
9    A.   Yes, it is.
10    Q.   Now, Steve, there's a third page to Exhibit 5
11 which is a repossession affidavit.
12    A.   Yes, sir.
13    Q.   Are you familiar with this document?
14    A.   I am familiar with documents like this one,
15 yes.
16    Q.   What does this document mean? What does it
17 show?
18    A.   It shows a release of lien from Arizona Central
19 Credit Union, is what it is. It says that they
20 repossessed it and signed it off by them to Steve's Auto
21 Sales. It's an affidavit of repossession and bill of
22 sale.
23    Q.   And on the front of the title on Exhibit 5, the
24 owner is shown as Sandra Louise Alvarado and Nicholas
25 Pete Alvarado.

JAN BARRY COURT REPORTING
406.259.8111

PAGE 39

39

1    A.   Correct.
2    Q.   Do you understand the third page of Exhibit 5
3 to affect a transfer of the ownership from the Alvarados
4 back to the Arizona Central Credit Union?
5    A.   Do I understand --
6    Q.   The repossession affidavit to affect a transfer
7 of title from the Alvarados to the credit union.
8    A.   Yes, I do.
9    Q.   Were you ever tendered payment by Incredible
10 Auto Sales for the 2002 Mercury Sable?
11    A.   No, I have not.
12    Q.   Look at Exhibit 6, do you know where the
13 original copy of this title is?
14    A.   Yes, I do.
15    Q.   Where?
16    A.   Dealer Services Corporation.
17    Q.   And do you have physical possession of the 2006
18 Pontiac G6?
19    A.   Yes, I do.
20    Q.   How long have you had possession?
21    A.   One day.
22    Q.   So that was another one you recovered pursuant
23 to the judge's order?
24    A.   Yes.
25    Q.   Have you ever been tendered payment on the 2006

JAN BARRY COURT REPORTING
406.259.8111

PAGE 40

40

1 Pontiac G6 from Incredible Auto Sales?
2    A.   No.
3    Q.   Now, this one is already in your name -- title
4 is in your name; correct?
5    A.   Yes, it is.
6    Q.   Look at Exhibit No. 7, do know where the
7 original copy of this title is?
8    A.   Yes, I do.
9    Q.   Where?
10    A.   Dealer Services Corporation.
11    Q.   And do you have possession of this 2005 Suzuki?
12    A.   Yes, I do.
13    Q.   Did you get that yesterday pursuant to the
14 judge's order?
15    A.   Yes, I did.
16    Q.   Have you ever been tendered payment by
17 Incredible Auto Sales for this 2005 Suzuki?
18    A.   No.
19    Q.   Look at Exhibit No. 8, do you recognize this
20 document?
21    A.   Yes, I do.
22    Q.   Do you know where the original copy of this car
23 title is?
24    A.   Yes.
25    Q.   Where?

JAN BARRY COURT REPORTING
406.259.8111

SHEET 11  PAGE 41

41

1    A.    AFC -- Automotive Finance Corporation.
2    Q.    And do you have possession of this vehicle?
3    A.    No.
4    Q.    Do you know where this vehicle is?
5    A.    No.
6    Q.    Do you have any understanding as to what's
7  happened with this vehicle?
8    A.    Incredible Auto Sales/Nick Gutierrez retailed
9  this vehicle as far as they are telling us.
10   Q.    Sold it to somebody else?
11   A.    Sold it to someone.
12   Q.    Have you ever been tendered payment on this
13 2005 Chrysler -- is it a Town and Country?  Is that what
14 it is?
15   A.    Yes, it is.  No, I have not.
16   Q.    Now, Steve, Exhibits 1, 4, 5, and 7 are Arizona
17 titles; correct?
18   A.    Correct.
19   Q.    And I understand you would have bought these
20 vehicles at the Phoenix auction.
21   A.    Yes, sir.
22   Q.    You've also testified that these titles are
23 possessed by either AFC or DSC.
24   A.    Correct.
25   Q.    Do you know how they were delivered to AFC or

JAN BARRY COURT REPORTING
406.259.8111

PAGE 42

42

1  DSC?
2    A.    I don't know what you mean, but the auto
3  auction is the one that handles that, I don't even get to
4  see titles.
5    Q.    Do you know does AFC do business in Arizona?
6    A.    Yes, they do.
7    Q.    Does DSC do business in Arizona?
8    A.    Yes, they do.  They both have offices at that
9  particular auction -- at various auctions.
10   Q.    Okay.  Is it pretty common for AFC to have an
11 office at -- physically at the same place as the auto
12 auction?
13   A.    It's more common than you will imagine.
14   Q.    Same for DSC?
15   A.    Correct.
16   Q.    So you've never seen the original of these or
17 you've never had possession of the original of these
18 titles?
19   A.    No.
20   Q.    That happens in the background with the various
21 auction companies and with AFC or DSC?
22   A.    Correct.  They handle all the title paperwork,
23 we don't handle it.
24   Q.    But ultimately the titles get up here?
25   A.    Ultimately, yes.

JAN BARRY COURT REPORTING
406.259.8111

PAGE 43

43

1    Q.    If these vehicles were sold now, how would you
2  be able to transfer title?
3    A.    I would have to go to AFC or DSC -- whoever the
4  vehicle is financed through -- my financier -- and have
5  to tender them payment to pay the vehicles off, then
6  receive title.
7    Q.    So you can't transfer title unless the lien is
8  paid off?
9    A.    Well, of course not.
10   Q.    What's your current status with AFC and DSC?
11   A.    AFC and DSC -- AFC which I have a $200,000
12 floor line has totally cut me off at this point in time
13 because of this status.
14   Q.    Okay.  And when you say "because of this
15 status," what do you mean exactly?
16   A.    They wanted the vehicles to have them paid
17 off -- the two vehicles that they have floored or I can't
18 do any more business with them -- or I haven't done any
19 more business with them since.
20   Q.    So you can't go buy any more vehicles and
21 finance them through AFC?
22   A.    No, sir.
23   Q.    How about DSC?
24   A.    DSC will still let me floor vehicles, the issue
25 we have with them is we have -- our limit is floored up,

JAN BARRY COURT REPORTING
406.259.8111

PAGE 44

44

1  we don't have any more room to purchase no vehicles.
2    Q.    Okay.  So you have to liquidate --
3    A.    Correct.
4    Q.    -- cars in order to get --
5    A.    Anymore available funding.
6    Q.    Do you have other cars besides any of them
7  reflected in Exhibits 1 through 8 that are financed
8  through DSC?
9    A.    Yes.
10         (Recess taken)
11 BY MR. PATTEN:
12   Q.    Steve, has Steve's Auto ever sold cars to
13 Incredible Auto Sales -- excuse me, have you purchased
14 cars from Incredible Auto Sales?
15   A.    Yes, I have.
16   Q.    And have you purchased any recently?
17   A.    I purchased 3 vehicles on the same date that I
18 sold him these 14 -- or that he said he was going to buy
19 these 14, I purchased 3 from him.
20   Q.    Okay.  So the deal was Incredible was going to
21 buy 14 from Steve's, and Steve's was going to buy 3 from
22 Incredible?
23   A.    Correct.
24   Q.    And did you, in fact, buy the three from
25 Incredible?

JAN BARRY COURT REPORTING
406.259.8111

SHEET 12  PAGE 45
45

1    A.    Yes, I did.
2    Q.    Was that also done through the auto auction?
3    A.    Yes, it was.
4    Q.    Did you tender payment --
5    A.    Yes, I did.
6    Q.    -- for the three?
7    A.    Yes.
8    Q.    To whom did you tender the payment?
9    A.    The auto auction.
10   Q.    And did you get the title work on the three?
11   A.    I did.
12   Q.    From whom did you get the title work?
13   A.    Auto auction.
14   Q.    And the title work was all signed and so forth
15   so that it put the title into the name of Steve's Auto?
16   A.    To my knowledge -- I didn't see the title work,
17   but to my knowledge, it must have been.
18   Q.    Okay. Why didn't you see the title work?
19   A.    It's something that I don't necessarily do
20   myself -- there's instances that I would, but most times
21   it's either done by the flooring company or done by my
22   secretary.
23   Q.    Were the cars that you bought from
24   Incredible -- these three -- were they floored?
25   A.    No, they weren't.

JAN BARRY COURT REPORTING
406.259.8111

PAGE 46
46

1    Q.    You paid those out of your own pocket also?
2    A.    Correct.
3    Q.    So your title clerk would have been the person
4    who would have handled that?
5    A.    Correct.
6         MR. PATTEN: That's all I've got.
7               EXAMINATION
8    BY MR. COLEMAN:
9    Q.    Mr. Marks, my name is Shane Coleman, I
10   represent Hyundai Motor Finance Company. We've met
11   before, haven't we?
12   A.    Yes, we have.
13   Q.    Let me apologize in advance, I'm going to skip
14   around quite a bit because your counsel covered an awful
15   lot of material and I may take some of that out of order.
16   First off, let's talk about these three vehicles you
17   purchased from Mr. Gutierrez, when did you purchase
18   those?
19   A.    They would be on the same afternoon that he
20   purchased mine, it was that Friday.
21   Q.    What vehicles were those?
22   A.    It was a 2004 Impala, a 2005 Chrysler Sebring,
23   and I don't recall the last one -- I think the last one
24   was a Neon -- an '05 Neon.
25   Q.    And as far as you know, you did get clean

JAN BARRY COURT REPORTING
406.259.8111

PAGE 47
47

1    titles to those?
2    A.    As far as I know, yes, I've never had any
3    problems with them. I sold them and collected on them so
4    I'm sure we did, yes.
5    Q.    Did you sell them retail or wholesale?
6    A.    Wholesale.
7    Q.    Do you know who you sold them to?
8    A.    Right through the auto auction.
9    Q.    Did Mr. Gutierrez tell you why he wanted to get
10   rid of those?
11   A.    He said they were over age and inventory.
12   Q.    Now, he maintains at least two different lots
13   for Incredible Kia; is that your understanding?
14   A.    Locally in Billings, yes.
15   Q.    And those are what we have called the primary
16   and secondary lots -- the primary one being further east
17   on King Avenue?
18   A.    Correct.
19   Q.    And the secondary lot is out in front of New
20   Beginnings?
21   A.    It is.
22   Q.    Do you remember which lot these vehicles were
23   sitting on?
24   A.    One -- two were on the primary lot, and one was
25   on the New Beginnings lot.

JAN BARRY COURT REPORTING
406.259.8111

PAGE 48
48

1    Q.    What was your understanding of New Beginnings?
2    Was that owned by Incredible Kia or Incredible Chevrolet?
3    A.    Incredible Kia.
4    Q.    Tell me why you say that.
5    A.    Incredible Kia has always owned New Beginnings
6    since it opened.
7    Q.    You mean the employees that worked out of that
8    building?
9    A.    Both the employees and the business itself.
10   Q.    The vehicles out front were all owned by
11   Incredible Kia, as far as you know?
12   A.    I assume so.
13   Q.    I want to make sure that I understand exactly
14   the status of each of the 8 vehicles that we are talking
15   about, and, first off, so I'm clear, you sold 14 vehicles
16   to Mr. Gutierrez?
17   A.    Correct.
18   Q.    Are you only seeking to repossess or retake
19   possession of eight of those?
20   A.    Correct.
21   Q.    And of those eight, we've got the 2004 Chevy
22   Cavalier, this is a vehicle that Mr. Gutierrez has
23   already retailed?
24   A.    That's what they told me, to my knowledge,
25   that's correct.

JAN BARRY COURT REPORTING
406.259.8111

SHEET 13  PAGE 49

49

1  Q.  Have you seen it since the bankruptcy was
2  filed?
3  A.  No.
4  Q.  The 2007 Caliber is a vehicle that you retook
5  possession of within the last --
6  A.  Twenty-four hours.
7  Q.  And when you retook possession of that vehicle,
8  did you retake -- was it on one of Incredible's lots?
9  A.  It was staged in an area -- or I should say New
10  Beginnings, along with a dozen more -- probably 14 more
11  vehicles.
12  Q.  Not for sale, but on their lot in the back
13  somewhere?
14  A.  Correct.
15  Q.  How did that vehicle -- the 2007 Dodge
16  Caliber -- get to Nick's lot? Did he pick that up or did
17  you deliver it?
18  A.  They picked it up. I was out of state when
19  they picked it up right from the body shop.
20  Q.  Do you remember which body shop that was?
21  A.  It was at the Paint Doctor up on the Heights.
22  Q.  How about the 2004 Cavalier that we just talked
23  about that was retailed, do you remember how that got to
24  Incredible?
25  A.  I don't recall, I'm not sure if one of their

JAN BARRY COURT REPORTING
406.259.8111

PAGE 50

50

1  salespeople picked it up or maybe one of my salespeople
2  dropped it off, I'm not sure.
3  Q.  At some point, though, it was physically on
4  Incredible's lot?
5  A.  It was.
6  Q.  The 2003 Dodge Stratus, I understood you to
7  testify had never been physically delivered to Incredible
8  Auto Sales?
9  A.  That's correct.
10  Q.  Where was that specifically?
11  A.  It was at my location, then went to a service
12  place to get some service work done.
13  Q.  Which service place?
14  A.  I think it was Griffins Enterprise to get some
15  painting done.
16  Q.  What was the arrangement with Mr. Gutierrez in
17  terms of when he could pick that up or when they would
18  deliver it?
19  A.  When it was completed.
20  Q.  Would he have to get permission from you to
21  pick it up at that point or would the paint shop call him
22  directly?
23  A.  You know, I don't -- it's something that we
24  don't really forego arrangements of who -- if you need
25  permission to pick something up or not, you know,

JAN BARRY COURT REPORTING
406.259.8111

PAGE 51

51

1  basically he could pick it up if he wanted to. It's no
2  different than the Caliber, he never got permission from
3  me to pick up the Caliber, but he did.
4  Q.  And that's just how it works in the business?
5  A.  Well, I mean generally with someone that you
6  know that you've done business with -- generally someone
7  you know in the industry that's purchased a vehicle from
8  you, yeah, pick it up.
9  Q.  As far as you know, was the 2003 Dodge Stratus
10  ever on the Incredible Auto Sales lot?
11  A.  Not to my knowledge.
12  Q.  How about the 2005 Kia? This one was never
13  delivered to the lot either?
14  A.  No, sir.
15  Q.  Where was that specifically when it was
16  purchased by Nick?
17  A.  The paint doctor.
18  Q.  Same as the previous car, as far as you know,
19  he never picked it up?
20  A.  The '07 caliber?
21  Q.  I'm sorry, the 2005 Kia, Nick never picked that
22  one up?
23  A.  No, that's correct.
24  Q.  And you have had possession of -- let's get
25  back to the Status, I apologize. The Stratus is one you

JAN BARRY COURT REPORTING
406.259.8111

PAGE 52

52

1  picked up within the last 24 hours as well?
2  A.  No, sir. I've had that since the beginning.
3  Q.  When did you -- so you picked it up from the
4  paint shop, then?
5  A.  Correct.
6  Q.  When did you pick it up from the paint shop?
7  A.  Probably -- I don't know the exact date, to be
8  honest with you, I wouldn't want to --
9  Q.  More than a week ago?
10  A.  Oh, yes.
11  Q.  And the same with the Kia Spectra, it's one
12  that you picked up more than a week ago?
13  A.  Yes.
14  Q.  The 2002 Mercury Sable, that one was, in fact,
15  delivered to Nick's lot?
16  A.  It was.
17  Q.  Do you remember whether it was delivered by you
18  or whether he picked it up?
19  A.  I don't recall.
20  Q.  Do you remember if it was in a body shop before
21  it was picked up?
22  A.  I don't recall it was, no.
23  Q.  Same with the Pontiac G6, this is something you
24  picked up in the last 24 hours?
25  A.  Yes, it was.

JAN BARRY COURT REPORTING
406.259.8111

SHEET 14  PAGE 53

53

1    Q.   This one was physically delivered to Incredible
2 Auto Sales before the bankruptcy?
3    A.   Before the bankruptcy, yes.
4    Q.   The 2005 Suzuki Forenza, same with that one, it
5 was physically on the Incredible Auto Sales lot?
6    A.   At the time of --
7    Q.   At the time of bankruptcy?
8    A.   Yes, it was.
9    Q.   And you have that one in your possession within
10 the last 24 hours?
11    A.   Yes.
12    Q.   How about -- I don't remember the name of it --
13 whatever Exhibit 8 was?
14    A.   Chrysler Town and Country.
15    Q.   That vehicle was also physically delivered to
16 the lot, I assume?
17    A.   That's another one they picked up from the body
18 shop.
19    Q.   And this one, I believe you testified has been
20 retailed?
21    A.   Yes.
22    Q.   Do you know who owns that now?
23    A.   I do.
24    Q.   You do?
25    A.   Of course.

JAN BARRY COURT REPORTING
406.259.8111

PAGE 54

54

1    Q.   Maybe I misunderstood you. You own this on
2 your lot, Exhibit 8?
3    A.   No, I own the vehicle, I don't have it, though.
4    Q.   Oh, okay, I see the distinction you are making
5 now. Who has physical possession of it?
6    A.   I have no idea.
7    Q.   It's -- have you asked Nick or anybody in
8 Incredible who has these vehicles that have been sold?
9    A.   They actually supplied a list of vehicles that
10 were sold to all the attorneys, and I did see the list,
11 but I don't know the people's name on the list.
12    Q.   Have you spoken to anyone at Incredible Auto
13 Sales about what happened to these vehicles?
14    A.   Personally, no.
15    Q.   Where are the vehicles that you've taken
16 possession of physically located now?
17    A.   1717 First Avenue North.
18    Q.   And again, I apologize if this was covered
19 already, but do each of these vehicles then have -- are
20 they each subject to the flooring line of your lenders?
21    A.   Yes, they are.
22    Q.   Even the one that had the title from Denny
23 Menholt?
24    A.   I haven't borrowed any money on it yet, no,
25 that would be the only one that hasn't.

JAN BARRY COURT REPORTING
406.259.8111

PAGE 55

55

1    Q.   Now, before September of 2006, when was the
2 last time you bought or sold vehicles to or from Nick or
3 any of his companies?
4    A.   Physically on a one to one basis, probably four
5 to six months prior.
6    Q.   And tell me what you mean by physically on a
7 one to one basis?
8    A.   If I were to go to his dealership or he was to
9 come to my dealership. Now, if he has employees at the
10 auto auction that I have a vehicle that runs through the
11 auto auction they purchase, I consider that not a deal
12 that I have done with him personally.
13    Q.   You might have bought his vehicles, but if you
14 did so, it was because they just happened to pass through
15 the auto auction -- you may have purchased vehicles from
16 Incredible Auto Sales or sold them to him, but if those
17 transactions -- within the preceding four months, but if
18 those transactions happened, it was purely because they
19 went through the -- I forgot the term you used -- they
20 went through the auction open to everybody?
21    A.   Correct.
22    Q.   What's that called where they -- not the
23 showroom, but where they go through the --
24    A.   The arena.
25    Q.   The arena. Had you spoken with Mr. Gutierrez

JAN BARRY COURT REPORTING
406.259.8111

PAGE 56

56

1 about purchasing or selling vehicles in the previous four
2 to five months?
3    A.   No.
4    Q.   And over the last six years, I think you
5 testified you probably had sold a hundred vehicles to
6 him?
7    A.   Probably, yes.
8    Q.   So was it unusual that you had not sold
9 vehicles to or from him within the last four to
10 five months?
11    A.   It was -- it's unusual in a sense of him buying
12 as many as he did, but it wasn't a question of if I sold
13 them in the past as many as 20 as one time.
14    Q.   But how about the lapse in time there of four
15 to five months without selling anything to him, was that
16 unusual?
17    A.   Well, no, I went through -- that four or
18 five-month period was kind of a bad period for us, losing
19 our grandchild, and, you know, it's kind of -- it takes a
20 lot out of you, I hope no one ever feels the feeling of
21 that, and the business wasn't something that -- it was
22 secondhand, to be honest with you.
23    Q.   Sure. I'm very sorry to hear that. Have you
24 ever been in business with Nick?
25    A.   No.

JAN BARRY COURT REPORTING
406.259.8111

SHEET 15  PAGE 57

57

1    Q.    Did Nick used to own a car lot on First Avenue
2  somewhere -- 1500, I think the address might have been?
3    A.    1501.  Not owned, leased.
4    Q.    Leased.  What was the name of that car lot?
5    A.    New Beginnings.
6    Q.    That was as well?
7    A.    Yes.
8    Q.    When was that in existence?
9    A.    From the beginning of New Beginnings name.
10    Q.    Just the lot on 1501 First Avenue.
11    A.    Are you saying since Nick had it or since the
12  previous person besides Nick, because it wasn't Nick's in
13  the beginning, it was Tony Woolery.
14    Q.    Yeah, why don't you tell me about that.  So
15  that's a Tony Woolery location -- or was?
16    A.    Was.
17    Q.    Did Nick ever operate it then?
18    A.    Yes, he did.
19    Q.    He did he operate it as Auto Pro Auto Sales or
20  was it operated as New Beginnings?
21    A.    Auto Pro Auto Sales is a name that Nick used,
22  but everything was still under New Beginnings.  I think
23  it's one of his corporations that he uses to funnel this
24  or that through.
25    Q.    Do you know from whom he leased that property?

JAN BARRY COURT REPORTING
406.259.8111

PAGE 58

58

1    A.    He leased it from me.
2    Q.    Do you still own that property?
3    A.    No, I don't.
4    Q.    For how long were you leasing that property to
5  Nick?
6    A.    I think there was a -- Tony Woolery had a
7  five-year lease that was existing when Nick purchased
8  Incredible from him, I think there was still two years
9  left on that lease, and a two year lease after that so
10  approximately four years.
11    Q.    Do you still own that property today?
12    A.    No, I sold it.
13    Q.    When did you sell it?
14    A.    On November 1st of this year.
15    Q.    Why did you sell it?
16    A.    I had different ventures.
17    Q.    Were you using that property or had you leased
18  it out to somebody else?
19    A.    In that interim?
20    Q.    At the time you sold it.
21    A.    No, I was not using it.
22    Q.    We've talked about Exhibits 1 through 8, have
23  you seen -- since the bankruptcy was filed, have you seen
24  the actual originals of these titles?
25    A.    No.

JAN BARRY COURT REPORTING
406.259.8111

PAGE 59

59

1    Q.    Have any of your employees seen the originals
2  of these titles?
3    A.    They may have.
4    Q.    How many employees do you have?
5    A.    I have four.
6    Q.    Who, if any of them, may have seen the
7  originals of these titles?
8    A.    Martha Bradley.
9    Q.    Under what circumstances would she have seen
10  the originals?
11    A.    She's my title clerk at the dealership.
12    Q.    So when we -- we looked at a number of these,
13  and I think your counsel asked with respect to a lot them
14  how do we know what on here shows that you are the owner,
15  and there appears to be something signed by somebody
16  giving you the title; is that -- you've never seen these
17  physically, but somebody in your office signed that on
18  your behalf?
19    A.    Correct.
20    Q.    I mean on behalf of Steve's Auto?
21    A.    Steve's Auto.
22    Q.    How often when you wholesale vehicles to
23  another dealer in an arrangement that you've already made
24  ahead of time will you run the transaction through the
25  auto auction any way?

JAN BARRY COURT REPORTING
406.259.8111

PAGE 60

60

1    A.    It's not something that's done regularly, but
2  it has been done.  I couldn't give you an amount of how
3  many times, but there's been occasions when it has been
4  done.
5    Q.    Does it happen most of the time?
6    A.    No.
7    Q.    10 percent of the time, maybe?
8    A.    I would say more like 3 percent of the sales
9  that I do.
10    Q.    Fairly unusual, then?
11    A.    Well, it's not that it's unusual, it happens --
12  most likely it happens when you have two dealers -- one
13  from out of town or out of state and one from, you know,
14  here, and it just is something that you feel a lot more
15  comfortable with -- product, paper wise and so forth.
16  They are making sure you give title, you get check, you
17  give check, you get title.
18    Q.    Have you ever previously used the auto auction
19  under those circumstances for a transaction with another
20  dealer here in town?
21    A.    Another dealer here in town -- I don't recall.
22    Q.    Did it seem unusual that since you already knew
23  Nick -- I think you testified you were social friends and
24  had done business before that he wanted these vehicles to
25  go through the auto auction even though he was here in

JAN BARRY COURT REPORTING
406.259.8111

SHEET 16  PAGE 61

61

1  town?
2      A.    It wasn't unusual, but the statements that he
3  made when he wanted the copies of the titles were to see
4  if there was any discrepancies on the titles of being
5  flood damage or anything from the Katrina or from the
6  Louisiana area or if there's a big situation with
7  vehicles having frame damage -- frame damage is a vehicle
8  that's been wrecked or sustained a large amount of damage
9  to the structure of the vehicle, you want to make sure
10  that everything is okay before you put it on your retail
11  lot, and that's one thing that the auction provides is
12  that protection.
13      Q.    In your previous dealings with Mr. Gutierrez,
14  had any of those transactions run through the auction?
15      A.    I can't recall, to be honest with you.
16      Q.    You don't remember anyt that did, anyway?
17      A.    You know, none that strikes me right away, but
18  I'm not saying that there wasn't.
19      Q.    I think I heard you say a minute ago when
20  Mr. Gutierrez asked for copies of the titles, did he at
21  some point ask you for photocopies of these titles?
22      A.    Yes.
23      Q.    When was that?
24      A.    Right on that Friday morning -- might have been
25  Thursday -- Thursday or Friday.
        JAN BARRY COURT REPORTING
           406.259.8111

PAGE 62

62

1      Q.    Before he had received possession of the
2  vehicles?
3      A.    Yes.
4      Q.    Did he tell you why he wanted those?
5      A.    For that reason, to see if there was anything
6  that came from Louisiana area, making sure there was no
7  flood damage history vehicles, if there was any mileage
8  discrepancies, making sure all the mileage was accurate
9  and actual, making sure that there was no prior flood or
10  salvage announcements on the vehicles, and that's why he
11  wanted to go through the auction just so he feels
12  comfortable about buying the vehicles.
13      Q.    Was it unusual for another dealer to ask for
14  photocopies of the titles before the vehicles were
15  delivered?
16      A.    Yeah.
17      Q.    Did you say anything to Nick at the time that,
18  hey, this seems unusual?
19      A.    I said I don't have them -- actually, what he
20  wanted was a physical title of the vehicle, and I said I
21  don't have them.
22      Q.    So did you arrange for him to get photocopies
23  of the titles or to look at the photocopies of the
24  titles?
25      A.    We called the flooring company that we had and
        JAN BARRY COURT REPORTING
           406.259.8111

PAGE 63

63

1  they faxed him out copies of them; and also the auction
2  where the titles were, we made the phone calls and got
3  him copies of the titles.
4      Q.    And just asked those folks to fax them over to
5  Nick?
6      A.    Yeah.
7      Q.    Do you remember -- and I said Nick, obviously I
8  meant Incredible Auto Sales, but do you remember to whom
9  at Incredible Auto Sales specifically they were faxed?
10      A.    Not really, no.
11      Q.    You don't know if it was Jody, his office
12  manager?
13      A.    I'm not sure if it was Jody or Nick or Leilana,
14  I'm not sure.  They use -- I presume they use one fax in
15  a general area.
16      Q.    As far as you know, he did receive photocopies
17  of the titles?
18      A.    As far as I know, yes.
19      Q.    Did you personally call any finance companies
20  in the auction to ask them to do that?
21      A.    I think so.
22      Q.    Did anyone there say that this sounded like an
23  unusual request?
24      A.    No.
25      Q.    Did they have any problem doing that?
        JAN BARRY COURT REPORTING
           406.259.8111

PAGE 64

64

1      A.    Not at the time, no.
2      Q.    Have they mentioned that they have a problem
3  with it since?
4      A.    Yeah.
5      Q.    Who mentioned that they had a problem with it?
6      A.    Well, both companies won't do that anymore.
7      Q.    Why not?
8      A.    Because of this situation.
9      Q.    And tell me what your understanding of this
10  situation is.
11      A.    That you guys -- Hyundai Motor Credit --
12  financed -- I shouldn't say financed, but gave sums of
13  money on copies of titles to prospective dealers, not the
14  physical title.
15      Q.    And it's your understanding that someone at
16  Incredible Auto Sales received the photocopies of the
17  titles, completed additional information, and submitted
18  those reworked titles -- photocopies of titles to Hyundai
19  in order to obtain financing?
20      A.    After looking at the documents that was
21  presented as evidence, yes -- after looking at documents
22  pertaining to evidence that was submitted to the court.
23      Q.    When you were talking to Nick about these
24  titles, did he ever mention that he would use these
25  titles in order to obtain financing?
        JAN BARRY COURT REPORTING
           406.259.8111

SHEET 17  PAGE 65

65

1    A.    No.
2    Q.    Did he ever mention that he would have somebody
3  sign the photocopies of the titles?
4    A.    No.
5    Q.    When you were talking about running these
6  vehicles through the auction, did he ever mention that
7  running them through the auction would help him obtain
8  financing?
9    A.    It was never something that was brought up.  I
10 didn't know his finances at the time.
11   Q.    Did you know Hyundai was his flooring lender?
12   A.    I didn't know Hyundai, I thought it was Kia.
13 It was Kia Financial and Stockman Bank, is what I
14 thought.
15   Q.    And Nick has done business with Stockman Bank
16 in the past, hasn't he?
17   A.    He has, to my knowledge.
18   Q.    But he never mentioned one reason he would send
19 these through the auction would be so that he could
20 obtain financing more easily?
21   A.    I never questioned his finances.
22   Q.    Aside from the titles, are there any other
23 written documents that you are aware of that are related
24 to your agreement to sell these 14 vehicles to
25 Incredible?

JAN BARRY COURT REPORTING
406.259.8111

PAGE 66

66

1    A.    I'm not sure what you are pertaining to.
2    Q.    Is there a master contract somewhere that says
3  how these vehicles will be delivered or anything like
4  that?
5    A.    Not that I'm aware of at this point in time.
6    Q.    There's no documents, for instance, that says I
7  agree to sell the following 14 vehicles to Nick
8  Gutierrez?
9    A.    Not that I'm aware of, no.
10   Q.    Just the titles, is what we have for
11 documentation?
12   A.    You mean the photocopies?
13   Q.    Photocopies of the title, sure.
14   A.    Yeah, and the stuff that he got from the auto
15 auction, is what I understand.
16   Q.    What else do you understand that he has from
17 the auto auction?
18   A.    Just the sales orders that have been pertained
19 into evidence.
20   Q.    When did you first discover that there was a
21 problem with payment on these vehicles?
22   A.    When we took down -- when my secretary took
23 down titles to receive payment from the auto auction and
24 they denied payment because of the vehicle that Nick did
25 pay for, checks came back not sufficient funds, and at

JAN BARRY COURT REPORTING
406.259.8111

PAGE 67

67

1  that point in time they said they wouldn't pay us for
2  anything else until he straightens out the existing
3  problem they have.
4    Q.    What did you do at that time?
5    A.    My secretary turned around and just walked
6  across the hallway and gave the titles back to my finance
7  company.
8    Q.    Did you contact Nick or anybody at Incredible
9  then?
10   A.    I think I spoke to him late that afternoon,
11 yes.
12   Q.    And what did you say to him?
13   A.    I asked him what's going on, and he said they
14 are waiting for funding to come in from various banks or
15 lending companies himself and he has already has arranged
16 it with the auction that he's going to be taking care of
17 everything, and that was acceptable.
18   Q.    Did he mention to you at that time that he had
19 tried to floor some or all of these vehicles through his
20 finance company?
21   A.    It never was brought up, no.
22   Q.    And he, I assume, didn't mention that he had
23 already faxed off copies of the titles to the finance
24 company then?
25   A.    No, I mean because to my knowledge I didn't

JAN BARRY COURT REPORTING
406.259.8111

PAGE 68

68

1  think you guys would even floor a vehicle without having
2  titles.
3    Q.    And what -- roughly, how long before the
4  bankruptcy was filed was this?
5    A.    I don't remember the exact date, but I would
6  say probably three days.
7    Q.    Did you make attempts to repossess these
8  vehicles at any time?
9    A.    I did not, no.
10   Q.    Did anybody, as far as you know?
11   A.    The auto auction did.
12   Q.    What attempts did they make to repossess the
13 vehicles?
14   A.    They made an attempt to actually physically go
15 to his place of business and try to retrieve the
16 vehicles, and he said -- this is hearsay, the auto
17 auction is telling me is that he -- Nick denied them
18 rights to take the vehicles and that he would be there
19 that afternoon in their attorney's office with a
20 cashier's check for the whole amount of what he owed at
21 3 p.m..
22   Q.    Okay.
23   A.    At 2:59 p.m. they get a phone call at the
24 attorney's office and said they filed Chapter 11.
25   Q.    So the day the auction showed up, as far as you

JAN BARRY COURT REPORTING
406.259.8111

SHEET 18   PAGE 69

69

```
1   know, was the day the bankruptcy was filed?
2       A.   I'm pretty sure, yes.
3       Q.   Did you ever prepare any written demand to
4   Incredible to get these vehicles back?
5       A.   Any written demand to Incredible?
6       Q.   Did you send them a letter or anything?
7       A.   No.
8       Q.   Since the bankruptcy was filed, have you had
9   any conversations with Nick?
10      A.   Yes.
11      Q.   How many conversations have you had?
12      A.   He's called me three times.
13      Q.   When was the first time he called you?
14      A.   The first time he called me was -- well, my
15  first conversation with Nick was in church the following
16  Sunday.
17      Q.   What church is that?
18      A.   Life Center Church.
19      Q.   And what was the nature of that conversation?
20      A.   Again, we sat where we usually sit, and he sits
21  up in the balcony, and either -- well, I know he told the
22  pastor what happened and what was going on, and the
23  pastor was leading into a sermon how even when people do
24  bad things to people, you should forgive them and
25  everything else, and it just didn't feel comfortable with
```

JAN BARRY COURT REPORTING
406.259.8111

PAGE 70

70

```
1   me so I walked out -- my wife and grandchildren were
2   still in church, and I walked into the foyer, just
3   waiting for them to be done, and about two minutes before
4   service ended, he comes down and talks to me in the
5   foyer, and I really didn't say much.  He says, you know,
6   "I'm sorry for what happened, we are trying to work this
7   out to get it corrected."  I says, "Nick, all you need to
8   do is I just want my cars back, simply."  And he says,
9   "Oh, I can't do that, there's no possible chance that
10  that's ever going to happen."  "Well, why not?  I've
11  never got paid for them, I just want my cars back."
12          And then my wife and everyone else in church
13  gets -- church is over, and my wife sees him there
14  talking to me, then my wife kind of told him a lot more
15  what she thought of him than I did by all means and what
16  kind of strain he put us in and our financial problem
17  that he put us through and so on and so forth, and then
18  his wife just grabbed his arm and she drugged him out the
19  door -- Zsaneece did.
20      Q.   Was that the end of the first conversation, I'm
21  guessing, then?
22      A.   That was the end of the first conversation,
23  correct.
24      Q.   When was the second conversation that you had
25  with Nick?
```

JAN BARRY COURT REPORTING
406.259.8111

PAGE 71

71

```
1       A.   He called me on my cell phone about 15 minutes
2   later that day.
3       Q.   How long did you speak with him?
4       A.   I did not speak to him, I just seen it was his
5   number, and it went into voice mail.  I wasn't in -- I
6   didn't want to speak to him, and he just left a real long
7   message of how sorry he was and he knows everything we
8   went through and so on and so forth, and that was the
9   extent of it.
10      Q.   Did you save that message?
11      A.   Until about four days ago.
12      Q.   Did you have it transcribed, by chance?
13      A.   No, I haven't.
14      Q.   Who else would have listened to that voice
15  message?
16      A.   I'm not sure.  Did I play it for you?
17      Q.   Other than your lawyer.
18      A.   Oh, my wife, of course, I think a couple other
19  people in the industry, I'm not sure if they listened to
20  the whole entire thing or not -- in the automobile
21  industry.
22      Q.   Why would you have played the message for other
23  individuals to hear?
24      A.   Just because of what he's done and had the gall
25  of calling me and saying that, you know, it wasn't his
```

JAN BARRY COURT REPORTING
406.259.8111

PAGE 72

72

```
1   fault, it was Hyundai's fault for doing this to him.
2       Q.   Did he tell you why he thought it was Hyundai's
3   fault?
4       A.   No, he just said it was not so much -- it was
5   Kia's fault, is what he said.
6       Q.   It was Kia's fault?
7       A.   Yeah.
8       Q.   He didn't tell you why it was Kia's fault?
9       A.   No.
10      Q.   You mentioned three conversations; is this
11  voice message the second conversation?
12      A.   Correct.
13      Q.   When was the third conversation, then?
14      A.   The third conversation was after our very first
15  meeting with all the attorneys and everything when we
16  were in -- I think right after we left your office -- is
17  that the first time -- I think that was the first time.
18      Q.   When we took testimony in court?
19      A.   Right.  Then we went to your office to try to
20  resolve the vehicles -- who gets what vehicles and so on
21  and so forth -- it's when we sat there for a long time
22  and you guys ignored us.
23      Q.   Didn't mean to ignore you.
24      A.   Right after that, that evening he called me and
25  said, "What did you guys agree upon?"  And I said, "Well,
```

JAN BARRY COURT REPORTING
406.259.8111

SHEET 19  PAGE 73

73

1  why would you care?" He said, "Well, no, I just wanted
2  to find out what the end result was." I said, "The end
3  result was nothing," and that was the extent of it, and I
4  hung up.
5      Q.    You haven't spoken with him since?
6      A.    No, once when I think we were in court or
7  something like that, just small talk. I think you were
8  there also.
9      Q.    Have you spoken with his wife at all?
10     A.    No.
11     Q.    How about Ken Cornelison, you know who he is?
12     A.    I know of him.
13     Q.    You haven't had any conversations with him?
14     A.    No.
15     Q.    Within the last week, Incredible Auto Sales
16  withdrew its objection to your motion to modify stay; you
17  are aware of that, aren't you?
18     A.    Yes.
19     Q.    Did you have any discussions with anyone other
20  than your lawyer about that withdrawal?
21     A.    No, I didn't even know they were doing it.
22     Q.    Do you know why they did it?
23     A.    No, I don't -- can I rephrase that?
24     Q.    Go right ahead.
25     A.    Because he thinks he did wrong.

JAN BARRY COURT REPORTING
406.259.8111

PAGE 74

74

1      Q.    One thing you mentioned when Nick went looking
2  at these vehicles -- I think it was a Friday when he
3  looked at the vehicles --
4      A.    Thursday, I think.
5      Q.    -- Nick was interested in vehicles with low
6  mileage; is that accurate?
7      A.    Yes.
8      Q.    Did he tell you why he was interested in
9  vehicles with low mileage?
10     A.    It's just generally when you have a new car
11  dealership, you don't want nothing with 130,000 miles on
12  them, that's just natural industry -- I mean everybody
13  wants something with low mileage and being clean.
14     Q.    Did he also ever mention he wanted something
15  with a fairly late model year?
16     A.    Yeah, he didn't want anything old, old, yeah.
17     Q.    Did he ever tell you in connection with those
18  conversations that it would be easier for him to get
19  financing if it was a late model vehicle or a low mile
20  vehicle?
21     A.    No, we never really brought up the financing,
22  to be honest with you.
23     Q.    Of the 14 vehicles that he purchased, how many
24  were in body shops, roughly, or any sort of service shop?
25     A.    I'm going to say without looking back at some

JAN BARRY COURT REPORTING
406.259.8111

PAGE 75

75

1  notes, probably eight or nine.
2      Q.    When you sell vehicles to other dealers, how
3  often do they agree to purchase them before they are out
4  of the body shop or paint shop?
5      A.    It doesn't happen on a regular basis, but it
6  does happen, you know, where it's -- it depends on the
7  vehicle and how in demand that vehicle is and if they
8  have it presold or if they need it -- I mean it's not
9  unheard of in the industry to buy something that is in
10  the body shop or being -- having a motor repaired or in a
11  transmission or anything else.
12     Q.    It's not unheard of, but I take it from your
13  answer it's not the normal case either.
14     A.    No, it isn't, but it happens.
15     Q.    The body shop and paint shops we talked about
16  previously where these vehicles were located, do you own
17  any of those?
18     A.    No, sir.
19     Q.    If you would look at Exhibit 5, please, I
20  believe this is for a Mercury Sable.
21     A.    It is.
22     Q.    And you repossessed this within the last
23  24 hours?
24     A.    Yes.
25     Q.    Where was it when you picked it up?

JAN BARRY COURT REPORTING
406.259.8111

PAGE 76

76

1      A.    I didn't do it personally, I sent my people to
2  pick it up -- my salespeople.
3      Q.    Did you know whether it was on Incredible's
4  lot?
5      A.    It was in the same area with all the other
6  cars -- or at least that's where they had it staged when
7  we came to pick it up, because I talked to Ken Cornelison
8  yesterday early morning at about 9:15, he said give me
9  until late this afternoon which would have been yesterday
10  to get everything keyed up and make sure everything
11  starts and that way you guys won't have any problem
12  taking anything away from that area. I presume they were
13  all within the same area. They were at one time when we
14  inspected them.
15     Q.    So you had previously been out to inspect these
16  vehicles during the course of the bankruptcy?
17     A.    Yes, right after our first meeting.
18     Q.    Is that the only time you inspected them?
19     A.    That was the only time.
20     Q.    You did that personally?
21     A.    Yes, me and the owner from the Auto Auction of
22  Montana.
23     Q.    Do you recall whether you saw this specific
24  vehicle on Exhibit 5?
25     A.    Yes, it was there.

JAN BARRY COURT REPORTING
406.259.8111

SHEET 20  PAGE 77

77

1      Q.    The reason I ask is I can't find that on their
2  list of inventory that they supposedly had when the case
3  was filed, and that's why -- I was hoping maybe you could
4  shed some light on that -- I mean when you were there,
5  you touched it, saw it?
6      A.    Yes.
7            MR. COLEMAN: That's all I have.
8                     RE-EXAMINATION
9  BY MR. PATTEN:
10     Q.    Steve, you said something that -- to the effect
11 that the auto auction provides protection from frame or
12 flood damage?
13     A.    Correct.
14     Q.    How does it provide any protection from frame
15 or flood damage?
16     A.    As a dealer that runs a vehicle through the
17 sale -- or purchases a vehicle, I should say, you have
18 14 days from date of purchase in that if you find any
19 frame damage to a vehicle, any unannounced problems that
20 may have occurred, anything that's a hidden issue -- and
21 a hidden issue is like flood, frame, a vehicle that could
22 have been salvaged -- you know, someone has fixed it and
23 turned out to be a salvage vehicle, salvage history, one
24 with an odometer problem -- you have -- an odometer
25 problem is open to years, it's not something that has a

JAN BARRY COURT REPORTING
406.259.8111

PAGE 78

78

1  one week or two-week status, saying that two weeks if you
2  can't find an odometer problem, it's yours, no, it's a
3  federal offense so it stays with the vehicle, and the
4  auto auction gives you protection because they do a
5  background search on every vehicle that's sold which is
6  called a Carfax.
7      Q.    Steve, now, you've said -- and you've used the
8  term "purchased" in describing the transactions that are
9  at issue here with Incredible Auto Sales.
10     A.    Mm-hmn.
11     Q.    Is it your position that Incredible Auto Sales
12 purchased the vehicles that are reflected in Exhibits 1
13 through 8?
14     A.    To make a purchase, you have to pay for
15 something; when there's nothing paid, it's not considered
16 a purchase.
17     Q.    Why do you use the word "purchase", then, if
18 your testimony is that you weren't paid for them?
19     A.    Well, because in the normal sense of business,
20 you buy something, you pay for it. It might be a term
21 that I use in a normal act of business that's supposed to
22 be done that way; he didn't do it in the normal way.
23            MR. PATTEN: That's all I have.
24 . . .
25 . . .

JAN BARRY COURT REPORTING
406.259.8111

PAGE 79

79

1                     RE-EXAMINATION
2  BY MR. COLEMAN:
3      Q.    If I can just follow up on that briefly, in
4  your mind, then, if payment had been made, then it would
5  have been a purchase?
6      A.    Pardon me?
7      Q.    If payment had been made, then there would have
8  been a purchase of these vehicles?
9      A.    If payment has been made, would there be a
10 purchase --
11     Q.    Let me start over. In your mind, if payment
12 had been made by Incredible Auto Sales for these
13 vehicles, then there would have been a purchase?
14     A.    Yes.
15            MR. COLEMAN: That's all I have.
16            MR. PATTEN: That's all I have.
17            (Deposition concluded)

JAN BARRY COURT REPORTING
406.259.8111

PAGE 80

80

                 DEPONENT'S CERTIFICATE

     I, STEVE MARKS, do hereby certify that I have
read the foregoing 79 pages of typewritten material and
that the same is, with any changes noted below, a full,
true, and correct transcript of my oral deposition given
at the time and place hereinbefore mentioned.

PAGE    LINE    CORRECTION            REASON FOR CORRECTION

                    _____
                        STEVE MARKS.

     Subscribed and sworn to before me this _____

day of _____, _____.

                    Notary Public
                    For the State of _____
                    Residing at _____
                    My commission expires: _____

(Seal)

JAN BARRY COURT REPORTING
406.259.8111

SHEET 21  PAGE 81

81

REPORTER'S CERTIFICATE

1

2        I, JAN HANSEN BARRY, a Registered Professional

3  Reporter and notary public, certify STEVE MARKS was first

4  duly sworn by me to testify to the truth; that I was then

5  and there authorized to administer an oath; that his

6  deposition was reported by me in machine shorthand and

7  thereafter reduced to writing; that after being reduced

8  to writing, the original of this transcript was made

9  available to the deponent for examination and signature;

10  that this is a true and correct record of the testimony

11  given by said deponent.

12        I further certify that I am not attorney for,

13  nor employed by, nor related to any of the parties or

14  attorneys to this action, nor financially interested in

15  the action.

16        IN WITNESS WHEREOF, I have set my hand and seal

17  ................., Montana this 9th day of December, 2006.

18

Jan Hansen Barry
Registered Professional Reporter
Notary Public for the State of
Montana
Residing at PO Box 1321
Billings, Montana 59103
(406) 259-8111

My commission expires:
April 23, 2008

25

JAN BARRY COURT REPORTING
406.259.8111

ORIGINAL

80

1                 DEPONENT'S CERTIFICATE

2         I, STEVE MARKS, do hereby certify that I have

3 read the foregoing 79 pages of typewritten material and

4 that the same is, with any changes noted below, a full,

5 true, and correct transcript of my oral deposition given

6 at the time and place hereinbefore mentioned.

7 PAGE    LINE    CORRECTION         REASON FOR CORRECTION

8 43   20 THRU.   NO. SIR.      IT SHOULD READ

9      22                    "NO SIR. I CAN NOT"

10 52   6 THRU. 8   WOULDNT WANT TO   WOULDNT WANT TO

11                                 GUESS THE DATE

12

13

14

15

16 _____

17                STEVE MARKS.

18     Subscribed and sworn to before me this 12th

19 day of December, 2006.

20           Marcia Berg /Marcia Berg

21       Notary Public

22       For the State of Montana

23       Residing at Billings, Montana

      My commission expires: 10/10/2007

23 (Seal)

24

25