Charles W. Hingle, #1947
Shane P. Coleman, #3417
Jason S. Ritchie, #7442
Holland & Hart LLP
401 North 31st Street
Suite 1500
P.O. Box 639
Billings, MT  59103-0639
Telephone:  (406) 252-2166
Facsimile:   (406) 252-1669

Attorneys for Hyundai Motor Finance Co.

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| INCREDIBLE AUTO SALES, LLC, | ) | Bankruptcy No. 06-60855-RBK |
| | ) | |
| Debtor. | ) | **HMFC'S OBJECTION TO DEBTOR'S** |
| | ) | **MOTION FOR CONTINUED USE OF** |
| | ) | **CASH COLLATERAL (dkt. 106)** |
| | ) | |

_____

**Notice of Hearing:**
**Date:         December 19, 2006**
**Time:        9:00 a.m.**
**Location:   Billings, Montana**

Hyundai Motor Finance Company ("HMFC") hereby objects to Debtor's "Additional Motion To Be Extended To Request That The Stipulation As To Use Of Cash Collateral Previously Filed With The Court Be Approved And Cash Usage Included Budgeted Expenditures Through February 28, 2006" (dkt. 106) as failing to provide adequate protection to HMFC for the following reasons:

1.      HMFC is a secured creditor, having a security interest in, *inter alia*, all of Debtor's vehicle inventory, parts inventory, equipment, and intangibles.  HMFC was owed approximately $2,275,375.82 as of the date of filing.  Debtor sold vehicles out of trust pre-petition.  As of the date of filing, the total sales out of trust were $366,880.00.  As of November 29, 2006, there was a total of approximately $681,633.00 in vehicle sales for which HMFC did not receive the proceeds.  (See HMFC Ex. 22 to 12/5/06 Hearing.)

2.      Debtor's motion for continued use of cash collateral is premised upon the faulty notion that HMFC is significantly oversecured.  Debtor bases this on its asset exhibit attached to its Motion.  (This document is marked as both "Exhibit 1" and "Exhibit 3" to Debtor's Motion, and is hereinafter referred to as Debtor's "Asset Exhibit.")  The facts show that HMFC is not oversecured.  Further, Debtor's actions – both pre-petition and post-petition – show that Debtor cannot be trusted with HMFC's cash collateral.

3.      Since the Debtor initially sought use of cash collateral, numerous issues have arisen that impair HMFC's secured position.

   A.      **Post-Petition Insider Transactions.**  Debtor has engaged in numerous post-petition insider transactions.  On the date of filing, the Debtor, Incredible Kia, was majority-owned by the same individual, Nick Gutierrez, who owns Graham-Staunton Chevrolet, dba Incredible Chevrolet.  Debtor's new General Manager, Ken Cornelison, also owns a part of Incredible Chevrolet and part of Incredible Kia.  In several post-petition transactions, Debtor sold vehicles wholesale to its sister corporation, Incredible Chevrolet.  Ken Cornelison testified that Incredible Chevrolet paid Debtor a wholesale price for these vehicles and then immediately "flipped" the vehicles by selling them at a retail profit to third-party customers.  The vehicles were sold to retail customers from Debtor's lot and were sold by employees who worked for

2

Debtor until last month, when they were transferred on the books to Incredible Chevrolet. The amount of these post-petition, related-party transactions is at least $62,718.83. (See HMFC Ex. 13 to 12/5/06 Hearing.)

HMFC's Exhibit 14 from the 12/5/06 Hearing is illustrative of Debtor's scheme. It is the only available document showing the retail transaction between Incredible Chevrolet and a customer. Comparing Exhibit 14 with the last page of Exhibit 13 reveals that this particular vehicle – a 2006 Malibu – was sold post-petition from Debtor to its sister company, Incredible Chevrolet on November 4, 2006, for a wholesale value of $12,689. On that exact day, Exhibit 14 shows that Incredible Chevrolet immediately sold the vehicle to a retail customer for $16,500, plus a document fee of $399 ($16,899 total). Incredible Chevrolet, rather than Debtor, pocketed the $4,210 profit at the expense of HMFC and other creditors. Furthermore, the vehicle was sold at Incredible Chevrolet from Debtor's lot by Debtor's former employee, Krista Davis. Ken Cornelison testified that Ms. Davis, and all other current employees at the King Avenue lot of Incredible Chevrolet, worked for Debtor until the bankruptcy. Nick Gutierrez testified at the November 6 hearing that Ms. Davis was responsible for falsifying loan documents and that she no longer works for him, yet she appears on this transaction as an employee of Debtor's sister corporation, selling Debtor's vehicles. Debtor's statement of financial affairs reveal that the lease to the building (but not the lot) on West King Avenue was transferred to Incredible Chevrolet on the day of filing. Apparently, all of Debtor's employees were transferred to Debtor's sister corporation that same day. Interestingly, Debtor still listed Ms. Davis as an employee on its payroll revised 11/24/06, which reflect payment to her on 11/22/06. (See HMFC Ex. 20 to 12/5/06 Hearing.)

3

The scheme is transparent. Debtor is using the same employees to sell the same vehicles from the same lot, but is siphoning the retail profit from the vehicles by selling them at wholesale to its sister corporation. This is done at the expense of HMFC's secured position.

Further, Debtor did not promptly cash checks from Incredible Chevrolet. Post-petition, HMFC's auditors discovered several checks received primarily from Incredible Chevrolet that Debtor had not yet bothered to deposit. Some were weeks old according to HMFC's records. (See HMFC Ex. 19 to 12/5/2006 Hearing) These checks were finally deposited after HMFC filed its pending motion for relief from stay and mentioned these items. Absent HMFC's Motion for Relief, it is not clear that Debtor ever intended to negotiate checks from its sister corporation.

      B. **Blue Sky.** Debtor has significantly overstated the value of the dealership's "blue sky." Debtor's Asset Exhibit asserts a value of $800,000 for the intangible value of the dealership. HMFC is secured by the proceeds of any sale of the franchise. The $800,000 has no basis in fact and is contrary to Ken Cornelison's own testimony. The **only** written offer that has been received for the dealership was for $400,000, and that amount included Debtor's parts inventory, equipment, and signage. Each of these other items is valued separately on Debtor's Asset Exhibit: Parts and Supplies - $153,510, Signage and Improvements - $25,000, Machinery and Fixtures - $42,352. All of these items would go with the dealership as a part of the sale and as a part of the $400,000 purchase price. Subtracting these amounts from the offer leaves only $179,138 for the "blue sky." Furthermore, Ken Cornelison testified that Debtor made its own counteroffer of $575,000 under the same terms, which is only $175,000 more than the written offer. Far from the asserted $800,000 value of the franchise, Debtor's own counteroffer implicitly values the franchise at $354,138 ($179,138 + $178,000). This is the amount of "blue sky" that Debtor would receive if its own offer is accepted. This is $445,862.00

4

less than the blue sky value Debtor continues to represent to the Court. Debtor cannot credibly claim that the blue sky value of the dealership exceeds even the total purchase price of its own counteroffer.

      C.    **Lawsuit Receivable.**  Debtor has significantly overstated the value of the United Car Care lawsuit. HMFC's debt is secured by the proceeds, if any, from Debtor's lawsuit with United Car Care. Debtor's Asset Exhibit shows a value of $502,400 as the value of the pending lawsuit between Debtor and United Car Care. Debtor's own litigation attorney, Bill O'Connor, testified at the first cash collateral hearing that this is the maximum amount that Debtor could possibly receive. This is the full amount that Debtor is claiming, and it presupposes that Debtor will separately collect 100% of its attorney's fees as well. Depositions have not even begun in this lawsuit, so a judgment will not be entered, let alone collected, any time soon. Further, it is possible that Debtor will recover nothing from this suit. In fact, the defendant in the lawsuit has filed a counterclaim seeking approximately $100,000-200,000. As a result of these contingencies, the true value of Debtor's lawsuit against United Car Care is far from the $502,400 that Debtor seeks, and may in actuality be a liability.

      D.    **Unpaid Liens.**  Debtor has significantly understated amount of liens against vehicles taken in on trade. During the course of its business, Debtor's practice was to take vehicles on trade, but contrary to disclosures in contracts with customers, Debtor did not pay off the trade-in customers' liens against the trade-in vehicles. Instead, Debtor would make monthly payments to the trade-in customers' lenders without ever telling the trade-in customers that the lien remained unpaid or telling the lenders that the vehicles had been sold.

      i.    Debtor has significantly understated the total amount of liens on the vehicles. During the first cash collateral hearing and again now in its Asset Exhibit, Debtor

5

has asserted that its total liens are $65,125.  Debtor has admitted that amount is incorrect.  After the first cash collateral hearing, Debtor produced an itemized list of its outstanding liens.  (See HMFC's Ex. 21 to 12/5/2006 Hearing.)  The outstanding liens shown on Debtor's own summary total $242,699.58.  (The "totals" Debtor shows at the bottom of Exhibit 21 are incorrect mathematical calculations.)  The new information that Debtor has produced shows that the total amount of unpaid liens vastly exceeds the amount that Debtor presented to the Court at the first cash collateral hearing.

    ii. Debtor has significantly understated the amount of liens on vehicles remaining in Debtor's inventory.  The $242,699.58 total liens include some vehicles that have been resold to retail customers, without repaying the trade-in customers' liens.  Unpaid liens for only those vehicles that remain in Debtor's inventory total $81,628.32, which is still significantly higher than the amount reported on Debtor's Asset Exhibit.

    iii. Debtor's own employees have purchased and are now driving vehicles with trade-in customers' liens  Ken Cornelison testified that at least one vehicle that was resold with a trade-in lien (a 1999 Suzuki Vitara) was sold to one of Debtor's employees, Lalonna Seymour.  This is the same employee who apparently signed photocopies of title documents in order for Debtor to obtain financing from HMFC, but did not sign the original titles.  (See, e.g., HMFC Ex. 23 to 12/5/2006 Hearing.)  As Debtor's General Manager, Ken Cornelison admitted that he has done absolutely nothing to investigate these or other actions by Debtors' current employees.

    iv. Vehicles taken in trade with unpaid liens may be vulnerable to repossession by the unpaid Lienholders.  Assets of Debtor may also be vulnerable to claims by the customers who traded such vehicles and then suffered damage to their credit ratings.

6

E.  **Misuse Of Inventory.**  Debtor has failed to control its vehicle inventory post-petition.  In particular, Debtor has permitted non-employee relatives to drive inventory vehicles post-petition.  At the December 5, 2006, Hearing, Ken Cornelison admitted that one vehicle – a 2004 Kia Amanti – has been driven by a cousin of Nick Gutierrez.  This is a vehicle that is a part of Debtor's inventory and one for which HMFC specifically advanced funds to purchase.  HMFC's audits show that this vehicle was in the possession of Nick's cousin before the filing of the bankruptcy and at least through the November 24, 2006, audit.  (See HMFC Ex. 9, 12 to 12/5/2006 Hearing.)  Nick's cousin is not an employee of the dealership and is apparently using this vehicle for personal use.  This is a vehicle that Debtor could otherwise keep in inventory for sale, and that the Inventory Loan and Security Agreement between Debtor and HMFC obligates Debtor to "exhibit and sell only in the ordinary course of business" and to "protect and secure." (See HMFC Ex. 1 to 12/5/06 Hearing)  Instead, Debtor has permitted a relative to drive the vehicle during the course of this bankruptcy, while the vehicle continues to depreciate.

F.  **FIB Repossessions.**  Debtor's itemization of vehicle inventory is overstated, because it includes two vehicles that have been repossessed by First Interstate Bank post-petition.  Since the filing of bankruptcy, First Interstate Bank has obtained relief from the stay and has repossessed two vehicles from Debtor's inventory.  These vehicles would otherwise secure HMFC's loan.  Together, these vehicles were worth approximately $8,543.09, according to First Interstate Bank's motions.

G.  **Incomplete Vehicle Listing.**  Debtor's vehicle inventory list is inaccurate because it does not include all vehicles that were in Debtor's inventory as of the date of filing.  One of the vehicles repossessed by First Interstate Bank is a Daewoo that was never listed by

7

Debtor on its list of used vehicle inventory. (See Debtor's Sched. B, Ex. B.) Debtor's failure to track its inventory and to list this vehicle calls into question the accuracy of all of Debtor's inventory and asset calculations that Debtor asserts is available as collateral to HMFC.

    H. **Valley FCU Repossessions.** Debtor's itemization of vehicle inventory is overstated, because it includes two vehicles that have been repossessed by Valley Federal Credit Union post-petition. Since the filing of the bankruptcy, Valley Federal Credit Union has repossessed two vehicles without seeking relief from the stay. Valley Federal Credit Union is the retail financer for these trade-in customers whose liens were not paid by Debtor. One vehicle was repossessed after it was purchased by a customer. The other vehicle, a 1996 Nissan Pathfinder (partial VIN 56130), was repossessed from Debtor's inventory last week. Both of these vehicles were listed by Debtor as assets that secure HMFC's loan. (See Debtor's Sched. B, Ex. B.) The Pathfinder is valued at $3,492.00 by Debtor. The details of the other missing vehicle are unknown to HMFC at this time.

    I. **Steve's Auto Repossessions.** Debtor's itemization of vehicle inventory is overstated, because it includes two vehicles that have been repossessed by Steve's Auto Sales post-petition. Steve's Auto Sales repossesses two vehicles post-petition – a 2005 Kia Spectra and a 2003 Stratus. Both of these vehicles are listed by Debtor as part of the assets securing HMFC's loan. (See Debtor's Sched. B, Ex. B.) After investigating the facts surrounding these matters, HMFC has concluded that Steve's Auto never delivered these two particular vehicles to Debtor, despite Debtor's representations that these are a part of the inventory. As a result, Debtor's security interest does not attach to these vehicles, and HMFC had to relinquish any claim to them. These two vehicles provide no value to HMFC's secured position. HMFC will

never realize the value of these vehicles, which is $18,649.00, according to Debtor. (See Debtor's Sched. B, Ex. B.)

    J. **Auto Auction Claims.** Debtor's itemization of vehicle inventory is overstated because it includes 17 vehicles claimed by auto auctions. According to Debtor's own inventory list, 17 vehicles are subject to reclamation claims by the auto auctions in the two pending adversary proceedings. (See Debtor's Sched. B, Ex. B.) HMFC believes that it will ultimately prevail in the adversary proceedings, but those matters are not yet resolved. Debtor's valuation of HMFC's secured position does not account for the significant attorney's fees and costs necessary to protect this collateral, all of which results from Debtor's failure to pay for the vehicles as it represented. Excluding the vehicles already repossessed by Steve's Auto Sales, the value of the remaining vehicles subject to claims by the auctions is $179,982.10, according to Debtor. (See Debtor's Sched. B, Ex. B.)

    K. **Phantom Flooring.** Since the first cash collateral hearing, HMFC has learned that Debtor was financing vehicles it did not even possess. Pre-petition, Debtor purchased a 2005 Kia Spectra from Steve's Auto Sales and floored the vehicle through HMFC. In order to floor the vehicle, Debtor faxed HMFC a completed document that was represented to be the title to the vehicle. In fact, HMFC has since learned that the original title was never signed or delivered by the seller, and that the sale information on the fax Debtor sent to HMFC was falsified by Debtor's employees. Further, this vehicle was never physically on Debtor's lot during HMFC's audits, so Debtor's employees showed HMFC's auditors the vehicle in a third-party vendor's shop for repairs. In order to obtain flooring financing, Debtor represented that it purchased this vehicle and had obtained the certificate of title. Since the first cash collateral hearing, HMFC has learned that this vehicle was never physically delivered to Debtor's lot. As a

9

result, HMFC's security interest did not attach despite the new financing, and HMFC's secured position is impaired.

      L.    **Forged Titles.**  Since the first cash collateral hearing, HMFC has learned that Debtor was financing vehicles by forging title documents that were sent to HMFC.  Based upon the documents that were produced by Steve's Auto Sales in connection with its Motion for Relief from Stay, HMFC has concluded that several vehicle titles sent to HMFC by Debtor do not match the original titles, which are still in the possession of the seller or its lenders.  Debtor's employees apparently signed photocopies of the original titles, rather than signing the originals, and then faxed these photocopies to HMFC.  In so doing, the photocopies of the vehicle titles were represented to be the original titles, when in fact Debtor did not yet have physical possession of the certificates of title.  The original certificates of title do not match the photocopies that were provided to HMFC in order to obtain financing because they were falsified by Debtor.  As a result, HMFC's secured position is impaired.

      M.    **Misstated "Profit".**  Debtor's cash collateral motion does not provide adequate protection because it uses a flawed "profit" definition that understates wholesale value of vehicle inventory in order to maximize Debtor's profit directed to the DIP account at the expense of HMFC's position in its cash collateral.  Debtor's cash collateral motion proposes to use the "profit" collected from the sale of used vehicles.  Debtor's calculation of profit is based upon a "wholesale" price of the vehicles set by Debtor.  The wholesale prices do not match Debtor's own purchase price of these vehicles, even though most vehicles were purchased shortly before filing.  As described further here, there are at least seven vehicles that Debtor now values as being worth significantly less than their purchase prices just a few months ago.  In other cases, Debtor's "wholesale" value is nominal at most.  Stated differently, Debtor reduced

the value of the inventory collateral with the sole purpose of taking out a larger amount of money to be put into the DIP account. With every vehicle sale, HMFC slips further out of trust. This is particularly significant in view of the fact that Debtor has been selling numerous vehicles to its sister company, Incredible Chevrolet, who immediately flips the vehicles and sells them at a retail profit.

N. **Owner's Draw.** Debtor's cash collateral motion improperly provides for a $5,000 per month owner's draw. At the first cash collateral hearing, Debtor proposed to use $5,000 per month to pay to Nick Gutierrez. Mr. Gutierrez owned 80% of Debtor at that time. Since the first cash collateral hearing, Debtor has removed Mr. Gutierrez from management. Within the last couple of weeks, Mr. Gutierrez has indicated that he transferred all of his stock in Debtor to his wife. Debtor now proposes to have Mrs. Gutierrez collect the same $5,000 per month that Mr. Gutierrez was to collect at the first cash collateral hearing. Mrs. Gutierrez does not have an office at Debtor's location, and her duties will include only signing checks when Mr. Cornelison is out of town, according to Mr. Cornelison. Mr. Cornelison, himself, as Debtor's General Manager, could not explain why Mrs. Gutierrez was hired or how her pay was determined. This is nothing more than a bald attempt by the owners of Debtor to continue to take an owner's draw out of the company, further deteriorating HMFC's position.

O. **Post-Petition Transfers of Vehicles Without Consideration.** Debtor's itemization of inventory is overstated because it includes vehicles that were supposedly sold to Debtor's sister company pre-petition. Two vehicles – a 2005 Dodge Stratus and a 2003 Pontiac Grand Am – are listed on Debtor's inventory. (See Debtor's Sched. B, Ex. B.) These vehicles and one other were physically located on Debtor's lot on the date of the bankruptcy filing. Post-petition, all three vehicles remained on the lot for a period of time. Then, during one post-

11

petition audit, all three vehicles were missing. Debtor explained to HMFC's auditors that all three vehicles were sold to an individual named "Ed Graham," and that the vehicles were sold out of trust pre-petition, which means that these vehicles would not be a part of Debtor's asset inventory at filing, but that the buyer chose to leave them on the lot to be picked up later. HMFC has since learned that "Ed Graham" is really Debtor's sister corporation, Graham-Staunton, dba Incredible Chevrolet. Stated differently, Debtor reported these vehicles as being a part of its inventory as of the date of the bankruptcy filing. Debtor valued these vehicles at $12,381 for the Stratus and $8,075 for the Grand Am. The vehicles were physically located on Debtor's lot, and there was never previously any money or funding information indicating that these vehicles were sold pre-petition. Debtor's employees never suggested that these vehicles were sold. Then, post-petition, Debtor claims that these vehicles were sold out of trust to a sister entity pre-petition, even though the sale documents have only now appeared. One of the vehicles, the Stratus, has since been returned to Debtor's lot and the transaction apparently has been unwound. This does not change the fact that Debtor apparently has no control over its inventory, nor does it change the fact that the 2003 Grand Am is gone post-petition without any consideration.

      P.     **Diminished Vehicle Values.**  The value of the vehicles in Debtor's inventory diminishes daily due to depreciation. Additionally, HMFC has learned from Debtor, post-petition, that Debtor now claims several new vehicles are now worth significantly less than the amount floored by HMFC. These vehicles were financed just months ago as new vehicles, but are now listed on Debtor's "List B" of used vehicles. Debtor now values these vehicles at amounts significantly below the values Debtor claimed when it financed these vehicles last summer. Collectively, these vehicles are now worth $54,161.17 less than the amount HMFC extended debtor in financing. The individual vehicles are as follows:

| VIN | Vehicle | | | Date Floored | Amount Floored | Debtor's New Valuation (List B) | Difference |
|---|---|---|---|---|---|---|---|
| 47378 | 2006 | KIA | SEDONA | 7/6/2006 | 22,804.00 | $18,200.00 | $4,604.00 |
| 51531 | 2005 | KIA | AMANTI | 8/15/2005 | 24,774.30 | $15,100.00 | $9,674.30 |
| 51988 | 2005 | KIA | AMANTI | 8/22/2005 | 22,891.07 | $15,100.00 | $7,791.07 |
| 52214 | 2005 | KIA | AMANTI | 8/19/2005 | 24,760.80 | $16,200.00 | $8,560.80 |
| 52263 | 2005 | KIA | AMANTI | 9/29/2006 | 22,009.60 | $14,625.00 | $7,384.60 |
| 67791 | 2005 | KIA | AMANTI | 9/27/2005 | 23,693.40 | $15,000.00 | $8,693.40 |
| 102568 | 2006 | KIA | SEDONA | 9/12/2006 | 28,153.00 | $20,700.00 | $7,453.00 |
| | | | | | | **Total** | **$54,161.17** |

Q. **Incomplete Record Keeping.** Debtor's records are inadequate for HMFC to verify vehicle sales, amounts attributable to specific sales, profit from sales, purchases of replacement collateral, sales of such replacement vehicles, and to otherwise verify compliance with the terms of the existing cash collateral order. Due to the inventory irregularities described above, HMFC is unable to track the inventory and its proceeds. The bank records supplied to HMFC are piecemeal and unclear, with handwritten notations.

R. **Non-Compliance With Trust Account Procedures.** Debtor's records suggest that monies have not reached the Trust Accounts promptly, as required by the existing cash collateral order. Only after HMFC's questioning of Mr. Cornelison has Debtor made a number of transfers.

S. **Unfulfilled Terms of Existing Cash Collateral Order.** To date, Debtor has not complied with the terms of the existing cash collateral order requiring payment to HMFC from Trust Account A in the amount of $27,000. In addition, as yet no monies have been received by HMFC from Kia Motors America, Inc.

4. These post-petition facts follow the numerous pre-petition actions by Debtor that make clear that HMFC is not adequately protected.

    A. **Sales Out of Trust.** Pre-petition, Debtor sold vehicles out of trust totaling $366,880.00.

    B. **Falsified Title Documents.** Pre-petition, Debtor's employees falsified title documents in order to obtain financing from HMFC. Those employees responsible for the title documents remain employed with Debtor.

    C. **Falsified Funding Information.** Pre-petition, Debtor's employees admittedly falsified funding information sent to HMFC in order to disguise the true dates of the retail funding received by Debtor, in order to comply with HMFC's financing requirements.

    D. **Unpaid Liens.** Pre-petition, Debtor took numerous vehicles on trade without repaying trade-in customers' liens. Instead, Debtor obtained these customers' trade-in financing information and made payments to the trade-in customers' banks. Even though Debtor received new funds sufficient to pay off the trade-in vehicles' liens, Debtor chose to pocket the money rather than paying off the lien amounts as required.

    E. **Resold Lien Vehicles.** Pre-petition, Debtor resold numerous vehicles without repaying the trade-in customers' liens. For these vehicles, Debtor has essentially been paid twice to pay off these liens, but instead pocketed the money.

    F. **Owners' Draw.** Pre-petition, Debtor's owner, Nick Gutierrez, directly received more than $230,000 from Debtor, according to Debtor's schedules.

    G. **Double-Flooring.** Pre-petition, Debtor engaged in a regular practice of "double-flooring" inventory vehicles, whereby it would obtain financing for the vehicles from two different lenders. Double-flooring occurred for at least 19 separate vehicles that were

14

floored by both HMFC and GMAC. Debtor double-floored vehicles for as long at 105 days, in some cases. In some instances, Debtor floored vehicles with HMFC **after** Debtor had already sold the vehicles to retail buyers.

    H.  **Incomplete Funding Documentation.**  Debtor's employees informed HMFC during its audit that Debtor made a practice of shredding all documents related to funding of vehicles. This information was critical to HMFC's ability to ensure compliance with the Inventory Loan and Security Agreement between HMFC and Debtor. (See HMFC Ex. 1 to 12/5/06 Hearing)

  5.  The reasons detailed above make abundantly clear that HMFC's security interest is not adequately protected. Far from being oversecured "by over $1,000,000, HMFC is very likely undersecured and its position is eroding daily due to Debtor's actions. For the foregoing reasons, Debtor's Additional Motion To Be Extended To Request That The Stipulation As To Use Of Cash Collateral Previously Filed With The Court Be Approved And Cash Usage Included Budgeted Expenditures Through February 28, 2006, must be DENIED. HMFC's pending Motion for Relief from Stay should be granted so that HMFC can prevent its secured position from deteriorating further.

  Dated this 13th day of December, 2006.

               /s/ Shane P. Coleman
              Shane P. Coleman
              Holland & Hart LLP
              401 North 31st Street, Suite 1500
              P.O. Box 639
              Billings, MT 59103-0639

              Attorneys for Hyundai Motor Finance Co.

## **CERTIFICATE OF SERVICE**

      I hereby certify under penalty of perjury that on this 13th day of December, 2006, a copy of this motion was served upon counsel of record by the following method:

__1-11__        CM/ECF

_____        Hand Delivery

_____        Mail

_____        Overnight Delivery Service

_____        Fax

_____        E-Mail

1. Clarke B. Rice
   2951 King Avenue West
   Billings, MT 59102

2. William L. Needler
   William L. Needles and Associates
   555 Skokie Blvd., Ste. 500
   Northbrook, IL 60062

3. Neal Jensen
   U.S. Trustee
   Liberty Center, Ste. 204
   301 Central Avenue
   P.O. Box 3509
   Great Falls, MT 59403

4. Bruce F. Fain
   Murphy, Kirkpatrick & Fain, P.L.L.P.
   208 North Broadway, Suite 208
   P.O. Box 429
   Billings, MT 59103-0429

5. Christopher P. Birkle
   Lovell Law Firm, P.C.
   175 North 27th Street, Suite 1206
   P.O. Box 1415
   Billings, MT 59101

6.  James A. Patten
    Patten, Peterman, Bekkedahl & Green, P.L.L.C.
    2817 2nd Avenue North, Suite 300
    Billings, MT 59101

7.  Doug James
    Moulton, Bellingham, Longo & Mather P.C.
    27 North 27th Street, Suite 1900
    P.O. Box 2559
    Billings, MT 59103-2559

8.  Ross Richardson
    P.O. Box 399
    Butte, MT 59703

9.  Christian T. Nygren
    Milodragovich, Dale, Steinbrenner & Nygren P.C.
    620 High Park Way
    P.O. Box 4947
    Missoula, MT 59806-4947

10. Jeffrey N. Rich
    Kirkpatrick & Lockhart Nicholson Graham LLP
    599 Lexington Avenue
    New York, NY 10022-6030

11. Alan C. Bryan
    Crowley, Haughey, Hanson, Toole
      & Dietrich, P.L.L.P.
    P.O. Box 2529
    Billings, MT 59103-2529

3643441_1.DOC