Charles W. Hingle, #1947
Shane P. Coleman, #3417
Jason S. Ritchie, #7442
Holland & Hart LLP
401 North 31st Street
Suite 1500
P.O. Box 639
Billings, MT  59103-0639
Telephone:  (406) 252-2166
Facsimile:   (406) 252-1669

Attorneys for Hyundai Motor Finance Co.

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| INCREDIBLE AUTO SALES, LLC, | ) | Bankruptcy No. 06-60855-RBK |
| | ) | |
| Debtor. | ) | **RESPONSE MEMORANDUM OF** |
| | ) | **HMFC IN OPPOSITION TO** |
| | ) | **STEVE'S AUTO SALES' MOTION** |
| | ) | **FOR RELIEF FROM THE** |
| | ) | **AUTOMATIC STAY (dkt. 67, 150)** |

_____

## INTRODUCTION

On filing, Debtor's inventory included the four (4) Subject Vehicles purchased from Steve's Auto Sales ("Steve's") through the Auto Auction of Montana ("AAM"). Hyundai Motor Finance Company ("HMFC") is Debtor's floor plan lender and holds a security interest in all of Debtor's inventory, including the Subject Vehicles. The Subject Vehicles were physically delivered to Debtor's lot pre-petition, and HMFC loaned Debtor new money for their purchase. Debtor did not pay for the Subject Vehicles, and Steve's did not deliver do Debtor the physical certificates of title.

This is the first of three separate claims or potential claims attacking HMFC's security interest in the Subject Vehicles. On this motion, Steve's claims that Debtor

never acquired legal title to the Subject Vehicles. Additionally, AAM seeks reclamation of the Subject Vehicles in Adversary Proceeding No. 06-00119. Finally, Steve's lenders may assert that their security interests in the Subject Vehicles continued after the sale to Debtor, though these entities have not yet appeared in this case.

The sole issue on this Motion is whether legal title passed to Debtor upon delivery of the Subject Vehicles, in the absence of the seller's delivery of the certificates of title. To prevail on its Motion, Steve's must prove that legal title did not pass to Debtor, despite physical delivery of the Subject Vehicles, which normally passes title under statutory and common law authority. Because Debtor did receive legal title, HMFC's security interest in Debtor's inventory attached to the Subject Vehicles, subject to the subordinate claims by AAM and others.

Montana case law and UCC § 2-401(2) make clear that legal title passed upon delivery of the Subject Vehicles despite Steve's retention of the physical certificates of title. The uncontroverted facts show that Debtor took physical possession of the Subject Vehicles. As a matter of law, legal title transferred to Debtor then. Steve's Motion for Relief from Stay must be denied.

## BACKGROUND

HMFC is Debtor's "floor plan" lender. HMFC holds a properly perfected security interest in, *inter alia*, "[a]ll inventory of new and used motor vehicles and other personal property held for sale or lease including, but not limited to, display or demonstration items, returns and repossessions, and all accessories and additions thereto." (HMFC Ex. 1[1].) HMFC's

---

[1] All references herein to Exhibits refer to the HMFC exhibits introduced and admitted during the December 5, 2006, hearing, unless otherwise noted. *See* Record of Exhibits Introduced (dkt.

security interest is evidenced by an Inventory Loan and Security Agreement, an Addendum, and three financing statements filed with the Montana Secretary of State's office. (HMFC Ex. 1-5.) To receive floor plan advances to buy used vehicle inventory, Debtor first pays for the vehicle with its own money. Ueno Aff. ¶ 5. When Debtor receives signed certificates of title for the vehicles, Debtor faxes those certificates to HMFC. *Id.* HMFC would then advance Debtor funds. *Id.* HMFC would advance 80% of the purchase price of used vehicles purchased directly from a seller and 100% for vehicles purchased through an auction. Ueno Aff. ¶ 4.

Steve's is a wholesale and retail auto dealer owned by Steve Marks. Marks depo., p. 4:6-8. In September of 2006, Marks was approached by his personal friend Nick Gutierrez, 80% owner of Debtor. Marks depo., p. 15:8-9. Gutierrez had previously leased a "New Beginnings" car lot from Marks. Marks depo., pp. 57-58. Gutierrez and Marks also had previously sold vehicles to each other "at least a hundred times," but had not done so for several months. Marks depo., pp. 15:22-16:1, 55-56. On this occasion, Gutierrez sought to purchase vehicles from Marks, so they visited various lots, warehouses, and repair shops where Steve's vehicles were located. Marks depo., pp. 17-19. Gutierrez selected fourteen vehicles for purchase, eight of which were located in repair shops. *Id.* Marks testified that buyers occasionally purchase his vehicles before they return from local repair shops, but "[i]t doesn't happen on a regular basis." Marks depo., p. 75:5.

Gutierrez insisted that the purchase of the Subject Vehicles be processed through AAM. Marks testified that this is highly unusual for pre-arranged transactions between dealers to run the purchased vehicles through an auto auction. This occurs in no more than 3% of all transactions that he has participated in, and that he has never previously done this with sales

---

114). Additionally, Exhibits 1-5 were also admitted at the November 6, 2006, hearing without objection. See Record of Exhibits Introduced (dkt. 50).

3

involving another Billings dealer. Marks depo., 59-60. Gutierrez's funneling of these vehicles' paperwork through AAM is significant not as an indicator of an express agreement to pass title differently than Montana statute provides, but rather because HMFC advanced Debtor 100% of the purchase price for used vehicles purchased from auctions, versus 80% for used vehicles purchased directly. Marks testified that he does not recall ever using the auction for previous "at least a hundred" transactions with Gutierrez. Marks depo., pp. 61:13-18, 15:22-16:1.

Gutierrez also requested copies of the Subject Vehicles' certificates of title before he took possession. Marks explained that this was also "unusual." Marks depo., p. 62:13-16. Marks personally arranged for photocopies of the certificates of title to be sent to Gutierrez before the Subject Vehicles were delivered. Marks depo., pp. 62-63. Upon receipt of these photocopies, Debtor's employees improperly altered them to make them appear as though the original certificates had been transferred to Debtor. Ueno Aff., Ex. 1-4. Debtor's employees faxed these completed photocopies of certificates to HMFC to obtain financing under the floor plan. *Id.* HMFC advanced Debtor funds on each of the Subject Vehicles for a total of $41,705.00, based upon the altered certificates of title received from Debtor. Ueno Aff. ¶ 7.

Only four (4) "Subject Vehicles" are at issue here, though Steve's Motion (dkt. 67) refers to "nine" vehicles, and eight different certificates of title are provided as exhibits to Marks' deposition. Two of the vehicles identified in Steve's Motion were resold by Debtor to customers pre-petition, namely a 2004 Cavalier and a 2005 Town and Country. Further, discovery revealed that two other vehicles identified by Steve's Motion were never delivered to Debtor, namely a 2005 Spectra (partial VIN 124532), and a 2003 Dodge Stratus (partial VIN 520717). See Marks depo., p. 51:9-14. At Debtor's request, HMFC advanced new money on the Spectra and Dale Ueno testified that he understood that this vehicle was in Debtor's physical possession, and that

4

Debtor had later taken it to a body shop. *See* HMFC Ex. 6, 22. As explained herein, Montana law makes clear that the transfer of legal title depends upon the physical delivery. Based upon the discovery that the Spectra and Stratus were never delivered to Debtor and the clarity of the governing statute, HMFC withdrew its objection to Steve's Motion as to these two vehicles only.

Steve's does not dispute that each of the four (4) Subject Vehicles were physically delivered to Debtor's lot pre-petition and remained on Debtor's lot at the time of filing. The Subject Vehicles are as follows:

| Year | Make | Model | Partial VIN | HMFC Advance |
|------|------|-------|-------------|--------------|
| 2007 | Dodge | Caliber | 530095 | $15,385 |
| 2002 | Mercury | Sable | 614160 | $4,700 |
| 2006 | Pontiac | G6 | 176395 | $14,560 |
| 2005 | Suzuki | Forenza | 174188 | $7,060 |
|      |      |       | **Total**   | **$41,705** |

*See* Marks depo., Ex. 2, 5, 6, 7; Ueno Aff., ¶ 7. Original certificates of title for the Subject Vehicles were held by Steve's lenders and were never delivered to Debtor. The original certificates do not match the certificates that Debtor faxed to HMFC to obtain floor plan advances. *Compare* Marks depo., Ex. 2, 5, 6, 7 *with* Ueno Aff., Ex. 1-4. To obtain advances, Debtor had to fax HMFC copies of the certificates of title showing the transfer of the certificates from Steve's to Debtor. Ueno Aff. ¶ 5. On the original titles, this transfer portion (typically page 2) is not completed. Marks depo., Ex. 2, 5, 6, 7. Yet, the copies faxed by Debtor to HMFC show that this portion is completed. Ueno Aff., Ex. 1-4. Stated differently, Debtor faxed HMFC altered copies of title certificates in order to obtain floor plan advances for the Subject Vehicles.

Pursuant to this Court's Order dated December 9, 2006 (dkt. 129), Steve's repossessed each of the Subject Vehicles and is holding them pending the Court's ruling on this Motion.

5

## DISCUSSION

**I.      Legal Title Passed To Debtor Upon Physical Delivery Of The Subject Vehicles.**

Delivery of the Subject Vehicles – not their certificates of title – determines when legal title passes. The legal concept of the passing of "title" under the UCC is completely different from, and independent of, the physical delivery of written "certificates of title" for goods. The UCC applies two different rules to the of delivery of certificates of title, depending upon where the buyer takes possession. *Compare* Mont. Code Ann. § 30-2-401(2) *with* § 30-2-401(3).

Subsection 401(2) makes clear that title to goods passes when the goods are delivered, regardless of reservation of title:

> (2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes performance with reference to the **delivery of the goods**, despite any reservation of a security interest and **even though a document of title is to be delivered at a different time or place**; and in particular and despite any reservation of a security interest by the bill of lading:
>
> (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require the seller to deliver them at destination, title passes to the buyer at the time and place of shipment; but
>
> (b) if the contract requires delivery at destination, title passes on tender there.

Mont. Code Ann. § 30-2-401(2) (emphasis added). Delivery of a certificate of title is relevant **only** where the goods are not physically delivered to the buyer:

> (3) Unless otherwise explicitly agreed **where delivery is to be made without moving the goods**,
>
> (a) if the seller is to deliver a tangible document of title, title passes **at the time when and the place where the seller delivers such documents** and if the seller is to deliver an electronic document of title, title passes when the seller delivers the document; or

6

> (b) if the goods are at the time of contracting already
> identified and no documents of title are to be delivered, title
> passes at the time and place of contracting.

Mont. Code Ann. § 30-2-401(3) (emphasis added).

In the motor vehicle context particularly, the Montana Supreme Court has made clear that the section 30-2-401, Mont. Code Ann. governs the passing of title. *Safeco Ins. Co. v. Lapp*, 215 Mont. 196, 200, 695 P.2d 1310, 1313 (1985).

> The sale of an automobile is a transaction in goods within
> the meaning of the Uniform Commercial Code …. Section
> 30-2-401, MCA, deals with passage of title under the
> Commercial Code.

*Id.* Title passes to the buyer upon physical delivery of the vehicles even if certificates of title are not delivered contemporaneously. *Id.* (holding that seller "relinquished all its legal rights to the vehicle even though it still had the statutory duties relating to the transfer of certificate of ownership").

Montana law follows the overwhelming authority from other jurisdictions that legal title to motor vehicles passes upon delivery of the vehicles, regardless of the seller's retention of the certificates of titles. *See*, *e.g.*, *Plotkin v. Pomona Valley Imports, Inc.*, 199 B.R. 709 (9th Cir. BAP 1996) ("transfer of the property interest in a motor vehicle is effective as between the immediate parties even though they have not complied with the registration statute"); *Right Touch of Class, Inc. v. Superior Bank*, 536 S.E.2d 181 (Ga. App. 2000) ("The fact that [the buyer] did not obtain the certificate of title did not deprive it of title in the car or prevent it from transferring it to [a third party]."); *Palm Beach Auto Brokers, Inc. v. DeCarlo*, 620 So. 2d 250 (Fla. App. 1993); *DiRocco v. Mich. Mut. Ins. Co.*, 692 F. Supp. 578 (E.D. Pa. 1988); *North Georgia Toyota v. Jahn*, 24 B.R. 529 (E.D. Tenn. Bankr. 1982) ("Once an automobile is delivered to the buyer, nondelivery of the title certificate does not prevent title from passing to

7

the buyer …."); *cf. Diesel Performance, Inc. v. G. Paoletti Co., Inc.*, 205 B.R. 251 (N.D.Cal. Bankr. 1997) (legal title to vehicles <u>did not pass</u> where vehicles were <u>not physically delivered</u> to buyer). Even the Texas case cited by Steve's found no explicit intent to alter the UCC provisions for title transfer. *Dinkel Enterprises, Inc. v. Colvin*, 139 B.R. 629 (N.D. Tex. 1992).

Steve's admits the critical fact at issue: the Subject Vehicles were physically delivered to Debtor pre-petition. Marks testified that each of the Subject Vehicles was physically delivered to Debtor's lot. Under section 30-2-401(2), title passed to Debtor upon delivery. Marks' own testimony made clear that he believed that the sale was complete, except for payment:

> Q. … In your mind, if payment had been made by Incredible Auto Sales for these vehicles, then there would have been a purchase?
>
> A. Yes.

Marks depo., p. 79:11-14. In other words, even Marks believes that he, as seller, had "complete[d] performance with reference to the delivery of the goods." Subsection 401(2) makes clear that legal title passes regardless of buyer's non-payment.

Steve's has failed to meet its burden of proving that it "explicitly agreed" to alter the default title transfer provisions of the UCC. As a threshold matter, Steve's reliance on the purported "usual and customary" industry practice is insufficient to "explicitly" override the UCC. Where, as here, the value of the goods exceeds $500, the UCC's statute of frauds requires contracts to be in writing. Mont. Code Ann. § 30-2-201. Addressing this exact issue of overriding the provisions of UCC 2-401, other courts have concluded "any explicit agreement between the Debtor and [buyer] that title to the [vehicles] would pass prior to physical delivery must have been in writing" pursuant to UCC § 2-201. *Diesel Performance, Inc. v. G. Paoletti Co., Inc.*, 205 B.R. 251, 259 (N.D.Cal. Bankr. 1997); *see also Palm Beach Auto Brokers*, 620 So. 2d at 252 (industry custom is

8

insufficient to evince an intent to explicitly override UCC rules for title transfer). Marks admitted that there is no bill of sale or other document that specifically explains when legal title would pass. Marks depo., p. 65:22-66:5. As a matter of law, there is no "explicit" agreement to override the provisions of Mont. Code Ann. § 30-2-401(2).

Further, nothing about this transaction was usual, as Marks' own testimony makes clear. Gutierrez purchased numerous vehicles before they were repaired, despite Marks' explanation to Gutierrez that he did not "have any [vehicles] ready yet." Marks depo. pp. 18:16, 75:5. Gutierrez insisted that the auction process the sales, even though the sales were pre-arranged. Marks depo. pp. 59-60. Gutierrez requested and received photocopies of certificates of title before the Subject Vehicles were delivered. Marks depo. p. 62:13-16. None of these things are customary in the ordinary course of Steve's business or in the "at least a hundred times" that Steve's had previously done business with Gutierrez. Marks depo. pp. 15:22-16:1.

Also, Steve's asserted "usual course of business" is contrary to Debtor's own actions. Upon receipt of the Subject Vehicles, Debtor did not wait to obtain certificates of title, but instead displayed the vehicles onto its lot and offered them for sale. Debtor obviously believed that it owned the vehicles when it offered them for sale and, in fact, sold several of the vehicles. Marks depo. pp. 48:21-25, 53:12-21.

Finally, Steve's directly assisted Debtor in this matter by directing that photocopies of the vehicle titles be sent to Debtor before delivery of the Subject Vehicles. Marks depo. pp. 62:22-64:1. Marks personally directed that these photocopies be sent to Debtor. *Id.* HMFC would never have advanced any funds for these vehicles if Debtor had not received the photocopies of certificates of title in the

9

first place. Ueno Aff. ¶ 4-5. Again, the "unusual" act of furnishing Debtor copies of certificates of title before delivery of the Subject Vehicles is inconsistent with Steve's claim that Debtor did not purchase the vehicles. It is clear that this transaction was uniquely structured for Debtor to obtain 100% financing from HMFC, not to alter the conditions for passing of legal title by express agreement.

## II. HMFC's Security Interest Attached To The Subject Vehicles When They Were Physically Delivered To Debtor's Lot.

For a security interest to attach, (1) the lender must give value, (2) the debtor must have rights in the collateral, and (3) the debtor must sign a security agreement describing the collateral. Mont. Code Ann. § 30-9A-203 (2005). *First*, HMFC clearly gave value. It provided Debtor with a floor plan line of credit. (HMFC Ex. 1.) HMFC also advanced new funds on each of the Subject Vehicles, though new financing is not required for attachment. Ueno Aff. ¶ 7. *Second*, Debtor acquired rights in the collateral as soon as legal title passed from Steve's to Debtor. Under section 30-2-401(2), this occurred as soon as the Subject Vehicles were physically delivered to Debtor's lot. *Third*, Debtor signed a security agreement granting HMFC a security interest in its inventory and after-acquired inventory. (HMFC Ex. 1.)

### CONCLUSION

For the foregoing reasons, the Court must DENY the Steve's Motion for Relief from Automatic Stay.

DATED this 26th day of December, 2006.

/s/ Shane P. Coleman
Shane P. Coleman
Holland & Hart LLP
P. O. Box 639
Billings, MT 59103-0639

Attorneys for Hyundai Motor Finance Co.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of December, 2006, I served a true and correct copy of the foregoing, addressed as follows and by the method shown below:

| | | |
|---|---|---|
| William L. Needler | [ ] | U.S. Mail, postage prepaid |
| P.O. Box 177 | [X] | Electronic service |
| Fuller Building Suite H | [ ] | Overnight Delivery |
| 2 North Spruce Street | | |
| Ogallala NE 69153 | | |
| williamlneedler@aol.com | | |

| | | |
|---|---|---|
| Clarke B. Rice | [X] | U.S. Mail, postage prepaid |
| Clark B. Rice, P.C. | [ ] | Electronic service |
| 2951 King Avenue West | [ ] | Overnight Delivery |
| Billings, MT 59102 | | |

| | | |
|---|---|---|
| Office of the U.S. Trustee | [ ] | U.S. Mail, postage prepaid |
| U.S. Trustee's Office | [X] | Electronic service |
| Liberty Center Suite 204 | [ ] | Overnight Delivery |
| 301 Central Avenue | | |
| Great Falls MT 59401 | | |

| | | |
|---|---|---|
| Bruce F. Fain | [ ] | U.S. Mail, postage prepaid |
| Murphy, Kirkpatrick & Fain, P.L.L.P. | [X] | Electronic service |
| 208 North Broadway, Suite 208 | [ ] | Overnight Delivery |
| P.O. Box 429 | | |
| Billings, MT 59103-0429 | | |
| bruce@murphkirk.com | | |

| | | |
|---|---|---|
| Christopher P. Birkle | [ ] | U.S. Mail, postage prepaid |
| Lovell Law Firm, P.C. | [X] | Electronic service |
| 175 North 27th Street, Suite 1206 | [ ] | Overnight Delivery |
| P.O. Box 1415 | | |
| Billings, MT 59101 | | |
| cbirkle@lovellaw.com | | |

| | | |
|---|---|---|
| James A. Patten | [ ] | U.S. Mail, postage prepaid |
| Patten, Peterman, Bekkedahl & Green, P.L.L.C. | [X] | Electronic service |
| | [ ] | Overnight Delivery |
| 2817 2nd Avenue North, Suite 300 | | |
| Billings, MT 59101 | | |
| japatten@ppbglaw.com | | |

| | | |
|---|---|---|
| Doug James | [ ] | U.S. Mail, postage prepaid |
| Moulton, Bellingham, Longo & Mather P.C. | [X] | Electronic service |
| 27 North 27th Street, Suite 1900 | [ ] | Overnight Delivery |
| P.O. Box 2559 | | |
| Billings, MT  59103-2559 | | |
| james@moultonlawfirm.com | | |
| | | |
| Alan C. Bryan | [ ] | U.S. Mail, postage prepaid |
| 490 North 31st Street, Suite 500 | [X] | Electronic service |
| P.O. Box 2529 | [ ] | Overnight Delivery |
| Billings, MT  59101 | | |
| abryan@crowleylaw.com | | |

/s/ Shane P. Coleman

3647616_1.DOC