UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**INCREDIBLE AUTO SALES LLC**,

Debtor.

Case No. **06-60855-11**

*MEMORANDUM of DECISION*

At Butte in said District this 12th day of January, 2007.

In this Chapter 11 bankruptcy, Steve's Auto Sales, Inc. ("Steve's") filed a Motion for Relief from the Automatic Stay on November 17, 2006. Docket No. 67. After due notice, a hearing on Steve's Motion was held December 5, 2006, in Butte.[1] Debtor originally filed an objection to Steve's Motion on November 27, docket No. 89, but at the December 5, 2006, hearing, Debtor's counsel, William L. Needler of Northbrook, Illinois, appeared and withdrew Debtor's objection. Hyundai Motor Finance Company ("Hyundai") opposes Steve's Motion, docket No. 76, and appeared at the hearing in opposition to Steve's Motion through its attorney, Shane Coleman, of Billings, Montana. Steve's was represented at the December 5, 2006, hearing

---

[1] The Court also heard testimony and took evidence at the December 5, 2006, hearing on Debtor's Emergency Motion for Use of Cash Collateral; Hyundai's Emergency Motion to Prohibit or Condition Use, Sale or Lease of Inventory and/or Cash Collateral; Hyundai's Motion for Entry of Order Allowing Use of Cash Collateral; and Hyundai's combined "Expedited Motion to Modify Stay, Alternative Motion for Appointment of Trustee". Debtor's Emergency Motion for Use of Cash Collateral; Hyundai's Emergency Motion to Prohibit or Condition Use, Sale or Lease of Inventory and/or Cash Collateral; and Hyundai's Motion for Entry of Order Allowing Use of Cash Collateral were disposed of by Order entered December 8, 2006. Hyundai's combined "Expedited Motion to Modify Stay, Alternative Motion for Appointment of Trustee" is presently under advisement.

1

by its counsel of record, James A. Patten, of Billings, Montana.

At the December 5, 2006, hearing, Derrick Stevens, Dale Ueno and Ken Cornelison testified and Hyundai's Exhibits 1 through 23 and Debtor's Exhibits 1, 2, 3, 4, 5, 6, page 3 only, Exhibit 7, and Exhibits 10, 11 and 12 were admitted into evidence. Counsel for Steve's and for Hyundai then agreed to continue the hearing to December 12, 2006. At the continued hearing held December 12, 2006, counsel for Steve's and Hyundai agreed to submit the testimony of Steve Marks ("Marks") by deposition. The parties also agreed that Steve's Motion could be fully granted as it related to a 2003 Dodge Status and 2005 Kia Spectra because Debtor never took possession of either of the aforementioned vehicles. In an Order entered December 12, 2006, the Court granted Steve's Motion as it related to the 2003 Dodge Status and 2005 Kia Spectra. Also, by stipulation, the Court previously granted Steve's the right to take possession of the four vehicles that are the subject of this Memorandum of Decision and sell such vehicles with the proceeds to be held in a segregated account pending final decision by this Court on the Motion to Modify Stay.

On December 13, 2006, counsel for Steve's filed a transcript of Marks' deposition taken December 7, 2006. Thereafter, counsel for Steve's filed on December 19, 2006, a Memorandum of Steve's Auto Sales in Support of Motion for Relief from the Stay, and on December 26, 2006, counsel for Hyundai filed a Response Memorandum of [Hyundai] in Opposition to Steve's Auto Sales' Motion for Relief from the Automatic Stay, which Memorandum was accompanied by a Declaration of Dale Ueno. Given the filing of briefs by Steve's and Hyundai, the matter is deemed submitted and ready for decision. This Memorandum of Decision sets forth the Court's findings of fact and conclusions of law on the matter, and for the reasons stated herein, the Court

finds in favor of Steve's.

## BACKGROUND

The facts in this case are fairly straight forward and do not appear to be in dispute. Hyundai is Debtor's "floor plan" lender. Pursuant to an Inventory Loan and Security Agreement between Hyundai and Debtor dated July 27, 2005, Hyundai holds a properly perfected security interest in, among other items, "[a]ll inventory of new and used motor vehicles and other personal property held for sale or lease including, but not limited to, display or demonstration items, returns and repossessions, and all accessories and additions thereto." Hyundai's Exhibit 1. According to Dale Ueno, the Assistant Manager of Commercial Credit for Hyundai, "[t]o obtain advances for particular vehicles, Debtor was required to first purchase the vehicles and then fax to Hyundai Motor Finance Company copies of the original certificates of title for the vehicles showing that the vehicles had been transferred to Debtor." Hyundai would advance funds to Debtor under the Inventory Loan and Security Agreement upon receipt of copies of certificates of title from Debtor. Dale Ueno has declared that Hyundai financed "80% of the purchase price for those vehicles purchased directly from sellers and 100% of the purchase price for those vehicles purchased through auto auctions."

Steve's is a wholesale and retail auto dealer owned by Marks. Nick Gutierrez ("Gutierrez") owns 80% of the stock in Debtor. Gutierrez and Marks were personal friends and Gutierrez previously leased a "New Beginnings" car lot from Marks. Gutierrez and Marks had also previously sold vehicles to each other "at least a hundred times," but had not done so for several months. However, in September of 2006, Gutierrez approached Marks seeking to purchase vehicles from Steve's. The two thus visited various lots, warehouses, and repair shops

where Steve's vehicles were located. Gutierrez proceeded to identify fourteen vehicles that he wanted to purchase from Steve's, eight of which were located in repair shops. Marks testified during his deposition that buyers occasionally purchase his vehicles before they return from local repair shops, but "[i]t doesn't happen on a regular basis."

Interestingly, Gutierrez insisted that the purchase of the fourteen identified vehicles be made through Auto Auction Associates of Montana, Inc., d/b/a Auto Auction of Montana, a/k/a Auto Auction of Billings ("Auto Auction"). Marks testified that this is highly unusual for auto dealers to run pre-arranged transactions through an auto auction. In fact, Marks stated that such an arrangement occurs in no more than 3% of all transactions in which Marks has participated. As noted by Hyundai, the purchase of the fourteen vehicles from Steve's through the Auto Auction is significant in that Debtor was able to obtain 100% of the purchase price for the vehicles from Hyundai as opposed to the 80% it would have received had the vehicles been purchased directly from Steve's.

According to Marks, all auto auctions, including the Auto Auction, have the same procedure with respect to payment of the purchase price and the receipt of the title work for automobiles sold and purchased at auction. When an automobile is purchased at auction, the buyer is required to immediately present payment for the automobile and if the title is present at the auction, the buyer receives the certificate of title upon payment for the vehicle. Once the auction receives the title work from the seller and payment from the buyer, the title work is delivered to the buyer. When the buyer makes payment of the purchase price, the auto auction retains its fees and remits the balance to the seller. Importantly, the auto auction will not remit the balance to the seller until a title is delivered to the auto auction and equally important is the

fact that the auto auction will not deliver a title to the buyer until the buyer has paid for the vehicle. The auto auction is an intermediary that collects both the money and the title before forwarding the title to the buyer and the purchase price to the seller. Marks likened the auto auction to a title company in a real estate transaction.

In further pursuit of its now apparent need for cash, Debtor, through Gutierrez, requested copies of the certificates of title for the fourteen vehicles from Steve's before Debtor took possession of said vehicles. Marks described Gutierrez' request as "unusual." Nevertheless, Marks personally arranged for photocopies of the certificates of title to be sent to Gutierrez before the fourteen vehicles were delivered to Debtor. The evidence shows that upon receipt of the photocopied certificates of title, someone in Debtor's organization altered the certificates of title to make them appear as though the original certificates had been transferred to Debtor. The altered certificates of title were then faxed to Hyundai and Hyundai advanced Debtor funds for the purchase of the fourteen vehicles.

Hyundai asserts that only four of the fourteen vehicles are at issue in Steve's Motion.[2] However, the record before the Court indicates that perhaps five vehicles are still at issue. As to the five vehicles in question, Steve's does not dispute that the vehicles were physically delivered to Debtor pre-petition and remained in Debtor's possession at the time Debtor's bankruptcy petition was filed. Debtor obtained possession of the cars by presenting payment for the cars as required by the Auto Auction. Debtor's check was subsequently dishonored, thus leading to the instant dispute. According to Hyundai, the vehicles that are the subject of this Motion are: (1) a

---

[2] Two vehicles were never delivered to Debtor and Hyundai concedes that it has no interest in either of those two vehicles. Also, Marks testified that Steve's received payment on six vehicles and titles to those vehicles were transferred to Debtor.

5

2007 Dodge Caliber 530095 for which Debtor agreed to pay $15,385; (2) a 2002 Mercury Sable 614160 for which Debtor agreed to pay $4,700; (3) a 2006 Pontiac G6 176395 for which Debtor agreed to pay $14,560; and (4) a 2005 Suzuki Forenza 174188 for which Debtor agreed to pay $7,060.  The Court finds that Steve's Motion also includes a 2004 Chevrolet Cavalier.  The original certificates of title for the above vehicles were held by Steve's lenders and were never delivered to Debtor. Additionally, the original certificates of title for the aforementioned vehicles do not match the certificates of title that Debtor faxed to Hyundai in order to obtain its floor plan advances of $41,705.00.  As noted earlier, someone in Debtor's organization altered the photocopied certificates of title and submitted them to Hyundai in order to obtain the floor plan advance of $41,705.00.

## DISCUSSION

Steve's seeks relief from the automatic stay on the basis that Debtor failed to pay for the vehicles at issue in breach of the agreement between Debtor and Steve's as facilitated by the Auto Auction.  Hyundai's opposition to Steve's Motion is premised on the fact that Hyundai is Debtor's flooring lender and thus has a properly perfected security interest in each of the vehicles by virtue of its properly filed UCC-1 Financing Statement which covers "[a]ll inventory of new and used motor vehicles and other personal property held for sale or lease including, but not limited to, display or demonstration items, returns and repossessions, and all accessories and additions thereto."

Steve's and Hyundai are in agreement that a motor vehicle is a "good" within the meaning of the Uniform Commercial Code, which was adopted in Montana and codified in Title 30 of the Montana Code Annotated.  *See* MONT. CODE ANN. ("MCA") § 30-2-105; *Safeco Ins.*

*Co. v. Lapp*, 215 Mont. 196, 200, 695 P.2d 1310 (1984). More recently, the Montana Supreme Court has acknowledged that the "transfer of title in goods is governed by § 30-2-401, *et seq.*, MCA." *Ace Leasing, Inc. v. Boustead*, 2002 MT 213, ¶ 24, 311 Mont. 285, ¶ 24, 55 P.3d 371, ¶ 24. As set forth more specifically, "[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes performance with reference to the delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading[.]" § 30-2-401(2), MCA; *see Ace Leasing*, ¶ 24 ("unless the agreement explicitly provides otherwise, the title of goods passes to the buyer at the 'time and place' at which the seller completes performance with reference to physical delivery of the goods.")

By definition, § 30-2-106(1), MCA, provides that a "'sale' consists in the passing of title from the seller to the buyer for a price (30-2-401)." Anderson, Uniform Commercial Code, Vol. 2, § 2-106:24 (3rd ed.), p.278, explains:

> In view of the fact that a sale is a transfer of title for a price and that consideration is necessary to make a binding contract for sale, the giving or promising of something, whether called the "price" or "consideration," is an essential element or characteristic of a sale and of a contract to sell. While the Code defines "value," it does not define "price" or "consideration." As a result, non-Code law must be consulted for such definitions.

Section 30-1-201(2)(j), MCA, defines a "buyer in ordinary course of business" as "a person that buys goods, in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person . . . in the business of selling goods of that kind." The term "good faith" is defined at § 30-1-201(2)(u), MCA, as

"honesty in fact and the observance of reasonable commercial standards of fair dealing." As noted in Anderson - UCC § 1-201:95, citing *Stephenson Finance Co. of Augusta, Inc. v. Bruce*, 254 S.C. 249, 174 S.Ed.2d 750 (1970):

> A buyer who purchased 13 automobiles and paid with two worthless checks clearly was not a buyer in the ordinary course of business where the buyer had knowledge that the sale was in violation of the secured creditor's rights.

Furthermore, § 30-1-205(5), MCA, requires that ". . . the express terms of an agreement and any applicable course of performance, course of dealing, or usage of trade, must be construed wherever reasonable as consistent with each other. If such a construction is unreasonable: (a) express terms prevail over course of performance, course of dealing, and usage of trade; (b) course of performance prevails over course of dealing and usage of trade; and (c) course of dealing prevails over usage of trade." As just explained, the course of dealing by the Auto Auction and its procedures, coupled with the express agreement between Marks and Gutierrez to consummate the sale through the Auto Auction, must be considered in deciding whether title to the four vehicles passed by mere possession.

The case of *Arcadia Financial, Ltd. v. Southwest-Tex Leasing Co.*, 78 S.W.3d 619 (Tex.App.-Austin 2002), is strikingly similar to the case *sub judice*. In *Southwest-Tex Leasing,* Advantage agreed to sell cars to Lone Star, but Advantage would provide certificates of title to Lone Star only in exchange for payment. Lone Star also had an agreement with Arcadia whereby Arcadia agreed to finance retail installment contracts for Lone Star's customers. Under its agreement with Arcadia, Lone Star was required "to submit to Arcadia 'a certificate of title with any liens thereon released and an application to register ownership in favor or the [purported

buyers and, correspondingly, Arcadia].'" *Id*. at 620. Lone Star purchased four cars from Advantage, but failed to pay for the cars. Lone Star then sold the cars to customers under contracts that were assigned to Arcadia. No titles were provided by Lone Star to Arcadia, but letters of guarantee were sent to Arcadia instead. Arcadia approved the sales and advanced Lone Star funds totaling $56,410.86. Lone Star then went out of business. Arcadia first demanded that Lone Star repurchase the retail installment contracts and when that demand went unanswered, Arcadia demanded that Advantage relinquish possession of the original certificates of title so Arcadia could perfect its security interests. In sustaining the trial court's denial of Arcadia's claim of conversion, tortuous interference with existing contracts and request for declaratory judgment, the court in *Southwest-Tex Leasing*, held:

> Advantage and Lone Star had an ongoing verbal agreement by which Advantage sold vehicles directly to Lone Star for cash. Although the agreement was not reduced to writing, it was agreed and understood, and a course of conduct and dealing was established, that *the sale of any vehicle to Lone Star was contingent upon Advantage's receipt of payment in full* from Lone Star. Advantage always retained the Original Texas Certificate of Title in its possession until payment was received, in full, from Lone Star. After Lone Star paid Advantage for the vehicles, Advantage would transfer the Original Texas Certificate Of Title to reflect Lone Star as the new owner.

*Id.* at 624. Although Arcadia urged the appellate court to find a conflict between the Certificate of Title Act and the UCC, and determine that the UCC should control, the Court in *Southwest-Tex Leasing* concluded that no conflict existed between the Certificate of Title Act and the UCC, and that because of the verbal agreement between Advantage and Lone Star and given the established course of conduct, "even under the UCC, title to the vehicles would not pass until Advantage obtained payment in full." *Id.*

Similar to *Southwest-Tex Leasing*, Steve's and Debtor were and are in the used car

9

business. Both have had past dealings with the Auto Auction, which engages in the auction, sale and purchase of used automobiles. The Auto Auction has established procedures for the handling of the purchase price and the receipt and clearing of certificates of title. In particular, when a buyer purchases a vehicle at the auction, the buyer is required to make immediate payment on the automobile to the Auto Auction, and thereafter, the Auto Auction obtains clear title, either at the time of purchase or shortly thereafter. Once the Auto Auction is paid the purchase price, said purchase price, less the Auto Auction's fees, are remitted to the seller of the vehicle. Further, the Auto Auction will not remit the balance due to the seller until the seller has delivered title to the Auto Auction of Montana, and conversely, the Auto Auction will not deliver title to the buyer until the buyer has paid the full purchase price of the automobiles.

Obviously aware of the above procedures through prior dealings, Gutierrez approached Marks with a request to purchase numerous vehicles from Steve's through the Auto Auction. Each of the four vehicles at issue in this case were floored or financed by Steve's financing company, which financing company holds the certificates of title to the vehicles.

The "course of performance" within § 30-1-205, MCA, together with the Auto Auction's clear and explicit agreement regarding payment, satisfies the preface clause of § 30-2-401(2), MCA. The Court therefore concludes that Debtor did not obtain ownership of the four vehicles simply by Steve's delivery of the vehicles to Debtor. Rather, legal title could only pass to Debtor, pursuant to the course of performance required by the Auto Auction in accordance with its established and recognized procedures, by payment in full by Debtor as an absolute prerequisite to obtaining title and ownership. Simply put, the sale and purchase of the vehicles at issue was not completed because Debtor failed to pay for the vehicles as required by the Auto

Auction. Because Debtor never acquired ownership of the vehicles through the express procedures established by the Auto Auction, Debtor could not transfer a security interest in the vehicles to Hyundai. Hyundai admits in its response Memorandum that while the vehicles were physically delivered to the Debtor's car lot by Steve's after Hyundai loaned Debtor new money to facilitate the purchase, the "Debtor did not pay for the Subject Vehicles, and Steve's did not deliver do [sic] Debtor the physical certificates of title." In accordance with the forgoing, the Court will enter a separate order providing as follows:

IT IS ORDERED that the Motion for Relief from the Automatic Stay filed by Steve's Auto Sales, Inc. on November 17, 2006, is GRANTED; and the stay afforded by § 362(a) of the Bankruptcy Code is modified to permit Steve's Auto Sales, Inc. to pursue its nonbankruptcy remedies with respect to a 2007 Dodge Caliber 530095; a 2002 Mercury Sable 614160; a 2006 Pontiac G6 176395; a 2005 Suzuki Forenza 174188; and a 2004 Chevrolet Cavalier 235271.

IT IS FURTHER ORDERED that this Order is effective immediately and shall not be stayed for ten (10) days as provided in F.R.B.P. 4001(a)(3).

BY THE COURT

*/s/ Ralph B. Kirscher*
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana