UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**INCREDIBLE AUTO SALES LLC**,

Debtor.

Case No. **06-60855-11**

## *MEMORANDUM of DECISION*

At Butte in said District this 12th day of January, 2007.

Pending in this Chapter 11 bankruptcy is an "Expedited Motion to Modify Stay, Alternative Motion for Appointment of Trustee" ("Expedited Motion") filed by Hyundai Motor Finance Company ("Hyundai") on November 17, 2006. In an Order entered November 20, 2006, the Court scheduled a hearing on Hyundai's Expedited Motion for December 5, 2006, in Butte. Subsequent to the Court's November 20, 2006, Order, objections to Hyundai's Expedited Motion were filed by Auto Auction Associates of Montana, Inc., d/b/a Auto Auction of Montana, a/k/a Auto Auction of Billings ("Auto Auction"), by Steve's Auto Sales, Inc. ("Steve's"), and by Debtor, all on November 27, 2006. At the December 5, 2006, hearing in Butte, Debtor was represented by attorneys William L. Needler of Northbrook, Illinois and Clarke B. Rice of Billings, Montana; Hyundai was represented by attorney Shane Coleman of Billings, Montana; Manheim Services Corporation, d/b/a South Seattle Auto Auction was represented by attorney Christopher Birkle of Billings, Montana; the Auto Auction was represented by attorney Bruce F. Fain of Billings, Montana; Steve's was represented by attorney James A. Patten of Billings,

1

Montana; and the United States Trustee was represented by attorney Daniel P. McKay of Great Falls, Montana. Derrick Stevens, Dale Ueno and Ken Cornelison testified and Hyundai's Exhibits 1 through 23 and Debtor's Exhibits 1, 2, 3, 4, 5, 6, page 3 of Exhibit 7, and Exhibits 10, 11 and 12 were admitted into evidence.[1]

This Court has exclusive jurisdiction in this Chapter 11 case under 28 U.S.C. § 1334(a). Hyundai's Motion to Modify Stay is a core proceeding under 28 U.S.C. § 157(b)(2)(G). Hyundai's Motion seeks relief from the stay under 11 U.S.C. § 362(d)(1) on the following grounds:

    a. As of the date of bankruptcy, Debtor had sold vehicle inventory securing the obligations due Hyundai and had failed to remit sales proceeds totaling approximately $366,880. Such proceeds of "sales out of trust" vehicles have not been remitted to Hyundai and Debtor does not have such proceeds in its possession. Since the date of bankruptcy, Debtor has continued to sell vehicles subject to Hyundai's lien, has segregated some or all of the proceeds of such sales in certain "trust accounts", but has not remitted any of the proceeds thereof to Hyundai. Vehicles sold and unpaid now total $628,081.

    b. Hyundai is informed and believes, by virtue of an audit conducted at Debtor's place of business on November 17, 2006, that Debtor has entered into sham transactions with an affiliate,

---

[1] Hyundai identified both Krista Davis ("Davis") and Lalonna Seymore ("Seymore") as potential witnesses for the December 5, 2006, hearing. Hyundai attempted to subpoena both Davis and Seymore on Friday, December 1, 2006, and Monday, December 4, 2006, but neither Davis nor Seymore reported to work on those dates. Davis was previously employed by Debtor, but has been employed by Graham-Staunton since approximately early November. Despite the change in employment, Davis is still earning commissions from Debtor. Seymore is apparently still employed by Debtor.

Graham-Staunton, Inc., d/b/a Incredible Chevrolet.  It is Hyundai's information and belief that Debtor has "sold" inventory located on its Billings lots to Incredible Chevrolet and received, but has not cashed checks for such "sales".  Some of the vehicles in question may have remained on Debtor's lots and have been sold to third-party consumers but no proceeds of such sales have been remitted to Debtor (or Hyundai) and, instead, may have been retained by Incredible Chevrolet.

     c.  Hyundai is informed and believes by virtue of a list provided to counsel by the Debtor that on Wednesday, November 15, 2006, Debtor has failed to pay liens totaling in excess of $250,000.00 on thirty-five vehicles taken in trade both before and after the date of bankruptcy. The list provided to Hyundai's counsel is identified as Exhibit F.  Motions for Relief from stay on two such vehicles have been filed by First Interstate Bank in this case.  Consumer creditors appearing at the Section 341 Meeting November 13, 2006, complained that Debtor had not paid the liens on their trade-ins and that in some cases, the consumers had been forced to make multiple car payments.

     d.  Hyundai is informed and believes that Debtor has represented to Hyundai and at least one other lender that one or more vehicles secure both creditors' loans resulting in so-called "double flooring".

     e.  As alleged in Adversary Proceedings Nos. 06-00119 and 06-00120, Debtor has purchased numerous vehicles from auto auctions and wholesalers with dishonored checks, has received loan proceeds from Hyundai and, in some cases, has resold such vehicles and retained the proceeds without any remittance to Hyundai or the auctions and wholesalers.

     f.  Numerous omissions and irregularities in vehicles and financing documentation by the

Debtor have been discovered. For example, Hyundai learned at the Section 341 Meeting that documentation of sales was altered by Debtor to reflect dates other than the actual dates of sales.

The Auto Auction has filed a limited objection to Hyundai's Motion as has Steve's. In Orders entered December 12, 2006, and January 12, 2007, the Court granted Steve's November 17, 2006, Motion for Relief from the Automatic Stay as it related to seven vehicles identified therein.[2] The Court's Orders of December 12, 2006, and January 12, 2007, render Steve's objection to Hyundai's Motion moot as it relates to a 2007 Dodge Caliber 530095; 2002 Mercury Sable 614160; 2006 Pontiac G6 176395; 2005 Suzuki Forenza 174188; 2004 Chevrolet Cavalier 235271; 2003 Dodge Stratus 620717; and 2005 KIA Spectra 124532. Steve's opposition references an additional seven vehicles not covered by its Motion for Relief from the Stay. The Court's Orders of December 12, 2006, and January 12, 2007, also limit the Auto Auction's objection, which references 19 vehicles, in that Steve's was granted relief from the stay with respect to seven vehicles that are included in Auto Auction's objection. The additional seven vehicles referenced in Steve's opposition, and not addressed in Steve's Motion for Relief from the Automatic Stay, are also included in Auto Auction's opposition, namely:

| Year | Make | Model | VIN | Price |
|---|---|---|---|---|
| 2005 | Chrysler | Town & Country | 2C4GP44R95R589847 | $6,700.00 |
| 2005 | Chevrolet | Malibu | 1G1ND52F75M177176 | $8,700.00 |
| 2004 | Ford | Ranger | 1FTZR44E34PA07225 | $9,950.00 |
| 2005 | Pontiac | Montana | 1GMDV23E75D121917 | $12,600.00 |
| 2005 | Chrysler | Sebring | 1C3EL46X35N568587 | $9,400.00 |
| 2003 | Chevrolet | Malibu | 1G1ND52J93M699843 | $7,000.00 |
| 2004 | Chevrolet | Blazer | 1GNDT13X74K163169 | $12,060.00 |

The Auto Auction's opposition also includes an additional five vehicles that appear to have no

---

[2] Steve's Motion makes reference to "nine motor vehicles", but only seven were identified.

relation to Steve's, a 2005 KIA Optima, 2005 KIA Spectra, 2006 Chevrolet Malibu, 2006 KIA Sorento, and 2005 KIA Rio.  As set forth above, given the Court's Orders of December 12, 2006, and January 12, 2007, the Auto Auction's and Steve's opposition to Hyundai's Motion are now limited to a total of 12 vehicles.

Under 11 U.S.C. § 362(g), a creditor has the burden of proving that a debtor does not have equity in property, while the debtor has the burden of proof on all other issues to show that the stay should not be modified.  *See First Interstate Bank of Billings v. Interstate Distrib. Co., Inc. (In re Interstate Distributing Co., Inc.)*, 13 Mont. B.R. 86, 89 (D. Mont. 1993); *In re Mittlestadt*, 20 Mont. B.R. 46, 52 (Bankr. D. Mont. 2002); *In re Hungerford*, 19 Mont. B.R. 103, 133-34 (Bankr. D. Mont. 2001); *In re National Environmental Waste* Corp., 191 B.R. 832, 836 (Bankr. C.D. Cal. 1996), *aff'd*, 129 F.3d 1052 (9th Cir. 1997); *In re Syed*, 238 B.R. 126, 132 (Bankr. N.D. Ill. 1999); *In re Sauk Steel Co., Inc.*, 133 B.R. 431, 436 (Bankr.N.D.Ill.1991); 11 U.S.C. § 362(g)(2).  Thus, Hyundai has the burden of proof under § 362(d)(2)(A) to show that the Debtor does not have any equity in its assets, and if Hyundai satisfies its burden, the burden then shifts to Debtor to show that Hyundai's Motion to Modify Stay should not be granted under § 362(d)(1) for "cause".

Section 362 vests this Court with wide latitude in granting appropriate relief from the automatic stay, and a decision to lift the automatic stay is within a bankruptcy court's discretion, and subject to review for an abuse of discretion.  *In re Delaney-Morin*, 304 B.R. 365, 369-70 (9th Cir. BAP 2003); *In re Leisure Corp.*, 234 B.R. 916, 920 (9th Cir. BAP 1999); *In re Plummer*, 20 Mont. B.R. 468, 477-78 (Bankr. D. Mont. 2003); *Mataya v. Kissinger (In re Kissinger)*, 72 F.3d 107, 108-109 (9th Cir. 1995).

As noted above, § 362(d)(1) allows a court to grant relief from the automatic stay for cause, "including the lack of adequate protection". What constitutes adequate protection for purposes of § 362(d)(1) is not defined in the Bankruptcy Code. However, "11 U.S.C. § 361 sets forth three non-exclusive examples of what may constitute adequate protection: 1) periodic cash payments equivalent to decrease in value, 2) an additional or replacement lien on other property, or 3) other relief that provides the indubitable equivalent." *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 (9th Cir. 1984). This Court discussed the concept of adequate protection in *In re WRB West Associates Joint Venture*, 106 B.R. 215, 219-20 (Bankr. Mont. 1989):

> In a classic sense, adequate protection payments should be applied to compensate a secured creditor for any diminution in the value of collateral as a result of use, depreciation, destruction or other caused reduction in value. 11 U.S.C. § 361; 11 U.S.C. § 363(e); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., (In re Timbers of Inwood Forest Assocs., Ltd.)*, 793 F.2d 1380, 1412 n. 57 (5th Cir.1986) (collecting supporting cases), *aff'd, United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, [484] U.S. [365], 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *General Elec. Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.)*, 25 B.R. 987, 994 (Bkrtcy.D.Utah 1982) ('adequate protection was protection ... against depreciation of the collateral when it erodes the allowed secured claim.').

> [*Matter of Kain*,86 B.R. 506, 511, 513 (Bankr. W.D. Mich. 1988)]

> On the issue of adequate protection required by § 363(d) and (e), *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir.1987) holds:

> In recognition of the powers created in bankruptcy law to adjust debts and creditors' interest, Congress realized the need to protect creditors from unfair treatment. Hence, it codified the concept of adequate protection into the several aggressive remedies available to debtors and bankruptcy trustees. *See 2 Collier on Bankruptcy* ¶ 361.01[1] (15th ed. 1979). The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy. House Rep. No. 95-595, 95 Cong., 2d Sess. 53, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6295. In

> determining these values, the courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis. *In re Martin*, 761 F.2d 472 (8th Cir.1985); *In re Monroe Park*, 17 B.R. 934 (D.C.Del.1982). Since 'value' is the linchpin of adequate protection, and since value is a function of many factual variables, it logically follows that adequate protection is a question of fact. *In re Martin*, 761 F.2d at 472; *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017 (11th Cir.1984); *In re Bank Hapoalim B.M., Chicago Branch v. E.L.I.*, Ltd., 42 B.R. 376 (D.C.N.D.Ill.1984); *Brookfield Production Credit Association v. Borron*, 36 B.R. 445 (D.C.E.D.Mo.1983), *aff'd*, 738 F.2d 951 (8th Cir.1984).

In *Mellor* the Ninth Circuit Court of Appeals recognized that an "equity cushion", while not specifically mentioned in the Bankruptcy Code, is a common form of adequate protection:

> [I]t is the classic form of protection for a secured debt justifying the restraint of lien enforcement by a bankruptcy court. *In re Curtis*, 9 B.R. at 112. In fact, it has been held that the existence of an equity cushion, standing alone, can provide adequate protection. *In re San Clemente Estates*, 5 B.R. 605, 610 (B.Ct.S.D.Cal.1980); *In re Tucker*, 5 B.R. 180, 182 (B.Ct.S.D.N.Y.1980); 2 COLLIER ON BANKRUPTCY, § 361.02[3] at 361-9; (15th ed. 1979). A sufficient equity cushion has been found to exist although not a single mortgage payment had been made. *In re Curtis*, 9 B.R. at 111.

*Id*. *See also In re Interstate Distrib. Co., Inc.*, 13 Mont. B.R. 86, 89-10 (Recognizing that an equity cushion is the classic form of protection for a secured debt, and its existence, standing alone, can provide adequate protection under the Bankruptcy Code.). The *Mellor* Court defined the term "equity cushion" as "the value in the property, above the amount owed to the creditor with a secured claim, that will shield that interest from loss due to any decrease in the value of the property during time the automatic stay remains in effect." *Id.* at 1400 n.2.

By way of background, Nick Gutierrez ("Gutierrez") owns 80% of the stock in Debtor. Gutierrez was also Debtor's President at the time Debtor's bankruptcy petition was filed. Gutierrez is also the majority shareholder of Graham-Staunton, Inc., d/b/a Incredible Chevrolet

("Graham-Saunton"). Ken Cornelison ("Cornelison") is a minority shareholder of both Debtor and Graham-Staunton and has been employed by Debtor since June 1, 2006.

According to Cornelison, Gutierrez relinquished his title as an officer of Debtor a couple weeks prior to the December 5, 2006, hearing. At that same time, Cornelison assumed the position of Vice President and General Manager of Debtor and Gutierrez' wife, Zsaneece, became an officer and check signer of Debtor. Cornelison also testified that Gutierrez transferred his ownership interest in Debtor to Zsaneece. However, Debtor's counsel advised the Court at a hearing held December 19, 2006, that Gutierrez had not transferred his interest in Debtor to Zsaneece as previously represented. At the time of the change in officers, sometime in November of 2006, Gutierrez gave up his officer's salary. At the same time, Zsaneece began receiving an officer's salary of $5,000.00 per month. For her monthly salary, Zsaneece agreed to sign checks if Cornelison was not available, and agreed to review bills and financials.

The evidence in this case overwhelmingly shows that someone in Debtor's organization has falsified certificates of title,[3] invoices and contracts. At a hearing held early on in this case, Gutierrez indicated that Davis was the person who falsified the certificates of title. Similarly, Cornelison testified at the December 5, 2006, hearing that two people were involved in the admitted fraud, Davis and "Jody". "Jody" apparently was and still is Debtor's office manager.

In addition to falsified certificates of title, invoices and documentation of sales, the

---

[3] A Memorandum of Decision entered by this Court on January 12, 2007, on the Motion for Relief from the Automatic Stay filed by Steve's discusses extensively the efforts Gutierrez undertook, on behalf of Debtor, to obtain copies of certificates of title and falsify such documents. The Court's Memorandum of Decision is incorporated by reference herein. Also, exhibit 23 admitted at the December 5, 2006, hearing, reflects both the true certificates of title and the falsified copies that Debtor submitted to Hyundai in order to obtain flooring advances.

evidence in this case also shows that Debtor has double-floored inventory. Debtor's counsel explains in Debtor's objection to Hyundai's Motion that: "As to the 'Double Flooring' charge of Hyundai, this was a timing issue of vehicles who left one floor plan and went to another. This occurred over a holiday weekend and was inadvertent ad [sic] not intentional." Contrary to counsel's response, Hyundai's Exhibit 18 shows that at least 19 vehicles were double floored by Debtor, and the number of days that said vehicles were double floored with Hyundai and GMAC ranged from 1 day to 105 days, with all but one of the 19 vehicles double floored nine or more days; a period of time that is undeniably longer than a "holiday weekend". Evidence and testimony exists in the record showing that Debtor floored and sold a vehicle and then later allegedly refloored the vehicle to obtain more money from Hyundai.[4]

Debtor also concedes that it was "out of trust" on certain prepetition vehicles and further admits that it failed to payoff existing liens on vehicles that were taken in on trade. As set forth in Debtor's opposition to Hyundai's Motion:

> 21. The prepetition facts that unpaid liens exist and cars were sold out of trust is not new.
>
> 22. Every car dealer who files a Chapter 11 in this Country, has unpaid liens and out of trust sales on filing.

Debtor's above admissions offer no explanation as to why Debtor was $366,880.00 "out of trust" on Debtor's petition date. Moreover, Debtor failed to explain why the "out of trust" amount increased to $626,131.00 as of November 29, 2006.

Dale Ueno testified that it is not uncommon for a dealership to have a lien open for

---

[4] The vehicle in issue is a 2003 Acura that was originally floored on August 2, 2006, and paid off on August 18, 2006. Debtor apparently refloored the same vehicle on September 5, 2006, and then paid it off a second time on October 5, 2006.

9

perhaps 20 to 30 days, yet Exhibit 21 shows that Debtor had liens on approximately 12 vehicles, that had been taken in on trade by Debtor, where the liens remained open for more than a month as of Debtor's petition date. Indeed, it appears from Exhibit 21 that Debtor took a 2004 Optima in on trade and sold the vehicle on April 17, 2006, and still had not paid off the previously existing lien as of Debtor's petition date of October 17, 2006. These people were most likely the consumer creditors who appeared at Debtor's § 341 Meeting of Creditors complaining that Debtor had not paid the liens on their trade-ins and that in some cases, the consumers were being forced to make multiple car payments.

Dale Ueno's testimony also highlighted a few of the instances where someone in Debtor's organization had falsified sales documents. For instance, four vehicles: a 2005 KIA Sportage; 2005 Chevy Classic; 2004 Chevy Impala and 2005 Dodge Neon, had two deal jackets; one containing the correct information and one containing fabricated information. The information in the fabricated deal jacket for the 2005 KIA Sportage was altered to reflect that the vehicle was sold on September 23, 2006, when in fact the vehicle was wholesaled on September 14, 2006. Similarly, the falsified deal jacket for the 2004 Chevy Impala showed that the vehicle was sold on September 23, 2006, when in fact the vehicle was sold on August 29, 2006, and Debtor received funds for the sale on September 12, 2006. The fabricated deal jackets for the 2005 Chevy Classic and 2005 Dodge Neon show more of the same; that someone in Debtor's organization was falsifying documents.

Despite all the foregoing, particularly the serious allegations of fraud, Cornelison, as Vice President and General Manager of Debtor, has taken no steps to investigate any of the frauds,

other than to ascertain whether a paper shredder existed on Debtor's premises.[5] Cornelison seemed totally unconcerned about the allegations, even though the two individuals implicated in the fraud are still employed by Debtor, or its sister organization, Graham-Staunton.

Equally troubling to the Court is the fact that Debtor has wholesaled at least three vehicles to Graham-Staunton postpetition. These wholesale transactions are troubling in three respects. First, Hyundai discovered that although Graham-Staunton had tendered checks to Debtor for each of the vehicles, none of the checks had been cashed by Debtor.[6] Second, the three vehicles at issue were apparently sold off of Debtor's secondary lot, referred to as New Beginnings. Cornelison testified that Debtor's New Beginnings lot is staffed by three Graham-Staunton employees, who were previously employed by Debtor on Debtor's petition date. One of the three employees is Davis. Third, while the vehicles were sold from Debtor's secondary lot by former employees of Debtor, Gutierrez and Cornelison were able to siphon the retail profits from the three sales by first wholesaling the vehicles to Graham-Staunton and then retailing the vehicles through Graham-Staunton, thereby avoiding the effects of the cash collateral restrictions imposed by Debtor's bankruptcy.

---

[5] While attempting to investigate the double flooring issue, which Hyundai learned about from GMAC and an anonymous tip, Dale Ueno had requested that Debtor produce various funding documents. Dale Ueno was advised by an employee or employees of Debtor that the funding documents had been shredded because neither Gutierrez nor "Jody" had any faith in the dates provided on the funding documents. Why Cornelison felt compelled to search for a paper shredder is a bit of a mystery because Gutierrez and Jody later produced the requested funding documents for Hyundai, explaining that they were found in the bottom of Jody's desk, and had not been shredded as previously indicated.

[6] Dale Ueno testified that one check was dated October 26th and two were dated October 31st, and related to vehicles that were ultimately sold by Graham-Staunton on October 26th, November 4th and November 7th. The checks from Graham-Staunton to Debtor remained uncashed as of November 17, 2006.

In addition to the above irregularities, Hyundai also discovered that Debtor was not remitting funds to Hyundai on a timely basis after vehicles were sold. When Hyundai was told by Debtor's employees that funding documents had been shredded, Hyundai took it upon itself to contact retail lenders. Hyundai learned from the retail lenders that many vehicles had indeed been funded, despite the representations of Debtor to the contrary. In fact, in at least one instance, it appears that Debtor may have not paid Steve's for a used vehicle that was floored by Hyundai. The vehicle was then sold, and payment was made to neither Steve's or Hyundai.

Notwithstanding the extremely troubling allegations by Hyundai and the admissions made by Debtor, Debtor demands that Hyundai's "ill-created" Motion be denied and that the Court enter an order "right away allowing normal Use of Collateral as previously consented to and approved by this Court." The Court finds it interesting that as of the date Debtor filed the above statement on November 27, 2006, the only cash collateral orders entered by this Court were an Order on November 8, 2006, which allowed Debtor to use $35,000.00 to pay past due payroll and $6,000.00 to pay insurance, and an Order on November 20, 2006, allowing Debtor to use additional cash collateral for the sole purpose of making the payroll that was due to Debtor's current employees as of Friday, November 17, 2006.

Debtor's sole attack against Hyundai's Motion is Debtor's misplaced belief that Hyundai is oversecured to the tune of $1,313,443.77. The foregoing equity cushion alleged by Debtor includes a law suit receivable of $502,400.00. Debtor offered no evidence with respect to this lawsuit at the December 5, 2006, hearing. Prior evidence showed that the lawsuit is in its early stages and this Court assigns no value to that lawsuit at this time. Also, Debtor now concurs that

Hyundai's prepetition claim was $2,275,375.82 as opposed to $2,163,000.00.[7] Finally, Cornelison testified that he is aware of an offer to purchase the KIA dealership from Debtor for the sum of $400,000.00. Cornelison testified that "we have countered the offer for $575,000 for everything leaving a blue sky value of $355,000." At a later hearing, Debtor's counsel advised the Court that Debtor's counteroffer went unanswered. Utilizing the only offer received by Debtor as of the date of the hearing of $400,000,[8] and Cornelison's blue sky calculation of $355,000, which was based on a sales price of $575,000, convinces this Court that Debtor's KIA franchise is worth somewhere in the neighborhood of $180,000, which is substantially less than the value of $800,000 used by Debtor when it calculated its estimate of Hyundai's alleged $1,313,443.77 equity cushion.

Consequently, disregarding the lawsuit, valued at $502,400 by Debtor, increasing Hyundai's claim to its appropriate amount of $2,275,375.82 and reducing the value of Debtor's franchise from $800,000 to $180,000, quickly reduces Debtor's calculation of Hyundai's equity cushion from $1,313,443.77 to a mere $78,667.95. An equity cushion of $78,667.95, or less than four percent, on a debt of $2,275,375.82 does not adequately protect Hyundai's position, particularly given all the fraudulent acts that have transpired in Debtor's organization over the past few months.

---

[7] Debtor's figure on the amount owed to Hyundai fails to account for payments made by Debtor to Hyundai in early October that were dishonored.

[8] Debtor filed an Emergency Motion to Approve the Contract for the Sale of Assets Pursuant to 11 USC Section 363 of the Bankruptcy Code on January 7, 2007, wherein the value of Debtor's KIA franchise is valued at $375,000. The January 7, 2007, Motion was filed long after the record was closed with respect to Hyundai's Motion and will thus not be considered by the Court at this time. In addition, the sale proposed in Debtor's Emergency Motion has neither been approved nor consummated.

The Court's overall belief that Hyundai's Motion should be granted is further buttressed by testimony that the value of Debtor's new and used vehicle inventory is depreciating at a very rapid rate.  Absent some other type of adequate protection, which has not been offered by Debtor, the Court sees no alternative but to grant Hyundai's Motion and stop any further diminution of Hyundai's secured position.  The Court therefore concludes that Hyundai's Motion to Modify Stay is filed for good cause and should be granted.

However, the question still remains as to whether Hyundai's Motion should be granted as it relates to those vehicles that are identified in the Adversary Proceedings filed by the Auto Auction and Manheim Services Corporation, d/b/a South Seattle Auto Auction.  Because those reclamation claims are still pending and are as of yet unresolved, the Court finds that the relief granted by this Memorandum of Decision and subsequent order will not pertain to those automobiles identified in either Adversary Proceeding Nos. 06-00119 or 06-00120.

As for Hyundai' Motion for Appointment of Trustee, the Court finds that such alternate Motion is moot given the Court's ruling on Hyundai's Motion to Modify Stay.  In accordance with the foregoing, the Court will enter a separate order providing as follows:

IT IS ORDERED that the Expedited Motion to Modify Stay filed by Hyundai Motor Finance Company on November 17, 2006, is GRANTED; and the stay afforded by § 362(a) of the Bankruptcy Code is modified to permit Hyundai Motor Finance Company to pursue its nonbankruptcy remedies against Debtor's new and used vehicle inventory, parts inventory, equipment and fixtures, but excluding those used vehicles identified in Adversary Proceeding Nos. 06-00119 or 06-00120.

IT IS FURTHER ORDERED that Hyundai Motor Finance Company's Alternative

Motion for Appointment of Trustee filed November 17, 2006, is DENIED.

BY THE COURT

/s/ Ralph B. Kirscher
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

15