UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**INCREDIBLE AUTO SALES LLC**,

Debtor.

Case No. **06-60855-11**

## MEMORANDUM of DECISION

At Butte in said District this 10th day of April, 2007.

In this Chapter 11 bankruptcy, the United States Trustee ("UST"), through counsel, filed a Motion to Convert on December 28, 2006, docket entry number 167, seeking to convert this case to Chapter 7 of the Bankruptcy Code. Hyundai Motor Finance Company ("Hyundai") filed a joinder in the UST's Motion on January 4, 2007, at docket entry number 170. Debtor, through counsel, filed an objection to the UST's Motion on January 11, 2007, and noticed the matter for hearing on January 23, 2007. In opposition to the UST's Motion, counsel for Debtor recites:

1.) This Debtor filed Chapter 11 on October 17, 2006, and since that date has been operating as Debtor-in-Possession.

2.) Since that date, all proceeds of all vehicle sales and repair sales have been deposited with approval of this Court and Hyundai Motor Finance (the "Secured Lender") into the Debtor's Trust Accounts.

3.) Reports on the contents of these Trust Accounts have been regularly provided to the Secured Lender without objection[.]

4.) As part of the Cash Collateral Usage Agreement, this Debtor early in this case has

1

changed the management structure of the operating Debtor as agreed with this Court and the Secured Lender as follows:

    a.)    Nick Gutierrez, the majority owner . . . no longer has check signing power under the Chapter 11.

    b.)    All Debtor-in-Possession Checks and Trust Account Transfers to be only handled and signed for by:

        1.)    Ken Cornelison the General Manager; and

        2.)    Zfaneece Gutierrez, the wife of Nick Gutierrez;

5.)    Additionally, the Debtor had agreed with the Secured Lender and the Court that:

    a.)    They would not do any more wholesale sales to Graham Stanton, a Chevrolet Dealership owned by Nick Gutierrez, and

    b.)    That Nick Gutierrez would have no management say so or control.

6.)    Even though a long delay had occurred before this Court entered the Cash Collateral Order, the Debtor continues to operate and sell vehicles.

7.)    The Debtor has employed an Automotive Broker, Southwest Brokerage Company to sell the Kia Franchise and assets of the Dealership.

8.)    Contemporaneously herewith a Motion to approve a Sale Contract with Rimrock Chrysler, Inc. of Billings, Montana has been docketed and is being served.

9.)    The Debtor has requested the approval of a Notice for Upset bids, which has also been filed so that higher bids can be solicited.

10.)    As a result of this initial offer, a large ad has been placed by the Debtor in Crains Automotive News, which is read by almost all parties connected with the Retail

Automotive Business. This ad will run for at least two weeks and has a large National circulation.

11.) Additionally, this Court has set a deadline of January 18, 2007, for the Debtor to file its Plan and Disclosure Statement.

12.) The Debtor's proposal along with its sales efforts is toward confirming a Liquidating Plan to pay creditors.

13.) It should be obvious to the Court and other Creditors that a conversion in this case to a Chapter 7 with the appointment of a Panel Trustee would not be in the best interests of this Debtor, this estate and its creditors.

14.) In the first instance, to sell the Franchise and maximize the sale proceeds from a sale of assets, the Debtor needs to continue to operate the Dealership.

15.) Key provisions of any vehicle franchise is that for this franchise to be viable and continue valid and enforceable and not subject to cancellation, the Dealer must maintain and continue to maintain an operating business.

16.) This Debtor will continue an operating and viable business until the Franchise and assets are sold.

17.) The provision of the Bankruptcy Code relating to dismissal and/or conversion is 11 USC Section 1112(b)(1) of the Bankruptcy Code.

18.) This section as revised calls for the Court to determine whether conversion is in the best interests of creditors and the estate and the movant must establish "cause".

19.) "Cause" includes under Section 1112(b)(4) the following:

\* \* \*

20.) No "cause" can be proven.

21.) In particular there has been no mismanagement of this estate. All steps taken by the Debtor in this case have assured this Court and Creditors that mismanagement does not occur.

At the January 23, 2007, hearing, Debtor was represented by attorney William L. Needler of Northbrook, Illinois; Hyundai was represented by attorney Shane Coleman of Billings, Montana; Auto Auction Associates of Montana, Inc., d/b/a Auto Auction of Montana, a.k.a. Auto Auction of Billings ("Auto Auction") was represented by attorney Bruce F. Fain of Billings, Montana; Kia Motors America, Inc. ("Kia") was represented by attorney Alan C. Bryan of Billings, Montana; First Advantage Credco was represented by attorney Steven M. Johnson of Great Falls, Montana; Ernie and Leanne Dutton and the other co-tenant lessors were represented by attorney Jeffrey A. Hunnes of Billings, Montana; Rimrock Chrysler, Inc. ("Rimrock") was represented by attorney Rodd A. Hamman of Billings Montana; and the UST was represented by senior attorney/attorney Daniel P. McKay of Great Falls, Montana.  Ken Cornelison ("Cornelison"), the General Manager of Debtor, testified and Debtor's Exhibit 5 was admitted into evidence without objection.  After hearing comments from counsel for the UST and Hyundai, the Court agreed to continue the January 23, 2007, hearing to afford Debtor additional time to procure the sale of Debtor's assets.  The hearing on the UST"s Motion was thus continued to February 26, 2007.

At the February 26, 2007, continued hearing, counsel for Debtor and for the UST agreed to continue the matter to March 20, 2007.  At the March 20, 2007, hearing, no appearance was

made on behalf of Debtor, but Hyundai was represented by attorney Shane Coleman; Auto Auction was represented by attorney Bruce F. Fain; Kia was represented by attorney Alan C. Bryan; the UST was represented by attorney Daniel P. McKay; and attorney Gary Deschenes of Great Falls, Montana appeared on behalf of Nick Gutierrez, the majority shareholder of Debtor. The Court heard statements from counsel, but no testimony was presented and no exhibits were offered into evidence.

As explained in an Order entered March 21, 2007, on March 10, 2007, Debtor, through counsel, filed a motion to continue the March 20, 2007, hearing on the UST's motion to convert. Counsel for the UST originally indicated to counsel for the Debtor that the UST would not oppose Debtor's request for a continuance. However, upon learning that business records of the Debtor had been inappropriately removed from Debtor's business premises, the UST promptly filed an objection to Debtor's request for continuance. Based upon the serious allegation of missing business records, the Court denied Debtor's request for a continuance. Although no appearance was made at the hearing on behalf of Debtor, counsel for the UST indicated that he was not opposed to continuing the hearing on his motion for a short period of time. Counsel for the UST stated that he was satisfied that the United States Attorney's Office had the records it needed to further its investigation.[1] Additionally, counsel for the UST recognized that conversion of this case to Chapter 7 may derail the pending sale of Debtor's Kia franchise to Rimrock.

Interestingly, Debtor does not dispute in various pleadings that its business records have

---

[1] Counsel for the UST later reported to the Court that there were "certain electronic and paper records of the Debtor at the Debtor's place of business that [were] not in the custody and control of the U.S. Department of Justice."

been inappropriately removed from Debtor's business premises. Specifically, in a "Status Report of Debtor and its Liquidation" filed March 20, 2007, counsel for Debtor disclosed that Debtor had transferred its 2005 and 2006 records to the United States Department of Justice. However, as reflected on page 2 of the Status Report, Cornelison, the General Manager of Debtor and a minority shareholder of Debtor, admittedly deleted "all the financial records on the office computer located in the General Managers Office." As previously noted by this Court in its March 21, 2007, Order:

> This case cries for conversion. The prior Orders entered by this Court delineate many of the fraudulent activities that occurred in Debtor's operation pre-petition. The recent disappearance of business records appears to this Court to be nothing more than a continuance of Debtor's pre-petition activities. A trustee or some similar person needs to be brought into this case to preserve the few assets that appear to remain and to protect the interests of the creditors. Nevertheless, the Court also appreciates the effort that various creditors are making in an attempt to salvage the potential sales value left in Debtor's assets. Therefore, the Court will continue the hearing on the UST's request for conversion and on Debtor's emergency motion to sell assets.
>
> * * *
>
> Many of the allegations that have been made in this case are criminal in nature and are deeply troubling. This Court agrees with the UST's characterization of this case as a rudderless ship. The efforts in this case to preserve assets and maximize the value of Debtor's bankruptcy estate have been borne solely by counsel for the various creditors. Debtor's attorney has done virtually nothing to benefit either Debtor or its creditors and the Court sees this case as nothing more than an embarrassment to Debtor's counsel.

Debtor has made no appearance in this case since the Status Report was filed on March 20, 2007, a period of three weeks. However, counsel for Kia did advise the Court in a "Notice of Final Approval of Assignment of Franchise Agreement" filed March 30, 2007, that Debtor's Kia franchise had been formally assigned from Debtor to Rimrock. The sale of Debtor's primary assets to Rimrock, the lack of activity by Debtor and the undisputed fact that Debtor's business

records were removed from Debtor's business premises, leaves this Court with the firm conviction that it is now time to convert this case to Chapter 7 of the Bankruptcy Code and put the Debtor in its final resting place.

Prior to enactment of BAPCPA, § 1112(b) provided that a court "may" convert or dismiss a Chapter 11 case for cause. Subsequent to the enactment of BAPCPA, it now appears that the Court's discretion with respect to conversion or dismissal has been somewhat circumscribed. This Court thus concludes that the UST has established cause for the dismissal or conversion of this case unless: (1) unusual circumstances establish that conversion or dismissal is not in the best interest of creditors and the estate, § 1112(b)(1); or (2) absent unusual circumstances, Debtor can: (a) show a reasonable likelihood that a Chapter 11 plan will be confirmed within a reasonable period of time; and (b) provide a reasonable justification for the deletion of business records by Debtor's General Manager and minority shareholder. The other alternative to conversion or dismissal is the appointment of a trustee if such appointment would be in the best interest of creditors and the estate. 11 U.S.C. §§ 1112(b)(1) and 1104(a)(3). As further explained in 7 COLLIER ON BANKRUPTCY, ¶ 1112.04[3] (15th ed. rev.):

> As amended in 2005, section 1112(b) provides further direction in guiding the court's discretion. To begin with, section 1112(b)(1) directs that the court must convert or dismiss the case if the movant establishes cause unless the court determines that unusual circumstances exist and the court enumerates the circumstances. Although section 1112(b) does not define the phrase "unusual circumstances," it clearly contemplates conditions that are not common in most chapter 11 cases. Although each chapter 11 case is to some extent unique, and unusual circumstances may exist in any particular case regardless of its size or complexity, the import of section 1112(b) is that, if cause exists, the case should be converted or dismissed unless unusual facts or circumstances demonstrate that the purposes of chapter 11 would be better served by maintaining the case as a chapter 11 proceeding.

In addition, section 1112(b)(1) directs that the court must convert or dismiss the case for cause unless the appointment of a chapter 11 trustee would be in the best interests of creditors and the estate. Under section 1104(a)(3), the court is directed to appoint a trustee if cause exists to convert or dismiss a chapter 11 case and doing so would be in the best interests of creditors and the estate. Notably, when sections 1104(a)(3) and 1112(b) are read together, it seems clear that the court *must* appoint a chapter 11 trustee rather than convert or dismiss the case if section 1104(a)(3) applies. Neither section 1104(a)(3) nor 1112(b) defines what constitutes the "best interests of creditors and the estate." This phrase, however, has long been used in section 1112 and courts have considered a number of factors in applying it.

Finally, section 1112(b)(2) creates an exception to section 1112(b)(1) by directing that, absent unusual circumstances, the court must *not* convert or dismiss the case if (1) there is a reasonable likelihood that a plan will be confirmed within the time frames specified in subsection 1112(b)(2), (2) the grounds for converting or dismissing the case include an act or omission by the debtor other than substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation and (3) there exists a reasonable justification for the act or omission, and the act or omission will be cured within a reasonable time fixed by the court. In establishing the time frames for confirmation of a plan, section 1112(b)(2) refers to sections 1121(e) and 1129(e), providing deadlines for the filing and confirmation of plans in small business cases. If the case is not a small business case, the time frame is designated as "a reasonable period of time." If the movant establishes cause to convert or dismiss the case for substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, then section 1112(b)(2) does not apply. If the movant demonstrates cause to convert or dismiss the case for a reason other than substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, then the court must consider whether there exists a reasonable justification for the act or omission constituting cause for conversion and dismissal, as well as whether the act or omission can be cured within a reasonable time fixed by the court. Yet if cause for conversion or dismissal exists because the debtor filed its chapter 11 case in bad faith, then section 1112(b)(2) would not apply because, by determining that the debtor filed the case in bad faith, the court would foreclose a reasonable justification for the filing. In addition, a bad faith determination would likely constitute "unusual circumstances" demonstrating that section 1112(b)(2) should not be applied. If the court declines to apply section 1112(b)(2) on the basis of the existence of unusual circumstances, the court must enumerate those circumstances.

As noted earlier, the UST has satisfied her burden by establishing cause, as defined in §

8

1112(b)(4)(B), for dismissal or conversion under § 1112(b)(1) on the basis of the gross mismanagement of Debtor's business operations as outlined in numerous Memorandums and Orders previously entered by this Court. For example, the Memorandum of Decision entered on January 12, 2007, on Hyundai's Expedited Motion to Modify Stay, Alternative Motion for Appointment of Trustee, recites the following:

> By way of background, Nick Gutierrez ("Gutierrez") owns 80% of the stock in Debtor. Gutierrez was also Debtor's President at the time Debtor's bankruptcy petition was filed. Gutierrez is also the majority shareholder of Graham-Staunton, Inc., d/b/a Incredible Chevrolet ("Graham-Saunton"). Ken Cornelison ("Cornelison") is a minority shareholder of both Debtor and Graham-Staunton and has been employed by Debtor since June 1, 2006.
>
> According to Cornelison, Gutierrez relinquished his title as an officer of Debtor a couple weeks prior to the December 5, 2006, hearing. At that same time, Cornelison assumed the position of Vice President and General Manager of Debtor and Gutierrez' wife, Zsaneece, became an officer and check signer of Debtor. Cornelison also testified that Gutierrez transferred his ownership interest in Debtor to Zsaneece. However, Debtor's counsel advised the Court at a hearing held December 19, 2006, that Gutierrez had not transferred his interest in Debtor to Zsaneece as previously represented. At the time of the change in officers, sometime in November of 2006, Gutierrez gave up his officer's salary. At the same time, Zsaneece began receiving an officer's salary of $5,000.00 per month. For her monthly salary, Zsaneece agreed to sign checks if Cornelison was not available, and agreed to review bills and financials.
>
> The evidence in this case overwhelmingly shows that someone in Debtor's organization has falsified certificates of title,[2] invoices and contracts. At a hearing held early on in this case, Gutierrez indicated that Davis was the person who falsified the certificates of title. Similarly, Cornelison testified at the December 5, 2006, hearing that two people were involved in the admitted fraud, Davis and "Jody". "Jody" apparently was and still is Debtor's office manager.

---

[2] A Memorandum of Decision entered by this Court on January 12, 2007, on the Motion for Relief from the Automatic Stay filed by Steve's discusses extensively the efforts Gutierrez undertook, on behalf of Debtor, to obtain copies of certificates of title and falsify such documents. The Court's Memorandum of Decision is incorporated by reference herein. Also, exhibit 23 admitted at the December 5, 2006, hearing, reflects both the true certificates of title and the falsified copies that Debtor submitted to Hyundai in order to obtain flooring advances.

In addition to falsified certificates of title, invoices and documentation of sales, the evidence in this case also shows that Debtor has double-floored inventory. Debtor's counsel explains in Debtor's objection to Hyundai's Motion that: "As to the 'Double Flooring' charge of Hyundai, this was a timing issue of vehicles who left one floor plan and went to another. This occurred over a holiday weekend and was inadvertent ad [sic] not intentional." Contrary to counsel's response, Hyundai's Exhibit 18 shows that at least 19 vehicles were double floored by Debtor, and the number of days that said vehicles were double floored with Hyundai and GMAC ranged from 1 day to 105 days, with all but one of the 19 vehicles double floored nine or more days; a period of time that is undeniably longer than a "holiday weekend". Evidence and testimony exists in the record showing that Debtor floored and sold a vehicle and then later allegedly refloored the vehicle to obtain more money from Hyundai.[3]

Debtor also concedes that it was "out of trust" on certain prepetition vehicles and further admits that it failed to payoff existing liens on vehicles that were taken in on trade. As set forth in Debtor's opposition to Hyundai's Motion:

> 21. The prepetition facts that unpaid liens exist and cars were sold out of trust is not new.
>
> 22. Every car dealer who files a Chapter 11 in this Country, has unpaid liens and out of trust sales on filing.

Debtor's above admissions offer no explanation as to why Debtor was $366,880.00 "out of trust" on Debtor's petition date. Moreover, Debtor failed to explain why the "out of trust" amount increased to $626,131.00 as of November 29, 2006.

Dale Ueno testified that it is not uncommon for a dealership to have a lien open for perhaps 20 to 30 days, yet Exhibit 21 shows that Debtor had liens on approximately 12 vehicles, that had been taken in on trade by Debtor, where the liens remained open for more than a month as of Debtor's petition date. Indeed, it appears from Exhibit 21 that Debtor took a 2004 Optima in on trade and sold the vehicle on April 17, 2006, and still had not paid off the previously existing lien as of Debtor's petition date of October 17, 2006. These people were most likely the consumer creditors who appeared at Debtor's § 341 Meeting of Creditors complaining that Debtor had not paid the liens on their trade-ins and that in some cases, the consumers were being forced to make multiple car

---

[3] The vehicle in issue is a 2003 Acura that was originally floored on August 2, 2006, and paid off on August 18, 2006. Debtor apparently refloored the same vehicle on September 5, 2006, and then paid it off a second time on October 5, 2006.

10

payments.

Dale Ueno's testimony also highlighted a few of the instances where someone in Debtor's organization had falsified sales documents. For instance, four vehicles: a 2005 KIA Sportage; 2005 Chevy Classic; 2004 Chevy Impala and 2005 Dodge Neon, had two deal jackets; one containing the correct information and one containing fabricated information. The information in the fabricated deal jacket for the 2005 KIA Sportage was altered to reflect that the vehicle was sold on September 23, 2006, when in fact the vehicle was wholesaled on September 14, 2006. Similarly, the falsified deal jacket for the 2004 Chevy Impala showed that the vehicle was sold on September 23, 2006, when in fact the vehicle was sold on August 29, 2006, and Debtor received funds for the sale on September 12, 2006. The fabricated deal jackets for the 2005 Chevy Classic and 2005 Dodge Neon show more of the same; that someone in Debtor's organization was falsifying documents.

Despite all the foregoing, particularly the serious allegations of fraud, Cornelison, as Vice President and General Manager of Debtor, has taken no steps to investigate any of the frauds, other than to ascertain whether a paper shredder existed on Debtor's premises.[4] Cornelison seemed totally unconcerned about the allegations, even though the two individuals implicated in the fraud are still employed by Debtor, or its sister organization, Graham-Staunton.

Equally troubling to the Court is the fact that Debtor has wholesaled at least three vehicles to Graham-Staunton postpetition. These wholesale transactions are troubling in three respects. First, Hyundai discovered that although Graham-Staunton had tendered checks to Debtor for each of the vehicles, none of the checks had been cashed by Debtor.[5] Second, the three vehicles at issue were apparently sold off of Debtor's secondary lot, referred to as

---

[4] While attempting to investigate the double flooring issue, which Hyundai learned about from GMAC and an anonymous tip, Dale Ueno had requested that Debtor produce various funding documents. Dale Ueno was advised by an employee or employees of Debtor that the funding documents had been shredded because neither Gutierrez nor "Jody" had any faith in the dates provided on the funding documents. Why Cornelison felt compelled to search for a paper shredder is a bit of a mystery because Gutierrez and Jody later produced the requested funding documents for Hyundai, explaining that they were found in the bottom of Jody's desk, and had not been shredded as previously indicated.

[5] Dale Ueno testified that one check was dated October 26th and two were dated October 31st, and related to vehicles that were ultimately sold by Graham-Staunton on October 26th, November 4th and November 7th. The checks from Graham-Staunton to Debtor remained uncashed as of November 17, 2006.

>New Beginnings.  Cornelison testified that Debtor's New Beginnings lot is staffed by three Graham-Staunton employees, who were previously employed by Debtor on Debtor's petition date.  One of the three employees is Davis.  Third, while the vehicles were sold from Debtor's secondary lot by former employees of Debtor, Gutierrez and Cornelison were able to siphon the retail profits from the three sales by first wholesaling the vehicles to Graham-Staunton and then retailing the vehicles through Graham-Staunton, thereby avoiding the effects of the cash collateral restrictions imposed by Debtor's bankruptcy.
>
>In addition to the above irregularities, Hyundai also discovered that Debtor was not remitting funds to Hyundai on a timely basis after vehicles were sold.  When Hyundai was told by Debtor's employees that funding documents had been shredded, Hyundai took it upon itself to contact retail lenders.  Hyundai learned from the retail lenders that many vehicles had indeed been funded, despite the representations of Debtor to the contrary.  In fact, in at least one instance, it appears that Debtor may have not paid Steve's for a used vehicle that was floored by Hyundai.  The vehicle was then sold, and payment was made to neither Steve's or Hyundai.

The facts in this case establish that Debtor's business operations were grossly mismanaged both pre-petition and post-petition.  Accordingly, the Court's inquiry now turns to whether unusual circumstances show that dismissal or conversion is not in the best interest of creditors or the estate.  As noted earlier, Debtor's counsel did not appear at the March 20, 2007, hearing.  The actions, or inactions, of Debtor's counsel in this case preclude this Court from articulating unusual circumstances that show that either conversion or dismissal is not in the best interest of the creditors.

While dismissal of this case may not provide any advantage to Debtor's creditors, conversion to Chapter 7 of the Bankruptcy Code would allow for the appointment of a Chapter 7 Trustee who could liquidate Debtor's remaining assets in an expeditious manner.  The conversion of this case to Chapter 7, as opposed to the appointment of a trustee under § 1112(b) and § 1104(a)(3), would also better serve the creditors in this case, where the Debtor no longer

has an ongoing business to preserve, in that the creditors would not be burdened with the higher fees associated with the administration of a Chapter 11 case.

Given the absence of unusual circumstances, the Court's final focus now shifts to whether Debtor has shown a reasonable likelihood that a Chapter 11 plan will be confirmed within a reasonable period of time; and has provided a reasonable justification for the disappearance of Debtor's business records. Approval of Debtor's disclosure statement was previously denied on the grounds that it was "woefully inadequate" and it appears, based upon Debtor's pathetic efforts in the past, highly unlikely that Debtor will be able to formulate a confirmable Chapter 11 plan at any time.

For the reasons discussed above, the Court finds that conversion of this case to Chapter 7 of the Bankruptcy Code, and appointment of a Chapter 7 trustee to administer the remaining assets of Debtor's bankruptcy estate, is in the best interest of Debtor's creditors. Thus, consistent with this Memorandum of Decision, the Court will enter a separate order providing as follows:

IT IS ORDERED that the Motion to Convert filed by the United States Trustee on December 28, 2006, is granted; and this case is converted to Chapter 7 of the Bankruptcy Code.

BY THE COURT

*/s/ Ralph B. Kirscher*
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

13