**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA**

In re

**INCREDIBLE AUTO SALES LLC**,

          Debtor.

Case No.  **06-60855-7**

# MEMORANDUM  OF  DECISION

At Butte in said District this 18th day of May, 2007.

Two applications for professional fees filed by William L. Needler ("Needler"), attorney for the Debtor, are pending in this Chapter 7 bankruptcy case that was converted from Chapter 11 by Order entered on April 10, 2007.  Neither Debtor nor any other party in interest has filed a notice of appeal from the Memorandum of Decision and Order converting this case to Chapter 7 and thus, the Court's findings of fact and conclusions of law set forth in the April 10, 2007, Memorandum of Decision are final, undisputed and deemed established for purposes of this Memorandum of Decision.

Needler filed his "First Interim Application for Fees and Expenses Sought in Chapter 11" ("First Interim Application") on March 8, 2007, seeking an award of fees and costs, pursuant to 11 U.S.C. § 330(a), in the sum of $100,956.71 for services performed, and costs incurred, between September 15, 2006, and February 18, 2007.  Needler filed a "Final Application of William L. Needler and Associates, Attorneys for Debtor, for Fee Allowance and

1

Reimbursement of Costs" ("Final Application") on May 13, 2007, seeking an additional award of fees and costs in the sum of $14,236.14 for services performed, and costs incurred, between February 28, 2007, and March 30, 2007. The combined total of the fees and costs requested by Needler is thus $115,192.85.

The United States Trustee ("UST") filed written opposition to Needler's First Interim Application on March 15, 2007, and after due notice, a hearing on approval of Needler's First Interim Application was held in Billings on April 24, 2007. Needler appeared at the hearing in support of this First Interim Application and argued that he was hired to do a job and that he did the job for which he was hired in that he maximized the value of Debtor's assets. Attorney Daniel P. McKay ("McKay") of the Office of the UST appeared in opposition to Needler's First Interim Application and explained that he would stand by the UST's written opposition to the First Interim Application. However, McKay reiterated that a Chapter 11 bankruptcy is a comprehensive reorganization of the debtor's affairs and that in this particular case, Debtor did not fully consider or appreciate the importance of the requirements for such a reorganization. McKay posited that the sale of Debtor's franchise was accomplished in large part due to the pro-active efforts of this Court. McKay did not dispute that a successful result occurred if one considers merely a pay-down of Hyundai's claim. McKay, however, contends that given the alleged expertise of Needler compared to the performance of Needler in this case, no justification has been adequately proffered for the level of fees requested by Needler.

The Trustee's written opposition was thus:

1. Generally this is a difficult fee application to evaluate. On the one hand, the main objective of finding a buyer for the bulk of the assets of this estate has been realized. On the other hand, it appears that to some extent, progress in this case is attributable as much to this Court's active management with regard to cash

2

collateral and sale issues as it is to the efforts of Debtor's attorney. The events leading up to the Court's approval of the Debtor's motion to sell assets to Rimrock Chrysler is the clearest example of this. On January 7, 2007, the Debtor filed an "emergency" motion to approve the contract of sale to Rimrock Chrysler (Docket no. 176). In spite of being styled an "emergency" motion, the motion was accompanied by a notice giving parties ten days to object and set the motion for hearing. That notice, rather than providing that an objecting party had to give at least 20 days notice of hearing, provided instead:

> This contested matter shall be scheduled for hearing for the next hearing date scheduled in the division within which the case of filed.........In the event such scheduled hearing date is thirty (30) days beyond the filing date of the motion for relief, then a preliminary hearing within such thirty (30) day period shall be scheduled by the responding party after such party contacts the Clerk of Court to confirm the preliminary telephone hearing date and time, which shall be set forth in the response.

Under this Court's local rules such a notice provision is peculiar to motions to lift the automatic stay and is not applicable to a sale motion under § 363 of the Bankruptcy Code. Mont. LBF 8.  Filed with the motion also was a proposed "Notice to All Creditors, Interested Parties and Other Bidders of the Sale of Assets". That proposed notice provided that objections to the sale would be heard on the next hearing date after February 15, 2007. Further, it stated "Notice of the objection period for objection [sic] or new bids is extended to February 10, 2007."

Perhaps realizing that these conflicting notice provisions made no sense, this Court, on January 12, 2007, set the sale motion for hearing on January 23, 2007 (Docket no.184). At that hearing, Debtor's attorney urged the Court to approve the sale to Rimrock even though no notice of any bidding procedures had been sent. It is the recollection of the undersigned that this Court solicited testimony regarding what efforts had been made to attract potential buyers in order to create a record sufficient to support approval of the sale to Rimrock without imposing any formal bidding procedures or further notice requirements.

While it is true that Debtor's attorney does not regularly practice before this Court, that is no excuse for failing to follow the procedures that govern such practice. Rather that [sic] associate with local counsel that is familiar with the procedural requirements of this Court, Debtor's attorney associated with an attorney that was just as unfamiliar with such practices as he is. Had this Court not steered the sale motion toward approval in spite of the procedural flaws, this case
might have been dismissed or converted before any sale was approved.

3

2. The following are specific examples of instances in which pleadings filed by Debtor's attorney were inadequate, or not filed on a timely basis:

a. Docket no. 40. Included request for Court to reset the 341 meeting.  A review of the local rules would have informed Debtor's attorney that such request must be made to the UST.

b. Docket no. 53. Amended application to employ Debtor's attorney. The employment had already been approved. The Court noted in a footnote in the order approving the amended application that it was substantially similar to the first application.

c. Docket no. 110. Application to Employ Southwest Brokerage Company. The Court denied the application, with leave to refile, because of what the Court called "obvious errors contained in the attachment to Debtor's Application." (Docket no. 151). Debtor's attorney did not file another application for employment of the broker until February 28, 2007, over five weeks after denial of the first application, thereby putting the broker's fee in jeopardy.

d. Docket no. 165. Application to employ Clarke Rice as co-counsel. This application was not filed until this case had been pending for over two months. The application was withdrawn after an objection was filed by the UST pointing out that Mr. Rice might not be disinterested and might have conflicts of interest. Had the application been timely filed at the start of the case, Mr. Rice could have made a determination at that time as to whether to withdraw the application or contest the objection. Instead he provided services for over two months for which he cannot apply for allowance as an administrative expense. Further, failure to file the application timely deprived the Court, the UST, and other parties the opportunity to assess whether the employment of Mr. Rice potentially was detrimental to the estate.

e. Docket no. 215. Plan of Reorganization. The plan provides that all claims are unimpaired "since all creditors will receive their claims [sic] pursuant to a Title 11 Code liquidation sale." Under Bankruptcy Code § 1124 **all** of the claims are impaired because the plan neither leaves the rights of any creditors unaltered (§ 1124(1)) nor provides for curing of defaults [sic] reinstatement of maturities, or any of the other requirements of § 1124(2).  If all of the claims truly were unimpaired, as asserted in the plan, no creditors would have the right to vote to accept or reject the plan.

f. Docket no. 224. Disclosure Statement. The Disclosure Statement

4

also asserts that the proposed plan does not require a vote but
inexplicably requests that all creditors vote in favor of the plan
anyway. It is generally poorly drafted and wholly inadequate.
Numerous objections were filed and Debtor's attorney
acknowledged the need to amend it.

3. Bankruptcy Code § 330(a)(3) provides in part:

In determining the amount of reasonable compensation....the court
shall consider the nature, the extent, and the value of such services,
taking into account all relevant factors, including -

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the
administration of, or beneficial at the time at which
the service was rendered toward the completion of,
a case under this title;

(D) whether the services were performed within a
reasonable amount of time commensurate with the
complexity, importance, and nature of the problem,
issue, or task addressed;

(E) with respect to a professional person, whether
the person is board certified or otherwise has
demonstrated skill and experience in the bankruptcy
field; and

(F) whether the compensation is reasonable based
on the customary compensation charged by
comparably skilled practitioners in cases
other than cases under this title.

Applying these criteria to the present fee application is very much a subjective
task. The fees sought for the time spent preparing the documents referenced in
paragraph 2 above, approximately 24 hours, are not great in relation to the total
amount requested. Disallowing such fees would result in a reduction of about
$6,500. However, it is the assertion of the UST that a larger reduction is
warranted based on an assessment of the first four criteria in § 330(a)(3).
Debtor's attorney's hourly rate exceeds that charged by local attorneys doing
chapter 11 work in the State of Montana. The Court should expect the services to
be performed as skillfully as would be expected from the most qualified Montana

5

attorneys. The UST asserts that, unfortunately, that has not been the case. Many of Debtor's attorneys pleadings appear to have been hastily thrown together and poorly researched. His assertions in the plan and disclosure statement that the plan does not require a vote for confirmation demonstrates an unacceptable lack of understanding of the legal requirements of Chapter 11 of the Bankruptcy Code. His failure to file timely applications for the employment of professionals evidences a disregard of the Debtor's duties under the Bankruptcy Code and of the interests of the professionals that provided services to the estate in reliance on the performance of those duties. For these reasons the UST asserts that a reduction of one third to one half of the requested fees is justified under the circumstances of this case.

Needler countered McKay's and objections at the April 24, 2007, hearing by stating:

I frankly believe that all this discussion about the plan and disclosure is ridiculous in this case. There was no way that this Debtor could operate after the sale. This was a Chapter 7. This was going to a Chapter 7. You know it, I know and the UST knows it. So the information in the disclosure statement and all the time amending the plan may not have been up to the UST's standards, but it really was not a necessary step here. Now, if the Court wants to dock me for some time on the disclosure and plan, that's fine, I'll abide by that, Judge. But, the point is that this was a Chapter 7. There was no way we could go forward, we were out of money, we were closed down, there was no money, there was no cash collateral. To use cash collateral here would have been counterproductive. So all the way through here, as far as I was concerned, although we objected to conversion, I was told to object to conversion, but I talked to Mr. Womack a number of times prior to this case about the assets that would be left and the status that this case would be in. This was going to a Chapter 7. So the plan didn't measure up but it wasn't going to confirmation, there was no way. There was no feasability for anything and your honor didn't rule, there is a case called *In re Braniff* [presumably *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935 (5th Cir. 1983)], I think, which is a liquidation, a 363 sale, and that Judge down there ruled way back that you didn't need a plan and disclosure statement for a 363 sale. Your honor didn't . . . that's silly to require a plan and disclosure statement for a 363 sale. So all the objections on the sufficiency of the disclosure statement and the contents of the plan, it was an effort that was going nowhere because this was a Chapter 7. The Trustee can complain about some of the operations of the Debtor, but just remember the situation that counsel arrived at when he came to this case. First place, there were all these facts that related to out of trust, unpaid consumers and I stated early on in this case that unpaid consumers and out of trust were normal in a Chapter 11 for a car dealer. And the UST took exception to that, that it wasn't normal. Well, let me tell you, I've never had a case where there weren't unpaid consumers prepetition or had a case were there isn't out of trust. The reason that you file a Chapter 11 to protect the

6

franchise, as a matter of fact, it is out of trust.  Now how I can be blamed for the prepetition out of trust , how I can be blamed for the unpaid consumers is beyond me and that's basically what the UST is trying to say here.

Irrespective of the UST's objection to Needler's First Interim Application, this Court has a separate and independent obligation to review all fee applications to evaluate the propriety of the compensation requested.  *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 841 (3rd Cir. 1994); *In re Wildman*, 72 B.R. 700, 701 (Bankr. N.D.Ill. 1987).  In *Busy Beaver*, the court explained:

> [T]he integrity of the bankruptcy system ... is at stake in the issue of a bankruptcy judge's performance of the duty to review fee applications *sua sponte*.  The public expects, and has a right to expect, that an order of a court is a judge's certification that the result is proper and justified under the law....  Nothing better serves to allay [public perceptions that high professional fees unduly drive up bankruptcy costs] than the recognition that a bankruptcy judge, before a fee application is approved, is obliged to [review it carefully] and find it personally acceptable, irrespective of the (always welcomed) observation of the [United States trustee] or other interested parties.

*Id.* (*quoting In re Evans*, 153 B.R. 960, 968 (Bankr. E.D.Pa 1993)).

Extensive case law has developed regarding the amount and type of information that applicants must include in their applications.  The case of *In re WRB-West Associates*, 9 Mont. B.R. 17, 18-20 (Bankr. D. Mont. 1990) summarizes thus:

> Pursuant to 11 U.S.C. §§ 327-330 and Bankruptcy Rules 2016 and 2017, this Court has an independent judicial responsibility to evaluate fees requested from the estate.  *In re S.T.N. Enterprises, Inc.*, 70 B.R. 823, 831 (Bankr. Vt. 1987); *In re Seneca Oil Co.*, 65 B.R. 902 (Bankr. W.D. Okla. 1986); *In re Frontier Airlines, Inc.*, 74 B.R. 973 (Bankr. Colo. 1987).  The burden of proof to show entitlement to all fees requested from the estate is on the applicant.  *In re Lindberg Products, Inc.*, 50 B.R. 220, 221 (Bankr. N.D. Ill. 1985).  This burden is not to be taken lightly, especially given the fact that every dollar expended on fees results in a dollar less for distribution to creditors of the estate.  *In re Yankton College*, 101 B.R. 151, 158 (Bankr. S.D. 1989); *In re Pettibone Corp.*, 74 B.R. 293, 305 (Bankr. N.D. Ill. 1987).  All expenses and fees must be shown as both actual and

7

necessary under § [330(a)(3)] of the Code.  *S.T.N.*, 70 B.R. at 834; *Yankton College*, 101 B.R. at 158; *Seneca Oil*, 65 B.R. at 912.  Moreover, *In re Convent Guardian Corp.*, 103 B.R. 937, 939-940 (Bankr. N.D. Ill. 1989) holds:

> Bankruptcy Rule 2016 provides that "[a]n entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file with the court an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." (emphasis added)  The Application should contain a detailed list of expenses including the date, the type and the amount.  Expenses must be actual not estimates.  *In re Wildman*, 72 B.R. 700-731 (Bankr. N.D. Ill. 1987); *In re Marsh*, 14 B.R. 615, 617 (Bankr. E.D. Va. 1981).  An expense is necessary if it is incurred because it was reasonably needed to accomplish the proper representation of the client.  *Wildman*, 72 B.R. at 731.

The above excerpt demonstrates that this Court is obligated to review each request for fees and costs to insure that applicants provide:

> 1.  a description of the services provided, setting forth, at a minimum, the parties involved and the nature and purpose of each task;
>
> 2.  the date each service was provided;
>
> 3.  the amount of time spent performing each task; and
>
> 4.  the amount of fees requested for performing each task.

As explained by the Ninth Circuit Court of Appeals: "The detailed fee applications enable the bankruptcy court to fulfill its obligation to examine carefully the requested compensation in order to ensure that the claimed expenses are justified."  *In re Nucorp Energy, Inc.*, 764 F.2d 655, 658 (9th Cir. 1985).

Attached to Needler's First Interim Application and Final Application are billing statements setting forth the services provided by Needler, the dates the services were provided,

and the amount of time spent on the services.  For the reasons discussed below, the Court finds it appropriate to award Needler $18,040.00 in fees and $4,610.69 in costs.  This Memorandum of Decision sets forth the Court's findings of fact and conclusions of law.

In reviewing the record in this case, the Court notes that Debtor promptly filed an application on October 17, 2006, seeking authorization to employ Needler as Debtor's counsel.[1] Needler asserts in the application that "Needler and the firm of William L. Needler and Associates, have considerable experience in Chapter 11 proceedings and especially Retail Automotive Debtor Chapter 11's and are well qualified to provide representation in these proceedings."  Needler also filed on October 18, 2006, a request to appear pro hac vice.[2]  The foregoing request recites that Debtor's case was filed by Needler and his co-counsel, Clarke B. Rice ("Rice") of Billings, Montana.  The application to employ Needer and the motion to appear pro hac vice were both granted on October 19, 2006.

Debtor's case proceeded quite smoothly for a few days, but on or about October 23, 2006, difficulties in resolving issues with creditors occurred in virtually every respect.  Needler was quick to explain on numerous occasions that this case was filed on an emergency basis, thus precluding Needler from properly preparing this case prior to filing.  Needler's comments that this case was filed on an emergency basis are suspect.  Needler began meeting with his "client"

---

[1]  For reasons not clear to the Court, Debtor filed an Amended Application to Employ Attorneys on November 10, 2006, seeking once again to employ Needler and the firm of William L. Needler and Associates.  The Court approved the Amended Application in an Order entered November 27, 2006.

[2]  In the request to appear pro hac vice, Needler again touts his bankruptcy experience: "Since 1980, this Applicant has represented some 30 or more retail Automotive Dealers in various States of the United States.  This Applicant[,] an experienced Chapter 11 Attorney[,] seeks leave to represent this Debtor Corporation before this Court."

9

on September 15, 2006, an entire month before Debtor's bankruptcy petition was filed.  In fact,

Needler is requesting an award of fees in the amount of $5,747.50 and costs of $7.00 that were

incurred prior to the commencement of Debtor's case.  It would thus appear to this Court that

Needler spent considerable time, approximately 21 hours [$5,747.50/$275 per hour] preparing

this Debtor for its bankruptcy filing.

      However, more troubling is Needler's overuse of the term "emergency", for under

Needler's direction, almost everything in this case was an emergency.  For instance, the first

substantive motion filed by Needler was "Debtor's Emergency Motion as to Use Cash Collateral

Pursuant to 11 USC Section 363 of the Bankruptcy Code and as to Offer of Adequate Protection

to Hyundai Motor Finance Company" ("Cash Collateral Motion") filed October 26, 2006.

According to Needler's billing statement, Needler began drafting Debtor's "Emergency Cash

Collateral Motion" on September 19, 2006.  Needler then waited until October 26, 2006, nine

days after Debtor's petition was filed, to file Debtor's Cash Collateral Motion.  If the use of cash

collateral was so critical, one would think that Needler would have included such motion as one

of his first day motions.

      Also on October 26, 2006, Hyundai Motor Finance Company ("HMFC") filed its own

"Emergency Motion to Prohibit or Condition Use, Sale or Lease of Inventory and/or Cash

Collateral" seeking to prohibit or condition Debtor's use of cash collateral for the following

reasons:

        4. As of October 23, 2006, HMFC had advanced $2,243,608.81 to the
Debtor that remains outstanding and unpaid.  The inspection held that day
identified actual inventory of new and used vehicles valued by HMFC at
$1,800,661.81.  Debtor has failed or so far refused to remit $442,947.00 of
proceeds of the sales of vehicles to HMFC contrary to the terms of the Inventory

10

Loan and Security Agreement.

5. HMFC's inspection also found that new and used vehicles valued at $76,067.00 have been sold by the Debtor since the date of the bankruptcy and, on information and belief, that the proceeds thereof are being held in a segregated account to which HMFC has no access. The proceeds obtained since the commencement of this case have not been remitted to HMFC.

6. HMFC is informed and believes certain of the vehicles securing Debtor's obligation under the Inventory Loan and Security Agreement (i) have been "double floored" with another lender, (ii) liens on vehicles taken as "trade in" have not been paid in full by Debtor and (iii) as alleged above, Debtor was "out-of-trust" in the approximate amount of $367,000 as of the date of bankruptcy and such amount has increased during the brief pendency of this case. In addition, at least two auto auctions have alleged that vehicles subject to HMFC's security interest were purchased with checks for which Debtor had insufficient funds and, therefore, claim an interest in the vehicles so purchased. HMFC has been required to answer and deny such allegations to protect its security interests in such vehicles.

After reviewing Debtor's Cash Collateral Motion and HMFC's Motion and upon receipt on October 27, 2006, of an objection to Debtor's Cash Collateral Motion by Manheim Services Corporation, d/b/a South Seattle Auto Auction" ("South Seattle"),[3] the Court promptly entered a notice of hearing on October 27, 2006, setting November 1, 2006, as the date of the hearing on Debtor's Cash Collateral Motion. On October 31, 2006, one day prior to the scheduled hearing, Debtor, through Needler, filed an "Emergency Motion to Continue the Emergency Hearing on Cash Collateral Hearing Reset for 11/1/06 for Cause."[4] Debtor's request was granted and the hearing on Debtor's Cash Collateral Motion and HMFC's Motion were continued to November

---

[3] Objections to Debtor's Cash Collateral Motion were also filed by Auto Auction Associates of Montana, Inc., d/b/a Auto Auction of Montana, a/k/a Auto Auction of Billings ("Auto Auction of Montana"); HMFC; and Steve's Auto Sales, Inc.

[4] The basis for Debtor's request for a continuance was that Needler had "an Emergency Cash Collateral Hearing in Albuquerque, New Mexico on another new car case."

6, 2006.

Debtor's next motion was an "Emergency Motion to Extend Deadlines for Filing Schedules, Statement of Affairs and Initial U.S. Trustee Report and to Reset Date for 341 Meeting" filed November 5, 2006.  In an Order entered November 6, 2006, the Court granted Debtor additional time to file its schedules and statement of financial affairs and set Debtor's Motion to Extend Deadlines for Filing [the] Initial U.S. Trustee Reports for hearing on November 14, 2006.  Despite having read and reviewed the Court's Local Rules on November 13, 2006, as reflected on Needler's billing statement, Needler inappropriately filed Debtor's request to reset the date of the 341 Meeting with this Court rather than the U.S. Trustee as required by Mont. LBR 2003-4.[5]  The Court, therefore, denied Debtor's request to reset the date of Debtor's 341(a) Meeting of Creditors.

The hearing on Debtor's Cash Collateral Motion was eventually held on November 6, 2007.  Debtor, HMFC, South Seattle, Auto Auction of Montana, and Steve's Auto Sales, Inc., were represented at the November 6, 2006, hearing.  During the course of the hearing, the parties agreed, in principal, that Debtor should be allowed to use its cash collateral because cash was a vital component of Debtor's continued operations.  The parties verbally recited the general terms of the stipulation and agreed to file a written stipulation to that effect with the Court.  The representatives for each entity involved in the cash collateral issue and their attorneys confirmed on the record their agreement to the verbally recited terms of the stipulation.  Until such stipulation was filed and approved, the parties further agreed that the Court could enter an order

---

[5] The first sentence of Mont. LBR 2003-4.  Continuance of Creditors' Meetings., reads: "An application seeking the continuance of a creditors' meeting set pursuant to 11 U.S.C. § 341(a) shall be made to the U.S. Trustee."

allowing Debtor immediate use of cash collateral for the sole purpose of paying past due payroll and present insurance obligations. In an Order entered November 7, 2006, the Court granted Debtor limited use of cash collateral and granted the parties through November 13, 2006, to file a stipulation setting forth the terms of Debtor's use of cash collateral.

Between November 6, 2006, and November 13, 2006, Debtor and HMFC reached an impasse on the cash collateral stipulation. Thus, instead of receiving a fully executed stipulation on November 13, 2006, the Court received a "Motion for Entry of Order Allowing Use of Cash Collateral" filed by HMFC and a "Stipulation as to the Use of Collateral Under 11 U.S.C. Section 363 and Adequate Protection Under 11 U.S.C. Section 361 of the Bankruptcy Code" filed by Debtor. The Stipulation filed by Debtor was not signed by counsel for HMFC, South Seattle, Auto Auction of Montana or Steve's Auto Sales, Inc., but rather, was signed only by Needler and Rice. HMFC's November 13, 2006, Motion was accompanied by a proposed order allowing Debtor's use of cash collateral. HMFC's Motion explained, in part:

> [T]he parties have been unable to reach agreement on a written stipulation[.] . . . Debtor has failed to negotiate the written terms in good faith. Debtor's initial draft of a Stipulation as well as the draft provided to HMFC's counsel Saturday failed to include even the most basis agreed upon terms, such as HMFC's replacement lien in Debtor's proposed new motor vehicle inventory or even a budget for use of cash collateral. HMFC has noted these patent deficiencies to Debtor's counsel, but Debtor has failed or refused to make even the most basic changes. HMFC presented Debtor with a comprehensive Stipulation that would govern the handling of cash collateral and replacement inventory, which draft included features suggested by Debtor. In particular, proposed Exhibits A and B to the Proposed Order, establishing procedures for use of trust accounts and for handling replacement collateral, were obtained from Debtor's motion and from Debtor's local counsel, respectively. Debtor has failed or refused to respond in any meaningful way.

> The Court's Order required the parties to file a Stipulation by Monday, November 13. Counsel for HMFC has attempted to negotiate with Debtor's counsel, Mr. Needler, over the weekend without success. HMFC has been

13

informed and believes that Mr. Needler is traveling and will not be available until
the Court's hearing on November 14 related to Debtor's Emergency Motion to
Extend Deadlines for Filing Initial U.S. Trustee Reports - - after the Court's
deadline.  Accordingly, the parties were unable to meet this Court's deadline on
November 13 for filing a Stipulation for implementing the terms of the cash
collateral agreement reached last week in Court.

In view of the parties' disagreement about the details of the cash collateral
stipulation and in view of Debtor's unwillingness to negotiate in good faith or
even be available to discuss the mechanics of implementing this Stipulation,
HMFC submits herewith a proposed Order.  The proposed Order implements the
terms that the parties agreed upon in open court last week.  The detailed
procedures for using cash collateral and for tracking replacement inventory come
almost entirely from Debtor's proposals.

At the hearing held November 14, 2006, on Debtor's Motion to Extend Deadlines for

Filing Initial U.S. Trustee Reports, the Court inquired as to the status of the cash collateral

stipulation.[6]  Needler explained at the hearing that he and Rice had drafted a stipulation that they

felt accurately reflected the oral agreement reached on November 6, 2006.  Apparently oblivious

to HMFC's motion filed November 13, 2006, and the comments contained therein, Needler

stated that he was hopeful he could obtain the appropriate signatures on Debtor's cash collateral

stipulation that day and file the same with the Court.

Nothing was filed on November 14, 15 or 16, but on November 17, 2006, Needler and

Rice filed "Debtor's Emergency Motion to Enter Order Approving Cash Collateral Stipulation".

The cash collateral stipulation attached to Debtor's November 17, 2006, emergency motion was

signed by Needler, Rice, and counsel for Auto Auction of Montana, South Seattle and Steve's

Auto Sales, Inc.  Counsel for HMFC promptly filed a response to Debtor' Motion to Approve

---

[6]  Needler indicated at the hearing that Rice attended Debtor's 341 Meeting of Creditors
held November 13, 2006.  Rice was also in attendance at the November 14, 2006, hearing.
Needler and Rice withdrew Debtor's Motion to Extend Deadlines for Filing Initial U.S. Trustee
Reports.

Cash Collateral Stipulation and the Revised Stipulation setting the matter for hearing on

December 12, 2006.[7]  Hyundai's response provides, in part:

> HMFC does not object to Debtor's alternative motion [for] use of cash collateral
> for the purpose of making its payroll due today to its current employees, provided,
> however that Debtor submits a budget for such payments within five (5) days.
> The only budget that the Debtor has ever provided is its actual expenditures from
> last year.  The amounts on Debtor's last year's budget do not reflect Debtor's
> current cash flow needs.  Last year's salary budget is particularly inaccurate,
> because the Debtor has admitted that it now operates on a skeletal staff, compared
> to previously [sic] years.  HMFC and the other creditors in this case are entitled to
> know exactly how the cash is currently being spent on employee salaries and
> other expenses.
>
>    HMFC objects to the remainder of the Debtor's Motion.  Particularly,
> HMFC denies the self-serving allegations that it has not cooperated with the other
> parties in connection with the cash collateral issue.  HMFC has provided Debtor
> very modest comments and revisions on Debtor's revised draft Stipulation, but
> Debtor has provided no response at all to HMFC.  Among other problems with
> Debtor's draft Stipulation is the Debtor's insistence that HMFC stipulate to an
> incorrect amount of the debt owed to HMFC.

HMFC's response was followed by HMFC's "Expedited Motion to Modify Stay, Alternative

Motion for Appointment of Trustee".

In an Order entered November 20, 2006, the Court allowed Debtor the limited use of

HMFC's cash collateral for the sole purpose of allowing Debtor to meet its payroll obligations

that were due as of November 17, 2006.  The remainder of Debtor's request to use cash collateral

was scheduled for hearing on December 5, 2006.

 Prior to the December 5, 2006, hearing Debtor filed an objection to HMFC's November

13, 2006, second Cash Collateral Motion on November 23, 2006.  Interestingly, Debtor's

November 23, 2006, objection addresses not one substantive issue with respect to HMFC's

---

[7]  By Order entered November 20, 2006, the Court moved the hearing scheduled for
December 12, 2006, in Billings to December 5, 2006, in Butte.

second Cash Collateral Motion.  Debtor's objection takes issue with one of HMFC's attorneys and asserts that "Hyundai is guilty of false charges, bad faith and intentional efforts to 'weasel out' of legitimate findings and consents by this Court." Debtor proceeded to respond, resist and object to "the false motion filed by Hyundai Motor Finance" and to request that the Court "pursuant to Bankruptcy Rule 9011 provide for a hearing on sanction and a hearing on this Motion at the next hearing date."  Debtor also filed an "Additional Motion to be Extended to Request that the Stipulation as to Use of Cash Collateral Previously Filed with the Court be Approved and Cash Usage Include Budgeted Expenditures Through February 28, 2006" on December 3, 2006.

After due notice, a hearing on Debtor's and HMFC's Cash Collateral Motions and on HMFC's "Expedited Motion to Modify Stay, Alternative Motion for Appointment of Trustee" was held in Butte on December 5, 2006.  At the conclusion of the December 5, 2006, hearing, the Court agreed to enter its own order on Debtor's request to use cash collateral through December 21, 2006, and scheduled a hearing for December 19, 2006, on Debtor's request to use cash collateral through February 28, 2007.

Before the Court entered any ruling on Debtor's use of cash collateral through December 21, 2006, Debtor filed a "Motion to Approve Stipulation and Agreement as to Cash Collateral" on December 7, 2006, which motion was accompanied by a "Stipulation as to the Use of Collateral Under 11 U.S.C. Section 363 and Adequate Protection Under 11 U.S.C. Section 361 of the Bankruptcy Code (Revised 11/15/06 and 12/6/06)".  The accompanying stipulation was signed once again by only Needler and Rice, and arguably superseded the stipulations previously filed November 13, 2006, and November 17, 2006.  The Court, after reviewing the record from

16

the November 6, 2006, hearing and after reviewing all the pleadings, entered on December 8, 2006, its first Order allowing Debtor to use cash collateral through December 21, 2007.

HMFC then proceeded to file, on December 13, 2006, an objection to Debtor's December 3, 2006, request to use cash collateral through February 28, 2007. HMFC's objections to any further use of cash collateral by Debtor were numerous and included allegations that Debtor's prepetition sales out of trust were $366,880.00, but as of November 29, 2006, said out of trust sales had increased to $626,131.00. HMFC also argued that it was not oversecured despite the continual assertions by Needler that HMFC was significantly oversecured. Other developments also occurred, such as postpetition insider transactions, including an apparent attempt to transfer vehicles without consideration. The foregoing allegations by HMFC were not disputed by Debtor and served, in part, as the basis for this Court granting HMFC relief from the automatic stay on January 12, 2007.

Notwithstanding the mounting concerns regarding Debtor's continued operations, the Court, in an Order entered December 21, 2006, ruled:

> Upon considering the testimony, the admitted exhibits and the record, the Court finds the decision on Debtor's motion to extend the cash collateral agreement to be a close one. The Court will extend the cash collateral agreement until January 31, 2007, and further requires Debtor to file a motion to extend such cash collateral agreement into February 2007 on or before January 16, 2007, so any objections to such motion can be heard on Tuesday, January 23, 2007[.]

The events that were taking place in this case also caused concern because the Debtor had not taken any effort to file either a disclosure statement or a Chapter 11 plan, which matter, along with other matters, was also addressed in the Court's December 21, 2006, Order:

> Mr. Needler, on behalf of Debtor, also informed the Court that Debtor would file a disclosure statement and a plan of reorganization within 30 days of

17

the date of this hearing.  The Court understands such disclosure statement and plan will be filed on or before January 18, 2007.  Mr. Needler further informed the Court that he would file an employment application on behalf of Clarke B. Rice, whose employment is still not approved after this case has been pending for over 60 days.  The Court further informed Mr. Needler that he needs to comply with Mont. LBR 9013 concerning notice periods and the procedure for filing a response and requesting a hearing.  He further needs to review the Court's local rules concerning filing exhibits and other documents prior to hearings and needs to further generally review this Court's local rules for other procedures that may affect the administration of this case.

Pursuant to the Court's December 21, 2006, Order, Needler did eventually file an application to approve Rice's employment on December 27, 2006, but the application to employ Rice was subsequently withdrawn on January 19, 2007.  Needler also finally filed an amended application to employ Jappy Dickson and Southwest Brokerage Company on January 20, 2007, even though Needler had been instructed to refile the application on December 5, 2006, and even though Jappy Dickson had been attempting to find a buyer for Debtor's auto dealership since sometime prior to Debtor's October 17, 2006, petition date.

Debtor also filed a "Plan of Reorganization" on January 18, 2007, and a Disclosure Statement on January 21, 2007.  However, apparently not mindful of the Court's Order of December 21, 2006, and the directive that required Debtor to file any requests for extensions of the existing cash collateral Order on or before January 16, 2007, Debtor did not file its subsequent "Emergency Motion for an Order Continuing the Debtor's Use of Cash Collateral" until January 22, 2007.

While the foregoing distillation of the record appears perhaps unnecessarily lengthy with respect to a fee request, Needler's delay in filing Debtor's Cash Collateral Motion, coupled with Needler's request for a 5-day continuance of the hearing on Debtor's Cash Collateral Motion and

the fact that Needler's actions did not convey any sense of urgency, as reflected in the fact that the first Order allowing use of cash collateral was not entered until December 21, 2006, and was entered only after the Court abandoned any attempt of receiving a fully executed cash collateral stipulation from Debtor, and instead took it upon itself to draft an Order that was intended to comport with the verbal statements made by Debtor's counsel, and others, at the November 6, 2006, hearing.

What is perhaps most troubling about the foregoing is that Needler was filing motions, which he referred to as "emergency motions" for the use of cash collateral and was continually telling the Court that it was imperative that Debtor get a cash collateral order in place if there was any hope for Debtor's reorganization. The time spent not only by this Court, but by all the parties, on the issue of cash collateral was enormous. Needler then had the audacity to appear at the April 24, 2007, hearing and assert that "[t]his was a Chapter 7. This was going to a Chapter 7. You know it, I know and the UST knows it. . . . But, the point is that this was a Chapter 7. There was no way we could go forward, we were out of money, we were closed down, there was no money, there was no cash collateral. To use cash collateral here would have been counterproductive."

This Court became concerned with the future of a successful reorganization of this case when the parties could not file a written stipulation concerning cash collateral after a verbal stipulation had been recited in the record. The Court further began questioning the ultimate viability of Debtor's reorganization in January of 2007, when Needler filed "Debtor's Emergency Motion to Approve the Contract for the Sale of Assets Pursuant to 11 USC Section 363 of the Bankruptcy Code and to Provide for Upset Bids" on January 7, 2007. Around this same time, the

19

UST filed a motion to convert this case to Chapter 7.[8]  HMFC filed a joinder in the UST's motion to convert.  As the Court tackled the Motion to Modify Stay filed by HMFC in January, it also came to light that Debtor's sales out of trust had increased significantly postpetition.  It was also evident that HMFC was not "significantly oversecured", as argued by Needler, and that Debtor had wholesaled at least three items of its inventory to a sister dealership, thereby allowing the owners of Debtor to reap the retail profits on the vehicles, free of the restrictions placed on such profits under the cash collateral orders in effect in this case.  Therefore, the Court takes exception with Needler's vociferous pontification before this Court on April 24, 2007, that this Court knew that this was a Chapter 7 case dressed up like a Chapter 11.

Needer's admission on April 24, 2007, that this case was going nowhere from its inception places Needler's applications for fees squarely within the analysis set forth in *In re Crown Oil, Inc.*, 257 B.R. 531 (Bankr. D. Mont. 2000), *aff'd* by the United States Bankruptcy Appellate Panel of the Ninth Circuit in an unpublished decision.  As in *Crown Oil*, this case went from bad to worse following the bankruptcy petition date and it is now clearly evident to this

---

[8]  In an Order entered December 21, 2006, this Court specifically directed Needler that he needed "to comply Mont. LBR 9013 concerning notice periods and the procedure for filing a response and requesting a hearing."  On January 7, 2007, Needler filed Debtor's opposition to the UST's motion to convert but failed to notice the matter for hearing.  Thus, on January 10, 2007, the Court entered an Order that reads in part:

> This Court has previously admonished Debtor's counsel for his failure to follow this Court's Local Rules.  Despite such admonition, counsel filed a response to the UST's Motion to Convert on January 7, 2007, and despite the express directive of Mont. LBR 9013-1 and the Notice attached to the UST's Motion, failed to notice the matter for hearing.  Accordingly,

> IT IS ORDERED that "Debtor's Response, Resistence and Objection to US Trustee's Motion to Convert the Chapter 11 to a Chapter 7" filed January 7, 2007, is stricken from the record.

20

Court that the services rendered by Needler, other than preparation of Debtor's petition and schedules, and efforts to sell Debtor's assets, were not reasonably likely to benefit Debtor's bankruptcy estate.  Specifically, the time spent by Needler on the issue of cash collateral was for naught because, according to Needler's own admission, "[t]his was a Chapter 7 . .. [and t]o use cash collateral here would have been counterproductive."  The same holds true for preparation of Debtor's "Plan of Reorganization", which could have been a canned "Plan of Liquidation" and Debtor's Disclosure Statement, that was woefully deficient in every respect.

At the hearing, Needler, referring to *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983), sought to convince this Court that his actions with respect to Debtor's woefully deficient Plan of Reorganization and Disclosure Statement were appropriate in this case because a debtor did not need to satisfy the requirements under Chapter 11 for a sale under 11 U.S.C. § 363. Needler misconstrues the Fifth Circuits holding in *Braniff Airways*.  The Fifth Circuit did not express an opinion on whether § 363(b) is applicable to sales or other dispositions of all the assets of a debtor, or whether such a transaction must be effected pursuant to the voting, disclosure and confirmation requirements of the Code.  *Id.* at 939.  What the Court in *Braniff Airways* did hold, however, is that a "debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets."  *Id.* at 940.  The Court notes that Needler informed the Court during the April 24, 2007, hearing in response to an inquiry by the Court that he did not know what a *sub rosa* plan was

In hindsight, particularly in light of Needler's admissions, the Court is also left to wonder why Debtor would oppose HMFC's request for appointment of a trustee and/or the UST's

request to convert this case to a Chapter 7, when counsel knew from the start that this case would fall flat under Chapter 11.  In this Court's opinion, Needler's actions did nothing but allow Debtor's shareholders additional time to siphon monies out of Debtor, to the detriment of Debtor's creditors, and also allowed Needler to present this Court with an exorbitant request for fees and costs.

In addition to the above actions of Needler, Needler and Rice, on behalf of Debtor, filed on December 4, 2006, an Application seeking to employ Jappy Dickson and Southwest Brokerage Company to sell Debtor's Kia Franchise for the sum of $800,000.  Although the forgoing Application was not termed an "emergency" Application, Needler and Rice did note in the Application that it was "important that this Employment Order be entered on an expedited basis."  Pursuant to a corrective entry entered by the Clerk of Court's Office on December 5, 2006, Needler's Application to employ Jappy Dickson was rejected on the basis that the Application was improperly filed on the Court's electronic case filing system.  Needler was thus instructed to refile the Application.  Needler failed to timely refile the application.

Nevertheless, HMFC filed an objection to Debtor's request to employ Jappy Dickson and noticed the matter for hearing.  Pursuant to the Exhibits attached to Debtor's request, it appeared that Debtor was seeking to sell its Kia franchise at a price of $25,000, with a fee to Jappy Dickson of $100,000.  Following the hearing held December 19, 2007, and given the obvious errors contained in the employment application, the Court denied Debtor's request to employ Jappy Dickson and Southwest Brokerage Company and granted Debtor leave to refile the application with correct attachments.  Needler finally filed an amended application to employ Jappy Dickson and Southwest Brokerage Company on January 20, 2007.  Needler offers no

explanation as to why it took him over three months to finally seek the employment of Jappy Dickson, despite the fact that as of December 4, 2007, Needler represented that it was "important that this Employment Order be entered on an expedited basis".

Similarly, it was not until this Court made several comments to Needer and Rice that Needler finally filed on December 27, 2006, an application to approve Rice's employment, even though Rice had been serving as Needler's co-counsel since as early as October 18, 2006.[9]

In sum, the Court concludes that the only efforts undertook by Needler, that had any potential benefit to Debtor's bankruptcy estate, were those activities that Needler characterizes as "Administrative matters, Creditor meetings, U.S. Trustee Reports, preparation of filing documents, Schedules, Statement of Affairs, and Committee Matters" and "Sale and Protection of Assets including preparation of documents to hire the Broker to sell all assets."  Needler spent a total of 53.4 hours on the above matters at a total charge of $18,040.00.  The other time spent by Needler on interim fee applications ($8,387.50 and $330.00), Debtor's Plan of Reorganization and Disclosure Statement ($2,832.50 and $2,007.50), matters relating to various creditor interests and claims ($8,992.50), cash collateral ($24,585.00 and $110.00), pending litigation ($12,815.00 and $1,897.50), dealer operations ($4,997.50 and $742.50), prepetition litigation ($577.50 and $1,375.00), travel ($11,632.50 and $1,237.50), appeals ($990.00) and protection of Debtor's files ($2,695.00) were never reasonably likely to benefit Debtor's bankruptcy estate given Needler's knowledge from the inception of this case that Debtor had no chance of a successful reorganization.

---

[9]  Needler's billing statement reflects that Needler's involvement or association with Rice in this case began as early as September 16, 2006.

Similarly, giving Needler the benefit of the doubt, the Court finds that the only costs that might have conceivably benefitted Debtor's bankruptcy estate are those costs incurred through November 13, 2006, the date of Debtor's 341(a) Meeting of Creditors. According to this Court's calculations, such costs total $4,610.69. Accordingly, under the standard articulated by this Court in *Crown Oil, supra,* Needler's allowable fees and costs total $22,650.69. The remainder of the fees and costs requested by Needler, totaling $92,542.16 simply cannot be allowed under the circumstances in this case.

Needler asserts in his First Interim Application that he has previously received $26,039.00 from Debtor. Because that amount exceeds the allowable fees and costs of $22,650.69 by $3,388.31, the Court finds the excess payments made by Debtor to Needler in the sum of $3,388.31 must be immediately disgorged to the Chapter 7 Trustee. In accordance with the foregoing, the Court will enter a separate Order that provides:

IT IS ORDERED that the Interim Application for Fees and Expenses Sought in Chapter 11 and the Final Application of William L. Needler and Associates, Attorneys for Debtor, for Fee Allowance and Reimbursement of Costs filed by attorney William L. Needler on March 8, 2007, and May 13, 2007, respectively, are granted, in part, and denied, in part; that attorney William L. Needler is awarded reasonable attorney fees in the sum of $18,040.00 and costs of $4,610.69, for a total of $22,650.69; that William L. Needler shall apply a portion of the retainer in the amount of $26,039.00 to the allowed fees and costs in the total of $22,650.69; and that attorney William L. Needler shall, within ten (10) days of the date of this Order, disgorge the sum of $3,388.31 and remit such sum to the Chapter 7 Trustee, Joseph V. Womack.

BY THE COURT

*Ralph B. Kirscher*

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana