William L. Needler
William L. Needler and Associates
555 Skokie Blvd Ste 500
Northbrook, IL 60062
(847) 559-8330 ph
(847) 559-8331 fax
Bar ID 02025248
E-Mail: WilliamLNeedler@aol.com
     Attorneys for the Debtor
     Incredible Auto Sales LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| INCREDIBLE AUTO SALES L.L.C. | ) | Case No. 06-60855-RBK |
| | ) | |
| | ) | Judge Ralph B Kirscher |
| | ) | |
| Debtor | ) | A Chapter 11 Proceedings |
| | ) | For Reorganization |
| | ) | Converted to a Chapter 7 |

## MEMORANDUM  ON REMAND FROM THE U.S. DISTRICT COURT

## IN SUPPORT OF THE

## THE FIRST INTERIM APPLICATION FOR ALLOWANCE OF FEES AND EXPENSES

## FOR WILLIAM L. NEEDLER THE DEBTOR'S ATTORNEY

## (HEREINAFTER, THE APPLICANT)

## TOGETHER WITH THOSE FEES AND COSTS REQUESTED IN

## THE FINAL AND SUPPLEMENTAL REQUESTS

This Memorandum is in support of the Applicant's three Fee and Cost

Applications and Statements now on file herein and now set for hearing before this

Court on Remand of Appeal from the U.S. District Court for the District of Montana to

this Court.  This Hearing on Remand is set for August 30, 2007 at 9:00 A.M. before this U.S. Bankruptcy Court.

# I.

## STATEMENT OF THE CASE

Under the filings herein, this Applicant requests that this Court award him $105,221.10 in total Fees and Costs and approve the Application of $26,039 in Costs and Fees advanced by Third Parties in this case.  All these Fees and Costs were included in the Final Application never heard by this Court.

This total of Fees and Costs were all in the Appeal filed in this case on 6/11/07 and at Docket #391 – Both Interim Application and final Application which included the First Interim were all on Appeal.

This Order of this Court May 18, 2007 appealed from, by this Applicant, was based not on the evidence presented by the Debtor, Incredible Auto Sales, at trial but was based on unsubstantiated pleading filed by the U.S. Trustee without evidence or testimony and adopted by this Court as "gospel".  These charges were challenged by the Debtor in a previous Pleading filed with this Court on 4/20/07 as Docket #364. (See also at Trial Exhibit 2 filed with the Court.) This Court in the Order at Docket #373 dated 5/02/07 denied any relief.

This matter was then appealed to the Ninth Circuit Appellate Panel.  At the request of the U.S. Trustee, this Appeal was then moved to the U.S. District Court for this District.  This case was docketed as Case No. 07-98-BLG-RFC in the U.S. District Court.

The Article III Court above granted the U.S. Trustee's Motion to Remand, since it properly determined that the Applicant was not granted a Final Hearing in the Article I Court below on his Request in the Final Application for Fees and Expenses filed 5/14/07 at docket # 377.   Requested to be paid were $105,221.89 and the net to be paid $89,153.88.

The Article III Court now has ordered the Remand as of July 27, 2007.

The First Interim Fee and Costs Application filed by the Applicant on 3/08/07 requested the following:

|  |  |
|---|---|
| A.) Fees | $ 90,475.00 |
| B.) Costs | $ 10,481.71 |
| Total | $100,956.71 |
| Less Third Party Advances | $ 26,039.00 |
| NET REQUESTED | $74,917.71 |

The Final Application for Fees and Expenses filed by Applicant on 5/14/07 requested in addition to the above. the following:

|  |  |
|---|---|
| A.) Fees | $13,750.00 |
| B.) Costs | $    486.14 |
| Total | $14,236.14 |

This total of the Final Application requested net, the net of retainer for fees and costs of $ 105,221.10.  This matter is now before this Court on Remand.

The Supplemental Application filed by Applicant on August 25, 2007 now included in the Remand Hearing requests the following:

|  |  |  |
|---|---|---|
| A.) Fees | $ 16,067.50 |
| B.) Costs | $    255.00 |
| Total | $16,322 .50 |

The Supplemental Application requests additionally $16,322.50 in Fees and Costs in pursuing and protecting his Fees and Expenses under 11 USC Section 330.  (Filing of Supplemental Application on 8/25/07 at Docket # 408.

This Debtor, Incredible Auto Sales L.L.C. filed Chapter 11 on October 17, 2006. This Debtor, at that time, was a Kia Franchised Car Dealer located with Dealer facilities for both new and used cars and repairs, at 1832 King Avenue, Billings, Montana.

On the date of filing, road construction on King Avenue in front of this store in Billings, Montana, had literally closed down public access to this Dealership and its showrooms and repair facilities. [1](Note)

This construction overnight stopped the flow of the public from viewing new and used cars on the premises.  It also hindered the access to the Debtor's extensive Repair Facilities on site. [2](Note)

All of its assets were liened to Hyundai Financial (herein after "Hyundai"), which held a pre petition claims of roughly $2,275,000.00. [3](Note)

On the date of filing, the Debtor was "out of trust" with Hyundai, who had denied the Dealer the extension of any additional credit for its purchases under the Floor Plan - All this without proper notice.

Additionally, pre petition efforts were made by a local Auto Auction, to seize cars on the Dealer's inventory lot. This Debtor, like all car dealers country wide, always

---

[1]1,2,3,Note: See further Testimony in Cash Collateral Hearing November 6, 2006.

supplemented its inventory needs with purchases from local Auto Auctions. This Debtor was no exception.

When Hyundai cut off its floor plan, funding on new car sales which event when combined with the blocked access to the Debtor Dealer's premises caused sales to plummet - as also did the Debtor's cash flow.  This was the "knock out blow" which required the Chapter 11 to be filed.

On filing, the Dealer Debtor had 23 new vehicles in inventory with a value of $467,100. and 143 used vehicles with a value of $1,490,691. [4] (Note)

On filing the Debtor estimated that all its asset values were $2,779,620 without the Franchise value. (See testimony November 6, 2006.)

The Debtor had valued this Franchise at filing date at $800,000. [5] (Note)

The Debtor's Attorney William L. Needler was employed by various Orders of the Court on 10/18/06 and 10/19/06 after filing the appropriate Applications for Employment.

On November 6, 2006, this Court heard the Debtor's Emergency Motion for Use of Cash Collateral with Exhibits and Testimony.

Hyundai agreed with its representatives under oath to the Cash Collateral Usage as proposed by the Debtor orally before the Court and in its Emergency Motion.  They stated this on the record. [6] (Note)

Nick Gutierrez agreed to the terms of the Cash Collateral proposal on the record.[7] (Note)

---

[4] Note: See further Testimony in Cash Collateral Hearing, November 6, 2006.
[5] Note: See further Testimony in Cash Collateral Hearing, November 6, 2006
[6] Note: See further Testimony in Cash Collateral Hearing, November 6, 2006
[7] Note: See further Testimony in Cash Collateral Hearing, November 6, 2006

This Court, however, failed to fully approve this Cash Collateral Usage until some 47 days later.  This Order appears at Docket # 159.

This 47 day delay in Cash Collateral Usage and Awards requested by the Debtor caused:

- Mounting operating loses;

- Loses of personnel who quit because pay checks were denied and not paid on time;

- Lack of moneys for advertising;

- Lack of any funds for any Administrative expenses except for insurance;

- Lack of Sales

The effect of this delay in the Court's failure to issue a Cash Collateral Order for this Debtor/Dealer for 47 days was catastrophic.  (See further paragraphs 31 through 43, pages 7 through 9 of Trial Exhibit 3.  Also found at Docket # 383 with Exhibit Group A, B,C,D,E,F and G.

This Debtor, prior to filing the Chapter 11 had a pre petition Brokerage Agreement with a Mr. Jappy Dickson of Southwest Brokerage of Arlington, Texas.

Jappy Dickson was a former Buick, Oldsmobile, Toyota, and Cadillac Dealer from Quincy, Illinois.  He had been in Chapter 11 in the Southern District of Illinois during the 1980's.

During his own personal Chapter 11, he was unable to sell his Dealership and his Franchises, so his case was unsuccessful.

Since that date and his failed dealership, Mr. Dickson had been in the Brokerage Business selling Automotive Franchises all over the Country.

During the period prior to the Chapter 11 of Incredible Auto Sales, when he was seeking to consummate a sale of the equity in the Franchise ("Blue Sky") for Incredible, the sale figure he was instructed to use was $800,000 – he was unsuccessful at this figure.

His employment as a Broker, at flat rate commission figure of $25,000, was approved by this Court.  After that he persuaded Rimrock Chrysler, Dodge, a local retail car dealer located near Incredible's Store to come forth with a "Blue Sky" offer of $250,000 plus cash for parts, lifts and a takeover of a good number of Debtor inventory. (It is this sale which has funded the Hyundai payoff to date.)

This proposed sale was consented to by Hyundai, the Kia Motor Company and all the Creditors except one- It was this one Creditor who delayed the closing for a period of time.  After an extensive hearing, this Court did approve the sale without an approved Plan or Disclosure Statement.

At the same time as this Court set a hearing on Debtor's Motion to Sell the Franchise on January 12, 2007 at Docket # 184, the Court granted the Relief from Stay to Hyundai Financial.  This Order granted Hyundai leave to pursue their State Court Remedies.

Hyundai requested the Debtor to voluntarily turnover their assets.  To this request, the Debtor refused.

No Replevin action was ever filed by Hyundai, but again there was no Order of Court as to Use of Collateral.

In spite of this Court's action, the sale, however, did go through and closed.

Hyundai made no attempt at this point to jeopardize either the sale or the assets since it realized that continued operation of the Debtor was necessary to facilitate and close the sale.  The sale did close through the efforts of the Broker, the Buyer's Attorney and the continuing efforts of the Debtor and its Attorneys. The proceeds of the sale here obtained by the Debtor were then transferred to Hyundai Financial.

Upon closing of the sale, the main remainder assets consisted of a pre petition State Court Law Suit previously filed by the Debtor and its companion Chevrolet Company – Staunton Chevrolet located in Hardin, Montana against United Car Care Case No. 0-v-05-0527 (See the Exhibits of Assets, Trial Exhibit 3 shown as Exhibit C to the Motion of William L. Needler for this Court to Reconsider Order of May 18, 2007 Docket 383.)

The Debtor had also filed with the Court as Exhibit D to this same Motion which is now part of Trial Exhibit 3, a recap of the liquidation of Debtor's assets demonstrating that the majority of the Hyundai $2,275,375.82 debt on filing owed by the Debtor had been paid.

The U.S. Trustee had filed a Motion to Convert to a Chapter 7 and Appoint a Trustee which had pended since 12/28/06.  This Motion had been strenuously objected to by the Debtor.  This objection was based on the possibility that Kia could cancel the Franchise.

The Debtor's continuing resistance to this U.S. Trustee's Motion continued until the case was converted.

The Debtor, prior to this Court's conversion had discussed this case with the

Standing Chapter 7 Trustee in this area.  He acknowledged he could not fund the continuation of the Debtor's State Court Law Suit. It was the continuation of this Law Suit and its funding, which caused the Debtor's resistance to conversion.

It is the Debtor's belief that the Chapter 11 was successful in that in less than 6 months the Chapter 11 main assets had been sold and turned into cash or promised receivables with more assets remaining, hopefully to pay unsecured creditors in the future

The Debtor by this Court's Order for Relief, issued on

 January 12, 2007, its denial of Cash Collateral Usage to fund the continuation of the business made the filing and pursuit of a Plan and Disclosure Statement an effort in futility.

## II.

## PRAYER FOR RELIEF

The Applicant, William L. Needler and Associates requests this Court on Remand grant all the Fees and Expenses in the Final Application, which includes those previously denied and prevent further Appeals and continuing costs to this estate.

# III.

<u>ARGUMENTS IN SUPPORT OF THE RELIEF REQUESTED</u>

<u>A.</u>

<u>Evidence In This Case **Does Not Support** This Court's Flawed Findings And</u>

<u>Charges That The Chapter 11 Was Unsuccessful And</u>

<u>That This Was A "Rudderless Ship".</u>

Numerous times in findings, this Court has discussed the "out of trust" issues.

Yes, this Debtor was seriously "out of trust", when it filed, so were all the other 30 plus car dealers this Applicant has previously represented in Chapter 11's.

This Court is aware that sales "out of trust" do not create a pre petition secured claim, but a pre petition unsecured claim. These "out of trusts" are pre petition history and not post petition.

No car dealer is going to have his operation jeopardized or his franchises jeopardized normally unless the Dealer is "out of trust". Without "out of trusts" and the subsequent cancelation of the floor plan, there would be no Chapter 11.

Financial trouble for a car dealer created the "out of trust".

This Court's findings <u>do not distinguish</u> and <u>make clear</u> that the "out of trusts" herein discussed occurred pre petition.

No post petition "out of trusts" occurred.

No violation existed at anytime under the November 6, 2006 Cash Collateral proposal.

This Applicant, a former World War II, Third Mate in the Merchant Marine knows all about a "rudderless ship" – this Chapter 11 was NOT such "a ship".

Obviously, in every Car Dealer Chapter 11, the only one who fully understands the Cash Collateral Proposal approved by the Court – is the drafter.

Daily discussions were held in this case with the Dealer's managers and all such cases to keep the "ship on course".

A review of the daily phone calls in the Applications for Fees and Expenses on file here will reveal this.  According to this Court, these efforts and costs should remain unreimbursed. Even during wartime when funds are scarce, the man and men who keep the "ship on course" and "on its way safely to its destination" were paid.

Various cases under 11 USC Section 330 should remind the Courts that it should not to deny fees and thereby create a "free windfall" for creditors.

Even though this Applicant is from a foreign State and jurisdiction, he should not be penalized because he is "not local".

This Applicant was hired by the Debtor and his Attorney's pre petition because he had experience.

The "course of this ship" from "leaving port, was charted by the Applicant. He charted a course" to a successful Chapter 11 by selling the franchise.

The evidence will show this from the start.

Contrary to charges herein "no fraud" occurred during this "ships voyage".  There may have been deeds done pre petition, which were less than correct, but this Applicant cannot be charged with these – what happened to "this ship" before the Applicant took over, cannot affect the quality of the Applicant's "duties on the bridge during this voyage."

Insider sales did occur, during the Chapter 11, but his was done without Applicant's knowledge.  This, as testified to was a normal course of business standard in all of the industry.

When the Court evidenced objection to this – it never happened again.

This practice had been common before this Chapter 11 was filed.  This practice was never objectionable to the Secured Creditor Hyundai.

The Court was upset about the Justice Departments seizure of documents.  (See Trial Exhibit 2.)

All efforts to protect this estate by this Applicant were cleared and noticed to the U.S. Trustee.

The only documents lost in this case were the computer records on the General Manager's own computer.  This loss cannot be charged to the Applicant, because he was not on site when the General Manager left.

The Debtor did elicit a promise before General Manager Cornelison left to leave all documents and records in place.

These lost computer files were rebuilt by the Debtor, so that there was "no harm no foul".

The charges that somehow the 47 day delay in the Cash Collateral Order was somehow the Applicant's fault is so ridiculous it can not even be responded to except to say no evidence in the Record supports this.

This Court must know that the Debtor's Cash Collateral Proposal used by this Applicant in cases over the last 20 years was agreed to by Hyundai Representatives and its Lawyers in Court.

Obviously, when this approval process was explained to the Hyundai Finance Home Office, they became "unglued" and threatened Holland & Hart with loss of any future business unless they could straighten this out.

The obviscations, excuses and obstructions by Hyundai were all part of this wasteful process of delay. The surplus funds which were lost during this 47 days should not be charged to this Applicant.

This Court must certainly understand that this is the real reason for the 47 day delay.

The recording makes clear on the valuation of the vehicles – subsequent pleadings of Hyundai show that it wanted "invoice value" and not actual value on the Debtor's inventory – Actual filing value is what the Code provides – <u>nothing less</u> – that was what was testified to on November 6, 2006.

No employees during the Chapter 11 were guilty of any fraud.

This was not a "rudderless ship" and this ship got to its destination with a liquidation of its major assets with total permission and Orders of this Court. – <u>The "ship's course did not vary!"</u>

B.

This Case of Incredible Auto Sales is

Not Similar at All to this Court's

Crown Oil inc. Case 257 BR 531(Bank D. Montana 2000)

This Court in its May 18, 2007 Order compares the facts in this Automobile Dealer, Incredible Auto Sales L.L.C. (hereinafter "Incredible"), Chapter 11 with Crown Oil Inc. as cited above.

This comparison is clearly erroneous and the Court should on remand clarify the record and erase this error of fact.

First place, this Court in Crown refers to certain "dilatory tactics by the Debtor's Attorney".  There were no such tactics here.

Incredible started out pure and simple with one goal and it was "to sell the Franchise and to pay off the Creditors."

This was testified to in the First hearing on Cash Collateral held on November 6, 2006 and contrary to the Court's prior statements, this hearing was an Emergency.

Second place, it should have been clear that for the Kia Franchise to remain "viable" and "saleable", Incredible had to continue in business.

This it did, despite the road blocks thrown in its way by the Court:

> a.) Failure to immediately issue Order as to the Debtor's Use of Collateral;
>
> b.) Failure to approve initial budget in a Cash Collateral hearing held without objection by the Secured Creditor, Hyundai Finance Company (hereinafter "Hyundai")
>
> c.) Failure of Cash Collateral Order to be issued for 47 days where there were no advertising moneys which could be spent to bring in new customers.
>
> d.) And eventually a grant of Relief from the Automatic Stay to Hyundai.

In spite of all these road blocks, the Debtor pursued its goal of an 11 USC Section 363 Sale – this was to be its Reorganization.

The only one who said that this case could not have a satisfactory conclusion was the U.S. Trustee, who obviously had no experience in Automotive Cases.

In spite of all the "bad press" in Billings, a ready, willing and able Dealer was found and liquidations to date have almost paid off the Secured Claim.

Was there a benefit achieved for this estate? The answer must be a resounding "yes" especially when you consider:

        a.) The obstacles thrown in front of the Debtor by both this Court and Hyundai.

        b.) The results of this case in paying off almost $2,000,000 in debt with some $300,000 in assets remaining to be liquidated by a Chapter 7 Trustee with no help; and

        c.) Doing all this from October 2006 to April 2007 – less than 6 months.

No objective observer could compare this to case of Incredible to the Crown Oil Case.

- All this Attorney's efforts in this case were to benefit the estate. <u>No one else.</u>

- All this Attorney's efforts were to benefit creditors.

The Chapter 7 Trustee, Womack, still has access to the pre petition lawsuit, and this Attorney, the Applicant herein, understands Trustee Womack, with help from the Debtor's owner, has a new lawyer to carry forward the collection efforts.

The Debtor's Franchise Agreement required the Kia Dealership to be operating – this was the goal, which it did, until the Court approved Sale was closed.

- No where in this case did this Attorney, the Applicant herein, lie to the Court.

- No where herein, in this case did this Attorney, the Applicant, knowingly cover up any false tax returns filed by the Debtor with the IRS.

- No where in this case did the Attorney, the Applicant herein, knowingly allow the Debtor to operate and incur debts, which it could not pay.

- No where in these Applications by the Applicant has either this Court or the U.S. Trustee pointed to any time or expense of this Applicant, which was not "reasonably needed to accomplish the proper representations of the client", (See further Court's Crown Oil Inc Opinion at 257 BR 531 citing In Re Wildman 72 BR 700 N.D. Ill. 1980 at 731.)

The head notes of this Court Crown Oil Case state as follows:

"Benefit to the estate," as must be shown in order for professional to be compensated by the estate, is not restricted to only monetary benefit;  another important consideration is whether the services rendered promoted the bankruptcy process or administration of the estate in accordance with the practice and procedures provided under the Bankruptcy Code and Rules for the orderly and prompt disposition of bankruptcy cases and related adversary proceedings.  Bankr.Code, 11 U.S.C.A. § 330(a).

Applicant's Comment

Certainly there was benefit to the estate here. The majority of the Automotive Assets were liquidated at retail prices and not 2006 lowered prices on filing. The Franchise was sold pursuant to Order of Court to a buyer acquired by the Debtor's Broker, who paid Broker's fees and costs. Full Services were provided by this Applicant to the Debtor and the correct Administrative process of governing the Debtor in Chapter 11 and its Chapter 11 transactions were closely adhered to.

Fact that Chapter 11 plan was ultimately not confirmed does not, by itself, bar professionals' recovery of compensation for services performed in the Chapter 11 case; to the contrary, so long as there was a reasonable chance of success which outweighed the cost in pursuing the action, the fees relating thereto are compensable.  Bankr.Code, 11 U.S.C.A. § 330(a)

Applicants Comments:

All Incredible Assets under the Chapter 11 liened to Hyundai were sold and are being collected pursuant to an Order of Court.  The Debtor has no assets remaining except the lawsuit against United on which the Debtor was not allowed to hire an Attorney. This Chapter 11 was a success. Additional assets still remain to be collected.


C.

The Nucor Energy Inc. 764 F2d 655 (Ninth Cir. Court of Appeals 1985)

Supports the Award of Fees and Costs to this Applicant and his Supplemental Fees.


As the facts in this case make clear, this Applicant William L. Needler's effort "created preserved and protected a fund".  (The total proceeds of liquidation and 11 USC Section 363 of assets) for the benefit of this estate and its creditors.

Without these efforts, the Hyundai Claim would not be paid, nor could the Lawsuit still pending be protected.

Remember in these efforts, the Applicant had to overcome:

- The delay of 42 days in the issuance of a Cash Collateral Order, and then to "top it off"

- The issuance of Stay Relief to Hyundai, which the Applicant had to Appeal to the U.S. District Court.]

Fortunately, in spite of these "road blocks" to date roughly $2,275,000 has been paid or expected to be paid.  (Exhibit  previously filed with the Court.)

The Ninth Circuit at 657 Supra does state that "the Bankruptcy Court's award will not be disturbed absent an abuse of discretion or erroneous applications of the law."

Here the Court's actions in applying its own standards to these facts here were flawed because, among other things:

A.) The Final Application was never heard as requested;

B.) The Order appealed from related on to an Interim Application, which can be charged, avoided or later disregarded.

C.) These facts in this instant Case, no where parallel the facts in the Crown Oil Case;

D.) The facts in this instant Case do not support the denial of over $ 92,541.96 in fees and costs to the Applicant'

E.) The Court failed to award fees and costs for the actual necessary services rendered by this Applicant "based on the time, the nature, the extent and value of the services and cost of comparable services"

This Court has been quick to criticize the Applicant for certain procedural events in this Case.  It forgets that there were Emergencies in this Case, which were caused proximately by Hyundai and this Court's failures to act.

This Court has totally ignored the following facts:

A.) This Applicant has appeared and solely represented some 30 retail Car Dealers before this Case.  (See Affidavit attached.)

B.) This applicant's Cash Collateral procedure was used successfully in a large percentage of these retail Car Dealer cases.

C.) That no evidence has been forthcoming in this Case, that any violations of this Cash Collateral procedure occurred, or that the Debtor at anytime, from the beginning of the Case on 10/17/06 to its conversion to a Chapter 7, on 4/10/07 ever violated the Cash Collateral Order or the proper deposit of funds.

All this Court could find to criticize the Debtor, during this Chapter 11, for were the inter-dealer sales between Debtor and a Chevrolet Dealer owned, in part, by the same owner.

This Court totally ignored the facts that inter-dealer sales had existed prior to the Chapter 11 – they were normal to the Car Industry – they are done to preserve sales where various types of vehicles are out of stock.

Both this Court and the U.S. Trustee have ignored the operational facts of this industry.  Additionally, both of them failed to appreciate that the main asset of a Dealership is that piece of paper called a Franchise – that under a non-operational debtor, who has "the lights off" and no service offered to the public and no sales hours at the Dealership – that this Franchise can be canceled.

Normal operations in a Dealership is that once "out of trust", that the Car Company, the Manufacturer, in this case, Kia Motors of American can send a letter which says "get in trust" – get a new floor plan in 30 days or otherwise the Franchise is cancelled.

This did not happen here because this Applicant expedited the filing even though at the time on 10/17/06, he was not in his office – the Applicant was on vacation between San Francisco for his wife's high school reunion and visiting relative in Lake

Tahoe. The Applicant should receive a bonus for his interrupted vacation and his wife's displeasure.

This Chapter 11 filing:

- Protected the Franchise;

- Prevented seizure of inventory.

Contrary to opinion in this case, it took an expert to advise the Debtor so as to protect the assets – further this Applicant should be paid:

D.

In Re. Nucor Energy Inc. Sets Forth Clearly For All Ninth Circuit Courts that

Time Devoted by Debtor's Attorney To

The Preparation of Fee Applications and Their Presentation and

Further Protections Should Be Paid and Compensated For:

This case when referring to the intent of Congress when it enacted Section 330 of the Reform Act stated:

> "..a refusal to award compensation for the time spent preparing or litigating fee applications results in a reduction of the rate paid for all attorneys' services. Were we to affirm the district court's decision, we would, in effect, be reducing the fees that bankruptcy counsel may earn to a level that fail to provide full compensation for their services."

The Court continue its comments as to Section 330 to state:

"There is even more reason to compensate attorneys for services related to fee application preparation in bankruptcy proceedings than in other statutory fee cases. Bankruptcy counsel devote substantially more time and effort to the preparation of fee applications than do attorneys who receive compensation for comparable services pursuant to other statutory fee award provisions. The fee applications required of counsel by the bankruptcy court generally are much

more detailed and time consuming than are the fee applications submitted in other types of cases."

The Ninth Circuit in Manoa Finance Company 853 F2d 687 (9th Cir 1988) affirmed the feeling of this Court in Nucor Energy, Inc. and further stated in referring to Nucor at 692 Supra:

> "Based on this reasoning appellant would be entitled to reimbursement for the reasonable costs of bringing this Appeal, only if he ultimately prevails in securing the bonus."

[In this case this Fee Application had requested a fee enhancement in the form of a bonus over and above the regular fees and expenses at the regular rates.]

In this instant case, the applicant is requesting his regular rate and his regular expenses to be paid.

Also, in this instant case, this Appeal has been remanded for another hearing below and obviously a new Order will be issued.

If this Order must then be appealed, this will be a new Appeal.  Thus the present Appeal on remand was <u>successful.</u>

The Applicant's additional and Supplemental Fees and Expenses are now on file. This Supplement represents costs of defending the Fee Application on Appeal.  The costs and fees are continuing.  At this time they total more than an additional $16,000.

<u>E.</u>

<u>The Ninth Circuit for Hearings Under</u>

<u>11 USC Section 330 of the Bankruptcy Code</u>

<u>Follow What Have Been Called the Johnson Factors</u>

In Johnson vs. the Georgia Highway Express 488 F2d 714, 717-719 (5th Circuit 1974) developed the 12 factor analysis in determining a reasonable fee under 11 USC Section 330.

The Ninth Circuit in Kerr vs. Screen Extra Guild 526 F2d 67 (9th Cir. 1975) Crt denied affirmed this 12 factor test.

"1. The factors listed in *Kerr* as relevant to the determination of a reasonable fee are: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases 526 F.2d at 70."

Time is too short to answer these and meet these points and they will be addressed in the hearing.

F.

Bankruptcy Fees Under 11 USC Section 330

Must Be Reasonably Likely to Benefit the Estate.

This Applicant has stated that none of the 30 plus dealer cases he has represented ever contemplated a continuing on going case under a Confirmed Chapter 11.

This is not the normal reorganization where the Debtor continues in control of his assets and the Absolute Priority Rule applies.

The typical reorganization or the typical confirmed Plan which envisions an "on going Chapter 11" does not apply to an Automotive Dealer case.

First, the normal car dealer on filing is "out of trust". Because he is "out of trust" his chances of obtaining a new floor plan credit from a new lender is zero.

He has so damaged his customer base, that continued car business past liquidation of his inventory is normally non-existent.

Floor plans are normally only granted by a secured floor plan lender, where the individual dealer, who is recited in the Franchise Agreement and is normally, called "the Article III Dealer" (i.e. "the Equity Holder") has a sizeable net worth.

By the time an Automotive Dealer files Chapter 11 – this Equity Holder's net worth between leases and potential liabilities is tainted and clouded so he is without potential borrowing sources.

All Chapter 11's for car dealers envision operating the business long enough to sell the Franchise, ("the Blue Sky"), the Parts, Machinery, Sale of New and Used Cars to public at retail prices or near retail and collectable all the receivables.

At the point of sale, with a new Dealership, owner and management, this proceeding is a Chapter 7.

The fact that because it is a Chapter 7, does not mean the Chapter 11 was unsuccessful.

Contrary to this, it was successful, since:

      A.) A Stay was put in place to forestall foreclosure and judgment Creditors;

      B.) A Cash Collateral Order is in place where the Debtor can protect his business, sell cars, order replacements, pay off post petition liens and deposit funds without seizures.

C.) It can hire a Broker, who is an expert to sell the Franchise and market this local location to someone hundreds of miles away.

D.) Then when finding a buyer, the Franchise can be protected from a manufacturer or factory who arbitrarily won't allow a sale to this found buyer. This happens where the factory acts arbitrarily in denying the transfer. With a Chapter 11, the Court is there to protect this new found buyer.

E.) Then the sale can be closed with a "sale free and clear" of liens with liens to attach to the proceeds.

F.) The sale free and clear of liens is not impeded by Creditor arguments.

This is what constitutes a successful Chapter 11 for a Car Dealer and this is exactly what has happened in this instant Incredible Auto Sales L.L.C. Case No. 06-60855.

The Kia Franchise has been sold. Some $2,700,000 plus has been turned over to Hyundai Financial, the lease of the premises has been canceled and settled, since the Franchise has been moved.

There exist additional assets for the Chapter 7 Trustee to liquidate. Obviously the total results of this liquidation are not know now and won't be known fully for six months plus yet.

No basis exists for this Court to fashion an Order which denies $97,000 plus in fees and costs to this Applicant. No Court in this Land will allow this 80% reduction and this ordered disgorgement of a third party retainer to stand.

Every action taken by this Applicant, the Debtor's Attorney he had to do.  There is no time pointed out which was wasteful, unnecessary or duplicative.

Here everything done in Court for this Debtor was done by this Applicant.  There was no Trustee appointed as in In Re. Hanson 172 BR 67 (9th Circuit BAP Col 1944) nor was the Fee Application that of a Special Counsel as in In Re. Mednet MPC Corporation 251 103 (9th Cir BAP Nev. 2000).  Here the only person to do the work, read all the pleadings, draft all the opposition papers, consult with the Debtor, move the case forward was this Applicant.

Fortunately for this Court and all Creditors this Applicant had over 30 like cases behind him.

### IV.

### Summary

In summary, for the reasons stated the Final Application, which included all Fees and Expenses from the Prior Interim Application including the Final Application and those in the Supplement should be granted.


August 28, 2007


/s/ William L. Needler

Attorney and Pro Se