UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**INCREDIBLE AUTO SALES LLC**,

Debtor.

Case No.  **06-60855-7**

# *MEMORANDUM of DECISION*

At Butte in said District this 30th day of October, 2007.

In this Chapter 7 bankruptcy, following a hearing held April 24, 2007, this Court entered a Memorandum of Decision and Order on May 18, 2007, which held as follows:

> [T]he Interim Application for Fees and Expenses Sought in Chapter 11 and the Final Application of William L. Needler and Associates, Attorneys for Debtor, for Fee Allowance and Reimbursement of Costs filed by attorney William L. Needler on March 8, 2007, and May 13, 2007, respectively, are granted, in part, and denied, in part; that attorney William L. Needler is awarded reasonable attorney fees in the sum of $18,040.00 and costs of $4,610.69, for a total of $22,650.69; that William L. Needler shall apply a portion of the retainer in the amount of $26,039.00 to the allowed fees and costs in the total of $22,650.69; and that attorney William L. Needler shall, within ten (10) days of the date of this Order, disgorge the sum of $3,388.31 and remit such sum to the Chapter 7 Trustee, Joseph V. Womack.

In response to the Court's Memorandum of Decision and Order of May 18, 2007, William L. Needler ("Needler") filed on May 29, 2007, a "Motion of William L. Needier of the Law Firm of William L. Needer and Associates, Attorney for the Debtor and Requests this Court to Modify, Amend, Vacate and Reconsider Its Order of May 18, 2007, Denying Attorney Fees and Expenses

1

for Debtor's Attorney and to Set a Rehearing and Trial."  By Order entered May 30, 2007, this Court denied Needler's aforementioned request for reconsideration.  On June 11, 2007, Needler filed a Notice of Appeal indicating that he was appealing both this Court's May 18, 2007, Order granting in part and denying in part Needler's interim and final fee requests and this Court's May 30, 2007, Order denying Needler's request for reconsideration.  The United States Trustee ("UST") subsequently filed a notice of "Election to Have Appeal Heard by the District Court".  Needler's appeal of this Court's Orders of May 18, 2007, and May 30, 2007, was thus assigned to the Honorable Richard F. Cebull of the United States District Court for the District of Montana, Billings Division.  Upon request of the UST, Judge Cebull entered an Order for Remand on July 27, 2007, remanding the matter to this Court in order that Needler could have a hearing, after proper notice, on the Final Application of William L. Needler and Associates, Attorneys for Debtor, for Fee Allowance and Reimbursement of Costs ("Final Application") filed May 13, 2007.

    In accordance with the Order for Remand, this Court entered an Order and Notice on July 31, 2007, giving Needler adequate notice of a hearing scheduled for August 30, 2007, on his Final Application.  On August 25, 2007, Needler filed a First Supplement to Allowance of Two Applications for Fees and Expenses for Debtor's Attorney on Remand from the U.S. District Court ("First Supplement").  Needler's First Supplement was accompanied by a Notice of Hearing wherein Needler noticed a hearing for August 30, 2007, on the First Supplement.  Following notice, albeit very short on Needler's First Supplement, a hearing on Needler's Final Application and First Supplement was held in Billings, Montana on August 30, 2007.  Needler appeared at the hearing in support of his fee requests and Daniel P. McKay of the UST's Office

appeared in opposition thereto. At the hearing, both Needler and attorney McKay waived the notice requirement with respect to the hearing on the First Supplement that Needler noticed for hearing on August 25, 2007. Needler was sworn and testified and Needler's Exhibits 1, 2 and 3 were admitted into evidence without objection.

Although the Court previously denied a large portion of the fees set forth in Needler's "First Interim Application for Fees and Expenses Sought in Chapter 11" ("Interim Application"), which Interim Application included services performed between September 15, 2006, and February 18, 2007, Needler contends that Judge Cebull's Order for Remand allows Needler to once again defend such fees on the basis that various denied fees and costs are also included in the Final Application, which Final Application includes a detailed summary of the services performed by Needler between February 28, 2007, and April 10, 2007, and as set forth in the prayer for relief, seeks an award in "the sum of $13,750.00 for legal services and $486.14 as reimbursement of out-of-pocket expenses, plus the net of $74,917.71 not granted from the First Fee Application; or a total net requested payout of $89,153.85."

The fees covered in the Interim Application for services performed between September 15, 2006, and February 18, 2007, are addressed in the Memorandum of Decision entered May 18, 2007. For purposes of brevity, the entire 25-page Memorandum of Decision entered May 18, 2007, is, by reference, herein incorporated in full. However, the Court would like to make a few additional observations with respect to the Interim Application and this Memorandum of Decision sets forth the Court's additional findings of fact and conclusions of law in independently reviewing Needler's fee applications.

It is quite apparent from comments made by Needler at the April 24, 2007, hearing and

3

the August 30, 2007, hearing that Needler thinks this Court has penalized Needler for the fact that Debtor had, prepetition, unpaid consumers and was out-of-trust. The prepetition activities of the Debtor have absolutely no bearing on this Court's assessment of Needler's performance in this case.[1]

As the Court stated at the hearing held April 24, 2007, the Court, when reviewing and ruling on Needler's Interim Application, was focusing on matters that occurred post-petition. For example, Needler glosses over the fact that he failed to timely employ Clarke B. Rice ("Rice") as a professional in this case. To this Court's recollection, there was not a single hearing held in this case where Needler did not remind the Court that Needler was a skilled and experienced bankruptcy practitioner, particularly in the area of auto dealerships. Notwithstanding all Needler's experience, not once did Needler offer any explanation for his failure to timely file an employment application on behalf of Rice. In addition, Needler apparently failed to give any consideration to whether Rice was a disinterested person as defined by 11 U.S.C. § 101(14).

Similarly, although Debtor had been working with Jappy Dickson and Southwest Brokerage Company of Arlington, Texas to sell Debtor's KIA Dealership since at least March 21, 2006, Needler did not file the first application to employ Jappy Dickson until December 4, 2006, and did not file the amended application until January 20, 2007. Another area that caused concern for the Court during the early stages of this case was Debtor's October 26, 2006,

---

[1] Needler seems to argue that all out of trust activity occurred prepetition, but as set forth in a Memorandum of Decision entered January 12, 2007, although Debtor was out of trust $366,880.00 on Debtor's petition date, "Debtor failed to explain why the 'out of trust' amount increased to $626,131.00 as of November 29, 2006." Moreover, this Court noted in a later Memorandum and Decision entered April 10, 2007, that "Debtor's business operations were grossly mismanaged both pre-petition and post-petition." *See* Docket Entry No. 353.

emergency motion to use cash collateral. At a hearing held November 6, 2006, and November 7, 2006, Debtor and various creditors agreed in principal to Debtor's use of cash collateral. However, following the hearing, counsel for Hyundai Motor Finance Company ("HMFC") took issue with how Debtor was valuing HMFC's collateral. Rather than cooperate with HMFC, Needler tried on two occasions to file a stipulation for use of cash collateral that was not signed by HMFC. After several more hearings and continual prodding by the Court for Needler to get the matter resolved, the Court finally prepared and entered an Order on December 21, 2006, allowing Debtor's use of cash collateral. Needler's explanation for the cash collateral fiasco was that he had used the same method of valuation of collateral for 20 years. The Court presumes that Needler's thinking on this issue was that since he had used his method for 20 years, HMFC should accept Needler's valuation techniques without question.

Related to the valuation issue is Debtor's assertion that HMFC was an oversecured creditor protected by an equity cushion of roughly $1,313,443.77. In a Memorandum of Decision entered January 12, 2007, this Court determined that HMFC's equity cushion was more in the neighborhood of $78,667.95. The Court concluded that "[a]n equity cushion of $78,667.95, or less than four percent, on a debt of $2,275.375.82 does not adequately protect [HMFC's] position," and thus, the Court granted HMFC relief from the automatic stay. Hindsight shows that this Court's equity cushion calculation was far more accurate than Debtor's $1,313,443.77 equity cushion calculation that was driven in part by the valuation methods used by Needler for the past 20 years.

Next, Needler asserts that he changed Debtor's management to appease the creditors. Needler admits that Ken Cornelison ("Cornelison"), a shareholder of Debtor, did not turn out to

5

be a "stellar performer" but irrespective of Cornelison's performance, the Court sees the change in management from R. Nick Gutierrez to Cornelison as a change in form but not a change in substance. For example, Cornelison was supposedly in charge when Debtor wholesaled at least three vehicles to a sister dealership, Graham-Staunton, Inc., d/b/a Incredible Chevrolet ("Graham-Staunton"). R. Nick Gutierrez is an 80% shareholder in Debtor and the majority shareholder in Graham-Staunton. Cornelison is also a minority shareholder in both Debtor and Graham-Staunton.

The aforementioned transactions between Debtor and Graham-Staunton enabled Cornelison and R. Nick Gutierrez to siphon the retail profits from the three sales, thereby avoiding the effects of the cash collateral restrictions imposed by Debtor's bankruptcy. Furthermore, even though Graham-Staunton tendered checks to Debtor for the three vehicles at issue, it was not until HMFC discovered the checks over two and one-half weeks later that said checks were finally deposited by Debtor. Another indication that the change in management was in appearance only involved Cornelison's lack of concern over the fact that two employees of Debtor implicated by R. Nick Gutierrez to have been involved in prepetition fraud, were still employed by Debtor or Graham-Staunton long after Debtor's petition date.

The Court was equally troubled by Needler's comment that it was "ridiculous" to have to file a disclosure statement and Chapter 11 plan in this case because "this was a Chapter 7". Needler of all people should know that this case was filed under Chapter 11 of the Bankruptcy Code and it was, therefore, incumbent upon Needler to comply with the requirements of Chapter 11. This Court has presided over numerous liquidating Chapter 11 cases where the debtors have filed a plan of liquidation. Instead of proceeding down such path, Needler elected to file a

6

wholly inadequate disclosure statement and Chapter 11 plan. Needler's election to file such disgraceful pleadings is a direct reflection upon Needler and illustrates Needler's sloppy approach in this case, which sloppy practices this Court does not condone.

When the UST challenged Needler's procedurally improper "Emergency Motion to Approve the Contract for the Sale of Assets Pursuant to 11 USC Section 363 of the Bankruptcy Code and to Provide for Upset Bids", Needler countered that he had sold a $9 million dealership in Chicago using the same procedure.[2] While such procedure may have been proper in Illinois, Needler, as Debtor's counsel, had the duty and obligation to determine the proper procedure to follow in this District. In this Court's opinion, Needler never took the time to perform even the most basic professional obligations. Indeed, Needler's disregard for this Court's Local Rules and procedure was evidenced throughout this case and is documented in more than one order.[3]

Finally, the Court was troubled once again when it was advised, after the fact, that the United States Attorney's Office was investigating Debtor and wanted some of Debtor's records.

---

[2] Perhaps this is the same bankruptcy referenced in Needler's request for reconsideration: "this Debtor Motion and Debtor procedure was in the same terms as filed a year earlier in West Suburban Volkswagen, A Chapter 11 pending before former Chief Bankruptcy Judge in Chicago of 'K Mart Fame', Case No. 05-61043."

[3] For example, in the Order Allowing Use of Cash Collateral through January 31, 2007, entered December 21, 2006, the Court wrote: "Mr Needler . . . needs to comply with Mont. LBR 9013 concerning notice periods and the procedure for filing a response and requesting a hearing. He further needs to review the Court's local rules concerning filing exhibits and other documents prior to hearings and needs to further generally review this Court's local rules for other procedures that may affect the administration of this case." Needler obviously failed to read this Court's local rules because on August 25, 2007, Needler filed a list of his exhibits for the August 30, 2007, hearing, but failed to electronically attach the exhibits to the exhibit list. Needler's failure to follow proper local procedure appears to occur in other court's as well. *See In re McClintock Dairy, LLC*, 2007 WL 2688541 (Bankr. W.D. Md. 2007) (where the court regrettably deferred ruling on Needler's fee application because of Needler's failure to follow the Compensation Guidelines for Professionals).

About the time that the Court learned of the criminal investigation, the Court also learned that Cornelison had absconded with some of Debtor's computer records. At the April 24, 2007, hearing, Needler was quick to let the Court know that it was not his fault that Cornelison had taken the records. At an even later date, Needler let the Court know that the missing records were not important and had no impact upon the Debtor, at least according to Needler.[4]

It was events such as those discussed above that compelled the Court to substantially reduce Needler's request for fees and costs. The fact that unpaid consumers existed and that Debtor was out-of-trust prepetition had no bearing on the Court's decision to reduce Needler's fee request. This Court's reduction of Needler's fee request, as set forth in both the Interim and Final Applications, was driven solely by two things. First, the caliber of professional services provided by Needler to this Debtor was significantly deficient. As aptly observed by the UST, Needler's performance in this case was not commensurate with Needler's claimed experience. Second, the actions taken by Needler, even though he later professed to clearly foreseeing the outcome of this case, were inconsistent with the facts that developed during the pendency of this Chapter 11 case. In particular, Needler admitted that he knew, at the inception of this case, that it would end up in Chapter 7 because "there was no feasibility for anything," yet Needler's only explanation as to why Debtor opposed the UST's motion to convert filed December 28, 2006,

---

[4] In a Memorandum of Decision entered April 10, 2007, the Court wrote: "Debtor does not dispute in various pleadings that its business records have been inappropriately removed from Debtor's business premises. Specifically, in a 'Status Report of Debtor and its Liquidation' filed March 20, 2007, counsel for Debtor disclosed that Debtor had transferred its 2005 and 2006 records to the United States Department of Justice. However, as reflected on page 2 of the Status Report, Cornelison, the General Manager of Debtor and a minority shareholder of Debtor, admittedly deleted 'all the financial records on the office computer located in the General Managers Office.'"

was that "I was told to object to conversion."

Prior to entry of the Memorandum of Decision and Order on May 18, 2007, the Court thoroughly reviewed Needler's Interim Application and gave careful consideration to the services performed in relation to the results obtained. This Court set forth the reasons for its decision in the Memorandum of Decision entered May 18, 2007, and denied a request to reconsider its denial of fees in an Order entered May 30, 2007. The matter, however, has once again come before the Court. As directed by Judge Cebull, a hearing on the Final Application, together with the First Supplement was held on August 30, 2007.

Needler believes that the issue on remand relates to the Final Application and the Final Application recognizes that the earlier application was an interim application and includes the incremental increase in fees and costs incurred since the date of the Interim Application, together with the fees and costs covered by the Interim Application. The Court firmly stands by the reasoning set forth in the Memorandum of Decision entered May 18, 2007, and the Order entered May 30, 2007, as it relates to all the fees and costs covered by the Interim Application.

As for the additional fees and costs contemplated by the Final Application and the First Supplement that are not addressed in the Interim Application, Needler generally challenged the findings of this Court, stating that this Court's findings were not clear. In support of the Final Application and First Supplement, Needler explained how he took the Debtor from an "upside down position" to a position where the Trustee hopefully has money to distribute.

In support of his fee and cost requests, Needler informed the Court of his professional experiences. Needler graduated from law school in 1952 and was an entrepreneur in 2 successful businesses, unfortunately, one of the "successful" businesses ended up in a Chapter 11

9

bankruptcy. With respect to Chapter 11 bankruptcies, Needler noted that Chapter 11 car dealerships are the most difficult to oversee. Needler stated that he has talked to a lot of attorneys who have failed in Chapter 11 car dealerships, but they do not use Needler's "method." According to Needler, in cases such as this, an attorney has to drop almost everything because such cases require an extreme amount of skill and experience. However, Needler explained that at the time Needler filed this case on behalf of the Debtor, he was extremely busy and his attentions were required elsewhere because he had an appeal before the Eighth Circuit Court of Appeals and was representing another car dealer in a bankruptcy case in New Mexico.[5] Needler explained that he is up against lawyers for large creditors such as Ford Motor Credit Company, Toyota Credit, etc. that have been involved in 8, 10, 20 Chapter 11's and they come into court with 3 and 4 attorneys.

Needler also states that he has been before the United States Supreme Court and was also asked by Senator Grassley to testify before the Judiciary Committee on courts and procedures. On November 15, 1985, Needler appeared on a panel with Professor Kennedy from the University of Michigan and Professor Anderson from Creighton University. Each of the persons on the 3-person panel were asked to submit a paper and Needler was astounded that the three papers were virtually identical. One of the issues the panel wanted Senator Grassley to consider was the Ninth Circuit Court of Appeals decision in *Crocker Nat'l Bank v. Am. Mariner Indus., Inc. (In re Am. Mariner Indus., Inc.)*, 734 F.2d 426 (9th Cir. 1984), which was causing Needler

---

[5] The Court wonders whether the New Mexico case referenced by Needler is the case of Rio Valley Motors Company wherein Needler's employment as the debtor's Chapter 11 counsel was denied, without prejudice, on August 29, 2007, even though the case was filed some ten months earlier on October 13, 2006. *See In re Rio Valley Motors Co.*, 2007 WL 2492685 (Bankr. D.N.M. 2007) (slip copy).

problems on "the plains." Needler testified at the August 30, 2007, hearing that his testimony in front of the Senate committee and his paper were picked up by the Fifth Circuit [*In re Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d 363 (5th Cir. 1987)], which overruled *American Mariner*. The Court would note that *American Mariner* was not overturned by the Fifth Circuit but was instead overruled by the United States Supreme Court in *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

In another curious comment, Needler explained that in 35 cases, Needler has never been able to reorganize a car dealership and keep them in their store. However, in this case, Needler asserts that he protected Debtor's KIA franchise, even against the threat of having the case converted to a Chapter 7. Needler maintains that conversion would have been detrimental to HMFC and concedes in his Memorandum on Remand that Debtor "strenuously objected" to conversion, but interestingly, HMFC joined in the UST's motion to convert.

Needler went on to explain that his cash collateral program was a good one "and it would have worked." Needler thus posits that it was wrong for the UST and this Court to characterize this case as a rudderless ship because Needler, "a former World War II, Third Mate in the Merchant Marines knows all about a 'rudderless ship' – this Chapter 11 was NOT such 'a ship'."

In further support of his fee requests, Needler stated that Judge Flowers awarded Needler all his fees in *In re Dan Hixson Chevrolet, Co.*, where the auto dealer was $1 million out of trust prepetition. Because Needler made a point of referencing the *Hixson Chevrolet* case, and an additional case that the Court was not able to locate, the Court thought that the referenced cases were perhaps similar to this case and may thus have had some relevance to the case at hand. The Court did a Westlaw search and discovered that Needler's name appears in many cases. The sole

11

published *Hixson Chevrolet* decision, however, did not address professional fees. *See In re Dan Hixson Chevrolet Co.*, 12 B.R. 917 (Bankr. D.Tex. 1981).

As previously indicated, the better portion of Needler's testimony at the August 30, 2007, hearing was spent detailing Needler's credentials.[6] However, Needler's past accomplishments, like Debtor's prepetition activities, are not relevant to the matter before the Court. The bottom

---

[6] In the process of drafting this Memorandum of Decision, the Court listened to the audio recordings of the April 24, 2007, and August 30, 2007, hearings. The Court was astounded at the number of times that Needler touted his skill and qualifications, particularly his accomplishments in other cases. Needler's boisterous boasting prompted this Court to do a search query of "William L. Needer" on Westlaw. The Court's search resulted in 74 hits. The Court found none of the cases referenced by Needler. What the Court did learn, however, from the search was that Needler's conduct in this case was not an isolated incidence but that it instead tracked with Needler's performance in other cases. For instance, in *In re Memorial Estates, Inc.*, 950 F.2d 1364, 1367 (7th Cir. 1991), *cert. denied*, 504 U.S. 986, 112 S.Ct. 2969 (1992), the court, upholding the imposition of a $1,000.00 sanction, wrote: "The bankruptcy court sanctioned [Needler] pursuant to Bankruptcy Rule 9011 and 28 U.S.C. § 1927 because he filed a motion to vacate the bankruptcy court's issuance of deeds of burial plots to FDIC customers which reiterated the same jurisdictional arguments he had made in numerous other pleadings. . . [T]he district court considered the merits of the sanction and found it reasonable and proper. We agree with that determination. Cemco's other arguments are without merit and warrant no discussion." Also, in *Valley Nat'l Bank of Ariz. v. Needler (In re Grantham Bros.)*, 922 F.2d 1438 (9th Cir. 1991), the Ninth Circuit, in affirming the lower court's decision, held that the "fact that the sanctioned claim . . . was only one of the counts contained in Needler's complaint does not insulate him from Rule 11 sanctions. . . . As discussed, Needler filed the collateral attack on the bankruptcy court's order while facts existed which clearly made the attack improper and frivolous. Needler sought to harass or intimidate the purchaser of the OSO Ranch and the bankruptcy trustee from acting pursuant to the sale order." Similarly, in the case of *In re TCI, Ltd.*, 769 F.2d 441 (7th Cir. 1985), Needler was sanctioned for multiplying proceedings "unreasonably and vexatiously". Needler had also previously utilized the same tactics in *In re Enrose Farms, Inc.*, 1999 WL 33486711 (Bankr. D.Ida. 1999), wherein Judge Pappas sanctioned Needler, in part, for using tactics that smacked "of blatant bad faith" such as "attempting to use a meritless or frivolous claim to extract concessions" from an opposing party." Judge Pappas noted in *Enrose Farms* that during the sanctions process, "Needler . . . continued his contentious ways, admitted no wrong, and attempted to blame others for the outcome of the case. . . . This response to the sanctions motion was, in the Court's opinion, misguided." *Id.* at *10. Finally, it does not appear that this Court was the first court to direct that Needler disgorge fees. *See In re Grimes*, 115 B.R. 639, 651 (Bankr. D.S.D. 1990) ("Needler and his firm have been warned by other courts that there is an inherent risk in running one's practice in a shipshod manner.")

12

line in this case is whether the fees and costs requested by Needler are commensurate with the benefit conferred upon the bankruptcy estate.

The standards this Court applies when evaluating fee requests are set forth in the May 18, 2007, Memorandum of Decision and need not be repeated here. Morever, as this Court noted in *In re Crown Oil*, 18 Mont. BR 169, 257 B.R. 531 (Bankr. D.Mont. 2000), *aff'd* (9th Cir. BAP Sept. 28, 2001), "'[w]hile it is not necessary to have a successful reorganization in order for debtor's counsel to be awarded fees, fees may be denied when counsel should have realized that reorganization was not feasible and therefore services in that effort did not benefit the estate.'" *Id.* at 539, quoting *In re Kohl*, 95 F.3d 713, 714 (8th Cir. 1996); *In re Coones Ranch, Inc.,* 7 F.3d 740, 744 (8th Cir. 1993); *In re Lederman Enterprises, Inc.*, 997 F.2d 1321, 1324 (10th Cir. 1993). This Court went on to explain:

> The test is whether the applicant's services are reasonably likely to benefit the estate. As the Ninth Circuit Bankruptcy Appellate Panel recently wrote: "[T]he applicant must demonstrate only that the services were 'reasonably likely' to benefit the estate at the time the services were rendered." *Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswig Drug Co., ( In re Mednet*), 251 B.R. 103, 108 (9th Cir. BAP 2000). On the other hand, "an attorney fee application in bankruptcy will be denied to the extent the services rendered were for the benefit of the debtor and did not benefit the estate." *Kohl,* 95 F.3d at 714 ( *quoting In re Reed,* 890 F.2d 104, 106 (8th Cir.1989)). "This rule is based upon the legislative history of the Bankruptcy Code section 330(a) and the unfairness of allowing the debtor to deplete the estate by pursuing its interests to the detriment of creditors." *Kohl,* 95 F.3d at 714 ( *quoting In re Hanson,* 172 B.R. 67, 74 (9th Cir. BAP 1994)); *see also In re Mahaffey,* 18 Mont. B.R. 285, 290 (Bankr.Mont.2000). The same unfairness occurs when a debtor's professionals seek to deplete the estate, as in the instant case, to the detriment of the estate and its creditors.
>
> \* \* \*
>
> Benefit to the estate is not restricted to only monetary benefit. *Kohl,* 95 F.3d at 715; *In re Holder,* 207 B.R. 574, 584 (Bankr.M.D.Tenn.1997). Another important consideration is whether the services rendered "promoted the

bankruptcy process or administration of the estate in accordance with the practice and procedures provided under the Bankruptcy Code and Rules for the orderly and prompt disposition of the bankruptcy cases and related adversary proceedings." *In re Holder*, 207 B.R. at 584 ( *quoting In re Spanjer Bros., Inc.,* 203 B.R. 85, 90 (Bankr.N.D.Ill.1996)).

\* \* \*

The fact that the Chapter 11 Plan was ultimately not confirmed does not, by itself, bar recovery of compensation for services performed in the Chapter 11 case. *In re American Metallurgical Products Co., Inc.,* 228 B.R. 146, 159 (Bankr.W.D.Pa.1998); *In re Jefsaba, Inc.,* 172 B.R. 786, 799 (Bankr.E.D.Pa.1994) ("[W]e do not conclude that only successful actions may be compensated under § 330. To the contrary, so long as there was a reasonable chance of success which outweighed the cost in pursuing the action, the fees relating thereto are compensable. Moreover, professionals must often perform significant work in making the determination whether a particular course of action could be successful. Such services are also compensable so long as, at the outset, it was not clear that success was remote."). On the other hand, whether a reorganization is successful is a factor to be considered in determining whether a debtor's counsel's services provide a benefit to the estate. *In re MFlex Corp.,* 172 B.R. 854, 857 (Bankr.W.D.Tex.1994); *In re Lederman Enterprises, Inc.,* 143 B.R. 772, 775 (D.Colo.1992), *aff'd,* 997 F.2d 1321 (10th Cir.1993).

One bankruptcy court writes: "The Court does not expect the attorney to succeed in every endeavor he undertakes on behalf of the client. But the endeavor for which the estate is expected to pay must be reasonably calculated to produce a benefit to the estate." *In re Hunt,* 124 B.R. 263, 267 (Bankr.S.D.Ohio 1990). "Chapter 11 cases which lack viable chances of reorganization may place the fees of counsel at risk." *In re MFlex Corp.,* 172 B.R. at 857 (*quoting In re Offield,* 128 B.R. 548, 550 (Bankr.W.D.Mo.1991)); *In re Lederman Enterprises, Inc.,* 143 B.R. at 775.

*Id.* Furthermore, although Needler appears to make the crabbed argument that HMFC somehow benefitted from Needler's actions in this case, this Court agrees with the comments of a court made in another case in which Needler was involved, where Needler's application for fees and costs was denied: "A secured creditor cannot be required to bear expenses that benefit the estate under the theory that the expenses were incurred to preserve the assets of the estate as a whole.

14

Instead, recovery of costs and expenses requires a showing that the secured creditor received a quantifiable, as opposed to a qualitative or generalized, benefit." *In re Standard Foundry Products, Inc.*, 1998 WL 729586 *4 (N.D.Ill. 1998).

Needler admits that he knew this case was going nowhere from its inception. It is therefore not surprising that this case unraveled at lighting speed following the November 6th and 7th hearings held in 2006. It was only Needler's bold recklessness that kept Debtor's Chapter 11 case afloat until April 10, 2007, when the hammer finally fell and a Trustee was appointed to expeditiously liquidate Debtor's remaining assets. Just as he was in *Enrose Farms*, Needler was in this case contentious, admitted no wrong, and has attempted to blame the auto auctions, HMFC, the UST and even this Court for the outcome of the case–even when Needler knew this case should have been filed under Chapter 7. In this Court's opinion, Needler's bombastic approach in this case did nothing but buy time for Nick Gutierrez and perhaps Cornelison to siphon the last bits of money out of the Debtor.

This Court firmly believes that awarding Needler fees of $18,040.00 and costs of $4,610.69, as set forth in the May 18, 2007, Memorandum of Decision, more than adequately and fairly compensates Needler for any benefit that he may have conferred upon this bankruptcy estate for services performed through April 15, 2007. As noted earlier, Needler also filed his First Supplement on August 25, 2007, seeking an additional award of $15,812.50 in fees and $255.00 in costs. The Court would note that $2,200.00 of the fees and all of the costs set forth in the First Supplement pertain to the appeal. Any decision on the fees and costs for the appeal are premature given the fact that Judge Cebull has not entered a decision on Needler's appeal. The balance of the fees in the amount of $13,612.50 mostly pertain to Needler's May 29, 2007,

15

motion to reconsider. The fees associated with the services purportedly provided by Needler between April 16, 2007, and May 30, 2007, provided no arguable benefit to this bankruptcy estate. Such fees are thus denied.

Section 1927 of Title 28 provides that "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct." Although this statute, given the reference to "any court of the United States" does not apply in bankruptcy courts, *see Perroton v. Gray (In re Perroton)*, 958 F.2d 889, 893 (9th Cir. 1992), this Court does have inherent power to sanction, *see Miller v. Cardinale (In re Deville)*, 361 F.3d 539, 551 (9th Cir. 2004). While Needler is not being sanctioned, Needler should carefully consider his services and the extent of his services and whether he has unreasonably and vexatiously multiplied the proceedings to the benefit of no one, except for perhaps Nick Gutierrez and Cornelison.

Therefore, upon remand and after further hearing and consideration, the Court will enter a separate order providing as follows:

IT IS ORDERED that the Interim Application for Fees and Expenses Sought in Chapter 11 and the Final Application of William L. Needler and Associates, Attorneys for Debtor, for Fee Allowance and Reimbursement of Costs filed by attorney William L. Needler on March 8, 2007, and May 13, 2007, respectively, are granted, in part, and denied, in part; that attorney William L. Needler is awarded reasonable attorney fees in the sum of $18,040.00 and costs of $4,610.69, for a total of $22,650.69; that William L. Needler shall apply a portion of the retainer in the amount

of $26,039.00 to the allowed fees and costs in the total of $22,650.69; and that attorney William L. Needler shall, within ten (10) days of the date of this Order, disgorge the sum of $3,388.31 and remit such sum to the Chapter 7 Trustee, Joseph V. Womack.

IT IS FURTHER ORDERED that $13,612.50 of the fees requested in the First Supplement to Allowance of Two Applications for Fees and Expenses for Debtor's Attorney on Remand from the U.S. District Court are DENIED for the reasons set forth in this Memorandum of Decision and the Memorandum of Decision entered May 18, 2007; and the request for fees of $2,200.00 and costs of $255.00 set forth in Needler's First Supplement to Allowance of Two Applications for Fees and Expenses for Debtor's Attorney on Remand from the U.S. District Court is DENIED on the basis that such request is premature.

BY THE COURT

_____
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana