IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

_____
                              )
In Re:                        ) Case No. 06-60855
                              )
Incredible Auto Sales, LLC,   )
                              )
            Debtor.           )
_____ )

THE HON. RALPH B. KIRSCHER, presiding

PARTIAL TRANSCRIPT OF PROCEEDINGS

November 6, 2006

Electronic Recording Operator:   Patti Mahoney

Transcript Services:

Proceedings recorded by electronic recording;
transcript produced by reporting service.

```
 1                        APPEARANCES

 2

 3      FOR THE DEBTOR:

 4           WILLIAM NEEDLER

 5           Attorney at Law

 6           William Needler and Associates

 7           555 Skokie Boulevard, Suite 500

 8           Northbrook, IL 60062

 9

10           CLARKE B. RICE

11           Attorney at Law

12           Clarke B. Rice, PC

13           2951 King Avenue West

14           Billings, MT  59102

15

16      FOR AUTO AUCTION ASSOCIATES OF MONTANA, INC.:

17           BRUCE FAIN

18           Attorney at Law

19           Murphy, Kirkpatrick & Fain, PLLP

20           P.O. Box 429

21           Billings, MT  59103-0429

22

23

24

25
```

```
 1                    APPEARANCES (continued)

 2


 3        FOR HYUNDAI MOTOR FINANCE CO.:

 4             SHANE COLEMAN

 5             Attorney at Law

 6             Holland & Hart, LLP

 7             P.O. Box 639

 8             Billings, MT  59103-0639

 9

10        FOR STEVE'S AUTO SALES, INC.:

11             JAMES PATTEN

12             Attorney at Law

13             Patten, Peterman, Bekkedahl & Green, PLLC

14             2817 Second Avenue North, Suite 300

15             Billings, MT  59101

16

17        FOR MANHEIM SERVICES CORPORATION:

18             CHRISTOPHER BIRKLE

19             Attorney at Law

20             Lovell Law Firm, PC

21             P.O. Box 1415

22             Billing, MT  59101-1415

23

24

25
```

1                     I N D E X

2    WITNESS:                                          PAGE:

3    NICK GUTIERREZ:

4         Direct Examination by Mr. Needler   .   .   .   .   .   5

5         Cross-Examination by Mr. Patten   .   .   .   .   .   78

6         Cross-Examination by Mr. Coleman   .   .   .   .   .   90

7         Cross-Exmination by Mr. Fain   .   .   .   .   .   101

8         Cross-Examination by Mr. Birkle   .   .   .   .   .   106

9         Redirect Examination by Mr. Needler.   .   .   .   .   108

10   DALE UENO:

11        Direct Examination by Mr. Coleman   .   .   .   .   .   119

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 INCREDIBLE AUTO SALES BANKRUPTCY

 2                      BILLINGS, MONTANA

 3                          -  -  -

 4           BE IT REMEMBERED THAT this matter came on for

 5     hearing on November 11, 2006, in the United States

 6     Bankruptcy Court, District of Montana, The Hon. Ralph B.

 7     Kirscher, presiding:

 8

 9      The following proceedings were had:

10

11              THE COURT:  Next witness?

12              MR. NEEDLER:  Judge, my next witness is Mr. Nick

13     Gutierrez.

14              THE COURT:  Okay.  If Mr. Gutierrez could come to

15     the podium to be sworn, please.

16                   NICK GUTIERREZ, WITNESS, SWORN

17              MR. NEEDLER:  Judge, as a matter of curtesy, am I

18     speaking too loud in this machine at all?

19              THE COURT:  No, you're fine.

20              MR. NEEDLER:  Okay.

21                      DIRECT EXAMINATION

22     BY MR. NEEDLER:

23     Q.  Will you state your name, please, for the record?

24     A.  Nick Gutierrez.

25     Q.  And your address?
```

1   A.  At home, it's 3303 Prestwick in Billings, Montana

2   59101.

3   Q.  And you are the -- a managing partner or 80 percent

4   owner of the Incredible Auto Sales, LLC; is that correct?

5   A.  Yes, that's correct.  I'm the majority owner.

6   Q.  Okay.  And you've owned this store for how long, sir?

7   A.  Seven, going on eight.

8   Q.  Seven years, approaching eight years?

9   A.  Yes, I think so.

10   Q.  Okay.  Has it always been a franchise holder of a Kia

11   franchise?

12   A.  Yes.

13   Q.  Okay.  And can you quickly outline your background for

14   this Court in the automotive business that you have had?

15   A.  Started out in the car business in 1984; and moved up

16   to the Midwest, to Iowa, and ran a Ford - Mercury store

17   there until about eight years ago.  Then I moved up here

18   as -- and at that time, I went to work for a company as an

19   automotive trainer.  And then I came up to --

20   Q.  That was eight years later, is that it?  Roughly 1992?

21   A.  '92, hm-hmm.

22   Q.  Okay.

23   A.  And came up to Montana at that time and bought into a

24   dealership here in town, and then opened up my own

25   businesses.

```
 1   Q.   When you worked for the Ford store in Iowa, what was --
 2   what were your functions there?
 3   A.   I was general manager.
 4   Q.   You were general manager there, okay.  Was that a large
 5   store?  Small store?  What?
 6   A.   Small.
 7   Q.   Okay.  Now, you say that you were in trainer in 1992 in
 8   Denver.
 9   A.   Yeah.
10   Q.   And what was the name of the company, again?
11   A.   Universal Underwriters.
12   Q.   And can you explain exactly what Universal Underwriters
13   did and what their mission was?
14   A.   I was one of five that was basically based in different
15   parts of the country to go in and assist auto dealers in
16   helping their finance department, their sales department,
17   parts and service, their secondary departments.  I had a
18   training center there in Denver.
19   Q.   Say that again.
20   A.   I had a training center there in Denver.
21   Q.   I see.  So you were, you were instructing other dealers
22   in both sales, finance, and other activities; is that
23   correct?
24   A.   Right.
25   Q.   And what was the goal of the training?
```

```
 1   A.   To enhance their profitability.

 2   Q.   I see.  And you worked there for two years?

 3   A.   No, seven.

 4   Q.   Seven years, okay.  And what type of dealers would,

 5   would come to the Denver training facility?

 6   A.   Any franchise dealer.  It was -- (inaudible, talking

 7   over each other.)

 8   Q.   Did they come from Colorado?  Did they come --

 9   A.   Oh, all of the 11 western states.

10   Q.   I see, I see.

11   A.   Yeah, that's where my territory was.

12   Q.   So you had contact with lots of different dealers?

13   A.   Correct.

14   Q.   Lots of different employees?

15   A.   Correct.

16   Q.   What level would these, these "pupils", let's call

17   them, be?  Would they be general managers?

18   A.   Oh, it could be -- mostly departmental managers.

19   Q.   Okay.

20   A.   And we also had service contracts that we offered as a

21   company.

22   Q.   Okay.  Now, when you purchased your dealership in --

23   would that have been, would that have been roughly 1994 or

24   thereabouts?

25   A.   '98 --
```

```
1    Q.   Okay, '98.

2    A.   -- '99.

3    Q.   Was it an established dealership then?

4    A.   Yes.

5    Q.   Okay.  And you purchased it from a former owner?

6    A.   Yes.

7    Q.   Did you pay blue sky for the purchase at that time?

8    A.   Yes.

9    Q.   Okay.

10   A.   I --

11   Q.   If you recall.

12   A.   Well, it was, it was a very -- a store that was

13   struggling quite considerably, and so I did pay some blue

14   sky, but it wasn't significant.

15   Q.   I see.

16   A.   It wasn't a significant -- (inaudible, talking over

17   each other.)

18   Q.   Do you recall what the, what the sales volume was in

19   1998 of this store?

20   A.   I think they were doing about 40 to 50 cars a month.

21   Q.   So related to dollars annually, what would that be?

22   A.   Oh, about 12 million.

23   Q.   Okay.  And your most recent year of sales here with Kia

24   has been what?

25   A.   Fifteen to seventeen million.
```

1   Q.   I see.  So you've increased the volume substantially

2   there, have you not?

3   A.   In previous years up to this point, yes.

4   Q.   Okay.  Now, this case was filed on 10/17/06.

5   A.   Yes, sir.

6   Q.   And you felt that it was an emergency to file the case?

7   A.   Yes, sir.

8   Q.   And we have now valued the inventory and assets as of

9   that date, have we not?

10  A.   That's correct.

11          MR. NEEDLER:  Now, I direct your attention -- by

12  the way, Your Honor, as far as the Exhibit 3 that we

13  discussed when Mr. O'Connor was here, I would ask that that

14  portion of the exhibit that he testified to be accepted

15  into evidence for whatever probative value it has.

16          THE COURT:  Okay.  Any objection?

17          MR. COLEMAN:  Yeah, Your Honor, we would object -

18  Shane Coleman for Hyundai - as lacking foundation.  If

19  there's someone who can testify to the other numbers in

20  there, I don't think we would have an objection.  I don't

21  see how Mr. O'Connor knows about those matters, though.

22          MR. NEEDLER:  I was just asking for limited

23  purpose of that particular line item, but we will present

24  evidence with regard to that.  That's okay, I can wait.

25          THE COURT:  Okay.

1          MR. NEEDLER:  Yes.

2          THE COURT:  I'll sustain the objection at this

3  time.

4          MR. NEEDLER:  All right.  Thank you, sir.

5  Q.  (By Mr. Needler)  Mr. Gutierrez, I direct your

6  attention to what is called Debtor's Exhibit 1 for

7  identification.  That is entitled:  A-list, new-car

8  inventory?

9  A.  That's correct.

10 Q.  Are you familiar with that list of vehicles?

11 A.  Yes, I am.

12 Q.  And can you tell the Court basically how that new-car

13 inventory was made up?

14 A.  We took all our 2006 and valued them based on invoice,

15 any car that had less than 200 miles on them, and

16 considered them still new since we still have pretty good

17 incentives and rebates, dealer cash available for these

18 cars through about March or April of next year.

19 Q.  Okay.  Are you saying, are you saying that these

20 particular cars, if they have over 200 miles, stayed on the

21 A-list?

22 A.  No, sir.  If they have 200 miles or over, we moved them

23 over to our used-car list.

24 Q.  Okay.  So these are 2006 cars, new, less than 200

25 miles.

1   A.   That's correct.

2   Q.   Okay.  And how have they been valued for purposes of

3   this -- these exhibits?

4   A.   Based on invoice.

5   Q.   Okay.  And when you say "invoice", that is what you

6   purchased the car for?

7   A.   Factory invoice.

8   Q.   And that's what you were financed for?

9   A.   That's correct.

10  Q.   Okay.  And that total is 467,100?

11  A.   Yes, sir.

12  Q.   Is that an accurate total, in your estimation?

13  A.   Yes, sir.

14  Q.   Have you and your people checked over this list to make

15  sure it's correct?

16  A.   We have, sir.

17  Q.   Okay.

18  A.   And that's off the 17th.

19  Q.   Okay.

20       MR. NEEDLER:  Judge, I would ask that Debtor's

21  Exhibit 1 for identification, new-car inventory, be

22  accepted into evidence.

23       THE COURT:  Any objection?

24       MR. COLEMAN:  None from Hyundai, Your Honor.

25       THE COURT:  Hearing no other objections,

```
 1    Exhibit 1's admitted.

 2         DEBTOR'S EXHIBIT NO. 1 ADMITTED INTO EVIDENCE

 3    BY MR. NEEDLER:

 4    Q.  Now I direct yourself -- your attention, sir, to,

 5    Debtor's Exhibit No. 2 entitled:  B-list.

 6         Do you see that?

 7    A.  Yes, sir.

 8    Q.  Can you tell the Court how that list was made up?

 9    A.  We took our existing used-car inventory that was on the

10    lot, anything that had 200 miles and over on new that's

11    invoiced.  And you can identify them with stock numbers

12    that started with "K" but do not end up with an initial.

13    So if, if you look at the last page of "B", those are our

14    new, we considered, used.  And you can see a lot of "K"

15    numbers there towards the end of the page.  They have

16    identified that we have '05 Montes, a couple '06 --

17    Q.  Okay.  So these are all, these are all the used

18    vehicles in-house?

19    A.  Correct.

20    Q.  Okay.  And you valued these.  How did you value these?

21    A.  Based on current market value of what's going through

22    the auctions.

23    Q.  Okay.  So, basically, you have used your auction

24    values.  And you've got some other columns here.  Kelley

25    Blue Book and NADA, those are as a guide to show the Court
```

1   exactly how our values compare to NADA and Blue Book.

2   A.   That's correct.  I listed both Kelley and NADA.  NADA's

3   predominantly used in this market; Kelley is used more in

4   the western part of the country.

5   Q.   All right.

6   A.   But just to give a comparison.

7   Q.   So if you take page 1 of the B-list, and page 2 of the

8   B-list, and page 3, those auction values add up to be

9   $1,317,065, do they not?

10  A.   That's correct, 1.3 million.

11  Q.   Okay.  And you believe that list is accurate?

12  A.   Yes, sir.

13  Q.   And that the values there as described are accurate?

14  A.   That's correct.

15  Q.   And the column to the right-hand side, which talks

16  about dealer cost, which has a total at the bottom of

17  1,828,490, explain to the Court what that total is.

18  A.   That's what -- we're in our inventory, if you go off of

19  invoice or our used-car list.  And that's what we own them

20  for after reconditioning, delivery expense, and any other

21  incidentals that may apply to those cars, that's the

22  difference between the two numbers.

23  Q.   Okay.  But the difference between the two numbers,

24  which I, in my pleadings, have used the term

25  "write-down" --

1    A.   That's correct.

2    Q.   -- is 511,425.  And that's our write-down of our

3    inventory value to the 10/17 auction value?

4    A.   That's correct.

5    Q.   In your opinion as a car expert, is that a valid

6    valuation on 10/17?

7    A.   Yes.

8    Q.   Okay, thank you very much.

9              MR. NEEDLER:  Judge, I would ask that the

10   Debtor's Exhibit B for identification, which represents the

11   list of used vehicles owned by the debtor valued at

12   auction, be accepted into evidence.

13             THE COURT:  Exhibit 2, is it?

14             MR. NEEDLER:  Exhibit 2, Your Honor.

15             THE COURT:  Any objection?

16             MR. PATTEN:  Your Honor, may I voir dire the

17   witness?

18             THE COURT:  You may.

19             MR. PATTEN:  Mr. Gutierrez, would you look at the

20   third page of the exhibit, B-list, please?

21             THE WITNESS:  The third page?

22             MR. PATTEN:  Yes.

23             THE WITNESS:  Yes, sir.

24             MR. PATTEN:  You're familiar with the dispute

25   that's been raised by Auto Auction Associates and Steve's

```
 1   Auto Sales?
 2              THE WITNESS:  Yes, sir.
 3              MR. PATTEN:  And that relates to a number of
 4   vehicles that you obtained possession of through the auto
 5   auction or through Steve's Auto Sales?
 6              THE WITNESS:  That's correct.
 7              MR. PATTEN:  And would you agree with me, sir,
 8   that a number of those automobiles have not been paid for?
 9              THE WITNESS:  That's correct, have not been paid
10   to the auctions, correct.
11              MR. PATTEN:  Or to Steve's Auto Sales?
12              THE WITNESS:  Through the auction, correct.
13              MR. PATTEN:  And would you agree with me that
14   those cars are listed and set out on page 3 of the B-list?
15              THE WITNESS:  Yes, sir.
16              MR. PATTEN:  And the exhibit shows a dealer cost
17   for those automobiles, doesn't it?
18              THE WITNESS:  That's correct.
19              MR. PATTEN:  Yet there really isn't any dealer
20   cost, is there?
21              THE WITNESS:  Repeat the question.  I'm sorry.
22              MR. PATTEN:  There is no dealer cost because you
23   haven't paid for them, correct?
24              THE WITNESS:  Well, no, that's just the value of
25   them.
```

1          MR. PATTEN:  Okay.  So the column that says

2     "dealer cost" doesn't really reflect what you're actually

3     out of pocket on; it's what -- some value you've put on

4     them?

5          THE WITNESS:  Well, that's what dealer cost is.

6     We, obviously, have stocked them in.  And by stocking them

7     in, you create a dealer cost on every unit once you put

8     them in the inventory, which is part of our schedules in

9     our, in our inventory right now.  So you do have the charge

10    of the units, you've reconditioned them.  We've done

11    everything we have to.  And that's what we have in these

12    units that we have in there even though your -- the checks

13    have not been paid on some of these; and on some, they

14    have.  I couldn't tell you which they have, but I'm --

15    there are some that have been paid.

16         MR. PATTEN:  Well, but let's pick one.  For

17    example, there's a -- it's called a G6.

18         THE WITNESS:  Yes, sir.

19         MR. PATTEN:  Do you see that?  That's a Pontiac,

20    is it not?

21         THE WITNESS:  That's correct.

22         MR. PATTEN:  Okay.  And that is a vehicle that

23    you have that I believe is still -- and the title is still

24    held in the name of Steve's Auto Sales, correct?

25         THE WITNESS:  I would assume so.  I guess so.

1          MR. PATTEN:  Okay.

2          THE WITNESS:  I don't know that.

3          MR. PATTEN:  And would it be correct that you

4    have not paid either Steve's Auto Sales or the Auto Auction

5    Associates for that vehicle?

6          THE WITNESS:  Correct.  But they are part of our

7    inventory, and Hyundai Motors has an interest in it.

8          MR. PATTEN:  Hyundai Motors --

9          THE WITNESS:  Hyundai --

10         MR. PATTEN:  -- may claim an interest in it.

11         THE WITNESS:  Hyundai Finance claims an interest

12   under their umbrella, correct.

13         MR. PATTEN:  That may be.  But I guess,

14   Mr. Gutierrez, is:  There's not -- for the G6, you do not

15   have $14,465 dealer cost in that automobile, do you?

16         MR. NEEDLER:  Judge, I think that question's been

17   asked and answered by my client.  He said:  When it comes

18   in, we book them at a given figure, and this is a booking

19   figure.

20         He's already answered that some of them are not

21   paid.

22         MR. PATTEN:  Your Honor, I would object to

23   admission of the exhibit as being inaccurate on its face.

24         THE COURT:  You know, base upon the --

25         MR. NEEDLER:  Judge, I would --

1          THE COURT:  Based upon the explanation made by

2    Mr. Gutierrez that they're booked at a price equivalent to

3    the check plus any reconditioning charge, I'm going to

4    admit Exhibit 2, clearly understanding that there are items

5    that are listed here that have not actually been paid for

6    either to Steve's or to the auto auction.

7          MR. NEEDLER:  Thank you, thank you, Judge.

8          DEBTOR'S EXHIBIT NO. 2 ADMITTED INTO EVIDENCE

9    BY MR. NEEDLER:

10   Q.  Mr. Gutierrez, I would ask you now to look -- turn your

11   attention to Debtor's Exhibit 3.

12   A.  Yes, sir.

13   Q.  Okay.  And it says at the top (quoted as recorded):

14   "Analysis of assets securing Hyundai Motor Finance", does

15   it not?

16   A.  That's correct.

17   Q.  Okay.  The top item is cash on hand.  We show cash on

18   hand on date of filing of $23,547.77.  Is that an accurate

19   figure?

20   A.  Yes, sir.

21   Q.  Okay.  Number 2, you've already talked about the new

22   cars of 467,100.  That figure is there, is it, also?

23   A.  That's correct.

24   Q.  Okay.  The next figure is List B, which we just talked

25   about, 1,317,065.  That was what we just discussed, is it

1    not?

2    A.   That's correct.

3    Q.   Okay.  And then the next line item is, is:  Less

4    payoffs.

5        Those are liens that still exist on those -- on some of

6    those vehicles in that list --

7    A.   That's correct.

8    Q.   -- is that correct?

9    A.   That's correct.

10   Q.   So the net to Hyundai would be, would be that

11   1,251,940; is that correct?

12   A.   That's correct.

13   Q.   Okay.  And Hyundai does have -- Hyundai Motor Finance

14   does have a security interest.  And you can see it in

15   basically all your assets, all your vehicles, intangibles,

16   etc.; is that correct?

17   A.   Yes, sir.

18   Q.   Okay.  The next line item, sir, is:  Service loaners of

19   33,600.

20       Can you explain to the Court what those are?

21   A.   That's inventory that we have on our service loaner

22   program through Hyundai Motor Finance to be able to provide

23   service loaners for their warranty customers.

24   Q.   And how are, how are those valued?

25   A.   At current market value.

```
 1    Q.   Okay, okay.  And those are on hand?

 2    A.   Yes, sir.

 3    Q.   Are those also available to sell?

 4    A.   No, sir.

 5    Q.   They're not for sale?

 6    A.   Correct.

 7    Q.   Okay.  But they are an asset of this estate?

 8    A.   Right.  And they're depreciated monthly.

 9    Q.   Okay.  Now, is their debt on that?  Is that debt in the

10    Hyundai Motor claim?

11    A.   Yes, sir.

12    Q.   Okay, thank you.  So that 33,600 is a valid value for

13    an asset of this estate?

14    A.   That's correct.

15    Q.   Thanks.  Machinery and fixtures -- I'm sorry, parts,

16    parts and supplies, 153,510, where did that figure come

17    from?

18    A.   Parts and supplies, parts is about 139,000, and then

19    the rest of it is accessories and supplies outside of

20    factory Kia Motor parts that also we use in our service

21    department.  One hundred forty thousand of it is returnable

22    to Kia.

23    Q.   Okay.  Now, we didn't provide a list of all the parts

24    item by item, but are they valued at your cost, your

25    original cost?
```

```
 1   A.   That's correct.
 2   Q.   Okay.  And if we were asked to provide a total list of
 3   those parts to show what the 153,510 is, would that be a
 4   problem?
 5   A.   Not a problem.
 6   Q.   Okay.  Address the issue of whether those parts are
 7   current.
 8   A.   Kia Motor America is actually one of the better
 9   franchises.  They're very good at -- obsolete product
10   doesn't really become obsolete.  They have a returnable
11   program, as long as you work with them, and they'll allow
12   most of that to be returnable --
13   Q.   Okay.  So --
14   A.   -- at any time, especially during a sale of a, of a
15   franchise.
16   Q.   So in your opinion, then, based on your experience, is
17   153,510 pretty much all current parts?
18   A.   Very real, yes, sir.
19   Q.   Okay.  And Kia has -- whether -- a very important
20   guarantee, does it not?
21   A.   A warranty?
22   Q.   Yes.
23   A.   Yes, sir.
24   Q.   Seven years, one hundred thousand miles.  Am I correct?
25   A.   Ten year, one hundred.
```

1   Q.   Ten, one hundred.  Does that assist your sales, that

2   warranty?

3   A.   It helps, yes, sir.

4   Q.   Does that assure you a continuing floor of warranty

5   business?

6   A.   Absolutely.

7   Q.   And the closest Kia dealer is how far away?

8   A.   Missoula.

9   Q.   Okay.  Which is roughly 280 miles, something like that?

10  A.   Yeah, 250 to 300.

11  Q.   Okay.  So you don't have much competition on Kia, Kia

12  repair here.

13  A.   Correct.

14  Q.   Thank you.  The next item that we've got there, sir,

15  is:  Machinery and fixtures, 42,352.

16       How would that -- how was that number arrived at?

17  A.   It's all our, our diagnostic computers, our lifts, our

18  hoists, our machinery, our equipment, air-conditioning

19  system, recharging systems, everything we have back in

20  service, plus our furniture.

21  Q.   Does that include a lineman?

22  A.   Yeah, lineman racks, a hoist.

23  Q.   Okay.

24  A.   Hm-hmm.

25  Q.   And how were those priced?  How were those valued?

1   A.   As if it was a fire sale, as if I was just liquidating.

2   Q.   Okay.  So to use the vernacular, it would be what you

3   would class as an under-the-hammer value?

4   A.   Correct.

5   Q.   Okay.  And the age of those -- the age of that

6   equipment is what?

7   A.   Anywhere from three years to five - seven years.

8   Q.   Okay, okay.  And this would include all the special

9   parts and --

10  A.   Special tools.

11  Q.   -- tools that you need to service Hyundai?

12  A.   Correct.

13  Q.   Thank you.  Signage and leasehold improvements is a

14  round figure of $25,000.  How did you arrive at that?

15  A.   We own all our light poles, signage around the

16  building, and even the asphalt.  Just as -- I called my

17  landlord and asked him if he was interested in buying it.

18  He indicated at one time that he would pay between the

19  25,000 and 35,000 for it, and that's the number I used.

20  Q.   And who was your landlord, by the way?

21  A.   Ernie Dutton.

22  Q.   Ernie Dutton?

23  A.   Hm-hmm.

24  Q.   And he owns the land and the buildings?

25  A.   It's a, it's a corporation.

```
 1   Q.   Oh, it's a corporation.

 2   A.   He controls 40 or 50 percent of the --

 3   Q.   Okay.  And what, what kind of lease do you have?

 4   A.   Four five-year terms.  We're in our third.

 5   Q.   Say it again.  You have a four-year term, or --

 6   A.   Four five-year terms.

 7   Q.   Oh, four five-year terms.  And you're in which term?

 8   A.   Third.

 9   Q.   Third, okay.  And we do have --

10   A.   Or beginning of --

11   Q.   We do have a prepetition default with a landlord in

12   which we'll have to address in this case.

13   A.   Correct.

14   Q.   And your landlord, as I understand, is very friendly to

15   the --

16   A.   Yes.

17   Q.   -- to the dealership --

18   A.   Very helpful.

19   Q.   -- and understands the problem with King Avenue.

20        The next item is:  Receivables.

21        Can you go down that list and explain generally what

22   those receivables are to the Court?

23   A.   Customer receivables is basically buy here, pay here.

24   Q.   I'm sorry, are buy here pay here?

25   A.   Yeah, car loans; hm-hmm, car loans.
```

1  Q.  Okay.  Those are, those are car loans that are on the

2  books --

3  A.  Right.

4  Q.  -- of, of Kia?

5  A.  Right.

6  Q.  And are a current receivable.  Are these paid monthly?

7  A.  Monthly.

8  Q.  Okay, thank you.

9  A.  Customer parts and service could be parts houses, could

10  be could be customer pay, could be commercial, a

11  construction company that has a fleet of cars.  That's all

12  part of that.

13      Factory holdback is the money we get from our factory,

14  our incentives on our new.

15      Factory incentives are rebates.  Factory warranty are

16  receivables and -- and factory incentives could also mean

17  dealer cash because I see that rebates is on the lower

18  line.  So factory warranty and receivables and rebates is

19  in the lower line.

20      And then contracts in transit is whatever we've sold

21  and we are still waiting for pending contracts to come in

22  as the banks fund it.

23      And then finance receivable is what we get in reserves

24  from our finance banks.  We get a percentage of interest on

25  the rate spread.

1    Q.   Now, that list total is 176,994.  Do you believe that

2    to be accurate?

3    A.   Yes, sir.

4    Q.   Have you gone over that with your various people in

5    your shop --

6    A.   Yes, sir.

7    Q.   -- to verify that?

8    A.   Yes, sir.

9    Q.   Now, it's my understanding from you as the debtor that

10   there's roughly 62,000 that's prepetition credit due from

11   the factory which is now on hold.

12   A.   It's on hold, yes, sir.

13   Q.   Okay.  Is that 62,000 reflected in these figures here?

14   A.   Yes, sir, because we have not received it in cash.

15   Q.   Okay.  So it's still a receivable?

16   A.   Correct.

17   Q.   And at some point here, we need to address that to the

18   Court, do we not?

19   A.   Yes, sir.

20   Q.   Okay.  So that total receivable, 176,994, you believe

21   is accurate?

22   A.   Yes, sir.

23   Q.   Okay.  Now, you've heard the testimony from Mr. Bill

24   O'Connor with regard to the lawsuit.  And he wasn't clear

25   at all or didn't seem to have any personal knowledge of the

1    collectability of any judgment that you might get.  Have

2    you had experience with United Car Care, or UCC as you call

3    it, that could bear on collectability and that issue of

4    whether a judgment, if granted by the State Court, would be

5    collectible?

6    A.   Yeah.  I know United Car Care from my Universal days.

7    They were -- their office was actually across the street

8    from us.  And they were a pretty strong competitor

9    nationally, and that's why I used them when I did in the

10   beginning.  I they're a solvent company, I think they were

11   -- they provided good product.  You know, so I see them as

12   an ongoing business that should be able to perform.

13   Q.   And they have -- they have national exposure, do they

14   not?

15   A.   That's correct.

16   Q.   Right.  So somebody in Evansville, Indiana, that would

17   use UCC is the same entity that uses it in Denver?

18   A.   That's correct.  And they never -- I never had problems

19   with --

20   Q.   Right.

21   A.   -- collecting on their --

22   Q.   And aren't they recognized as the premier teaching unit

23   in the whole automotive business?

24   A.   They have a training center, as well, for F&I.

25   Q.   Yeah, yeah.  So you would believe that the 502,400

1    that's listed there is, in your opinion, a collectible --

2    it's a judgment that you expect to get?

3    A.  Yes, sir.

4    Q.  And you believe if you get a judgment, it's going to be

5    collectible?

6    A.  Yes, sir.

7    Q.  Thank you.  And the case name that's there, Nick

8    Gutierrez, Incredible Auto Sales vs. United Car Care, that

9    is a correct description of that lawsuit?

10   A.  Yes, sir.

11   Q.  Thank you, okay.  That total down there, that subtotal

12   of those assets that you've just been through we have added

13   up to 2,676,443; is that correct?

14   A.  That's correct.

15   Q.  And up at the top, the claim of 2,163,000 for Hyundai

16   Motor Finance, you believe that to be accurate, also?

17   A.  Yes, sir.

18   Q.  So if you take these assets here which we just

19   subtotaled and compared them against the claim, these

20   assets without the franchise value exceed the claim of

21   Hyundai Motor Finance?

22   A.  Yes, sir.

23   Q.  Thank you.  Now, the next item on your list, sir, is

24   the franchise sale of $800,000.  Can you tell this Court

25   basically what -- how you arrived at the $800,000 value for

1   the value of the franchise and explain basically to the

2   Court what blue sky is and how it differs from asset value?

3   A.   Okay, let's see.  I'm going to have to go to Exhibit 8.

4           MR. NEEDLER:  That's fine, you can refer --

5   Judge, we're going to refer for a minute to Exhibit 8 on

6   the franchise.

7           THE WITNESS:  The third page.

8   Q.  (By Mr. Needler)  No, wait a minute, I think we've got

9   the wrong number.

10  A.   I'm sorry, seven, third page.

11  Q.   It's Exhibit 7.

12  A.   Yeah.  I'm sorry.

13          MR. NEEDLER:  Your Honor, Exhibit 7 is listed on

14  the, on the list of exhibits as debtor's exhibit as the

15  values of Kia franchise - blue sky.

16          MR. COLEMAN:  Your Honor, we'll object to any

17  reference to Exhibit 7 as being hearsay and lacking

18  foundation.

19          MR. NEEDLER:  Judge, we're going to ask him to

20  identify those exhibits.  And if he wants to object to it,

21  we can -- he can object to it when we offer them into

22  evidence.

23          MR. COLEMAN:  At this point, Your Honor, it

24  sounds as though the witness is being asked and intends

25  fully to regurgitate what is on those exhibits.

1          THE COURT:  Well, I'm going to allow the witness

2    to identify what the exhibit is.  You certainly can raise

3    your objection at that time.

4          MR. NEEDLER:  Thank you, Judge.

5          THE WITNESS:  Your Honor, this is nothing other

6    than a National Auto Dealer Association recommendation of

7    how to determine an auto franchise value for blue sky.  And

8    there's actually two options that they use.  And that's all

9    that is.  And so I've taken the liberty of providing in

10   Exhibit A -- eight, rather, my --

11   Q.  (By Mr. Needler)  Seven.  Seven, isn't it?

12   A.  Excuse me.  Exhibit 8, the financial statements of

13   which I've got -- I've gathered the information to make

14   this determination.

15   Q.  I'm sorry.

16   A.  And so the financial statements for '04, '05, and

17   current was what I used as the rule of thumb that NADA

18   provides to come up with the dollars values as to how to

19   come up with a fair value for the franchise.  And it

20   happens to concur with the broker that we're using, as I've

21   discussed with him.

22   Q.  Now, the broker that you're using is --

23   A.  Jappy Dickson.

24   Q.  -- is Jappy Dickson with Southwest --

25   A.  Brokerage.

1    Q.   -- Brokerage?  Is that the number he's using to try to

2    sell your franchise, or is he using a higher number?

3    A.   Actually, he's using a higher number.

4    Q.   Okay.  And am I correct that he's already elicited at

5    least one bid for the blue sky?

6    A.   That's correct.

7    Q.   Okay.  Is that bid acceptable to you?

8    A.   I haven't seen it --

9    Q.   I see.

10   A.   -- come through yet with a signature.

11   Q.   Okay.

12   A.   I've seen the proposal --

13   Q.   Okay.

14   A.   -- as was agreed upon, but I have not seen it with a

15   signature.

16   Q.   And Jappy Dickson has discussed with you the $800,000

17   value?

18   A.   That's correct.

19   Q.   Okay.  And if you had such an offer that would take out

20   Hyundai Motor Finance and also contribute $800,000 to the

21   debtor, all things being equal, would you accept that?

22   A.   Yes, sir.

23   Q.   Okay.  Now, when you taught class in Denver, Colorado,

24   did, did the subject of blue sky or the valuation of blue

25   sky or valuation of dealerships come up?  Was that

1    something that was discussed?

2    A.   Not much.

3    Q.   Not much?

4    A.   Not much.

5    Q.   Okay.  So any knowledge that you would have as to how

6    to value blue sky would be based on your years in the car

7    business?

8    A.   My experience in buying stores locally.

9    Q.   Right.

10   A.   Hm-hmm.

11   Q.   Now, tell the Court, is asset value plus blue sky, is

12   that the normal way a dealership is bought and sold?

13   A.   Yes.

14   Q.   Okay.  So whether you're at -- buying a Chevrolet store

15   in downtown Billings or buying a Kia store in Boulder,

16   Colorado, it would be based on somebody paying for the

17   assets and paying off the secured lender plus an increment

18   of money for blue sky.

19   A.   That's correct.

20   Q.   And you have no problem granting a security interest to

21   Hyundai Motor to secure the use of collateral in this

22   franchise?

23   A.   That's correct.

24   Q.   For whatever value it is.

25   A.   That's correct.

1    Q.   Okay.

2             MR. NEEDLER:  Judge, for purposes of valuation,

3    we have used the figure of $800,000 to arrive at the asset

4    value which is on Exhibit 1.  Obviously, the asset value

5    until there is a real sale may be, may be speculative, but

6    that is the figure that we will use in hiring the broker.

7    And it's the only way that I know as attorney for the

8    debtor, Your Honor, to arrive at an asset value so I can

9    indicate to Your Honor, "Yes, there is an equity cushion,"

10   "No, there isn't an equity cushion," or what there is.

11            So I would ask that Debtor's Exhibit 1 placed

12   before Your Honor for identification be accepted into

13   evidence at this time as debtor's indication of value of

14   the assets of this estate subject to Hyundai's lien as of

15   10/17/06.

16            THE COURT:  Did you mean to say "Exhibit 1" or

17   "Exhibit 7" --

18            MR. NEEDLER:  I'm sorry.

19            THE COURT:  -- or "Exhibit 3"?

20            MR. NEEDLER:  It was Exhibit 1 in my pleadings,

21   but it is, it is Exhibit 3.  Sorry, sorry.

22            THE COURT:  Any objection?

23            MR. PATTEN:  I object, Your Honor.

24            THE COURT:  Mr. Patten, basis?

25            MR. PATTEN:  Can I voir dire the witness again,

1      Your Honor?

2            THE COURT:  You may.

3            MR. PATTEN:  Mr. Gutierrez, were any of the cars

4      that you have as used car on your used-car inventory, were

5      they subject to liens when they were taken in by you -- or

6      taken in by Incredible Kia?

7            THE WITNESS:  Were they subject to -- I don't

8      understand the question.

9            MR. PATTEN:  Okay.  Some of the cars on Exhibit B

10     that -- your B-list cars, your used-car inventory --

11           THE WITNESS:  Yes, sir.

12           MR. PATTEN:  -- were trade-ins, correct?

13           THE WITNESS:  That's correct.

14           MR. PATTEN:  And did any of those trade-ins have

15     existing liens on them when they were traded in?

16           MR. NEEDLER:  Judge, I'm going to object.  We've

17     already talked about the liens on Exhibit 3.  They are

18     listed on there in an amount of -- he's already testified

19     to it.  They are listed in there as a deduction in an

20     amount of $65,000.  So the guess the question is -- should

21     be directed to that, I would think.

22           THE COURT:  Well, the objection is overruled.

23     Mr. Patten, you may proceed.

24           MR. PATTEN:  Okay.  And maybe I misunderstood the

25     earlier testimony.  Mr. Gutierrez, is $65,000 the total

1    liens on the vehicles that were taken in on trade and

2    currently on the B-list?

3            THE WITNESS:  The 65,000 that's on the B-list is,

4    is cars that we owe on still to lien payoffs, correct.

5            MR. PATTEN:  Okay.  And are there cars that you

6    have already sold and have not satisfied the liens on?

7            THE WITNESS:  That's correct, yes, sir, there

8    are.

9            MR. PATTEN:  What's the dollar amount on that?

10            MR. NEEDLER:  Judge, I'm going to object again.

11    Cars that are sold are not on this inventory.  They're

12    prepetition cars on prepetition sales.  So the effect of

13    those liens would have nothing to do with our inventory.

14            THE COURT:  Well, but they would have a, they

15    would have an impact on expenses and debts, right?

16            MR. NEEDLER:  Yes, they --

17            MR. PATTEN:  Yes; yes, Your Honor.  I think they

18    would, Your Honor.

19            MR. NEEDLER:  Yes.  And those are expenses which

20    we're going to list on -- obviously, on Schedule F of the

21    schedules to be filed, so --

22            MR. PATTEN:  Well, therein may, may lie the

23    problem, Your Honor.  We know what, we know what the debts

24    to one of the creditors in this case is, but we don't

25    really have any idea whatsoever as what the debts to the

1     other creditors are.  And we're being asked to evaluate,

2     and you're being asked to rule on a cash collateral motion

3     in somewhat of a vacuum in terms of what the overall

4     picture of this business enterprise is.  We don't know what

5     the debts are.

6             MR. NEEDLER:  Can I respond to that, Your Honor?

7             THE COURT:  Mr. Needler.

8             MR. NEEDLER:  Judge, I understand that you were

9     very gracious in extending our time to file the schedules

10    and statement of affairs, which we needed.  But I did print

11    up today for Counsel -- and I could give it to him.  It's

12    not an exhibit because I just got it printed.  But I have

13    printed up Schedule F, and I have gone through Schedule F

14    in detail with my client.  Now, we are, we are checking it

15    at the office because there's some bills -- as you know, we

16    filed on the 17th and, obviously, some bills weren't in on

17    the 17th.

18            But I have a Schedule F here which shows all the

19    unsecured creditors.  We're not ready to file it because

20    we're rechecking the amounts with the mail.  But I can hand

21    to Counsel a copy of Exhibit F which shows all the

22    unsecured creditors, at least as far as we know them today

23    without more verification.

24            THE COURT:  You know, Mr. Needler, I guess I have

25    a question for you.

1          MR. NEEDLER:  Sure.

2          THE COURT:  Regarding your Exhibit 3, you go

3   through and you list the assets, new value, new cars, used

4   cars, the debt to Hyundai --

5          MR. NEEDLER:  Yes.

6          THE COURT:  -- potentially liens that are still

7   existing.  There isn't a reference on Exhibit 3 - and maybe

8   I missed it - to any of the other lienholders, right?

9          MR. NEEDLER:  Well, no, they're -- the only

10   reference to the other lienholders is a deduction as a

11   group where we took off 65,000 which were the liens that

12   the debtor corporation thought still existed on the

13   inventory.  So, yes, they're -- but they aren't identified,

14   yes.

15          THE COURT:  Okay.  But that $65,000 is not

16   inclusive of the amounts that you still owe to auto -- or

17   that the debtor owes to auto auction or Steve's Auto,

18   right?

19          MR. NEEDLER:  That's correct.  That's absolutely

20   correct.  Now, just stop for a second.  And I'm not going

21   to get into this argument, but this gentleman over here

22   representing Hyundai Motors is claiming that their

23   floor-plan lien and the prepetition UCC cover the autos

24   that were bought at the auction which were brought in-house

25   and, because of the timing of the Chapter 11, were not

```
 1   paid.
 2              So in my professional opinion, having done these
 3   before, they're claiming that as their lien, so obviously
 4   it's got to be part of the cash collateral since they claim
 5   it.  And there is a dispute, but I'm listing those amounts
 6   on Schedule F as unsecured.  Now, I could be proven wrong
 7   by however you rule on the adversary.  I'm not trying to do
 8   it.  But my experience tells me that auction claims where a
 9   title is passed and the car is passed, that they've got,
10   probably got a good lien.  So, no, they're not in here;
11   they're on Schedule F where I think they should be.
12              THE COURT:  Okay.  Depending upon reclamation
13   claims.
14              MR. NEEDLER:  Yes, sir; yes.
15              THE COURT:  Mr. Patten, back to --
16              MR. PATTEN:  Just a few more voir dire, Your
17   Honor.  I'll be brief, Your Honor.
18              THE COURT:  Well, we had an objection by
19   Mr. Needler, I think, to your -- Mr. Needler, would you
20   restate your objection?
21              MR. NEEDLER:  I think what he was asking was, he
22   was asking if there were any other liens on these autos in
23   the inventory.  And I objected saying it had already been
24   asked and answered, that the, the liens that are on those
25   autos are 65,125 and identified specifically on Debtor's
```

1    Exhibit 3.  That was my objection.

2             THE COURT:  Okay.  And, Mr. Patten, your question

3    really is if there are other liens on cars that have

4    already been sold that have not also been paid off.

5             MR. PATTEN:  Yes.

6             THE COURT:  I'm going to sustain the objection.

7    Yes, I'm going to sustain the objection on that basis.

8             MR. PATTEN:  I've got just a few more questions

9    for my voir dire, Your Honor.

10            THE COURT:  Very well.

11            MR. PATTEN:  Mr. Gutierrez, on the Schedule F

12   that your counsel handed to me, you show a liability to

13   Billings Auto Auction in the amount of $199,000.  Are you

14   aware of this debt?

15            THE WITNESS:  Yeah, I thought it was more like

16   184,000, but it could be 199,000.

17            MR. PATTEN:  Okay.  And that's the debt arising

18   from the reclamation claim that Billings Auto Auction has

19   filed in this case, correct?

20            THE WITNESS:  Yes, sir.

21            MR. PATTEN:  And those involve many of the same

22   cars that Steve's Auto Sales is involved in, correct?

23            THE WITNESS:  That's correct.

24            MR. PATTEN:  If Auto Auctions of Billings is

25   correct or Steve's Auto Sales is correct, then there would

1    be another $200,000 or $199,000 worth of liens on these

2    vehicles?

3              THE WITNESS:  No.

4              MR. NEEDLER:  Your Honor, I'm going to object.

5    That asks -- I think that asks for a legal conclusion.  I

6    don't think my client is qualified to answer that.

7              THE COURT:  Well, to the extent he was starting

8    to answer, I'm going to overrule and allow him to answer.

9              You may proceed.

10             THE WITNESS:  I guess I'm trying to understand

11   the question, more than anything.  I wasn't really sure of

12   the question.  But I think the, the, the interest shifts

13   from either the auction or Hyundai, one or the two, but the

14   dollars stays the same.

15             MR. PATTEN:  Well, if -- the total equity cushion

16   that is shown on Exhibit 3 could be off by $200,000 if the

17   Billings Auto Auction is correct in its reclamation claim.

18             THE WITNESS:  No, sir.  The, the, the --

19   my out-of-trust would be greater with Hyundai, but the

20   number would stay the same and that 60 percent would remain

21   the same.  The only thing that was -- the shifting would

22   change from who I'd owe, would it be more to Hyundai or to

23   the auction.  The percentage would stay the same, the

24   cushion would not change.  One or the other will take the

25   interest.

1          MR. PATTEN:  Why would you owe Hyundai more

2     money?

3          MR. NEEDLER:  Again, I'm going to object because

4     this requires him to have an understanding of the

5     difference between 506 claims, 703 claims, that kind of

6     thing, which I don't think he's qualified to answer.

7          MR. PATTEN:  Well, Your Honor, I'll stop here.  I

8     don't want to create any more confusion than we have.  I've

9     just got one --

10          THE COURT:  I'll sustain his objection.

11          MR. PATTEN:  Okay.  Mr. Gutierrez, do you have

12     any particular training and education in the valuation of

13     an automobile dealership, the blue-sky value of an

14     automobile dealership?

15          THE WITNESS:  No, other than I've only bought

16     four.

17          MR. PATTEN:  Okay.  And in putting the value on

18     the blue sky, what are the factors that you consider?

19          THE WITNESS:  Net profits, owner's compensation,

20     and three years worth of -- what I look at is three years

21     worth of income --

22          MR. PATTEN:  Okay.

23          MR. NEEDLER:  -- combined.

24          MR. PATTEN:  And are those factors that you've

25     utilized to come up with this value of $800,000?

1              THE WITNESS:  In one exercise, that's correct.

2     But that was also because of NADA recommendation.

3              MR. PATTEN:  And NADA being the National

4     Automobile Dealers Association?

5              THE WITNESS:  National Automobile Dealers

6     Association, hm-hmm.

7              MR. PATTEN:  And are those the exhibits -- I

8     think they were numbered Exhibit 7.

9              THE WITNESS:  That's correct.

10             MR. PATTEN:  Okay.  Tell me how in the --

11    ignoring NADA, how the three years experience that you

12    have, the last three years experience -- financial

13    performance of Incredible Kia, what aspect of that

14    generates this $800,000 blue-sky value?

15             THE WITNESS:  I don't know what that means, "what

16    aspect."

17             MR. PATTEN:  Well, how did you get 800,000?

18             THE WITNESS:  If I go with the worst-case

19    scenario, which is the current tracking of 2006 in the

20    lower page of 7, page 3 -- or Exhibit 7 page 3, I took the

21    worst-case scenario, which is 767,000.  And that's going

22    off of my financial statements, sir.

23             MR. PATTEN:  Okay, thank you.

24             MR. NEEDLER:  Judge, I would ask, subject to

25    going into more detail on Exhibit 7, which we really

1   haven't addressed, that Debtors's Exhibit 3 for

2   identification be accepted into evidence showing what we

3   believe to be the cushion against the debt of Hyundai at

4   this juncture.

5              THE COURT:  You said Exhibit 3?

6              MR. NEEDLER:  Yeah, it's called Exhibit 3.  It's

7   a one-page exhibit.

8              THE COURT:  Exhibit 3 is admitted.

9          DEBTOR'S EXHIBIT NO. 3 ADMITTED INTO EVIDENCE

10             MR. COLEMAN:  Your Honor, for the record, Shane

11  Coleman for Hyundai.

12             We do not object, but we do object to the

13  characterization of what the exhibit shows.

14             THE COURT:  Noted for the record.

15             MR. NEEDLER:  Thank you, Your Honor.  Is the

16  exhibit admitted?

17             THE COURT:  Yes.

18             MR. NEEDLER:  Thank you.

19  BY MR. NEEDLER:

20  Q.  Mr. Gutierrez, I direct now your attention to Debtor's

21  Exhibit 4 for identification.  And that is a multipage

22  exhibit.  I'm trying to count the pages, but it's

23  considerable.  I think it's some 10 pages.

24      Directing your attention to page 1 of Exhibit 4, can

25  you tell the Court basically what that, what that grid

1    represents?

2    A.  We created a summary of a -- basically, a

3    profit-and-loss statement for 12 months.

4    Q.  Okay.  And, basically, did you show -- you showed sales

5    on there --

6    A.  That's correct.

7    Q.  -- is that correct?

8    A.  Performance of sales.

9    Q.  And you also show expenses on there.

10   A.  Correct.

11   Q.  But the expenses have been further expanded on some

12   additional exhibits here.

13   A.  That's correct.

14   Q.  Right.  Because Hyundai Motors had indicated that this

15   wasn't a good budget, so we've also attached what would be

16   a more specific budget; is that correct?

17   A.  That's correct.

18   Q.  Which we'll address, okay.  So the month of November,

19   it shows a loss of 533, and then it goes across the bottom;

20   is that correct?

21   A.  Yes, sir.

22   Q.  And tell the Court basically how you figured -- at

23   least for this monthly profit and loss how you figured the

24   gross on vehicles.

25   A.  Based on new and used gross average that we

1   historically have done.

2   Q.  Okay.  So where you've got total sales, those are

3   total, total gross, is that it?

4   A.  Yes, sir.

5   Q.  Okay.  And, for example, directing yourself to

6   November, you think the new-car gross would be roughly

7   18,000?

8   A.  What month is that?

9   Q.  We're looking at the month of November.

10          MR. NEEDLER:  Can I approach the bench, sir?

11          THE COURT:  You may.

12          MR. NEEDLER:  (Inaudible, audio cuts out.)

13          THE WITNESS:  Eighteen thousand in gross for new,

14  yes.

15  Q.  (By Mr. Needler)  Okay.  Coming down this, this column.

16  A.  This column, yeah, okay.

17  Q.  You've got the gross in there for new cars?

18  A.  That's correct.

19  Q.  You've also got the gross in there for used cars?

20  A.  That's correct.

21  Q.  You've got the gross in there for service --

22  A.  That's correct.

23  Q.  -- parts, etc.?

24  A.  Yeah.

25  Q.  Now, is that -- basically, is that profitability of the

1    car over some figure?  In other words, that's your gross

2    profit?

3    A.  Cost plus -- right.

4    Q.  Okay.  Now, at the note at the bottom, it says (quoted

5    as recorded):  "Please note the above grosses are based on

6    the previous dealer costs; do not include the write-down."

7        Is that correct?

8    A.  That's correct.

9    Q.  Okay.  So the write-down is not factored into this pro

10   forma.

11   A.  That's correct.

12   Q.  Okay.  Now, digress for a minute.  The "B" cars that

13   are out there are the ones with the write-down; is that

14   correct?

15   A.  That's correct.

16   Q.  Okay.  And the write-down is roughly $511,000?

17   A.  Yes, sir.

18   Q.  Okay.  And if it were possible in the next 12 months to

19   sell all the "B" cars and if you sold them at the original

20   cost, you would have an additional 511,000 over this gross;

21   is that correct?

22   A.  That's correct.

23   Q.  Okay.  Just so the Court understands that the

24   write-down -- the reflection of the write-down is not in

25   this pro forma, correct?

1   A.   Yes, sir.

2   Q.   Because for one thing, we don't know how fast sales are

3   going to go, do we?

4   A.   Correct.

5   Q.   Okay.  Directing your attention to the page 2 of

6   Exhibit 7 -- 4, that is broken down by November, December,

7   January, and then other pages go through the end of the

8   year; is that correct?

9   A.   Yes, sir.

10   Q.   And so, basically, that has an analysis of the gross

11   and the number of units by month that you intend to sell,

12   does it not?

13   A.   Yes, sir.

14   Q.   Okay.  And so we've got, we've got a sheet like that

15   for every, for every month, do we not?

16   A.   Every month for 12 months.

17   Q.   And that analyzes the sales, the numbering units, etc.

18   So if we flip over one, two, three -- four pages and get to

19   monthly expenses, those expenses are detailed as to how

20   much you need, you need, as Incredible, to spend every

21   month to meet these sale goals.

22   A.   That's correct.

23   Q.   Okay.  And it's detailed down to wages and laundry,

24   exhibit -- all your expenses:  Rent, salaries, etc.?

25   A.   It's exactly the way the Kia financial statement would

1    look, hm-hmm.

2    Q.   Okay.  So, so this part of Exhibit 4 tracks Kia's

3    statements; is that correct?

4    A.   That's correct.

5    Q.   Okay.  Digress for a minute.  We talked about payroll.

6    But you've got payroll that was due on Friday, do you not?

7    A.   Yes, sir.

8    Q.   And that's approximately how many dollars?

9    A.   Thirty-five.

10   Q.   Okay.  And so those employees -- all the prepetition

11   payroll was paid before you filed?

12   A.   Yes, sir.

13   Q.   Okay.  So the 35 that was due Friday is postpetition

14   payroll which has not been paid?

15   A.   That's correct.

16   Q.   Okay.  And we've requested of Kia -- or of Hyundai to

17   OK the payroll and consent to it, but they have refused?

18   A.   That's correct.

19   Q.   Okay.  How much longer can you keep the people on your

20   payroll if you don't pay them shortly?

21   A.   I'll lose them tomorrow, probably.

22             MR. NEEDLER:  Okay.  Judge, without going into

23   more detail or more questions, because these are detail

24   pages, I would ask that these particular pages, which are a

25   pro forma backed up by estimates and analysis of sales by

```
1   car, by service, and the analysis of expenses by line item,

2   that these be accepted into evidence as Debtor's Exhibit 4.

3            THE COURT:  Any objection?  Exhibit 4 is

4   admitted.

5            MR. NEEDLER:  Thank you, Judge.

6         DEBTOR'S EXHIBIT NO. 4 ADMITTED INTO EVIDENCE

7            MR. NEEDLER:  Now, I direct your attention,

8   Mr. Gutierrez -- let me, let me ask a question, Judge:  Is

9   it possible we could take about a 10-minute break here?

10           THE COURT:  We will, we will take a 10-minute

11  break.  We'll reconvene at three-thirty.

12           And, Mr. Gutierrez, you may step down from the

13  witness stand.

14           THE WITNESS:  Okay.

15           MR. NEEDLER:  Thank you, Judge.

16           THE COURT:  We'll be in recess.

17           (A brief recess was taken.)

18           THE COURT:  Please be seated.

19           MR. NEEDLER:  Thank you, Judge.  Thank you very

20  much.

21           THE COURT:  I will have the witness resume the

22  witness stand.  I also will remind him that he's still

23  under oath.

24           THE WITNESS:  Thank you, Judge.

25           MR. NEEDLER:  Thank you, Judge.
```

1    BY MR. NEEDLER:

2    Q.   Mr. Gutierrez, the Court just admitted the exhibits

3    which were Exhibit 4, which were the pro formas, the

4    projections, etc., etc.  And just to address those for a

5    minute before we get to Exhibit 5, you've taken some really

6    extreme steps, have you not, to cut down the overhead of

7    this store in light of the Chapter 11 and gas prices and

8    curtailment -- I mean the problem with the roads, have you

9    not?

10   A.   Yes.

11   Q.   Your employee base was prepetition, some time ago, 32

12   employees; is that correct?

13   A.   That's correct.

14   Q.   And how many do you have today?

15   A.   Twenty-one.

16   Q.   Twenty-one.  And your expenses, which are on another

17   exhibit showing your past performance, your expenses were

18   somewhere around 240 a month, were they not?

19   A.   Yeah, between 240 and 250, plus interest.

20   Q.   Okay.

21   A.   Right.

22   Q.   And those now on the pro formas have been cut down to

23   about 160.

24   A.   Right, correct.

25   Q.   So you've trimmed employees.  You've also trimmed some

```
 1  of your advertising --
 2  A.  That's correct.
 3  Q.  -- and other expenses?
 4  A.  That's correct.
 5  Q.  Okay.  Am I correct that under some of your prior
 6  financial statements, you were spending like 20,000,
 7  30,000, 40,000 a month on advertising?
 8  A.  Yes, sir.
 9  Q.  And right now, we're programmed to spend --
10  A.  Twenty-nine.
11  Q.  Huh?
12  A.  Twenty-nine.
13  Q.  Twenty-nine.  Now is, is approval of cash collateral
14  necessary to go ahead and spend money for advertising?
15  A.  Absolutely.
16  Q.  Can you get sales without advertising, especially under
17  the condition that the streets are in?
18  A.  Not for a car lot, no.
19  Q.  I think you testified that the nearest Kia dealer was
20  some 280 miles away.
21  A.  Missoula, hm-hmm.
22  Q.  Okay.  But there are competitors in the local area.
23  There's lots of car dealers here, are there not?
24  A.  That's correct.
25          THE CLERK:  Mr. Gutierrez, could you speak a
```

1    little louder --

2              THE WITNESS:  Yes, ma'am.

3              THE CLERK:  -- and closer to the microphone?

4    Thank you.

5              THE WITNESS:  Certainly.

6    Q.  (By Mr. Needler)  Thank you, Mr. Gutierrez.  I direct

7    your attention now to Debtor's Exhibit 5.  Now, in our cash

8    collateral motion, Mr. Gutierrez, we told the Court that we

9    were going to set up these various trust accounts, Trust

10   Account A for new-car proceeds, "B" for used-car proceeds,

11   "C", etc., etc.  Those accounts were set up right after

12   filing the Chapter 11, were they not?

13   A.  That's correct.

14   Q.  Okay.  And they're at the Stockman Bank here in, in

15   Billings?

16   A.  That's correct.

17   Q.  Okay.  And your DIP account is there plus the other

18   trust accounts?

19   A.  Yes.

20   Q.  And the practice of your bank here is to not allow wire

21   transfers or money transfers direct to these accounts, so

22   all the money has to come into your DIP account first.

23   A.  That's correct.

24   Q.  And that's a bank rule, is it not?

25   A.  Right.

1   Q.   But the minute, let's say, proceeds of sale on new car

2   come into your store, they go into the DIP?

3   A.   That's correct.

4   Q.   And then you transfer it out into the trust account?

5   A.   Yes.  And I should clarify it's probably not as much as

6   a -- this bank rule, but our lenders that are funding our

7   contracts for our customers wouldn't know where to put the

8   money.  They wouldn't know if it's a new car or a used car

9   and which account to fund, so it's all going to go to the

10   DIP account.  So it's all processed through that account,

11   correct.

12   Q.   And when you talk about banks that were going to fund,

13   basically, they're -- these are funding on retail contracts

14   on sales out that are coming in?

15   A.   Yes, correct.

16   Q.   Okay.  Now, Debtor's Exhibit 5, which is different than

17   the Debtor's Exhibit 5 that was on my motion, this is your

18   refined procedure of our use of cash collateral, is it not,

19   to protect Hyundai Motors and to allow it to track and for

20   this system to work?

21   A.   This is a procedure that we've come up with so that we

22   could follow each step as well as be able to demonstrate to

23   the secured creditor how the money is moving and be able to

24   show them -- (inaudible, talking over each other.)

25   Q.   Okay.

1    A.   Hm-hmm.

2    Q.   So if you take the first paragraph up there, which is

3    some six lines, basically what that is saying is:   New-car

4    sales will go in "A", used-car sales will go in "B", etc.,

5    etc.; and shows where the money goes.

6    A.   Correct.

7    Q.   That's a simple explanation.   Step 2 indicates to all

8    interested parties and the Court, "A", how you define your

9    profit, and, "B", where the profit goes, does it not?

10   A.   Yes.

11   Q.   And that particular Step 2 allows our proposed profit

12   on sale to go to the debtor-in-possession account so that

13   we can pay our bills, does it not?

14   A.   To operate with, correct.

15   Q.   And the remainder of the money that's in the account,

16   which is Hyundai's, Hyundai's security interest, they will

17   have a replacement lien on, will they not?

18   A.   That's correct.

19   Q.   Okay.   And the profit coming out of the account to the

20   DIP account, they still will have a lien on that, will they

21   not?

22   A.   That's correct.

23   Q.   Okay.   So if there is a sale of, let's say of a new car

24   and all the proceeds of the sale go into, into "A" and the

25   profit comes out and Hyundai has a lien on both those

1    items, their collateral has not been jeopardized, has it?

2    A.  That's correct.

3    Q.  All right.  And the profit that goes into the DIP

4    account which is used to pay expenses basically enhances

5    the value of the franchise so that that collateral value,

6    whatever it is, will remain intact, also, and be available

7    for sale.

8    A.  Correct.

9    Q.  Additionally, as to use of collateral, we have agreed

10   in our motion filed with the Court, the emergency motion

11   which the Court was courteous enough to hear on an

12   expedited basis, we have provided for an incremental

13   interest to be paid to Hyundai Motor Finance commencing on

14   a date sometime after a cash collateral order is issued.

15   A.  Correct.

16   Q.  Okay.  And that could be classed as a periodic payment,

17   could it not --

18   A.  Yes, sir.

19   Q.  -- to Hyundai?  And that would be as further adequate

20   protection to Hyundai which could be used for whatever,

21   attorney's fees, or whatever.  But it would be, it would be

22   a periodic payment?

23   A.  That's correct.

24   Q.  Okay.  And in your estimation, although we haven't put

25   the, put the periodic payment into the pro forma, that is,

1    is a payment that you will be able to make on a monthly

2    basis, provided we get cash collateral use and can move

3    forward?

4    A.   Correct.

5    Q.   Now, a debtor in its normal course of business receives

6    varies factory receivables.  We've already talked about the

7    one receivable which has now been held up by, by Kia

8    Motors, which is a manufacturer.  But factory receivables,

9    hopefully in the normal course of events, will come into

10   the dealership, correct?

11   A.   Yes, sir.

12   Q.   And those factory receivables will be put intact into

13   the debtor-in-possession account --

14   A.   Yes, sir.

15   Q.   -- correct?

16   A.   Correct.

17   Q.   Okay.  And if they're -- if they are warranty

18   receivables, if they're warranty receivables, they will be

19   put back in the car parts account as a reimbursement for

20   parts?

21   A.   Correct.

22   Q.   All right.  So, basically, we're following the statute

23   and we're putting monies in trust into these accounts,

24   correct?

25   A.   Yes.

1    Q.   Okay.  And you have prepared a recap sheet, which is

2    the second page of this Exhibit 5, which is a sheet which

3    you will keep on every sale so that if Hyundai has a

4    question with regard to each transaction, there will be a

5    transaction sheet that they can follow the transaction; is

6    that correct?

7    A.   That's correct.

8    Q.   Now, this is a sheet that -- off some software you've

9    prepared so that both you and Hyundai can track these

10   sales.

11   A.   That's correct.

12   Q.   Okay.  Trade payoffs in five will be paid out of either

13   Account A or Account B; is that correct?

14   A.   That's correct.

15   Q.   Okay.  Trade-ins that are brought in that are used will

16   then be added to List B; is that correct?

17   A.   Yes, sir.

18   Q.   And they will be added to List B based on the then

19   trade-in value?

20   A.   Correct.

21   Q.   Okay.  I have no, no more questions with regard to

22   that.

23        As part of Exhibit 5, we have this transaction sheet.

24   Without going into any more detail unless somebody wants to

25   know it, would you tell the Court exactly how this sheet

1    was set up between you and your -- one of your partners,

2    Mr. Cornelison; is that his name, "Cornelison" --

3    A.   Cornelison.

4    Q.   -- yeah, how this sheet would work on a daily basis?

5    A.   When we deliver a car -- or, actually, when we book the

6    deal, we put the stock number on the upper left-hand

7    corner, and all these numbers would be generated starting

8    with the sale price on the left-hand side.  And then, of

9    course, it would show either the rebate -- this is

10   obviously a new car.  It has "used car" on top of the

11   sheet, but it should be labeled as "new" - (inaudible,

12   audio cuts out) - in this case, a down payment of 5,000,

13   showing a trade allowance of $14,500.  That's what we

14   allowed.  However, they have a payoff of 21,426.

15       And this is where the cash collateral really kind of

16   becomes inevitable.  The car business is difficult to

17   follow enough, but hopefully, we won't lose anyone.

18       Trade payoff of 21,426 with a subtotal of $30,926.  And

19   when you sell gap insurance or service contracts or credit

20   insurance, those are additional items that are sold in the

21   back end at $600; and then we have dock of 399, for a total

22   amount financed in this particular deal of $31,925.  And

23   for reserve --

24   Q.   That would be the amount that, that a --

25   A.   That the contract -- the face contract.

```
 1   Q.   Okay.

 2   A.   Yeah, that's what the amount of finance is.  And then

 3   the reserve is $1,197.

 4        And we have amount deposited, and it says "BOA", it's

 5   Bank of America.  I'm just assuming that.  33,122 is

 6   deposited in Account A and will post the date of deposit.

 7   The down payment of $5,000 when we deposited that will go

 8   into Account A, as well, on new car.  Going on to the

 9   subtotal, and then -- that's 38,122.

10        With an ACV, we actual, actual-cash-valued this car at

11   11,500 even though that was a $21,000 payoff, which will be

12   taken from Account B, the used-car money; moved over to

13   Account A to pay off this car.  And subtotal, that's

14   49,622.  The payoff is 21,426.

15        And then from Account A, we pay out that money to the

16   lender to get the free and clear title, subtotaling it to

17   28,196.  And rebates and holdback are on a receivable from

18   Kia Motor America, and they should come in weekly or

19   monthly.  That goes -- deposit it into Account A.  It

20   doesn't say that, but that goes back in to Account A, as it

21   stipulates on the second paragraph on page 1 of Section 5.

22   And then the cost of the service contracts or anything we

23   owe to the customer, such as a due bill, is taken out.  The

24   total dollars is $31,208.  The profit from this deal is

25   $3,278 swept into the DIP account for operating.
```

1       List of the balance of K6091 -- if you go to page --

2   Exhibit 1, you'll see that stock number in there for --

3   that particular stock number is K0661, and it's got a value

4   of -- invoice of $27,930, will be kept in that new-car

5   account, "A".

6       Holdback rebates and holdback will be part of that.  So

7   initially, 24,719 will come in until Kia holdback and

8   rebate comes in for $3,211, making that a total transaction

9   for K6091 of 27,930 that will remain in that account.

10  Q.  All right.  So that is a form that you will use on

11  every sale postpetition, that Kia -- that Hyundai Motor

12  Finance can check every sale and can trace the funds from

13  that sale into trust account, etc., and then to the DIP

14  account.

15  A.  That's correct.

16  Q.  Okay.  Now, new purchases of new vehicles would come

17  out of "A"?

18  A.  Correct.

19  Q.  Purchases of used vehicles would come out of the "B"?

20  A.  Correct.

21  Q.  And then all those vehicles postpetition, Hyundai would

22  be given a lien; is that correct?

23  A.  Correct.

24          MR. NEEDLER:  Judge, I would ask that Debtor's

25  Exhibit 5, which is two pages setting forth the cash

1    collateral procedure, be accepted into evidence.

2            THE COURT:  Any objection?

3            Exhibit 5 is admitted.

4        DEBTOR'S EXHIBIT NO. 5 ADMITTED INTO EVIDENCE

5    BY MR. NEEDLER:

6    Q.  Exhibit 5, Mr. Gutierrez, was two pages; and Exhibit 6

7    is one page.  I direct your attention to Exhibit 6.

8        Exhibit 6, Mr. Gutierrez, has a date of 11/4 on it.

9    11/4, I think, was Friday; is that correct?

10   A.  That's correct.

11   Q.  Okay.  And tell the Court what this recap of Incredible

12   Kia, this 160,000, means.

13   A.  That basically describes what's in the DIP account,

14   what's in the new account, what's in the used account, the

15   parts and service account, and then any receivable account

16   that comes in --

17   Q.  Okay.

18   A.  -- and then taxes.

19   Q.  But this is a statement of cash on hand --

20   A.  On hand, correct.

21   Q.  -- as of Friday?

22   A.  That's correct.

23   Q.  It wouldn't reflect any cash that came in on the

24   weekend.

25   A.  That's correct.

1    Q.   Wouldn't reflect any cash that comes in today.

2    A.   That's correct.

3    Q.   But these are all the sales -- first place, it's all

4    the cash you had on hand when you filed, correct?

5    A.   No.  When we filed, we had --

6    Q.   Let me restate it.

7    A.   Yeah.

8    Q.   There is $21,547 in the DIP account.  Isn't that the

9    cash on hand when you filed?

10   A.   That's correct, that was on hand when we filed.

11   Q.   Thank you.

12   A.   Yes, sir.

13   Q.   Thank you.  The new-car account has -- "A" has 63,970.

14   Those are proceeds from postpetition sales --

15   A.   Correct.

16   Q.   -- of new cars.

17   A.   Yes, sir.

18   Q.   Intact, in the account, not touched.

19   A.   Correct.

20   Q.   Used-car account is $61,889.91.  Those are monies in

21   the "B" account for used cars, intact, not touched.

22   A.   Correct.

23   Q.   The same for the rest.

24   A.   Yes, sir.

25   Q.   And the total is $160,096.95?

1    A.   Yes, sir.

2    Q.   You've verified that with your, with your people in

3    there?

4    A.   Yes.

5    Q.   You've checked the account?

6    A.   I have.

7    Q.   So these are accurate as of Friday night; is that

8    correct?

9    A.   Yes, sir.

10           MR. NEEDLER:  Judge, I would ask that debtor's

11   recap, Exhibit 6 for identification, stating the cash on

12   hand, both the on-hand at filing time and the postpetition

13   cash under our cash collateral proposal, be accepted into

14   evidence today.

15           THE COURT:  Any objection?

16           Exhibit 6 is admitted.

17        DEBTOR'S EXHIBIT NO. 6 ADMITTED INTO EVIDENCE

18           MR. NEEDLER:  Okay.  Now, Exhibit 7, I would ask

19   Mr. Gutierrez to identify the -- if he would for me, the

20   three pages in Exhibit 7, Exhibit 7.

21           THE WITNESS:  Yes, sir.  The first page is a --

22   basically came off of a website of a broker by the name of

23   Gordon Page who's listed four dealerships around the

24   country.  Don't know anything about these dealerships other

25   than the one, maybe, in the northwest that's comparably

1    sized to our that -- and I don't know anything about it

2    other than it says "northwest".  And then --

3    Q.  (By Mr. Needler)  Have you ever had any experience with

4    Gordon Page?

5    A.  Yes -- (inaudible, talking over each other.)

6    Q.  Am I correct that he's one of the largest brokers in

7    the United States?

8    A.  He is.

9    Q.  Based out of Tampa.

10   A.  That's correct.

11   Q.  Okay.  You did not choose him or -- as a, as a broker,

12   but --

13   A.  No.

14   Q.  -- you've chosen Jappy Dickson.

15   A.  Correct.

16   Q.  So is this a representation of asking prices on various

17   dealerships off the internet?  And that's all it is.

18   A.  That's all it is.

19   Q.  Okay.  And you don't have any knowledge whether they're

20   large, small, and whatever?

21   A.  No.

22   Q.  So this is furnished just to show the Court that, that

23   franchises are marketed, marketed every day, correct?

24   A.  Correct.

25   Q.  Okay.  The next page, identify the next page.

1    A.   That's actually from my broker as to what -- his

2    estimation he felt that this would come down to, even under

3    our current circumstances with the road construction and

4    our Chapter 11 situation.  He analyzed it based on this.

5    He's asking for more, but that's because he's seen stores

6    comparably sized in, in similar markets go for more.

7    Q.   But he's also very complimentary, is he not, as to the

8    marketability of a Kia franchise?

9              MR. COLEMAN:  Objection, Your Honor.  If he's

10   going to discuss the details of this exhibit, it needs to

11   be admitted first.  And we do object to its admission.

12             THE COURT:  I'll sustain that objection.

13   Q.   (By Mr. Needler)  Okay.  Page, page 3.  Now, you were

14   asked earlier about how you valued the franchise, were you

15   not?

16   A.   I was.

17   Q.   And you testified, basically, to these formulas when

18   you were asked on, on voir dire.  Were these the options

19   that, that you were discussing when you were asked before

20   by the other attorney?

21   A.   Yes.

22   Q.   Okay.  And tell me what Option 1 is.  What is Option 1?

23   A.   Option 1, you basically take year-end profits and all

24   profits, including dealer reserves, which is dealer money;

25   owner's compensation and benefits; and any other, any other

1    money that they make in this particular case - because I've

2    loaned my own company money; I also draw interest

3    prepetition, at least - and so you add them up for a total

4    dollar of what the owners actually get out of the business

5    on an annual business.  In '04, it was 430,000; in '05, it

6    was 211; and right now projected would be about 171,000.

7    Q.  All right.  So what you're saying is here, all the

8    increments of ownership that you took out in 2004 were

9    roughly $430,000; is that correct?

10                  MR. COLEMAN:  Objection, Your Honor; same

11    objection.

12                  MR. NEEDLER:  I'm just asking him to clarify it

13    for the record, what that total --

14                  THE COURT:  Well, I'll allow the clarification.

15    The objection is overruled.

16    Q.  (By Mr. Needler)  Explain to me again, if you would,

17    the 430,173.

18    A.  It's total net profit plus reserves, which is also

19    dealer profit that's set aside for reserve; and then

20    owner's compensation, which is what an owner makes off his

21    own company --

22    Q.  Okay.

23    A.  -- added together.

24    Q.  Now, is a dealer, is a dealer who would be buying your

25    store or any store, are those figures he looks at?

```
1    A.   Yes.

2    Q.   Are those figures he's interested in?

3    A.   That's correct.

4    Q.   And why is he interested in those figures?

5    A.   Because that's what his money is made -- I mean that's

6    where his money comes from.

7    Q.   In other words, he's figuring, well, if Nick took out

8    profit of -- if he had profit of 94 and his expenses are

9    high, I can lower it.  The same thing with dealer reserve:

10   If I can increase it, that will increase.

11   A.   Correct.

12   Q.   So that's what he looks at.  And I guess the year 2005

13   was 211, is that correct --

14   A.   That's correct.

15   Q.   -- based on the same figures there?

16        Are those from your financial statements?

17   A.   Yes, they are, which are in Exhibit A.

18   Q.   Which are appended over here?

19   A.   Correct.

20   Q.   So the financials will track Option 1?

21   A.   That's correct.

22   Q.   And then for, for 2006, you've projected 232,000; is

23   that correct?

24   A.   Yes.

25   Q.   Okay.
```

```
1    A.  Actually, it's 171,000 net after the next two or three

2    months.

3    Q.  Oh, I'm sorry.

4    A.  Yes, hm-hmm.

5    Q.  Okay, okay.  So what did you do to get this value that

6    you've got here of 813,201?

7    A.  I just took all three and added them.  And that's what

8    the owner would have made.  And that's usually what -- the

9    term is "blue sky" --

10   Q.  Okay.

11   A.  -- through NADA's --

12   Q.  So, basically, you're saying that NADA, "NADA", "NADA",

13   in their, in -- their instructions to dealers on buying

14   franchises is to go through this exercise and add up for

15   three years, and that's a valid -- one valid test.

16   A.  That's correct.

17           UNIDENTIFIED SPEAKER:  Objection; leading.

18           UNIDENTIFIED SPEAKER:  Objection; hearsay.

19           THE COURT:  I'm going to sustain the leading.

20   Q.  (By Mr. Needler)  So Option 1 you figure, based on

21   that, is 813.

22   A.  Yes.

23   Q.  Okay.  Now, explain, if you would, sir, what you've

24   done in Option 2.

25   A.  Option 2 is a textbook system which takes your gross
```

1   sales times 2 percent, which would be your annual profit;

2   times three years equals 935.  The same principle.  And if

3   I took current tracking of 2006 with gross sales at

4   2 percent, it's 255,682, times three years is 767.

5   Q.  Oh, that's on the line below?

6   A.  That's on the line below, which is current year in what

7   we're tracking.  So somewhere in between those numbers are

8   probably real, is my estimation.

9   Q.  Now, again, based on your experience in the industry,

10  is Option 2 another test that prospective buyers use?

11  A.  Yes.

12          MR. NEEDLER:  So, Judge, I would ask that

13  Debtor's Exhibit 7 be accepted into evidence as

14  substantiating or attempting to substantiate the values

15  which we have listed on the asset sheet.

16          MR. COLEMAN:  We do object, Your Honor:  Hearsay;

17  foundation; and, given Mr. Gutierrez's explanation of the

18  limited scope and his limited knowledge of especially the

19  first page, on relevance, as well.

20          THE COURT:  Okay.  Is that a collective

21  objection?

22          MR. PATTEN:  That is.  I'll repeat the objection,

23  Your Honor.

24          THE COURT:  Okay.  I just have one question for

25  Mr. Gutierrez:  Regarding Options 1 and 2 and the

```
1    calculations you did there, you made those calculations?
2              THE WITNESS:  I've made the calculations off of
3    my financials, correct, hm-hmm.
4              MR. NEEDLER:  And the financials are attached in
5    the next exhibit.
6              THE COURT:  You're just using a formula based on
7    NADA?
8              THE WITNESS:  Yes, sir.
9              THE COURT:  Okay.  Well, I'm not going to admit
10   pages 1 and 2 of this exhibit.  I don't see where
11   Mr. Gordon Page is present -- or I'm assuming he's not
12   present.
13             MR. NEEDLER:  No, he's not, sir.
14             THE COURT:  And I don't see where, and I don't
15   see where Jappy -- what's his name?  Jappy Dickson?
16             MR. NEEDLER:  Your Honor, he's not present
17   either.
18             THE COURT:  (Inaudible, talking over each
19   other) -- present.  I'm not going to admit those.  I am
20   going to admit page 3, based upon Mr. Gutierrez's
21   experience in the business as an owner and the fact that he
22   has put together these numbers on a formula that he
23   obtained from NADA.  Certainly, parties can cross-examine
24   him concerning that.  So only page 3 is admitted of
25   Exhibit 7.
```

1          PAGE 3 of DEBTOR'S EXHIBIT 7 ADMITTED INTO EVIDENCE

2               MR. NEEDLER:  Thank you, Judge.

3               Well, it's now four o'clock, so I'm not going to

4     belabor, unless parties have questions -- I have put into

5     Debtor's Exhibit 8 the financial statements for '04, '05,

6     and '06 through August.  And I would ask the debtor

7     representative here if, if these exhibits, Debtor's

8     Exhibit 8, are the correct financials for '04, 2004; 2005;

9     and 2006 through August.

10              THE WITNESS:  Yes, sir.

11    BY MR. NEEDLER:

12    Q.  And the form that you've used is a -- is that a Kia

13    form, or is that a Hyundai Motor Finance form, or both?

14    A.  I'm not sure what Hyundai uses, but it's a Kia form

15    for, for certain.

16    Q.  Okay.  And is that the form that you've used all the

17    way through since you've owned this dealership?

18    A.  That's correct.

19    Q.  And has it been accepted by Hyundai Motor Finance?

20    A.  That's correct.

21    Q.  And has it been accepted by Kia all the way through?

22    A.  That's correct.

23    Q.  And you've reviewed these, these, these forms, have

24    you?

25    A.  Yes, I have.

1    Q.  And you believe them to be accurate for '04, '05, and

2    '06 through August?

3    A.  That's correct.

4           MR. NEEDLER:  Judge, I would ask that, that

5    Debtor's Exhibit 8 for identification be accepted into

6    evidence.

7           THE COURT:  Any objection?

8           MR. COLEMAN:  No.

9           THE COURT:  Exhibit 8 is admitted.

10          DEBTOR'S EXHIBIT NO. 8 ADMITTED INTO EVIDENCE

11   BY MR. NEEDLER:

12   Q.  Now, the remaining one exhibit for the debtor is

13   Debtor's Exhibit 9.  Can you tell the Court basically what

14   Debtor's Exhibit 9 is and why you, why you put it in there?

15   A.  I just felt it was kind of important for the judge to

16   see the current state of our intersection and how it has

17   impacted us as of recent weeks.  The construction has been

18   going on since March, but they cut off our left-hand turn,

19   which coming from King Avenue towards the eastern part of

20   King Avenue, I guess you would say -- or southern eastern,

21   it would require people to actually have to go around two

22   blocks to get to us or cut across the Perkins parking lot,

23   as we do, if they needed to get to us.  So it makes it a

24   little challenging for us at this point.

25   Q.  Mr. Gutierrez, this is an article that was in your

1    local paper, is it not?

2    A.  Yes, it was, on Sunday's paper.

3    Q.  And this, this article here that is Debtor's Exhibit 9

4    was a copy of the front page on the first page.  And then

5    the balance of that is off the internet; is that correct?

6    A.  That's correct.

7    Q.  And did this, did this internet report -- does that

8    track the article that was in the paper?

9    A.  It does, exactly.

10   Q.  Okay.  And there's a quote in this article, Exhibit 9,

11   from you, is it not?

12   A.  It is, there is.

13   Q.  Okay.  And there's also a quote from another car dealer

14   that says that his sales aren't impacted at all.  Do you

15   believe that?

16   A.  No, sir.

17   Q.  Okay.  Is he a competitor of yours?

18   A.  Yes, sir.

19   Q.  Okay.  So, to your knowledge, most of the businesses

20   that are on your side of the street have been seriously

21   impacted by this, by this bridge construction.

22   A.  That's correct.

23   Q.  And am I correct that you still stand by the fact that

24   you need to get your advertising going to get customers

25   back in the store to make sales, to go forward?

1   A.   Yes, sir.

2          MR. NEEDLER:   So, Judge, we would ask that

3   Debtor's Exhibit 9 for identification be accepted into

4   evidence, which is an article from the local paper.

5          MR. COLEMAN:   Objection; hearsay.

6          THE COURT:   I'm going to sustain the objection.

7   Q.   (By Mr. Needler)  Mr. Gutierrez, we're here on an

8   emergency motion to use cash collateral.  You've already

9   stated there's no way you can run the dealership without

10  approval of cash collateral; is that correct?

11  A.   That is correct.

12  Q.   You can't keep your, you can't keep your workforce

13  together without some immediate relief so you can pay your,

14  your personnel?

15  A.   That's correct.

16  Q.   And you can't continue to buy new cars without an order

17  of Court approving our system of cash collateral use and

18  deposits?

19  A.   That's correct.

20  Q.   All right.  Mr. Gutierrez, the Court has admitted

21  debtor's group -- Debtor's Exhibit 3.  Would you direct

22  your attention to that?

23      Debtor's Exhibit 3 has a total of assets that are

24  securing Hyundai of $3,476,443.77; is that correct?

25  A.   Yes, sir.

1   Q.  And if you subtract from that the claim amount, it

2   would leave over $1 million as a cushion or equity over and

3   above the claim of Hyundai Motors, would it not?

4   A.  That's correct.

5   Q.  Okay.  And you and I discussed before and I gave a copy

6   to one of the attorneys here of our Schedule F, which other

7   than your claim, removing your insider claim, would leave

8   about -- including the auctions, would leave about a

9   $1 million unsecured claim in this case.  Do you recall

10  reviewing that?

11  A.  Yes, sir.

12  Q.  If these figures hold up and you sell the dealership

13  and get the 800,000, all the secured creditors can be paid

14  and those that are unsecured can be paid; is that correct?

15  A.  That's correct.

16  Q.  And there would also be a surplus over that amount?

17  A.  Yes, sir.

18  Q.  To the extent of any these values don't hold up, that

19  would be a lesser amount of what we'd call a "cushion"?

20  A.  Correct.

21  Q.  Okay.  So is there any reason in your mind, using the

22  cash collateral procedure that has been outlined and using

23  the values here, that Hyundai will not be protected going

24  forward?

25      In other words, forget the negatives.  Will Hyundai,

1    through this procedure, based on your experience in the car

2    business, have their claim protected as we go forward?

3    A.   Absolutely.

4    Q.   Okay.  And do you agree to allow inspections of your

5    books and records by Hyundai on a regular basis?

6    A.   Yes, sir.

7    Q.   Do you agree to allow them to look over these daily

8    reports?

9    A.   Yes, sir.

10   Q.   And do you agree to follow the budget as outlined in,

11   in Exhibit 4, which is set forth in our exhibits?

12   A.   Yes, sir.

13   Q.   The budget in Exhibit 4 is an estimate of those

14   expenses you think you'll need on a monthly basis.

15   A.   That's correct.

16   Q.   Is it possible that there might be some extraneous

17   expenses that would come in that you haven't forecasted?

18   A.   Possible, but not likely.

19   Q.   Okay.  So you believe you could live by that budget --

20   A.   Yes, sir.

21   Q.   -- and stay reasonably close to the budget and

22   categories?

23   A.   Yes, sir.

24   Q.   And assuming a cash collateral order is entered on a

25   timely basis here, at some point shortly you could be

1    paying interest, periodic interest to Hyundai for the

2    further privilege of using cash collateral?

3    A.  Yes, sir.

4            MR. NEEDLER:  Judge, at this time, we don't have

5    any other witness.  And I would -- I have no more questions

6    for Mr. Gutierrez.

7            THE COURT:  Okay.  Thank you, Mr. Needler.

8            Who wishes to proceed first on cross-examination?

9            Mr. Patten.

10           MR. PATTEN:  Thank you, Your Honor.

11                      CROSS-EXAMINATION

12   BY MR. PATTEN:

13   Q.  Mr. Gutierrez, the admitted portion of Exhibit No. 7

14   shows a $100,000 loss projected for 2006.

15   A.  Yes, sir.

16   Q.  And do you attribute that loss to the bridge

17   construction that's -- keeps the left-hand turn from being

18   available to your customers?

19   A.  Not all of it, but most of it.

20   Q.  What else do -- what other factors do you attribute the

21   loss to?

22   A.  Loss of personnel as a result of declining business.

23   Q.  Anything else?

24   A.  Probably the last 45 days, the presence of Hyundai

25   Motor Finance in our building.

```
 1   Q.   They've had a representative in the building?

 2   A.   Yeah, in and out regularly, hm-hmm.

 3   Q.   Has that impaired sales?

 4   A.   Sure.  It has impaired our staffing concerns.

 5   Q.   Are you out of trust with Hyundai Finance?

 6   A.   Yes, I am.

 7   Q.   And did you get out of trust during the 2006 year?

 8   A.   This is 2006, yes.

 9   Q.   I didn't ask that question very well, Mr. Gutierrez.

10   A.   Oh, I'm sorry.

11   Q.   But when did you first get out of trust with Hyundai?

12   A.   Well, I guess the, the out-of-trust was discovered --

13              MR. NEEDLER:   Judge, I'm going to object.  Our

14   direct presentation had to do with mainly condition of the

15   debtor on filing date and what has happened postpetition.

16   This projection of a $100,000 loss as a projection which

17   he's projecting through the whole year doesn't have

18   anything to do with the post -- really, the postpetition

19   era.  So I'm not so sure that this questioning is, is

20   relevant to this cash collateral motion.

21              MR. PATTEN:   Your Honor, I think --

22              THE COURT:   Objection is overruled.

23              MR. PATTEN:   Thank you.

24   Q.   (By Mr. Patten)  I think my question, Mr. Gutierrez,

25   was when you first started going out of trust.  And you
```

1   were answering you discovered it, and --

2   A.   I think the discovery date was probably the first part

3   of October.

4   Q.   And have you investigated it to determine when it

5   began?

6   A.   No, sir.

7   Q.   How many vehicles are we talking about in terms of

8   being out of trust?

9   A.   I don't know in vehicle unit numbers.  The dollar

10   amount was 260.

11   Q.   Two hundred sixty thousand?

12   A.   Yes, roughly.

13   Q.   Now, correct me if I'm wrong, but in your 2006

14   projections, then, would that net profit include $260,000

15   worth of sales for which you didn't pay Hyundai?

16   A.   In my 2006 projections --

17   Q.   Direct your attention to the third page of

18   Exhibit No. 7.

19   A.   Third page, seven.  Okay.

20   Q.   Okay.  There's a $100,000 loss projected for 2006.

21   A.   Right.

22   Q.   Okay.  Now, is that based on -- is that a cash- or is

23   that an accrual-based calculation?

24   A.   Cash.

25   Q.   Okay.  So you lost $100,000.  At the same time, you

1   were selling $260,000 worth of cars financed through

2   Hyundai Finance that you weren't paying them for, correct?

3   A.  Okay.

4           MR. NEEDLER:  Judge, I'm going to object.  I

5   don't know that even I understand the question.

6           THE WITNESS:  I don't understand the question.

7           THE COURT:  Well, I'll sustain and allow

8   Mr. Patten to re-ask his question.

9   Q.  (By Mr. Patten)  Okay.  The $100,000 projected loss in

10  2006 is based on a cash basis to calculate the $100,000

11  loss.  I think that was your testimony just a minute ago.

12  A.  Okay.

13  Q.  Is that correct?

14  A.  That's correct.

15  Q.  Okay.  And you discovered in October that you're

16  $260,000 out of trust with Hyundai Finance.  That was your

17  testimony, as well, correct?

18  A.  Correct.

19  Q.  Okay.  And when, when you say you're $260,000 out of

20  trust, do you mean that you sold, that Incredible Kia sold

21  $260,000 worth of automobiles on which Hyundai Finance had

22  a lien and you didn't pay the proceeds to Hyundai Finance?

23          MR. NEEDLER:  Judge, I'm going to object because

24  I don't see how that, the failure to pay, affects the

25  profit.

1          MR. PATTEN:  Well, Your Honor, I think you could

2   make the --

3          THE COURT:  Well, I think he's trying, I think

4   he's trying to get there.  I'm going to sustain the

5   objection and allow him to re-ask the question.

6   Q.  (By Mr. Patten)  Let me ask it this way, Mr. Gutierrez:

7   Would your 2006 projected loss be $360,000 if you take into

8   account the out-of-trust sales with Hyundai Finance?

9   A.  No, not --

10         MR. NEEDLER:  I'll object again because I don't

11  think his question tracks, just because --

12         THE COURT:  Overruled.  Mr. Gutierrez, you can

13  answer that.

14         MR. NEEDLER:  I would instruct my client -- if he

15  doesn't understand the question, I would prefer he not

16  answer it.  I mean I guess I'm --

17         THE COURT:  Mr. Needler, he already, he already

18  started to answer the question.

19         MR. NEEDLER:  Okay.

20         THE WITNESS:  I'm trying to identify the

21  question -- (inaudible, audio cuts out.)  I guess I'm

22  trying to understand it, and I'm not sure if I do.  But a

23  loss is a loss on a financial statement; an out-of-trust

24  situation is a deficiency in cash flow.  So I don't see the

25  two correlations.

1    Q.   (By Mr. Patten)   Okay.   Well, had you paid --

2    hypothetically, had you paid Hyundai Financial $260,000,

3    then wouldn't your loss be an additional $260,000 above and

4    beyond what you've identified on the third page of

5    Exhibit 7?

6    A.   No.   That would be just your depletion of cash.   To, to

7    pay off your liens or to pay off your flooring is a

8    depreciation of cash, but it is not -- has nothing to do

9    with profitability.   You can be undercapitalized and either

10   make profits or show losses.   I mean the two don't have any

11   bearing.

12   Q.   Well, you've got $260,000 worth of cash into the

13   business from the sale of some cars that were financed by

14   Hyundai Financial.

15   A.   But you're operating undercapitalized if you're

16   operating that way, but that doesn't necessarily mean that

17   you're -- that's what you lost that month.   And I think

18   that's what you're asking.

19   Q.   Well, I think what I'm asking is that:   Your loss, your

20   cash loss would have been even greater, would it not, had

21   you, in fact, not been out of trust and had paid Hyundai

22   Financial?

23   A.   No.   You just would have been less cash in the bank,

24   negative.

25   Q.   Okay.   Two hundred sixty thousand dollars less cash in

1    the bank.

2    A.   But I'm not, I'm not showing that 100,000 as a bank

3    balance.

4    Q.   Okay.  What's going to change over the next year in

5    terms of the road construction at King Avenue that will

6    address -- that will turn the 2006 loss into some kind of

7    profit?

8    A.   Well, I think we've got our pro formas working in the

9    direction where we've scaled down considerably where we can

10   operate, actually, quite similarly to our Chevrolet store

11   in a much lower overhead.  And we had not expected the

12   conditions of that road construction to impact us as much

13   as it did, and that was a big part of that.

14        But the second thing is we have a subsidiary company or

15   a sister store up on King Avenue in front of Denny Menholt

16   that we can use for offsite sales, or Kmart, or other areas

17   that we can also -- our landlord's also offered two of his

18   other properties for offsite sales that he would not even

19   charge us even rents for.  So we have remedies to get us

20   through this time.

21        The road construction actually is going quite fast,

22   ironically enough, but it's never fast enough.  But it's

23   moving along quickly.  So they anticipate it's going to be

24   a 15- to 18-month project yet.

25   Q.   So the events that caused the loss in 2006 are going to

1   be addressed somehow during the pendency of the bankruptcy?

2   A.  I'm not sure I understand the question.  I'm sorry.

3          MR. NEEDLER:  Judge, is it possible he could

4   restate the question so my client could answer it?

5          MR. PATTEN:  I'll skip it, Your Honor.  I'll

6   withdraw the question.

7          THE COURT:  Okay.

8   Q.  (By Mr. Patten)  Mr. Gutierrez, look at Exhibit 4,

9   please.  Do you have that in front of you?

10  A.  Yes, sir.

11  Q.  It says that "note" -- (quoted as recorded):  "Please

12  note that the above grosses per vehicle are based on" -- I

13  think it's supposed to say "previous dealer cost".

14      Correct?

15  A.  Yes, sir.

16  Q.  Okay.  And the previous dealer cost is reflected in, at

17  least for the used cars, in Schedule No. 2, List B?

18  A.  That's correct.

19  Q.  Okay.  And so Exhibit 4 is based on the dealer cost,

20  which is List B, which, if I read it correctly, is

21  $1,828,000 of -- valued of inventory --

22  A.  Yes, sir.

23  Q.  -- correct?

24      So your projections are based upon the dealer cost, not

25  this write-down cost that you have reflected at the very

1   bottom of Exhibit -- of the B-list, which is Exhibit 3?

2   A.   That is correct.

3   Q.   Okay.  So if, in fact, you have to write down the

4   vehicles to sell them, would your gross used-car proceeds

5   not be reduced by $511,000?

6   A.   It would actually increase.

7   Q.   Why?

8   A.   Because you're using a lesser dollar amount for ACV,

9   for actual value of the car.

10   Q.   But you're using a value of the car at $1,828,000.

11   A.   For the purpose of my, of my pro forma, that's correct.

12   Q.   Okay.  And, in fact, your cars, you think -- I don't

13   want to put word in your mouth, but my understanding is you

14   think the cars are worth $511,000 less than that.

15   A.   No.  We're proposing to the Court that it would be an

16   appropriate time to go ahead and write down this inventory

17   so that we could actually generate profits in excess of

18   what we put in our pro forma to turn this thing around much

19   sooner.  Since we're so close to the end of the year, the

20   IRS allows us to do this on the 12th month, which is two

21   months from now.

22   Q.   Okay.  Now, you've got me confused.  How much money are

23   you going to sell the cars for, the dealer cost or the

24   written-down amount?

25   A.   I'm going to sell them, I'm going to sell them using

```
1    the monthly profit performance, which is the 1.8 million.

2    But I'm going to be using the write-down for funding

3    because that's -- I guess I'm trying to get as much as I

4    can.  We've been operating under the normal cost and still

5    averaging $2700 a car.

6    Q.  So the amount that has to stay in the "B" account -- is

7    that the used-car account?

8    A.  That's correct.

9    Q.  Okay.  The amount that has to stay in the "B" account

10   is the 1.8 million minus the $511,000?

11   A.  Right, because we're valuing them at current value,

12   correct.

13   Q.  Okay.  So the amount that you call "write-down" is the

14   amount that you want to take out and use for operations

15   during the period over the next year?

16   A.  Correct.

17   Q.  Now, so the net profit that you show on Exhibit 4 of

18   180,000, that's selling the cars at 1.8 million, correct?

19   A.  Yes, sir.

20   Q.  But you're going to take out and spend and not reserve

21   for Hyundai $511,000 of that 1.8 million.  Is that what

22   you're asking the Court to do?

23   A.  That's what we're proposing, correct.  That puts the

24   value of the car at what it's worth today.

25   Q.  So wouldn't that make the net profit shown on Exhibit 4
```

```
 1   $511,000 less than $180,000?

 2   A.  No.

 3   Q.  Why not?

 4   A.  The net profits on Exhibit 4 would be greater by

 5   $511,000 by using that if you turned all that inventory

 6   within a 12-month period.

 7   Q.  But you're selling it at 1.8 million.

 8   A.  No, you're not selling it at 1.8 million; you're using

 9   that as the base price of it and working off of that.

10   Q.  What are you selling it at?

11   A.  Retail.

12   Q.  What is that?

13   A.  Whatever a person will bear.

14   Q.  How much is that?

15   A.  It depends on the car.

16   Q.  What's the total for the used cars?

17   A.  If you had 1.8 million, 20 percent above that would

18   probably be normal.

19   Q.  So are your projections of sales of the used cars at 20

20   percent above and beyond 1.8 million?

21   A.  Correct.

22   Q.  And out of those sales, what you're asking this Court

23   to authorize is that you reserve, I'll round it off at -

24   (inaudible, audio cuts out) - three.

25   A.  Correct.
```

1   Q.   And then you get to keep and spend everything above and

2   beyond that.

3   A.   To operate.

4   Q.   To operate.

5   A.   To pay back creditors when we're done, to pull out of

6   this, correct.

7   Q.   And how much money are we talking about?  I mean where

8   is that reflected in the -- where is that reflected in your

9   projections?

10  A.   I don't understand the question.  What part of it?

11  Q.   Okay.  Exhibit 4 shows how much money you're going to

12  make, net profit over the next 12 months.  Isn't that what

13  that shows?

14  A.   Yes, sir.

15  Q.   And that shows used-car sales totaling 1,196,000,

16  correct?

17  A.   I'm not sure where you're at.  I'm sorry.

18  Q.   I'm looking at the far right-hand column on Exhibit 4

19  for used cars.

20  A.   Okay.  Yes, sir.

21  Q.   Now, is that, is that gross used-car sales?

22  A.   That's correct.

23  Q.   So when you liquidate the inventory, that's shown on

24  Exhibit B as having a value of dealer cost of 1.8 million?

25  A.   That's without write-down.

```
1    Q.  Okay.  But that's liquidating that, that -- the

2    1,196,000 is what you get when you sell that inventory --

3    A.  That's correct.

4    Q.  -- correct?  Is that what that means?

5    A.  Yes, sir.

6    Q.  So you're projecting to get 1,196,000 from selling your

7    used-car inventory over the next year?

8    A.  Correct.

9              MR. PATTEN:  Okay.

10             MR. NEEDLER:  Based on that, those questions,

11   could I ask him a couple more before we get started with --

12             THE COURT:  No, I prefer to have all of the

13   people that have cross-examination ask questions --

14             MR. NEEDLER:  Fine.

15             THE COURT:  -- and then you'll redirect.

16             MR. NEEDLER:  That's fine, Judge; that's fine.

17                         CROSS-EXAMINATION

18   BY MR. COLEMAN:

19   Q.  Mr. Gutierrez, my name is Shane Coleman.  I represent

20   Hyundai Motor Finance Company.

21       I want to follow up with a number of different things

22   you've been asked about.  I'll ask you to first take a look

23   an Exhibit 2 in front of you.  Now, I think during voir

24   dire, you were asked specifically about a vehicle on page 3

25   of Exhibit 2.  Do you recall that, the G8 -- G6?
```

1    A.   Okay.

2    Q.   Do you recall that questioning?

3    A.   Yes, sir.

4    Q.   Okay.  Is that vehicle presently on your lot today?

5    A.   Yes, sir.

6    Q.   Now, with respect to Exhibits 1 and 2, are these both

7    all of the vehicles that were physically located on your

8    lots as of the date of filing?

9    A.   Were they physically on the lot the day of filing?

10   Q.   Yes.

11   A.   Most of them were.

12   Q.   Most of them.  Which ones were not on your lot at the

13   date of filing?

14   A.   I couldn't tell you that.  I'm just saying that they

15   might have been in a detail shop or a body shop.

16   Q.   Okay.  So other than those that may have been in a

17   detail shop or a body shop on the date of your bankruptcy

18   filing, every one of the vehicles on Exhibits 1 and 2 were

19   on your lot?

20   A.   Okay, yes.

21   Q.   That's my question.

22            MR. NEEDLER:  Judge, I'm, I'm --

23   Q.   (By Mr. Coleman)  Is that --

24   A.   Yes.

25   Q.   -- true or not?

1          MR. NEEDLER:  I'm going to object because I think

2    we have to understand that you've also got some auction

3    cars that are on this list that are on other lots, do you

4    not?

5          THE COURT:  Well, I'm going to --

6          MR. NEEDLER:  (Inaudible.)

7          THE COURT:  Mr. Needler, I'm not sure -- I'm

8    going to overrule your objection and allow Mr. Coleman to

9    ask his and have the witness answer.

10          THE WITNESS:  I guess I don't understand the

11   question.  Were they on the lot?

12   Q.  (By Mr. Coleman)  I'm trying to figure out -- you've

13   given us two lists, Exhibit 1 and 2.  You see that?

14   A.  Yes.

15   Q.  Is it -- my understanding is that those are the

16   vehicles that were on your lot the date you filed

17   bankruptcy unless they were in a detail shop or a body

18   shop.  Is that correct?

19   A.  Yes.

20   Q.  There were no other vehicles -- each of these vehicles

21   was located there as opposed to someplace else?

22   A.  As far as I can remember.

23   Q.  There would be no reason for them to be anywhere else,

24   would there?

25   A.  I can't think of one.

1          THE COURT:  He's answered the question.  Let's

2    move on.

3    Q.  (By Mr. Coleman)  Please take a look at Exhibit 3.  I

4    want to go through just a couple of items briefly.  First,

5    I want to talk about the lawsuit which you've valued at

6    $502,400.  Do you see that item?

7    A.  Yes, sir.

8    Q.  And you heard your litigation attorney, Mr. O'Connor,

9    testify earlier.  Is it true, then, there's -- no

10   depositions have been taken in this case?

11   A.  They were scheduled for the 1st of November, and we had

12   to postpone.

13   Q.  You were supposed to go down to Denver for those?

14   A.  Yes, sir.

15   Q.  This matter is not going to trial in February, is it?

16   A.  You're asking the wrong person.  I don't know.  I'm not

17   a lawyer.

18   Q.  You're employing not only Mr. O'Connor but the Kutak

19   Rock firm for that litigation, as well?

20   A.  Correct.

21   Q.  What hourly rates are you paying the Kutak Rock firm?

22   A.  I don't have that agreement with me.  I don't recall, I

23   really don't.

24   Q.  How many Kutak Rock attorneys are working on this case

25   for you?

1   A.  Just one.

2   Q.  And what's his name or her name?

3   A.  Mark Willis.

4   Q.  And what is the amount of the counterclaim against you

5   in that case?

6   A.  It's under 200 -- or -- yeah, it's under 200.

7   Q.  Under 200,000?

8   A.  Two hundred thousand, correct.

9   Q.  And the $502,000-and-change represented on Exhibit 3 is

10  the maximum amount that you could receive in that lawsuit,

11  correct?

12  A.  For Kia, correct -- or Incredible Auto Sales, LLC,

13  correct.

14  Q.  The rest would go to a different entity, not the debtor

15  in this case?

16  A.  Correct.

17  Q.  With respect to the $800,000 evaluation of the blue sky

18  in this that you've given, what did you pay for the blue

19  sky when you purchased this dealership?

20  A.  Probably more than that by the time I count everything

21  I took on.  But, again, I don't remember.

22  Q.  Who did you purchase it from?

23  A.  A gentleman by the name of Tony Willary.

24  Q.  Okay.  And there were deal documents that would --

25  A.  Hm-hmm.

1   Q.   -- disclose the amount of cash you paid for the blue

2   sky on that deal?

3   A.   Hm-hmm.

4   Q.   And right now, you don't remember what that was?

5   A.   No, sir.

6   Q.   Okay.  Now, the -- you understand that there are two

7   separate adversary proceedings that have been filed in

8   connection with this Bankruptcy Court -- with this

9   bankruptcy proceeding by the auto auctions, correct?

10  A.   Yes.

11  Q.   By the South Seattle Auto Auction and the auto auction

12  in Montana?

13  A.   Yes.

14  Q.   Now, the vehicles for which reclamation is sought in

15  those lawsuits are also scheduled on your Exhibits 1 and 2,

16  correct?

17  A.   Correct.

18  Q.   So in other words, your schedules assume that Hyundai

19  Motor Finance will prevail in both of those adversary

20  proceedings in total?

21  A.   The list of inventory assumes that it falls under the

22  umbrella of the secured lender, correct.

23  Q.   And if those vehicles went back to the auto auctions

24  instead of to Hyundai Motor Finance, this valuation would

25  be significantly less in terms of the Hyundai secured

1    claim?

2    A.   Correct.

3    Q.   I want to understand your entry for less lien payoffs

4    at the top of Exhibit 3.  Do you see that?

5    A.   Yes, sir.

6    Q.   These are liens from trade-in vehicles that you

7    receive?

8    A.   Yes, sir.

9    Q.   These are liens from a retail financier such as First

10   Interstate Bank for vehicles that you've taken in on trade,

11   then?

12   A.   Yes, sir.

13   Q.   And on those vehicles, you've been fully funded by --

14   well, strike that.

15       You've taken in the vehicles on trade, got these

16   individuals new vehicles which have then been financed, but

17   you just haven't paid off the old lien that your buyers

18   owed to their bank; is that correct?

19   A.   Correct.

20   Q.   Is that all of them reflected in that 65,125 number?

21   A.   All that are in the inventory, correct.

22   Q.   Approximately, how many vehicles is that, total, that

23   you've taken in on trade but haven't paid off the liens?

24   A.   Repeat the question.  How many lien payoffs?

25   Q.   Of that $65,000 number, how many vehicles is that for?

1  A.  Oh, I don't know how many cars that is.

2  Q.  Now, a lot of the blue-sky value of a dealership is

3  based upon the fact that this would be the only Kia

4  dealership this side of the divide, I guess, as far over as

5  Missoula, anyway, correct?

6  A.  Well, not necessarily.  But I mean I think every

7  franchise has its value.  Ford stores are 17 to 20 miles

8  apart; imports don't work that way.  And so it's just

9  different in the way they operate.

10  Q.  But is one of the things you considered in your

11  valuation the fact that this would be the only Kia

12  franchise in the area?

13  A.  Only for one reason.  We get all of the Helena and

14  Bozeman business when Kia did not renew their franchise

15  agreements in those markets.  We get all of their service

16  business in Billings.

17  Q.  Okay.

18  A.  And that adds to a substantial amount of service

19  business for us.

20  Q.  Sure.  But on the, the vehicle sales, you're the only

21  one in the area that can sell Kia vehicles, new Kia

22  vehicles, correct?

23  A.  That's correct.  Cheyenne would be the next, and then

24  Sioux Falls.

25  Q.  Okay.  But your operation is essentially, primarily

1 anyway, a used-car dealer, isn't it?

2 A. We sell a lot of used cars, probably a four-to-one

3 ratio.

4 Q. Four-to-one ratio used to new?

5 A. Hm-hmm.

6 Q. Are you familiar with the term "double-flooring"?

7 A. I am.

8 Q. What does "double-flooring" mean to you?

9 A. Floored in two different locations.

10 Q. This is when a car dealer has flooring financiers from

11 two -- let me start that again:  The car dealer has more

12 than one flooring financier yet floors the same vehicle

13 under two different lines of credit, correct?

14 A. Correct.

15 Q. You've double-floored some vehicles during your

16 operation of Incredible Kia, haven't you?

17 A. It wasn't, it wasn't intentional.  It wasn't designed

18 to do that.  But I have a Chevy store, and we transferred

19 cars back and forth.

20 Q. Okay.  So at certain times, some of vehicles would be

21 floored under both lines of credit?

22 A. For a short period of time.

23 Q. When I say "both", I mean I GMAC line for the Chevy

24 dealer as well as the Hyundai Motor Finance line?

25 A. That's correct.

```
 1   Q.  Do you also -- have you also double-floored vehicles
 2   through Little Horn State Bank?
 3   A.  I'm not aware of any.
 4   Q.  Have you ever falsified funding information that you've
 5   provided to Hyundai Motor Finance Company?
 6   A.  No, I haven't.
 7   Q.  Have you ever changed the date on any deal jackets for
 8   transactions that have been funded?
 9   A.  No, sir, I haven't.
10   Q.  Are you aware of whether anybody at Incredible has
11   falsified deal jackets or other documents given to Hyundai
12   Motor Finance Company?
13   A.  Yes, sir, I was made aware of the situation.
14   Q.  Okay.  Who falsified what documents?
15   A.  I'm not -- I wasn't present, so it would only be
16   hearsay as to who I heard did it.
17   Q.  What did you hear?
18   A.  There were four cars during our --
19           MR. NEEDLER:  Judge, I'm going to object.  If he
20   doesn't have any personal knowledge about that, I would
21   suggest he not answer that.
22           MR. COLEMAN:  It's an admission against interest.
23           THE COURT:  Sustained.
24   Q.  (By Mr. Coleman)  Have you reviewed any documents that
25   you belief had been forged by other individuals at
```

```
 1   Incredible Auto Sales?
 2   A.  Yes.
 3   Q.  What documents have you reviewed that have been
 4   falsified?
 5   A.  I didn't really get into the documentation itself; I
 6   looked at more the, the deal jackets and the customers.  I
 7   didn't really get into the, the areas of signing.  I just
 8   went -- I just looked at the deals themselves.
 9   Q.  The deal jackets and --
10   A.  The deal jackets.  I didn't go through the contents; I
11   just went through the customer names.
12   Q.  Did you discuss those deal jackets with anybody else at
13   Incredible Auto Sales?
14   A.  Yes.
15   Q.  With whom did you discuss them?
16   A.  With my office manager.
17   Q.  Who is she?
18   A.  Jody.
19   Q.  Did Jody tell you whether she was the individual who
20   falsified the documents for Hyundai?
21   A.  No, sir.
22   Q.  Did anybody at Incredible tell you who the individual
23   was who falsified the documents for Hyundai?
24   A.  No, sir.
25   Q.  You just know that somebody at Incredible did, and
```

1    nobody would fess up to it?

2    A.  Correct.

3    Q.  You've proposed to pay periodic payments to Hyundai

4    Motor Finance at the rate of 7 percent in your briefs.  Do

5    you recall reading that or preparing that?

6    A.  Yes, sir.

7    Q.  Okay.  And the actual contract -- or the existing

8    contract that you've got with Hyundai Motor Finance Company

9    actually calls for rates set at a certain spread above the

10   prime rate; is that correct?

11   A.  Correct.

12   Q.  Okay.  And the prime rate right now is 8.5 percent; is

13   that correct?

14   A.  I don't know.

15   Q.  Well, in any event, the 7 percent that you're asking to

16   pay Hyundai Motor Finance Company here is a subprime rate,

17   isn't it?

18   A.  It may be.

19            MR. COLEMAN:  That's all I have, Your Honor.

20            THE COURT:  Mr. Birkle, do you have questions?

21            MR. FAIN:  Your Honor, Bruce Fain.  I'll step up,

22   if I may, real quick.

23            THE COURT:  Okay.  Mr. Fain.

24                      CROSS-EXAMINATION

25   BY MR. FAIN:

1    Q.  Mr. Gutierrez, first, when I came in earlier, your

2    counsel, Mr. Needler, made it clear that today's order --

3    you acknowledge we have a stipulation, right, in the

4    adversary proceeding relating to the auto auction

5    reclamation vehicles?

6    A.  Yes, sir.

7    Q.  Okay.  And although you may be using those for a value

8    of some type of your inventory for the purpose of the cash

9    collateral, you're still going to abide by the terms of the

10   stipulation; isn't that right?

11   A.  Absolutely.

12   Q.  You're not going to sell those vehicles?

13   A.  No, sir.

14   Q.  You're not going to encumber them any further?

15   A.  No, sir.

16   Q.  You're not going to transfer them around any further?

17   A.  No, sir.

18   Q.  Okay.  On Exhibit No. 6, it talks about proceeds.  If

19   you'll take a look at that.  Briefly -- and, unfortunately,

20   I don't have my stipulation -- or our stipulation with me

21   right now; however, I noted when I looked through your list

22   that I was provided after our stipulation was completed

23   that there are one, two, three, four, five, six -- seven

24   vehicles that I can't locate.  All right?

25       And I presume that they might have been sold.

1    (Inaudible) -- inventory list, okay, I presume they might

2    have been sold prior to bankruptcy or shortly after, and

3    you weren't aware of that at the time.

4              MR. NEEDLER:  Judge, can I ask a question?

5    Because I don't follow his questions, and I can't track

6    what's going on here.

7              MR. FAIN:  Your Honor, if I may --

8              MR. NEEDLER:  Exhibit 6 is a bank statement.

9              MR. FAIN:  I understand that.

10   Q.  (By Mr. Fain)  My question is this, Your Honor -- or

11   Mr. Gutierrez:  We're missing some vehicles off our

12   stipulation.  Okay?

13       My question is:  On Exhibit 6, it shows that you have

14   some money set aside for used-car proceeds.

15   A.  Correct.

16   Q.  All right.  Are those proceeds from the sale of the six

17   vehicles that are missing off of our stipulation?

18   A.  I'm not sure; could be.

19   Q.  Now, on our stipulation, there was a Mercury Sable that

20   shows up.  I don't see the Mercury Sable anywhere in your

21   inventory.

22   A.  That's correct.

23   Q.  Where is the Mercury Sable?  Do you know?

24   A.  Is it not segregated?

25   Q.  I do not believe so.  We haven't been able to locate

1    it, anyway.

2    A.   It should be there on the lot.

3    Q.   Okay.

4    A.   Yes, sir.

5    Q.   Now, Mr. Needler talked about you having more than one

6    lot for a second one when -- I think Mr. Patten was asking.

7    Where are the vehicles for the auto auction, at what lot?

8    A.   At the second lot.

9    Q.   When you say "the second lot", you mean the one across

10   from Frontier Chevrolet?

11   A.   That's correct.  And they're segregated all in the back

12   facing the wall with no sale signs on them.

13   Q.   All right.  The used -- now, back on Exhibit 6, it

14   talks about used car -- the used-car proceeds in the

15   account.  Mr. Needler was very specific when he said that

16   the new-car proceeds dealt with postpetition sales.  What

17   exactly are in the used-car accounts, what type of

18   proceeds?  Postpetition?  Prepetition?  What?

19   A.   Most of those two accounts are pre -- are postpetition.

20   Yeah, the only account as a DIP was at that morning.

21   Q.   Okay.  So all the used-car accounts, all the used-car

22   proceeds that are in there right now are for used cars that

23   you've sold postpetition?

24   A.   Correct.

25   Q.   Okay.  On Exhibit 3, Mr. Coleman was asking you

1   about -- if you'll take a quick look on Exhibit 3.  And

2   this shows up in more than one place, but, again, it talks

3   about the lien payoffs --

4   A.  Yes, sir.

5   Q.  -- $65,000.  And you indicated those were for the lien

6   payoffs of the vehicles in your inventory right now; is

7   that correct?

8   A.  Correct.

9   Q.  Okay.  Those are not lien payoffs that haven't been

10  made for vehicles that had been sold?

11  A.  Prepetition?

12  Q.  Correct.

13  A.  Correct.

14  Q.  Okay.  So this only takes into account liens on

15  vehicles that are currently in your inventory?

16  A.  Correct.

17  Q.  Last question:  On the deal jackets that you've

18  reviewed, Mr. Coleman was asking you about these

19  transactions.  Is there a way, looking at the deal jacket,

20  you know who put together the deal?

21  A.  I'm sure I could.  And I've been told who put the deal

22  together, but it's, again, hearsay.  And that person's no

23  longer in our organization, no longer working for Kia.

24  Q.  Did you try to confirm through your own observations

25  whether that was true or not what you were told, in your

1   opinion whether that was true?

2   A.  Yes.

3   Q.  Okay.  So, now, somebody told you, and you confirmed

4   it.  Who was it?

5   A.  The person that --

6   Q.  In your opinion, who was it?

7   A.  A young lady by the name of Crista Davis.

8           MR. FAIN:  No further questions, Your Honor.

9           THE COURT:  Mr. Birkle.

10          MR. BIRKLE:  Thank you, Your Honor.

11                      CROSS-EXAMINATION

12  BY MR. BIRKLE:

13  Q.  I'm Christopher Birkle.  I represent South Seattle Auto

14  Auction.  How are you doing?

15  A.  Good, sir.

16  Q.  You mentioned in your cross-examination with

17  Mr. Coleman that you recognize some of the vehicles listed

18  on your exhibit attached to your motion to use cash

19  collateral is also some of the vehicles listed for the TRO

20  and the stipulation you entered into to preserve the 10

21  vehicles that South Seattle Auto Auction sold you; is that

22  correct?

23  A.  Correct.

24  Q.  What are your intentions with those vehicles?

25  A.  They are to stay there and remain there until this gets

1    resolved.

2    Q.  In abidance by the stipulation, right?

3    A.  Correct.

4    Q.  And where would those vehicles be located for South

5    Seattle Auto Auction?

6    A.  The same place as they are right now, by the side --

7    actually, we -- as of the 1st of this month, we have access

8    to the bull pen.  We can move them in the bull pen and

9    secure them under lock, if that will make people feel

10   better.

11   Q.  You also -- your used inventory, according to your

12   Exhibit 3, states that approximately -- your used

13   inventory's value, according to you, is approximately

14   1.3 million.  If you would take a look at that and confirm

15   that.

16   A.  Exhibit 2, you mean?

17   Q.  Debtor's Exhibit 3.  Excuse me.

18   A.  Okay, hm-hmm.

19   Q.  Assuming for the sake of argument that the value of

20   South Seattle's vehicles would be the range from $60,000 to

21   $70,000, would you consider that a significant amount

22   compared with your $1.3 million?

23   A.  It's all significant.

24   Q.  Also, just like Billings Auto Auction's vehicles, some

25   of already been sold according to your list, some of South

1    Seattle Auto Auction's cars, approximately three.  Do you

2    know when those vehicles would have been, been sold?

3    A.   Prepetition.

4          MR. BIRKLE:  Thank you.  I have no further

5    questions.

6          THE COURT:  Mr. Needler, you may redirect.

7          MR. NEEDLER:  Thank you, Judge.

8                    REDIRECT EXAMINATION

9    BY MR. NEEDLER:

10   Q.  Mr. Gutierrez, I would like to go back to, I'd like to

11   go back to Exhibit 2, which is the used-car list.  You

12   answered some questions on cross which, to me, weren't very

13   clear.  And I want to make -- understand and clarify, if I

14   can.

15      If you look at Exhibit B, the left-hand column total of

16   1.3 million represents your value for inventory.  Look at

17   page 3 of the inventory -- of "B".

18   A.   Yes, sir, I have it.

19   Q.   1,317,065, that's the total of the reevaluated

20   inventory.

21   A.   That's correct.

22   Q.   Okay.  And what you've said before is that your cost on

23   that basically was 1.8 million, somewhere around there?

24   A.   Correct.

25   Q.   Okay.  And we've already established is there's a,

1    there's a difference between those two columns, roughly

2    511.

3    A.   Correct.

4    Q.   Okay.  And I asked you before whether, as you sold

5    vehicles now postpetition, whether, as a matter of fact,

6    you could sell them at at least dealer cost or more.  And

7    you said "yes".

8    A.   Absolutely.

9    Q.   Okay.  So when you're pricing your profit, it has

10   nothing to do with 1.8 million; it has to do with the

11   write-down value, does it not?

12   A.   Correct.

13   Q.   Okay.  So when you determined your profit, it's coming

14   off the inventory value.

15   A.   Correct.

16   Q.   The only thing that this other column is, is indicating

17   is what the write-down was from prepetition.

18   A.   Yes, sir.

19   Q.   But if you can sell all those cars at some point, I

20   mean you've got in here a projection for used cars for a

21   12-month period, but we don't know for sure whether all the

22   sales are going to come off Exhibit B or some of them are

23   going to be new used cars coming in, correct?

24   A.   Correct.

25   Q.   But assuming all the cars on Exhibit B could be sold,

1   you would have, if you sell them by that one column, you

2   would have an extra $511,000?

3   A.   That's correct.

4   Q.   Okay.  Now, if you'll look back at your pro forma -

5   which you've already answered, and I want to make sure the

6   Court and the creditors understand - that pro forma of

7   monthly bottom-line profit does not take into consideration

8   the new costs.

9   A.   Correct.

10  Q.   And that's what we tried to say, didn't we (quoted as

11  recorded):

12          "Please note that the above grosses per vehicle

13  are based on previous dealer cost and do not reflect the

14  write-down values."

15  A.   Correct.

16  Q.   So we didn't project -- it's a debtor-in-possession

17  projection, but it's based on prior --

18  A.   Correct.

19  Q.   -- (inaudible, talking over each other) -- sales --

20  A.   Correct.

21  Q.   -- not including the write-down.

22  A.   Correct.

23  Q.   So, obviously, the profits are going to be much higher

24  because your costs on the inventory are --

25          THE COURT:  Mr. Needler.

1              MR. NEEDLER:  Sorry.

2              THE COURT:  You know, let's ask questions.

3    You're really testifying --

4              MR. NEEDLER:  I'm sorry, I'm sorry.

5              THE COURT:  -- in this case, and I want the

6    witness to testify.

7              MR. NEEDLER:  Okay.

8    Q.  (By Mr. Needler)  The net profits set forth, sir, are

9    based on prior history.  Is that not true?

10   A.  That's correct.

11   Q.  Do the -- does the net profit shown on Exhibit 4

12   reflect the write-down cost?

13   A.  No.

14   Q.  Okay.  Is it true that as you sell cars going forward

15   off List B, that the gross is going to increase over what

16   your pro forma is?

17   A.  Correct.

18   Q.  Thank you.  A lot of questions asked about the cars on

19   hand from the auctions.  Again, you're going to segregate

20   those, and those are not going to be sold.

21   A.  Correct.

22   Q.  Okay.  You acknowledge, do you not, that the periodic

23   payment offered to the secured creditor is less than their

24   present payment?

25   A.  Yes.

1  Q.  The 7 percent that you offer now, based on, based on

2  the use of their assets is, is less in the interest than,

3  than it was before?

4  A.  Correct.

5  Q.  The basis for the interest that Hyundai charged, the

6  basis for interest that Hyundai charged before, was it

7  based on just vehicle advances?

8  A.  It's current balance and the -- whether it was new or

9  used had a different rate.

10 Q.  I see, okay.  So you're -- am I correct that this

11 7 percent is based on, on use of the inventory, of use of

12 Inventory A?

13 A.  Correct.

14 Q.  Your 7 percent is also going to be based and charged

15 against Inventory B.

16 A.  Correct.

17 Q.  You are also going to pay interest on parts under "C",

18 are you not?

19 A.  We don't pay interest on parts --

20 Q.  No.

21 A.  -- because we own them.

22 Q.  Going forward --

23 A.  Oh.

24 Q.  -- parts developed cash collateral.  And you are going

25 to pay interest, are you not --

1  A.  Sure.

2  Q.  -- on "C"?

3      You are also going to pay interest based on -- your

4  interest is to be figured on the filing-date values,

5  including "A", "B", "C", and receivables.

6  A.  Correct.

7  Q.  That's a broader base, is it not, than you are

8  presently charged?

9  A.  Yes.

10  Q.  And it is fair to say that you would categorize that

11  payment as a periodic payment.

12  A.  That's correct.

13  Q.  They talked about double-floored vehicles.  Did you

14  intend to double-floor vehicles?

15  A.  No, sir.

16  Q.  They charged that somehow some dates were changed in

17  deal jackets.  Did you intend to change dates in deal

18  jackets?

19  A.  No, sir, I didn't.

20  Q.  In the example that was given before that there were

21  some vehicles that were out of trust and if those, if those

22  amounts were considered, that it would somehow change this

23  $100,000 gross loss, if the monies that were out of trust

24  were used, you have figured those in costs, have you not?

25  A.  I have.

```
 1    Q.  So any out-of-trust money would not affect your

 2    projected 100,000 loss.  And that loss, was it not, it was

 3    a projected loss that you had --

 4    A.  Over a course of several months.

 5    Q.  Yeah.  But we're not projecting any losses going

 6    forward in this Chapter 11.

 7    A.  Correct.

 8    Q.  You believe in the viability of that action that's

 9    filed in State Court here in Montana?

10              THE WITNESS:  I do, Your Honor.

11    Q.  (By Mr. Needler)  When you said, "We could, we could

12    move these cars to the bull pen," what did you mean?

13    What's the bull pen?

14    A.  A gated area behind the building now available to us

15    that we can move them and secure them there if we -- if

16    they wish to.

17    Q.  So you would move Seattle's cars into there?

18    A.  And Auto Auction of Montana's.

19    Q.  Okay.  You intend to make a profit going forward.

20    A.  Yes, sir.

21    Q.  You intend to adhere to the rules of the adequate

22    protection and make a periodic payment.

23    A.  Absolutely.

24    Q.  And you intend to live by strict accounting for

25    furnishing the Hyundai --
```

1    A.   Yes, sir.

2    Q.   -- and deposit the monies intact in the trust?

3    A.   Yes, sir.

4              MR. NEEDLER:  Thank you very much.

5              THE COURT:  Mr. Gutierrez, you may step down.

6              Next witness?

7              MR. NEEDLER:  The debtor does not have any other

8    witnesses, Your Honor.

9              THE COURT:  Okay.  Mr. Patten, any witnesses?

10             MR. PATTEN:  No, Your Honor.

11             THE COURT:  Mr. Coleman, any witnesses?

12             MR. COLEMAN:  Yes, Your Honor.  We had intended

13   to call Mr. Dale Ueno.  In the interest of speeding this

14   up, however, I would -- a big part of the reason we had

15   intended to call him was simply to lay foundation for our

16   secured position, which I don't think is controverted.

17             I would ask that exhibits -- HMFC's Exhibits 1

18   through 5 be admitted.  Those are the financing statements

19   and the relevant loan documents.  And I would also propose

20   to call Mr. Ueno briefly on some other matters, time

21   permitting.

22             THE COURT:  Any objections to Hyundai's Exhibits

23   1 through 5?

24             MR. NEEDLER:  Not from the debtor -- that does

25   not include the car list, does it?

1               MR. COLEMAN:  No.

2               MR. NEEDLER:  No objection of one through five.

3               THE COURT:  Exhibits 1 through 5 are admitted.

4          HMFC'S EXHIBIT NOS. 1 - 5 ADMITTED INTO EVIDENCE

5               MR. COLEMAN:  So at this point, we would call

6    Mr. Dale Ueno to the stand, Your Honor.

7               MR. NEEDLER:  I'm sorry, but I would like to take

8    a couple seconds to go out in the hall, if I could.

9               THE COURT:  Okay.  I guess I'm just wondering

10   here -- Lynn, are you still there?

11              THE CLERK:  Yes, we are, Judge.  The lights just

12   were turned off accidentally.

13              MR. NEEDLER:  We can see you, sir.

14              THE COURT:  It looks a little dark there.

15              THE CLERK:  The cleaning lady came in and turned

16   them off accidentally, so --

17              THE COURT:  That does happen.  And that brings me

18   to the point I was going to raise.  You know, it is five

19   o'clock.  And with staff and with court security in that

20   building in Billings, obviously that creates a little

21   difficulty.  I know Mr. Coleman has a witness.

22              Let's see, Mr. Fain, do you have a witness?

23              MR. FAIN:  No, Your Honor.

24              THE COURT:  Mr. Birkle?

25              MR. BIRKLE:  No, Your Honor.

1      THE COURT:  And, Mr. Coleman, your witness is

2  short-term?

3      MR. COLEMAN:  I sure hope so, Your Honor.  I've

4  done what I can to curtail it.  I'm going to ask him to go

5  through how he became involved in this.  And we believe

6  some of the out-of-trust numbers that the Court's just

7  heard are understated significantly.

8      THE COURT:  Well --

9      MR. NEEDLER:  Judge, could I make a comment

10  there?

11      THE COURT:  Mr. Needler.

12      MR. NEEDLER:  We acknowledge there were some

13  out-of-trusts.  I don't know how the out-of-trusts, though,

14  would affect a pure motion to use cash collateral unless

15  the Court would believe that the out-of-trusts would in any

16  way impact on, on the debtor's ability to perform his

17  duties as a trustee under 1108, 1103, and any cash

18  collateral order.  So we acknowledge there was

19  out-of-trust.  As Your Honor knows, on a given day, the

20  Chapter 11 starts, and if it's not paid for, they can't pay

21  after that, so --

22      MR. COLEMAN:  If I may address that very briefly,

23  Your Honor.  We think a big issue on this motion is trust

24  and some of the controls that we've proposed versus what

25  the debtor has proposed.  We think some of the out-of-trust

1    numbers and some of the facts that relate to how this

2    matter came about and how it came to Hyundai Motor

3    Finance's attention are directly relevant on the types of

4    controls that the Court should impose going forward.

5           From our perspective, we see vehicles

6    disappearing or our collateral, at least, being impaired

7    daily.  We've got two different auto auctions who have

8    asserted claims in what we thought were our vehicles free

9    and clear.  We've got -- we know that there are at least

10   $65,000 in lien claimants who will come forward and who

11   very likely may have a claim ahead of Hyundai Motor

12   Finance.  We think the facts that gave rise to this, from

13   our perspective, are directly relevant to the types of

14   controls the Court should impose to prevent us from getting

15   even further out of trust.

16           MR. NEEDLER:  Judge, I might address that.

17           THE COURT:  Well, Mr. Needler --

18           MR. NEEDLER:  Yes.

19           THE COURT:  -- I would ask that you -- we're

20   going to take about a five-minute break so you can step out

21   in the hall.  But I'm going to bring this to a conclusion

22   when we come back; however, we'll do it in about five

23   minutes.

24           We'll be in recess.

25           (A brief recess was taken.)

1        THE COURT:  Mr. Coleman, concerning your witness

2   regarding the out-of-trust, I mean obviously I think

3   there's been considerable discussion about that having

4   occurred, which obviously is troubling to the Court.

5        And I don't know -- why don't I let you call your

6   witness, and we'll try to move it along.  I'm going to give

7   you about five minutes, though, is all.

8        MR. COLEMAN:  Thank you, Your Honor.  We call

9   Dale Ueno, U-E-N-O.

10       THE COURT:  If the witness would come to the

11  podium to be sworn, please.

12                  DALE UENO, WITNESS, SWORN

13                     DIRECT EXAMINATION

14  BY MR. COLEMAN:

15  Q.  Please state your name and address for the record.

16  A.  Dale Ueno.  My home address is 9590 Calendula Avenue;

17  Westminster, California 92683.

18       THE COURT:  How do you spell your last name?

19       THE WITNESS:  It's U-E-N-O.

20       THE COURT:  Very good.  Thank you.

21  Q.  (By Mr. Coleman)  What is your position with Hyundai

22  Motor Finance?

23  A.  I am one of the assistant managers in the commercial

24  credit department.

25  Q.  How did you first become involved in this matter?

1  A.  We, we received a tip of double-flooring from an

2  anonymous -- well, actually, it was from GMAC, General

3  Motors Acceptance Corp.  And as a result of that, we needed

4  to investigate further.

5  Q.  Meaning that some of your vehicles were also floored

6  with GMAC?

7  A.  Double-floored, yes, floored with us and floored with

8  General Motors at the same time.

9  Q.  Did you investigate that?

10  A.  I did.

11  Q.  What did you do to investigate it?

12  A.  We received an inventory run from General Motors, and

13  researched all the vehicles, and found that there were

14  several that were double floored.

15  Q.  Did you come to Montana at any point --

16  A.  I did.

17  Q.  -- in that investigation?

18  A.  Yes, I did.

19  Q.  When did you first come to Montana to investigate the

20  double-flooring?

21  A.  It was October 2nd.

22  Q.  Of this year?

23  A.  Of this year.

24  Q.  What did you do when you got here?

25  A.  Performed a floor-plan audit to determine the status of

1   the vehicle inventory, what was on the, on the lot and what

2   was sold at the time.

3   Q.  Very briefly, describe how you do the audit.  What do

4   you look at?

5   A.  What we do is we do a physical check of the inventory,

6   we touch every vehicle.  If something is missing, we need

7   to determine the disposition of those missing vehicles,

8   determine if there they're sold, at a body shop, you know,

9   wherever they may be, at a local store, or something on

10  display.  To check the vehicles that are sold, basically,

11  we look at the contracts, determine when it was sold to

12  customers, and if it's been funded.

13  Q.  What do you mean by "funded"?

14  A.  "Funded" is when they submit the retail contract to a

15  lender, if they've been -- if they've received proceeds on

16  that contract.

17  Q.  When you say "they", you mean your dealer?

18  A.  The dealer, yes, that's correct.

19  Q.  Okay.  And who maintains all of this paperwork?

20  A.  It's generally maintained by the dealer, the office

21  staff.

22  Q.  It's something you look at in their office?

23  A.  Correct.

24  Q.  What did you discover when you performed your audit on

25  October the 2nd?

1    A.   We didn't see too much unusual as far as what we found.

2    We were unable to determine at the time what units had been

3    funded.  The dealer had indicated that they didn't keep

4    those records.

5    Q.   Okay.  And is there a certain period of time in which a

6    dealer must pay you once the dealer has been funded?

7    A.   Our payoff policy is two days from date of funding, 15

8    calendar days maximum from date of sale.

9    Q.   If the dealer does not make that payment, are they

10   considered out of trust in your lingo?

11   A.   Yes.

12   Q.   Okay.  Once you move back -- or went back from the

13   October 2nd audit, did you continue your investigation?

14   A.   We did.  Because we were unable to determine through

15   the dealer whether or not contracts had been funded, we

16   contacted the lenders ourselves to determine if they had,

17   in fact, been funded.  And we determined there were several

18   that were funded at the time.

19   Q.   Which means what in terms of being out of trust?

20   A.   It means that they received contract proceeds, they had

21   not paid us, which defines the out-of-trust situation.

22   Q.   Do you remember at that point how many vehicles were

23   out of trust?

24   A.   Not off the top of my head, no.

25   Q.   What else did you at that point in your investigation?

1    A.   We, we relooked at the GMAC list to determine if there

2    was any problem there with that.  Again, we did determine

3    that there were several units maybe not double-floored at

4    the time but sometime in the past that were double-floored

5    with us and them at the same time.

6    Q.   At some point, were you contacted by someone from

7    Montana?

8    A.   We were.  We received an anonymous tip from an

9    ex-employee that there had been a unit that was floored

10   that had been sold prior to being floored with us.

11   Q.   What do you mean by that?

12   A.   What had happened was:  The unit was floored with us at

13   one point in time; they sold the vehicle; they paid it off,

14   and at a later date after that sale, they refloored that

15   vehicle again with us, we advanced again on that same

16   vehicle.

17   Q.   Even though it had already been sold?

18   A.   Even though it had already been sold.

19   Q.   And did you investigate that allegation?

20   A.   We did, and we determined it to be valid --

21   Q.   And what --

22   A.   -- and as a result, scheduled another trip out here.

23   Q.   And when did you come out for that second trip?

24   A.   It was the 9th of October, '06.

25   Q.   What did you do during that second trip?

1    A.  We conducted another floor-plan audit:  Basically

2    checked the vehicles, the inventory physically; and checked

3    the units that had been sold, as well.

4    Q.  And what did you find at that time?

5    A.  At that time, we had discovered that there was some,

6    there was some deal jackets where there was some

7    discrepancy.  We had questioned the dealer about it, and we

8    were informed by them that these were contracts that had

9    been fabricated.

10   Q.  Tell us what you mean by discrepancies.

11   A.  We had -- in a normal audit when you pull a deal

12   jacket, a typical sale has several items in it, contract

13   credit app, due bills, title work, and whatnot.  There were

14   four particular contracts or four particular deal jackets

15   that just had maybe three sheets of paper in them, a

16   contract, and maybe another item in there.  It was unusual

17   for the situation, so we asked, inquired with the dealer as

18   to why that was like that.

19   Q.  Specifically, whom did you talk to?

20   A.  Spoke to first Jody, the office manager; and then Nick,

21   Mr. Gutierrez.

22   Q.  Who's here with us today?

23   A.  Correct.

24   Q.  What did they tell you about these deal jackets that

25   seemed unusual?

1    A.  Well, first, they had to -- they researched it and then

2    came in.  And we had a meeting with Mr. Gutierrez and Jody.

3    And Jody admitted that these contracts had been fabricated.

4    Q.  In what way had they been fabricated?

5    A.  They were units that had been sold at an earlier date,

6    and they reprinted contracts at a later date and signed a

7    customer's name to them.

8    Q.  They told you that they had signed the customer's name?

9    A.  No, well, they didn't admit that.  I'm sorry.

10   Q.  Did they admit that they had changed dates on them?

11   A.  They did.

12   Q.  How does the -- or what's the significance of the dates

13   relative to your policy regarding funding?

14   A.  Our payoff policy is 15 days from date of sale, 15

15   calendar days maximum; or 2, or 2 business days from the

16   date they're funded.  In this case here, they had sold the

17   vehicles at an earlier time, reprinted the contracts at a

18   later date making it look like they were still within our

19   payment parameters -- or repayment parameters.

20   Q.  Did you reach an opinion at that time of your second

21   trip as to how far out of trust Incredible was?

22   A.  We had a better understanding of it.  We didn't --

23   weren't able to determine completely because we still could

24   not gather all the correct funding information, but we had

25   a better idea of it.  We had determined that we were about

1    260,000 out of trust at that time.

2    Q.  And that was October 9th?

3    A.  It was more like, I think, around the 12th -- the 10th,

4    or 11th, I think.

5    Q.  Okay.  Have you since learned that there were

6    additional vehicles out of trust?

7    A.  Yes.  There had been additional sales.  They had been

8    funded by their retail lenders on them, so the amount has

9    grown since then.

10   Q.  Have you also learned of sales of three vehicles to a

11   Mr. Graham?

12   A.  Yes, that was learned on an audit that was conducted

13   last week.

14   Q.  What did you learn about those vehicles?

15   A.  We had done in our -- our inventory inspections of the

16   dealership through the entire month of October.  We had

17   actually inspected these vehicles in an audit conducted in

18   November.  By our vendor, DataScan, who does some of our

19   audits for us, they had indicated that these vehicles were

20   now missing.  And the dealer had indicated that they were

21   sold back on September 27th of 2006.

22   Q.  Prepetition?

23   A.  Correct.

24   Q.  Did you physically see those vehicles when you had done

25   your earlier audit?

1  A.  I did.

2  Q.  Was there any indication that those vehicles had been

3  sold?

4  A.  No.

5  Q.  Were there any deal jackets at that time that you

6  reviewed that said they were sold?

7  A.  No.

8  Q.  Did you also discuss at any point with Mr. Gutierrez

9  the unpaid liens on vehicles taken in on trade?

10  A.  We did, yes.

11  Q.  Tell us about those conversations.

12  A.  They, they had indicated that, that they had estimated

13  there was probably around 20 liens, or so, that were still

14  out there that they had not paid.

15  Q.  Is this ordinary to see in your business?

16  A.  There is a certain amount of time, but, you know, what

17  they had indicated was it's common here that they make

18  payments and not pay these off.  I don't see that, no.

19  That's not common in -- as far as what I see.

20  Q.  I'll ask you to look briefly at what's been marked as

21  Hyundai Motor Finance Company's Exhibit 6 in front of you.

22          THE COURT:  You know, Mr. Coleman, before you

23  proceed, let me throw this on the table:  I don't see how

24  we're going to conclude this afternoon.

25          I have Butte hearings tomorrow starting at nine.

1   Briefly looking at that calendar - and, obviously, I can't

2   guarantee - but it looks like maybe we could be done by

3   about 11.  I realize Mr. Needler's traveling, I realize the

4   witness is traveling, but I guess the alternative to it is

5   -- until there's some conclusion here, there won't be an

6   order.  And so how important is the order?

7           So from the standpoint of where we're at right

8   now, and also giving consideration to court security and

9   staff, I don't see any way I can, I can do it but to

10  continue this until about 11 tomorrow.

11          MR. COLEMAN:  If it, if it changes --

12          THE COURT:  But I'm, but I'm continuing that on a

13  couple of conditions that I want to find out at the time we

14  reconvene tomorrow.  I guess I want -- I'm not sure that I

15  understand the exact amount that they're wanting, the

16  debtors are wanting in the cash collateral.  I know they've

17  talked about employees at 35,000, we're talking about

18  adequate protection payments at 7 percent.  And it looks

19  like it's kind of an open-ended request.  I'm not so

20  certain I'm going to do an open-ended request.  And I

21  really would like the debtor to indicate to me exactly what

22  cash collateral needs there are for the next month.  And

23  maybe, maybe the exhibits show it, but I guess I want it

24  just really clarified for me; and maybe the next -- maybe

25  for two months.  Because this case is going to have to move

1    quickly with a plan and disclosure statement, from what I'm

2    seeing right now.

3            Also, I want the parties to consider we've got

4    these adversary proceedings regarding the reclamation

5    rights and the blanket lien rights, which, in one way, the

6    debtor probably has less interest in.  But we have vehicles

7    sitting on lots that aren't being sold, aren't being --

8    nothing's being done with them that may be subject to these

9    adversaries.

10           I guess I want counsel and Debtor to consider, I

11   mean, these vehicles are sitting there just depreciating.

12   Why aren't we getting them moved, sold, segregating the

13   cash, and then having the battle over whether there's a

14   blanket lien or reclamation claim?  Because by the time we

15   get that concluded, what's the value of these vehicles

16   going to be?  I mean I think we need to consider that.  So

17   I want, I want the parties to give me a proposal on that --

18           MR. NEEDLER:  Good idea.

19           THE COURT:  -- whether they have to move them to

20   another site or, or sold by the dealer.

21           Now, also, obviously, Hyundai's going to -- I

22   have a very vested interest in watching all the

23   transactions in this, this case, I'm sure, very closely.

24   And I guess I want to see if those procedures that are set

25   forth, if there's any agreement to those procedures that

1    the debtor's proposing at this time as to the accounts and

2    how they're segregated and transferred back and forth.

3            So I guess I'm, I'm giving you a little bit of

4    homework before we reconvene tomorrow to have some

5    discussions about the best thing to do regarding the

6    vehicles that are, that are being held subject to the

7    adversaries, what really are the actual cash needs this

8    debtor needs in the short term, and whether the proposed

9    way of handling the -- and managing the funds and the

10   transactions meets with Hyundai's approval.

11           So I just can't, I can't let this thing go on

12   later tonight.  And so with that, I'm going to recess and

13   convene tomorrow morning at 11.  Now, that's subject,

14   obviously -- the chief clerk of court's going to confirm

15   that this room isn't being used, the room in Billings being

16   used for some other hearing tomorrow that I'm unaware of.

17   We'll confirm that, and we'll get back to you all on that

18   in the morning.

19           And with that, I'll also let the witness step

20   down, subject to being recalled tomorrow to conclude any

21   testimony subject to cross-examination.

22           But I will tell all the parties there:  I'm very

23   concerned about the status of this and where this case is

24   headed and the ability of the debtor to proceed.  And it's

25   going to have an impact on my decision on the cash

```
 1    collateral.

 2            Mr. Patten.

 3            MR. PATTEN:  Your Honor, just for your

 4    information, I've made arrangements to appear at one of the

 5    hearings at nine o'clock in this courtroom, so I think it

 6    must be open, at least in the morning.

 7            THE COURT:  Okay, very good.  With that, then, I

 8    encourage you all to sit down and visit, see if there's

 9    some resolution on some of the issues that I've raised

10    prior to conclusion tomorrow.  So I'll reconvene this case

11    at 11 o'clock.

12            And with that, we'll be in recess.

13

14                        *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25
```

1                       C E R T I F I C A T E

2

3        I certify that the foregoing is a correct transcript

4    from the electronic recording of the partial proceedings in

5    the above-entitled matter, all done to the best of my skill

6    and ability.

7

8        _____    _____

9        Jonny B. Nordhagen

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25