IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MONTANA

_____
                              )
In Re:                        ) Case No. 06-60855
                              )
Incredible Auto Sales, LLC,   )
                              )
          Debtor.             )
_____)

THE HON. RALPH B. KIRSCHER, presiding

PARTIAL TRANSCRIPT OF PROCEEDINGS

December 5, 2006

Electronic Recording Operator:   Peggy McGowan

Transcript Services:

Proceedings recorded by electronic recording;
transcript produced by reporting service.

```
 1                        APPEARANCES

 2


 3      FOR THE DEBTOR:

 4           WILLIAM NEEDLER

 5           Attorney at Law

 6           William Needler and Associates

 7           555 Skokie Boulevard, Suite 500

 8           Northbrook, IL 60062

 9

10           CLARKE B. RICE

11           Attorney at Law

12           Clarke B. Rice, PC

13           2951 King Avenue West

14           Billings, MT  59102

15

16      FOR AUTO AUCTION ASSOCIATES OF MONTANA, INC.:

17           BRUCE FAIN

18           Attorney at Law

19           Murphy, Kirkpatrick & Fain, PLLP

20           P.O. Box 429

21           Billings, MT  59103-0429

22

23

24

25
```

```
 1                    APPEARANCES (continued)

 2

 3      FOR HYUNDAI MOTOR FINANCE CO.:

 4           SHANE COLEMAN

 5           CHARLES HINGLE

 6           Attorneys at Law

 7           Holland & Hart, LLP

 8           P.O. Box 639

 9           Billings, MT  59103-0639

10

11      FOR STEVE'S AUTO SALES, INC.:

12           JAMES PATTEN

13           Attorney at Law

14           Patten, Peterman, Bekkedahl & Green, PLLC

15           2817 Second Avenue North, Suite 300

16           Billings, MT  59101

17

18      FOR MANHEIM SERVICES CORPORATION:

19           CHRISTOPHER BIRKLE

20           Attorney at Law

21           Lovell Law Firm, PC

22           P.O. Box 1415

23           Billing, MT  59101-1415

24

25
```

```
 1                 APPEARANCES (continued)

 2

 3      FOR THE U.S. TRUSTEE:

 4           DAN McKAY

 5           Bankruptcy Trustee

 6           U.S. Trustee's Office

 7           Liberty Center, Suite 204

 8           301 Central Avenue

 9           Great Falls, MT  59401

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1               I N D E X

2   WITNESS:                                    PAGE:

3   DALE UENO:

4       Direct Examination by Mr. Coleman  .  .  .  .  .   6

5       Cross-Examination by Mr. Needler  .  .  .  .  .  70

6       Cross-Examination by Mr. Patten  .  .  .  .  .  92

7       Cross-Exmination by Mr. Fain  .  .  .  .  .  96

8       Cross-Examination by Mr. Birkle  .  .  .  .  . 101

9       Redirect Examination by Mr. Coleman.  .  .  .  . 104

10  KEN CORNELISON:

11      Direct Examination by Mr. Coleman  .  .  .  .  . 106

12      Cross-Examination by Mr. Needler  .  .  .  .  . 136

13      Cross-Examination by Mr. Patten  .  .  .  .  . 144

14      Cross-Exmination by Mr. Fain  .  .  .  .  . 147

15      Redirect Examination by Mr. Coleman.  .  .  .  . 153

16      Recross-Examination by Mr. Needler  .  .  .  .  . 157

17

18

19

20

21

22

23

24

25

```
 1              INCREDIBLE AUTO SALES BANKRUPTCY

 2                     BUTTE, MONTANA

 3                         - - -

 4          BE IT REMEMBERED THAT this matter came on for

 5   hearing on December 5, 2006, in the United States

 6   Bankruptcy Court, District of Montana, The Hon. Ralph B.

 7   Kirscher, presiding:

 8

 9    The following proceedings were had:

10

11          MR. COLEMAN:  I'd call Mr. Dale Ueno.

12          THE COURT:  Okay.  If you could come forward to

13   be sworn, please.

14              DALE UENO, WITNESS, SWORN

15          MR. NEEDLER:  Judge, is it possible to make a

16   statement for the record before we start with witnesses on

17   this matter?  Just a short statement.

18          THE COURT:  I don't see the need.

19          MR. NEEDLER:  Fine.  Thank you.

20                 DIRECT EXAMINATION

21   BY MR. COLEMAN:

22   Q.  Please state your name and address for the record.

23   A.  Dale Ueno; 9590 Calendula Avenue, Westminster,

24   California 92683.

25          THE COURT:  And how do you spell your last name?
```

```
 1              THE WITNESS:  It is U-E-N-O.
 2   Q.  (By Mr. Coleman)  What is your job title at Hyundai
 3   Motor?
 4   A.  I am an assistant manager in the commercial lending
 5   department.
 6   Q.  What generally do your job duties entail?
 7   A.  My duties entail managing the portfolio of existing
 8   dealers that we have, to monitor for any, any issues that
 9   we may have with, with these dealerships.
10   Q.  Does that occasionally involve traveling out to the
11   dealerships?
12   A.  It does.
13   Q.  Does it involve working with folks like Mr. Stevens at
14   DataScan?
15   A.  Yes.
16   Q.  What is DataScan's relationship to Hyundai Motor
17   Finance?
18   A.  DataScan is a company that Hyundai contracts out to
19   that performance our floor-plan audits for us.
20   Q.  Generally, tell me how the flooring system works.  When
21   a dealer has a floor plan through Hyundai Motor Finance
22   Company, how are funds advanced and repaid on that flooring
23   line?
24   A.  For new vehicles, the, the manufacturer - in this case,
25   Kia Motor America - will, will ship them vehicles, and they
```

```
 1    will draft directly on us.
 2        In the case of used vehicles, the dealerships can
 3    purchase the vehicles from the auction.  They can, they
 4    can -- we can pay the auction directly for those, or they
 5    can submit a request to direct-floor them with us, and
 6    we'll advance funds on those units.
 7    Q.  When they acquire, when the dealer acquires a vehicle
 8    from an auction or from some other source, what
 9    mechanically goes on for Hyundai to advance funds on that
10    used vehicle?
11    A.  Hyundai uses an online system.  The dealers are able to
12    go online and enter the information on the vehicle.
13    However, we do, we do require that they send us copies of
14    titles, front and back, so we can verify that they're
15    signed properly.
16    Q.  Why is that important?
17    A.  Just to make sure that the dealership has ownership of
18    the vehicle.
19    Q.  And the titles are, you said, are sent by fax?
20    A.  They're sent by fax.
21    Q.  Okay.  And tell me briefly, how are the audit
22    conducted?
23    A.  The audits -- are you talking about the DataScan
24    audits --
25    Q.  DataScan, or -- yes, DataScan audits.
```

```
 1   A.   -- or us?

 2       Okay.  The audits are generally conducted every 30 days

 3   -- or monthly.  It requires an individual to go out and

 4   physically inspect all of the vehicles.  They'll physically

 5   touch the vehicles, they'll notate anything that is

 6   missing.  And once they determine what is missing, it's

 7   their job to find out the reason why, the disposition of

 8   the vehicle.  In most cases, it's due to a sale.  You know,

 9   there's a possibility that the vehicle could be located at

10   a body shop, on display at a mall, or something.

11       Once they determine the sale of the vehicle, it's their

12   job to determine to who, when, and if the dealership has

13   been funded on that retail contract.

14   Q.  And then are there procedures, periods during which the

15   dealership must repay Hyundai once they've been funded?

16   A.  Hyundai's repayment policy is 15 calendar days maximum

17   from the date of sale or 2 business days from the date that

18   the dealer receives contract proceeds, the date that

19   they're funded.

20   Q.  How does the dealer go about repaying Hyundai for

21   vehicles that are sold?

22   A.  It is done electronically, ACH.

23   Q.  Now, with respect to the specific audits, are the

24   DataScan individuals given a list of the vehicles so they

25   know what they're looking for?
```

1   A.   DataScan actually manages our wholesale -- they provide

2   the system that manages our wholesale accounts.  So they

3   have a list of all the vehicles that are on the floor plan

4   for each individual dealer.

5   Q.   Are these all the vehicles that are on the lot, or are

6   these only the vehicles for which Hyundai Motor Finance has

7   advanced money?

8   A.   These are the vehicles that Hyundai has advanced funds

9   for.

10  Q.   Okay.  Do the auditors look for other vehicles on the

11  lot for which Hyundai has not advanced funds?

12  A.   They can.

13  Q.   Okay.  And how do they report those, if they do?

14  A.   There's a list of -- that they'll provide us that are

15  units that are not floor plan.

16  Q.   In the regular course of your business, then, does

17  DataScan return printed audits to you?

18  A.   To our company, yes, they do.

19  Q.   And do you have the stack of exhibits in front of you

20  there?

21  A.   Yes.

22  Q.   I'm going to ask you to take a look at Exhibit 7,

23  please.

24  A.   Okay.

25  Q.   Do you recognize this document?

1    A.   Yes, I do.

2    Q.   Okay.  What is this document?

3    A.   This is a list of the inventory on a dealer's -- on our

4    floor plan for Incredible Kia as of the date stated on the

5    top of it, 10/6.

6    Q.   Is this an example of the document that you testified

7    that Hyundai Motor Finance keeps in the ordinary course of

8    its business?

9    A.   Yes, it is.

10   Q.   Okay.  And is there a date for this particular audit?

11   A.   Yeah.  The date of this inventory run is 10/6/06.  I

12   believe the audit was conducted on this one, on 10/9.

13   Q.   Explain that to me.  The inventory printout, you said,

14   was 10/6, but the audit was conducted sometime later?

15   A.   Yeah.  And the reason being there is, is I believe that

16   I came out on Monday; and the audit, in order for me to

17   bring it with me, I had to print it on a Friday.  So that's

18   the difference in the dates there.  I printed it on Friday,

19   brought it out with me, and conducted the audit on Monday

20   and Tuesday.

21   Q.   Okay.  And is this a true, correct, and complete copy

22   of the inventory audit for the inventory run of 10/6 of '06

23   as it's kept in the ordinary course of your business?

24   A.   Yes, it is.

25            MR. COLEMAN:  Your Honor, we'd move the admission

1    of Exhibit 7.

2              THE COURT:  Any objection to Exhibit 7?

3              MR. PATTEN:  No objection.

4              UNIDENTIFIED SPEAKER:  No objection, Your Honor.

5              MR. NEEDLER:  Judge, subject to reviewing this

6    matter with, with our witness, Mr. Cornelison, as to its

7    accuracy -- this is represented as a prepetition audit and,

8    to our knowledge, really doesn't relate to today's cash

9    collateral hearing but has -- relates, apparently, to

10   charges that he's going to file.  So subject to allowing

11   our witness to review it, we would, we would let it -- we

12   would ask that it be admitted at this time subject to our

13   review.

14             THE COURT:  Very good.  Exhibit 7 is admitted.

15             MR. COLEMAN:  Thank you, Your Honor.

16        HMFC'S EXHIBIT NO. 7 ADMITTED INTO EVIDENCE

17             THE COURT:  You know, Mr. Coleman, I'm just

18   trying to locate it here.  I came across Exhibit 6.

19   Obviously, it should be right after it, but let me just

20   make sure I've got the right one.

21             Okay, I do have it, Exhibit 7.  Very well, please

22   proceed.

23             MR. COLEMAN:  Thank you.

24   BY MR. COLEMAN:

25   Q.  Mr. Ueno, I'm going to ask you to look at a number of

1    very similar exhibits, Exhibit 8, 9, 10, 11, and 12.  Are

2    these also inventory audits for the Incredible Auto Sales

3    dealer maintained by Hyundai Finance?

4    A.  Yes.

5    Q.  And each of those has dates at the top.  Do you see

6    those?

7    A.  Yes.

8    Q.  Exhibit 8 reads 10/11 of 2006.  Is that the date of the

9    inventory run, just like it was for Exhibit 7?

10   A.  Yes, it is.

11   Q.  Are each of these Exhibits 8 through 12, true, correct,

12   and complete copies of the inventory audits maintained by

13   Hyundai Motor Finance Company in the ordinary course of its

14   business?

15   A.  Yes, they are.

16         MR. COLEMAN:  Your Honor, we'd move the admission

17   of Exhibits 8 through 12.

18         THE COURT:  Any objection?

19         UNIDENTIFIED SPEAKER:  No objection.

20         MR. PATTEN:  No objection.

21         UNIDENTIFIED SPEAKER:  No objection, Your Honor.

22         THE COURT:  Okay.  Exhibits 8, 9, 10, 11, 12 are

23   admitted.

24      HMFC'S EXHIBIT NOS. 8 - 12 ADMITTED INTO EVIDENCE

25   BY MR. COLEMAN:

```
 1    Q.  Mr. Ueno, please take a look at Exhibit 19.

 2            MR. NEEDLER:  Judge, I'm going to object to

 3    Exhibit 11.  Eleven is postpetition.  And we need testimony

 4    if there -- if this is being submitted to indicate an

 5    out-of-trust after, after filing and he doesn't take into

 6    consideration our use of collateral and deposited funds,

 7    then the exhibit may be accurate from their standpoint, but

 8    it's not accurate to indicate any untoward activity.

 9    That's --

10            THE COURT:  I'm going to allow you to

11    cross-examine on the document --

12            MR. NEEDLER:  Okay.

13            THE COURT:  -- to clarify your position.

14            MR. NEEDLER:  Fine, thank you.

15            THE WITNESS:  Okay.

16    Q.  (By Mr. Coleman)  Please look at Exhibit 19.

17    A.  Okay.

18    Q.  Do you recognize this document?

19    A.  Yes, I do.

20    Q.  What is this?

21    A.  This is a recap that the DataScan auditor sends to us

22    after he completes his audit.

23    Q.  And what vehicles are shown on Exhibit 19?

24    A.  These are the vehicles that are sold and unpaid at the

25    time of the audit.
```

1    Q.   And what was the time of this audit?

2    A.   November 17, 2006.

3    Q.   And are these -- was this the audit that was performed,

4    then, by Mr. Derrick Stevens of DataScan?

5    A.   Yes, it is.

6    Q.   Whose notes are those on the front page?

7    A.   Those are mine.

8    Q.   Okay.  And is this a true, correct, and complete copy

9    of the vehicle summary for sales for which we've not

10   received funds for Hyundai Motor Finance Company as it

11   keeps it in its ordinary course of business?

12   A.   Yes, it is.

13            MR. COLEMAN:  I would move the admission, Your

14   Honor, of Exhibit 19.

15            THE COURT:  Any objection?

16            MR. PATTEN:  No objection.

17            UNIDENTIFIED SPEAKER:  No objection.

18            UNIDENTIFIED SPEAKER:  No objection, Your Honor.

19            THE COURT:  Exhibit 19 is admitted.

20         HMFC'S EXHIBIT NO. 19 ADMITTED INTO EVIDENCE

21   BY MR. COLEMAN:

22   Q.   Did you hear Mr. Stevens testify that he spoke to you

23   about the checks to Incredible Chevrolet?

24   A.   Yes, I did.

25   Q.   What did he tell you about those?

1    A.  He just informed me that, in his course of completing

2    the audit, that when going through deal jackets, he noticed

3    there were several checks in there, original checks that

4    had not been cashed.

5    Q.  Did this seem unusual to you?

6    A.  Yes, it did, based on the dates that were on the

7    checks.

8    Q.  Okay.  Have you noted the dates on the first page of

9    Exhibit 19?

10   A.  I did.

11   Q.  Okay.  Were those the date that is Mr. Stevens told you

12   at the time?

13   A.  Yes, they are.

14            MR. COLEMAN:  Your Honor, I apologize for jumping

15   around here.  At this time, I'm going to ask that the Court

16   admit Exhibits 1 through 5.  These were admitted at the

17   last hearing.  I'm hopeful that they will be admitted once

18   again without objection.

19            THE COURT:  What are Exhibits 1 through 5?

20            MR. COLEMAN:  Exhibit 1 is the financing

21   agreement, the loan agreement with Hyundai Finance;

22   Exhibit 2 is the addendum that sets the interest rate; and

23   Exhibits 3 through 5 are filed financing statements.

24            THE COURT:  Okay.  Any objections?

25            UNIDENTIFIED SPEAKER:  No.

1           MR. PATTEN:  No objection.

2           UNIDENTIFIED SPEAKER:  No objection.

3           UNIDENTIFIED SPEAKER:  No objection, Your Honor.

4           THE COURT:  Exhibits 1 through 5 are admitted.

5      HMFC'S EXHIBIT NOS. 1 - 5 ADMITTED INTO EVIDENCE

6  BY MR. COLEMAN:

7  Q.  Mr. Ueno, as of the date of filing, do you know what

8  the total amount owed by Incredible Auto Sales to Hyundai

9  Motor Finance Company was?

10  A.  I'd have to look it up in the exhibits here, but the

11  figure is there.  It's around 2.2 million.

12  Q.  Okay.  I'll ask you to take a look at -- do you know

13  which exhibit specifically you were thinking of?

14  A.  Yeah, I can find it.

15           THE COURT:  Mr. Coleman, you should have that at

16  your fingertips.

17           MR. COLEMAN:  It's a very long number, Your

18  Honor.

19  Q.  (By Mr. Coleman)  I'll direct your attention to

20  Exhibit 6.  And please don't answer my question yet.  Do

21  you recognize Exhibit 6?

22  A.  Yes, I do.

23  Q.  Is this a document that you prepared or someone at

24  Hyundai Motor prepared --

25  A.  Yes, it is.

1   Q.   -- itemizing the vehicles?

2   A.   Yes.

3   Q.   Okay.   In reviewing Exhibit 6, does that refresh your

4   recollection as to what the amount of the debt owed to

5   Hyundai Motor Finance at the time of filing was?

6   A.   Yes, it does.

7   Q.   Okay.   What was the amount owed to Hyundai Motor

8   Finance?

9   A.   It's $2,243,608.81.

10   Q.   And we've seen at least some briefs, anyway, that

11   suggest a lower amount, approximately 2.163 million was

12   owed by Incredible Auto Sales.

13   A.   Yes.

14   Q.   Can you explain that discrepancy?

15   A.   Yes.   What had happened was the, the lower figure

16   represents what was owed based on payments that Hyundai

17   Motor Finance received for certain units that were sold.   I

18   believe these payments were admitted to Hyundai around the

19   6th or 7th of October.   Around the 16th of October, we

20   were, we were informed by our bank that these came back for

21   non-sufficient funds.   They were added back to the amount

22   that's owed to Hyundai.

23   Q.   Were these the electronic ACH payments as you testified

24   earlier?

25   A.   Yes, they were.

1   Q.  Okay.  Were they -- so the -- and they were returned to

2   Hyundai as of 10/16?

3   A.  I believe that's the date that we received

4   notification.  It could have been somewhere around there.

5   Q.  Okay.  Do you know what the amount, the total amount of

6   the sales out of trust for vehicles that Hyundai Motor

7   Finance Company floored was as of the date of filing?

8   A.  Again, I'd have to look through these.  I know it's in

9   the exhibits.

10  Q.  I'll direct your attention to Exhibit 22.  Do you

11  recognize this document?

12  A.  Yes, I do.

13  Q.  What is Exhibit 22?

14  A.  Exhibit 22 is a spreadsheet that we prepared to just

15  help us track the units that had been sold through specific

16  dates.

17  Q.  What data was used to prepare this spreadsheet?

18  A.  Data from the audits conducted by both DataScan and

19  Hyundai Finance.

20  Q.  Okay.  Now, the date of this is -- it says (quoted as

21  recorded):  "Sales information as of 11/29 of '06," at the

22  top.

23      Do you see that?

24  A.  Yes, I do.

25  Q.  Is that the accurate date of this document?

20

```
 1   A.  Yes.

 2   Q.  Okay.  So this includes sales both before and after the

 3   bankruptcy was filed?

 4   A.  Yes, it does.

 5   Q.  Okay.

 6           MR. COLEMAN:  Looking at -- first off, I guess,

 7   Your Honor, we would move the admission of Exhibit 22.

 8           THE COURT:  Any objection?

 9           UNIDENTIFIED SPEAKER:  No, Your Honor.

10           MR. NEEDLER:  I will object, Your Honor.  I don't

11   see the relevancy of the document.  It clouds the issue of

12   the both prepetition and postpetition.  It's misleading to

13   the trier of fact.

14           THE COURT:  Well, I'm going to admit Exhibit 22

15   subject to your ability to cross-examine this witness

16   concerning this exhibit.

17       HMFC'S EXHIBIT NO. 22 ADMITTED INTO EVIDENCE

18           THE COURT:  What about Exhibit 6?  I think we

19   just did one through five.  Is six already in?

20           MR. COLEMAN:  We would move the admission, Your

21   Honor.  I believe, actually, from the last hearing, the

22   Court's order noted it was admitted, and I think that's

23   incorrect.  I don't believe that it was admitted last time.

24           THE COURT:  Okay.  Any objection to Exhibit 6?

25           MR. PATTEN:  No objection.
```

1              UNIDENTIFIED SPEAKER:  No objection.

2              UNIDENTIFIED SPEAKER:  No objection.

3              MR. NEEDLER:  I guess no objection, no objection.

4              THE COURT:  Exhibit 6 is admitted.

5         HMFC'S EXHIBIT NO. 6 ADMITTED INTO EVIDENCE

6    BY MR. COLEMAN:

7    Q.  Mr. Ueno, please turn back to Exhibit 22.  Based on

8    Exhibit 22, can you tell what the total amount of

9    out-of-trust sales were at the time of filing?

10   A.  It was 366,880.

11   Q.  Okay.

12             MR. NEEDLER:  Can you repeat that number, sir?

13             THE WITNESS:  366,880.

14   Q.  (By Mr. Coleman)  Do you know what the total amount of

15   sales of vehicles are now for which Hyundai Motor Finance

16   has not been paid?

17   A.  Through 11/29, I know that figure, which is 626,131.

18   Q.  Is it your understanding that some of those funds are

19   deposited into trust accounts?

20   A.  Yes.

21   Q.  Okay.  Are all of those funds deposited into trust

22   accounts?

23   A.  I don't believe they're all in there.

24   Q.  Okay.  Tell me why you say that.

25   A.  It's possible that they have not been funded on some of

1     it yet, also.

2     Q.  Okay.  I see a reference to a Stevie Repo/Graham sales

3     at the bottom.  Do you recognize that entry?

4     A.  Yes, I do.

5     Q.  What does that refer to?

6     A.  I'm sorry, you're referring again to the Ed Graham, or

7     the Stevie?

8     Q.  I'm looking at the bottom just in your total.

9     A.  Okay, Stevie and Ed Graham.  The Stevie vehicle was a

10    vehicle that was at a body shop that was taken, taken back.

11    The Graham vehicles are vehicles that we understood were

12    sold prior to the bankruptcy filing on 9/27, I believe it

13    is.

14    Q.  Okay.  And we'll talk more about those later.  I just

15    wanted to get that clear right now.

16        Are you familiar with any sort of double-flooring that

17    occurred at this dealership?

18    A.  Yes, I am.

19    Q.  Now, one of the attorneys in this case has suggested

20    that, quote, the double-flooring was, quote, a timing issue

21    of vehicles who left one floor plan and went to another.

22    This occurred over a holiday weekend and was inadvertent

23    and not intentional, end quote.

24        Do you agree with that statement?

25    A.  No, I don't.

1   Q.   How did you first learn that there may be potential

2   double-flooring of vehicles?

3   A.   We received a call from General Motor Acceptance Corp.,

4   which is the floor-plan provider to his Chevrolet dealer.

5   And they were inquiring about the possibility of

6   double-flooring.

7   Q.   As a result of the contact from GMAC, did you

8   investigate the matter?

9   A.   Yes, we did.

10   Q.   Okay.  Did GMAC send you any lists of vehicles that

11   they had floored?

12   A.   GMAC sent us a copy of their inventory run.

13   Q.   I'll ask you to please take a look at Exhibits 16 and

14   17.  Do you recognize those documents?

15   A.   Yes, I do.

16   Q.   Okay.  What are they?

17   A.   They are copies of inventory runs received from General

18   Motors, GMAC.

19   Q.   Are these lists of vehicles that General Motors had

20   floored at those times?

21   A.   Yes, it is.

22   Q.   And there's fax dates at the top of each of those

23   exhibits.  I don't see any other dates on there.  Do you?

24   A.   There's a date at the bottom-right corner, which is the

25   date that they printed this, this run.

1   Q.  My mistake.  And are these true, correct, and complete

2   copies of the inventory runs that you received from GMAC

3   during the ordinary course of your business?

4   A.  Yes, they are true copies that were received from them.

5   Q.  And did you rely on these in the course of your

6   investigation of the double-flooring?

7   A.  Yes, we did.

8           MR. COLEMAN:  Your Honor, we move the admission

9   of Exhibits 16 and 17.

10          THE COURT:  Any objection?

11          MR. PATTEN:  No objection.

12          UNIDENTIFIED SPEAKER:  No objection.

13          UNIDENTIFIED SPEAKER:  No objection.

14          MR. NEEDLER:  No objection.

15          THE COURT:  Exhibits 16 and 17 are admitted.

16      HMFC'S EXHIBIT NOS. 16 and 17 ADMITTED INTO EVIDENCE

17  BY MR. COLEMAN:

18  Q.  Mr. Ueno, did you compare the listing of inventory that

19  GMAC sent you with your own inventory listing at the time?

20  A.  Yes, we did.

21  Q.  Okay.  And was that as part of your investigation?

22  A.  As a result of the call, yes, it was part of our

23  investigation into this.

24  Q.  Okay.  Did you prepare a summary of the double-flooring

25  at that time?

1    A.  Yes, we did.

2    Q.  I'll ask you to take a look at Exhibit 18.  Do you

3    recognize this document?

4    A.  Yes, I do.

5    Q.  Okay.  What is it?

6    A.  It is a spreadsheet which points out the period of time

7    that the units were floored with both Hyundai Motor Finance

8    Company and General Motors.

9    Q.  Is this prepared based on Exhibit 16 and 17?

10   A.  Yes, it is.

11   Q.  Was it prepared at that time based on Hyundai's own

12   inventory information?

13   A.  Yes.

14   Q.  Okay.  And it's a true, correct, and complete copy of

15   that compilation?

16   A.  Yes, it is.

17            MR. COLEMAN:  Your Honor, we move the admission

18   of Exhibit 18.

19            THE COURT:  Any objection?

20            MR. PATTEN:  No objection.

21            UNIDENTIFIED SPEAKER:  No objection.

22            THE COURT:  Exhibit 18 is admitted.

23            UNIDENTIFIED SPEAKER:  No objection.

24            THE COURT:  Exhibit 18 is admitted.

25         HMFC'S EXHIBIT NO. 18 ADMITTED INTO EVIDENCE

```
1   BY MR. COLEMAN:
2   Q.  Is Exhibit 18 essentially a summary of your findings
3   with respect to double-flooring?
4   A.  Yes, it is.
5   Q.  Okay.  And do you conclude that vehicles had been
6   double-floored?
7   A.  Yes, we did.
8   Q.  Okay.  And a minute ago, we looked at Debtor's
9   statement that this occurred with respect to one vehicle
10  over a holiday weekend.  Is your investigation conclusions,
11  are those consistent with that statement?
12  A.  No.
13  Q.  Okay.  In fact, if I look at the last column here, tell
14  me what I see there.
15  A.  That represents the number of days that the unit --
16  those particular units were floored with both Hyundai Motor
17  Finance Company and General Motors.
18  Q.  So where it says, for instance, an Impala was
19  double-floored for 105 days, that means it was floored by
20  both GMAC and by Hyundai Motor Finance?
21  A.  For a period of 105 days, it was on both floor-plan
22  lines.
23  Q.  Okay.  And, likewise, where I see the Taurus that's
24  only double-floored for one day in that last column, that's
25  what that means, isn't it?
```

1    A.   Correct.

2    Q.   Okay.  And how many vehicles total, then, were

3    double-floored that you were able to find out about?

4    A.   Approximately 19, it looks like.

5    Q.   Okay.  And are they all reflected on Exhibit 18?

6    A.   Yes, they are.

7    Q.   Okay.  At some point during the course of your

8    investigation of double-flooring, did you -- were you

9    contacted by an individual who supposedly worked for

10   Incredible Auto Sales?

11   A.   Yes, we were.

12   Q.   What was the nature of that contact?

13   A.   We were contacted by an anonymous individual who stated

14   that there was a possibility that there was some --

15            MR. NEEDLER:  Judge, I'm going to object to

16   anonymous -- discussions of anonymous witnesses.  I think

17   it's purely hearsay and shouldn't be admitted.  I think

18   it's very prejudicial to the debtor and should be -- that

19   this line of questioning should be stricken.

20            MR. COLEMAN:  It goes to their reason for

21   investigating it and the results, which are completely not

22   hearsay, Your Honor.

23            THE COURT:  I'm going to overrule.

24            You may answer.

25            THE WITNESS:  We received a tip from an

1    individual who, who recommended that we review certain

2    vehicles.  He made specific -- he was specific on one

3    vehicle that he indicated was floored, paid off, and then

4    refloored again, although -- and that the dealer had sold

5    the car previously.

6    Q.  (By Mr. Coleman)   Now, walk us through that.  What

7    does that mean:  Floored, sold, and then refloored?

8    A.   In this particular case here, what, what happened was

9    that the vehicle was floored with Hyundai Motor Finance

10   Company, it was sold to a customer, and it was paid off.

11   At a later date, it was refloored with us again.  According

12   to this individual who called us, he said that the dealer

13   did not have the car the second time they floored it; that

14   they had sold the car, it was gone, they resubmitted the

15   paperwork to us, we floored it again.  So it was floored

16   twice.

17            MR. NEEDLER:  Judge, I'm going to object again.

18   He doesn't have any personal knowledge of this transaction.

19   He's listing a third party who he can't identify on dates

20   he can't identify.  So I would ask Your Honor to strike

21   this testimony.

22            THE COURT:  I'm going to overrule, but

23   Mr. Needler, you can certainly inquire with this witness

24   about it.

25   Q.  (By Mr. Coleman)  Did you investigate this tip?

1    A.   Yes, we did.

2    Q.   Okay.  Do you know what type of a vehicle -- or did you

3    discover a vehicle that this individual was referring to?

4    A.   Yes, we did.

5    Q.   What type of vehicle was that?

6    A.   I have notes on it.  If I could refer to those, I'd

7    like to.

8    Q.   Would they help refresh your memory?

9    A.   Yes, they would.

10   Q.   Please do, then.

11   A.   It was a 2003 Acura.

12   Q.   Do you remember the individual who -- was there a name

13   associated with that vehicle, someone who purchased it,

14   perhaps?

15   A.   Yes.  The name of the customer was Colbrese.

16   Q.   And did you have a -- based on your investigation, when

17   was this vehicle floored and sold?

18   A.   The vehicle was originally floored with us on August

19   2nd of '06, we received a payoff for it on August 16th of

20   '06, it was refloored again on 9/15 of '06 and paid off the

21   second time on October 5th of '06.

22   Q.   When you said it was paid off, what is that -- what's

23   the significance of that?  Somebody purchased it?

24   A.   "Paid off" meaning that the floor plan was paid off on

25   it, the floor-plan obligation was paid off on it.

1    Q.  Okay.  And, I'm sorry, when did you say it was finally

2    removed for the second time from the floor plan?

3    A.  October 5th of '06.

4    Q.  How often does Hyundai Motor Finance Company normally

5    audit dealerships prebankruptcy?

6    A.  The typical cycle is monthly.

7    Q.  So it's possible that there was just no inventory audit

8    during those 20 days when it was refloored?

9    A.  It's possible.

10   Q.  Okay.  I want to talk about the timing of this

11   anonymous tip.  When you first learned about

12   double-flooring, did you go to the Incredible Auto Sales

13   dealership?

14   A.  On the, the first tip -- we actually received a couple

15   calls from GMAC.  On the first tip, no, I don't believe I

16   went out there personally.

17   Q.  Did the company send somebody out there?

18   A.  We had a DataScan audit around that time that we, we

19   scheduled.

20   Q.  And, and what, if anything, was significant about the

21   results of that audit?

22   A.  We really didn't notice anything out of ordinary on

23   that particular audit.  We also talked to the dealer

24   principal about it, as well.

25   Q.  At some point, did you personally go out to the

1   Incredible Auto Sales dealership to discuss the matter?

2   A.  We did.  After the second inventory run was sent to us

3   from General Motors, we -- I personally went out to the

4   dealer to accompany DataScan on the audit.

5   Q.  And did you have discussions with the individuals

6   running Incredible Auto Sales at that time?

7   A.  Regarding the double-flooring, or --

8   Q.  Regarding double-flooring.

9   A.  I don't believe I had discussions that -- when I was

10  out there personally.

11  Q.  Were you still conducting your investigation at that

12  time?

13  A.  Yes.

14  Q.  Okay.  Did you speak with the owner of the place,

15  Mr. Nick Gutierrez, at any time?

16  A.  Yes.

17  Q.  And did you speak with anyone else about possible

18  problems at the dealership at that time?

19  A.  Yes, the office manager.

20  Q.  Who is he or she?

21  A.  Jody Stevens.

22  Q.  Okay.  Did you -- what were the nature of your

23  discussions with them?

24  A.  Our concern on the audits was their inability to

25  provide us information on if they had been funded or not on

1     their, on their retail contracts.  Typically, during an

2     audit, we'll look to see when the vehicle was sold, who it

3     was sold to, and if the dealer has received contract

4     proceeds.  We were told by Mr. Gutierrez and Jody, that all

5     those documents were shredded.

6     Q.   Okay.  Which documents, specifically?

7     A.   The funding documents.  Basically, these are documents

8     that are received from retail lenders on retail contracts

9     that, that indicate when they're funded.

10    Q.   So, so these documents would tell you when they're

11    funded.

12    A.   Yes.

13    Q.   Okay.  Did they explain why they had shredded these

14    documents?

15    A.   They just said that they had no faith in the dates on

16    these.

17    Q.   Why wouldn't they have any faith in the dates if you

18    know?

19    A.   The explanation that was given to me was that the dates

20    on the retail funding notices are not the dates that the

21    funds go into the bank account.

22    Q.   Okay.  Who told you that?

23    A.   That was told to me by both Jody and Nick Gutierrez.

24    Q.   Why did they tell you that the dates on our documents

25    with respect to funding were different than the real dates?

1    A.   Well, what they were -- I guess what they're pointing

2    out is that the dates that the retail lenders indicate that

3    they fund the contracts are not always the dates that the

4    funds actually go into the bank account.

5    Q.   Who writes that information on the funding, or writes

6    the funding information on the documents that are sent to

7    you?

8    A.   Are you talking about the funding notices?

9    Q.   Yeah.  "Who would have put, put the wrong dates on

10   these documents?" is what I'm asking.

11   A.   I don't -- they're -- I guess I'm not understanding

12   correctly.  The dates on the -- or the dates on the funding

13   notices weren't changed.  They were provided by the retail

14   lender's company such as Bank of America, Wells Fargo,

15   AmeriCredit.

16   Q.   So these are notices directly from the funding

17   entities?

18   A.   From the entities to the dealership itself.

19   Q.   And those are the ones that were shredded?

20   A.   Those are the ones that were shredded.

21   Q.   Okay.  Were there documents that -- on which the wrong

22   date was put?

23   A.   Not on the documents.  We weren't able to view the

24   documents.  They didn't have them.

25   Q.   Were they -- is there something that Incredible Auto

1    Sales reported to you with respect to the dates of funding?

2    A.  What they typically would do is tell the auditors when

3    they were funded.  They would shred the documents and then

4    verbally tell the auditor when they were funded.

5    Q.  At some point, did they present to you a second set of

6    funding documents?

7    A.  We did receive several funding documents at a later

8    date.

9    Q.  Okay, maybe I'm not asking right.  When you met with

10   Nick and Jody, did they bring you any documents?

11   A.  On that first meeting, no.

12   Q.  On a subsequent meeting face-to-face?

13   A.  Yes.

14   Q.  Okay.  What documents did they bring you?

15   A.  They brought several copies of funding, funding

16   notices.

17   Q.  Were these the same funding notices that they said they

18   had shredded previously?

19   A.  Yes, it appeared that way.

20   Q.  What was the explanation that they gave you?

21   A.  Jody had indicated that she found them on the bottom of

22   her drawer, her desk.

23   Q.  Okay.  So they were all -- they were separate from the

24   deal jackets, then?

25   A.  Yes.

1   Q.   Do you remember how many vehicles there were with this

2   new funding information?

3   A.   Not offhand.   You know, I would say roughly about half

4   a dozen of them.

5   Q.   Do you remember specifically a 2005 Kia Sportage?

6   A.   Not off the top of my head.

7   Q.   Okay.   Is there anything you could review that would

8   refresh your recollection of that?

9   A.   I have, again, notes that I can take a look at that

10   I've referenced several vehicles on.

11   Q.   These are notes that you made at the time?

12   A.   Notes that I've made at the time or subsequent to.

13   Q.   And they're based on your review of the funding

14   information?

15   A.   Based on my audits that were performed at the

16   dealership.

17   Q.   Okay.   I'll ask that you be permitted to please review

18   those and tell me what, if anything, you remember about a

19   2005 Kia Sportage.

20        THE COURT:   Mr. Coleman, I guess I just wanted to

21   kind of just ask procedurally how long you may have with

22   this witness.

23        MR. COLEMAN:   Another hour, Your Honor.

24        THE COURT:   Another hour?

25        MR. COLEMAN:   If permitted.

1          THE COURT:  Okay.  With that, I'm going to take a

2    recess until two o'clock for lunch.  And the reason I'm

3    doing that is because a number of restaurants uptown will

4    close at two.  And so I want to let you move, move out and

5    go wherever you want for some lunch.  And we'll continue

6    your testimony when you return.

7          THE WITNESS:  Okay.

8          THE COURT:  So you may step down.  Thank you.

9          MR. NEEDLER:  May we leave --

10          THE COURT:  You may leave all of your documents

11   where they are, your files.  They'll be in a locked

12   courtroom.  So with that, we'll be in recess.

13          (The lunch recess was taken.)

14          THE COURT:  Mr. Ueno, I'll have you take the

15   stand again.  I'll remind you, also, you're still under

16   oath.

17          Billings, you can still hear us?

18          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

19          THE COURT:  And Great Falls?

20          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

21          THE COURT:  Thanks.  Mr. Coleman, you may

22   proceed.

23          MR. COLEMAN:  Thank you, Your Honor.

24   BY MR. COLEMAN:

25   Q.  Mr. Ueno, before lunch, we were talking about your

1   trips to the Incredible Auto Sales store in early October.

2   Do you recall that?

3   A.   Yes.

4   Q.   Okay.   Do you remember what the dates were -- or how

5   many trip times were you out there in early October?

6   A.   I believe I was out there on the 2nd of October as well

7   as the 6th.   And the trip on the 6th extended through

8   several days.

9   Q.   And we also talked about you receiving an anonymous

10  tip.   Do you recall when that tip was received?

11  A.   It was received sometime between the 2nd the 6th of the

12  month.

13  Q.   Okay.   So in between --

14          MR. NEEDLER:   Judge, I would ask that he speak

15  up.   I'm having a hard time hearing him back here.

16          THE WITNESS:   I'm sorry.

17  Q.   (By Mr. Coleman)   Sometime between the two trips?

18  A.   Sometime between the 2nd and the 6th of October.

19  Q.   After your first trip?

20  A.   Correct.

21  Q.   And we also talked about certain funding information

22  supposedly being shredded by Incredible Auto Sales.   Do you

23  recall that?

24  A.   Yes.

25  Q.   Okay.   What, if anything, did you do to further

1    investigate funding information for vehicles for which

2    funding information was supposedly shredded?

3    A.   What we did was we contacted some of the retail lenders

4    on our own to verify if some of these contracts had been

5    funded.

6    Q.   Okay.  And what did you discover, based on your

7    contacts with them?

8    A.   There were numerous contracts that we discovered that

9    were funded that the dealer had stated to us were not.

10   Q.   And were they funded outside of the 2- and 15-day

11   periods you explained earlier?

12   A.   Yes.

13   Q.   Okay.  And at some point, you testified you met with

14   Mr. Gutierrez and Jody.  And, I apologize, I forgot her

15   last name.

16   A.   Yes, I did.

17   Q.   Okay.  Did they bring you funding information?

18   A.   At a later date, yes, they did provide some of the

19   funding slips.

20   Q.   Was this during your trip out there beginning on

21   October 6th?

22   A.   Yes, it was, it was on that trip.

23   Q.   Okay.  And tell me:  Specifically, when you're looking

24   for funding information and you're looking at the deal

25   jackets, what specifically are you looking for in those

1   deal jackets?

2   A.  What we look for is the, the date the vehicle was sold,

3   the customer that it was sold to, and whether or not the

4   dealer had received the funding proceeds on that particular

5   deal.

6   Q.  And in the so-called "deal jacket", what documents are

7   contained therein, typically?

8   A.  In a deal jacket, typically on a sale, you'll see the

9   retail contract, the application for title, any of the

10  title information, due bills, if there's any work that's

11  going to be done, any type of -- if they sold any

12  insurance, or anything.  There's several documents that

13  generally accompany a sale.

14  Q.  Do they include credit application -- (inaudible,

15  talking over each other)?

16  A.  And credit applications, yes.

17  Q.  Okay.  Did all of the deal jackets that you reviewed

18  with Nick and Jodie have that information?

19  A.  No, there were a few that did not.

20  Q.  Okay.  And did you ask them what the situation was for

21  those?

22  A.  Yes, yes.

23  Q.  Okay.  What did they tell you about those?

24  A.  They questioned why we needed it.  And we just, you

25  know, informed them that it just didn't appear to be a

1    complete jacket.

2    Q.   Okay.  And let's -- I skipped ahead on you a little

3    bit.  Tell me specifically what was missing in those deal

4    jackets as you recall.

5    A.   There were a few jackets that contained only a retail

6    sales contract and maybe one other document, whereas

7    typically in a retail jacket -- or a sale on a retail

8    jacket, we'll see several other documents included in

9    there.  It just didn't fit, is basically what it was.

10   Q.   Was there anyone else from Hyundai with you at the time

11   you were meeting with Nick and Jody?

12   A.   There was.  I had a sales rep with me, as well, Hyundai

13   sales rep.

14   Q.   What was his name?

15   A.   Larry Lowen.

16   Q.   How do you spell his last name?

17   A.   L-O-W-E-N.

18   Q.   Okay.  Did you ask Nick and Jody specifically, "Where's

19   the missing information for these deals?"

20   A.   I did.

21   Q.   And what was their response?

22   A.   Nick's response was basically he needed some time to

23   research it.

24   Q.   Okay.

25   A.   At that point in time, basically, Larry and I stepped

```
 1    out to grab something to eat.  When we came back into the
 2    dealership, we were approached by Nick and Jody with
 3    several different files.
 4    Q.  Okay.  And what were in those files?
 5    A.  What they had, basically, were two set -- there were
 6    four, four deals in question.  Each deal that they had,
 7    they had two separate files for.  According to Jody and --
 8    well, Jody actually admitted that, you know, her, her --
 9    what she told me was this was the hardest thing she ever
10    had to do and basically admitted that there were two
11    jackets for each of these deals:  One with a retail
12    contract that was, in essence, fabricated; and the real
13    contract.
14    Q.  Did she tell you what information specifically had been
15    fabricated?
16    A.  It was the retail contract itself.
17    Q.  Okay.  What information on that contract?  Was it the
18    dates, as we've talked about?
19    A.  The dates were changed, yeah.  The real deal jacket had
20    one date; the fabricated deal jacket had a different date
21    on the contract.
22    Q.  Did Jody tell you who specifically in the Incredible
23    Auto Sales organization was doing the fabricating?
24    A.  Jody took the, the full blame for it.  Her claim was
25    that Nick didn't know anything about it.
```

1  Q.  Okay.  And did Nick also deny knowing anything about

2  it?

3  A.  He did.

4  Q.  Do you remember which vehicles these were,

5  specifically?

6  A.  I would have to refer to my notes to do that.

7  Q.  Specifically -- and do you have notes that would

8  refresh your memory on this point?

9  A.  I have notes that would tell me the exact VINs and

10  customer names on these contracts.

11  Q.  Okay.  Please go ahead and, and look at those.

12  A.  Okay.  One of them was a 2005 Kia Sportage.  The

13  customer name on this particular deal was a Jorge Arroyo,

14  A-R-R-O-Y-O.

15  Q.  What was the circumstances with that vehicle?

16  A.  On this one here, there was a contract that stated it

17  was sold to Mr. Arroyo on 9/23/06, when, in fact, we

18  learned that the vehicle had actually been wholesaled at an

19  auction on 9/14.

20  Q.  How did you learn that?

21  A.  Through the, through the actual contract -- or through

22  the second deal jacket.

23  Q.  The second set of books that Jody showed you?

24  A.  The real jacket, yeah, basically.

25  Q.  Okay.  Were there other vehicles, as well?

43

1   A.   There were.   There were three others.

2   Q.   What were those vehicles?

3   A.   One was a 2005 Chevy Classic.   The customer name was

4   Martha LaFountain.

5   Q.   What were the circumstances with the vehicle purchased

6   by Ms. LaFountain?

7   A.   The second contract showed a retail sale date of

8   9/23/06.   The actual jacket, the real deal jacket, showed a

9   sale date of 9/8/06.

10   Q.   Okay.

11   A.   The third one was a 2004 Chevy Impala.   This was sold

12   to a customer by the name of Robert Gillard.   This one also

13   showed a contract dated 9/23/06.   We saw the actual jacket

14   which showed a sale date of 8/29/06; and we also reviewed

15   in this one here that the dealer had been paid on 9/12/06,

16   meaning they received the retail contract proceeds on 9/12.

17   Q.   So Incredible Auto Sales had already received the money

18   on when?

19   A.   9/12/06.

20   Q.   Okay.

21   A.   And the last one was on a 2005 Dodge Neon.   The

22   customer name was Shirley Whiteside.   The retail contract,

23   the second contract was dated 9/22/06; the actual contract

24   was dated 8/29/06.

25   Q.   So these were all vehicles, if I understand you, that

1   they had, they had -- the dates had been changed as to when

2   they were supposedly funded in order to fit within

3   Hyundai's 15-day window?

4   A.   Yeah.   Basically what was done was the contract was --

5   a second contract was drafted just to give the appearance

6   that it was within Hyundai's repayment period.

7   Q.   Okay.   Did Jody or Nick offer you any explanation for

8   why Incredible had done that?

9   A.   The explanation that was given by Jody was that Nick

10  had very stringent rules with respect to wholesale audit

11  exceptions and she wasn't allowed to have any.   And with

12  that being said, she drafted up these contracts.

13  Q.   Now, at that same time you were out at the dealership

14  in early October, did you also learn that there were unpaid

15  customer liens from trade-in vehicles?

16  A.   During the meeting that we had with Nick and Jody

17  regarding these four contracts, at the same time I asked

18  them, as well, if they had a situation with their lien

19  payoffs.   And Jody's comment was that -- you know, she

20  said, "I'm not going to lie to you:   We do have probably

21  approximately 200,000 out there in lien payoffs that are

22  floating out there."

23  Q.   And did she explain to you how there, there could be

24  this much in unpaid liens?

25  A.   Not much explanation.   You know, shortage of cash is

1    basically what causes the, the liens to not be paid off.

2    You know, Nick did offer that, according to him, he said it

3    was common for there to be liens out there that, you know,

4    a dealer can make payments on.

5    Q.  Tell me what you mean by "make payments on".

6    A.  The customer trades a car in; there's a lien on it

7    through their bank; and the dealer, in essence, is making

8    that monthly payment for that customer.  Rather than paying

9    off the car, they're making a monthly payment.

10   Q.  Did Nick or Jody tell you where they got the customer

11   finance information from their previous liens that they

12   took on trade-in?

13   A.  No.

14   Q.  Did they tell you how many of those liens were for

15   vehicles still on the lot versus vehicles that had already

16   been sold to new customers?

17   A.  No, not at that time.

18   Q.  Now, in this case, Counsel's filed a brief - Counsel

19   for Incredible Auto Sales - saying (quoted sa recorded):

20        "Every car dealer who files a Chapter 11 in this

21   country has unpaid liens and out-of-trust sales on filing.

22   Depending on the lender and its payment requirements, there

23   can be a legitimate lag of seven days on all normal

24   automotive sales before settlement."

25      Was it your understanding at that time that all of the

1    liens that were outstanding were within seven days, for

2    instance?

3    A.   No.   It sounded more like that they -- you know,

4    they -- when I asked them about the situation with the

5    liens, it appeared that they had several that were outside

6    of that.   Now, it is, it is normal for a dealership to have

7    a lien open for, you know, a certain amount of time, but,

8    you know, I don't want see it going beyond, say, 20 to 30

9    days, usually.

10   Q.   Tell me how you come up with that time period.   Why

11   would it be normal under certain circumstances to have a

12   short period during which there was an unpaid lien?

13   A.   I don't know the laws in the state of Montana.   I know

14   different states have different laws as far as how long

15   they have to pay off a lien.   But what they could be doing,

16   also, is just waiting to get their retail contract proceeds

17   and applying some of that towards, towards the lien.

18   Q.   Just as a part of the title work or the funding

19   information?

20   A.   Yeah.   And they may be waiting for the money to come

21   in, and then they'll pay off the lien at that time, as

22   well.

23   Q.   Is it common for a dealer, in your experience, to get a

24   trade-in customer's finance information and continue to

25   make payments on the vehicle that they took on trade?

1    A.   It's not something that I see regularly.

2    Q.   Okay.  Is it something you've ever seen before?

3    A.   No, not personally; no.

4    Q.   Okay.  Did you ask Nick or Jody whether their trade-in

5    customers knew that they still had liens outstanding on the

6    vehicles they traded in?

7    A.   No, I didn't.

8    Q.   Okay.  I'll ask you to take a look at Exhibit 21,

9    please.

10   A.   Okay.

11        MR. COLEMAN:  Your Honor, this is a document we

12   got from opposing counsel.  At this time, we would move its

13   admission.

14        THE COURT:  Let me find it here first.  Lien

15   payoff list is 21.

16        THE WITNESS:  Yes.

17        THE COURT:  Any objection to Exhibit 21?

18        MR. PATTEN:  No objection.

19        UNIDENTIFIED SPEAKER:  No objection.

20        UNIDENTIFIED SPEAKER:  No objection.

21        MR. NEEDLER:  Question:  Is Exhibit 21 two pages,

22   one entitled:  Lien before payoffs, and liens after?

23        MR. COLEMAN:  Yes.

24        MR. NEEDLER:  Okay.  No objection.

25        THE COURT:  Exhibit 21 is admitted, two pages.

```
 1          HMFC'S EXHIBIT NO. 21 ADMITTED INTO EVIDENCE
 2     BY MR. COLEMAN:
 3     Q.  Mr. Ueno, you understand that Exhibit 21 is a list of
 4     unpaid liens on vehicles that are in inventory at
 5     Incredible Auto Sales?
 6     A.  Yes.
 7     Q.  Okay.  And you understand that some of these liens date
 8     back -- do you see where there's a date sold?
 9     A.  Yes, I do.
10     Q.  Okay.  The first one on that list, for instance, says
11     that this 2004 Optima was taken in on trade, apparently,
12     and resold to a Mr. and Mrs. Carton, C-A-R-T-O-N; and it
13     was resold, apparently without paying the lien on 4/17/06.
14     Do you see that?
15     A.  Yes, I do.
16     Q.  Okay.  Is that sort of a lag time common when you talk
17     about there sometimes being a lag time before repaying
18     liens?
19     A.  No, no.  Typical lag time that I see is generally maybe
20     a couple weeks, 30 days at the outset --
21     Q.  Okay.
22     A.  -- outside.
23             MR. COLEMAN:  Your Honor, may I approach the
24     witness?
25             THE COURT:  You may.
```

1   Q.  (By Mr. Coleman)  Mr. Ueno, we've placed in front of

2   you what's been marked -- an enlargement of what's been

3   marked as Exhibit 15.  Do you see that?

4   A.  Yes.

5   Q.  And there are three enlarged pages of this three-page

6   exhibit.

7           MR. COLEMAN:  I'm going to ask -- and, Your

8   Honor, at this point, I guess I would move the admission of

9   Exhibit 15.  This is the schedule.  It's an Exhibit B to

10  Schedule B of the debtor's schedules.

11          THE COURT:  Any objection to Exhibit 15?

12          UNIDENTIFIED SPEAKER:  No objection.

13          MR. NEEDLER:  No.

14          UNIDENTIFIED SPEAKER:  No objection.

15          THE COURT:  Exhibit 15 is admitted.

16      HMFC'S EXHIBIT NO. 15 ADMITTED INTO EVIDENCE

17  BY MR. COLEMAN:

18  Q.  Mr. Ueno, I would ask you to take a look again at the

19  first page of Exhibit 21.  And if you would, please, on the

20  enlargement next to you, with that marker, make a notation

21  for each of the vehicles and tell us what you're doing.

22  I'm looking at, beginning with the Audi, these are vehicles

23  that were on the lot as of filing.  I would ask that you

24  please put a mark, a red mark next to those that have

25  unpaid liens against them.

1        And I'll give you a hint and say some of them have a

2    notation, "LP", in the middle of this.

3    A.  You just want a checkmark next to them?

4    Q.  Please.  You may have to flip to the second page if

5    you're not finding it.

6    A.  Some on - (inaudible, out of range of microphone) - as

7    well?

8    Q.  Yes.  If it helps, I think there's only one on the

9    third page.

10   A.  I'm having trouble finding this on the other one right

11   now.  That's all I'm able to find right now.

12   Q.  Okay.  Please go ahead and have a seat.

13       Which ones were you unable to find?

14   A.  I didn't see the Chevy 2500.  And I'm not sure if I

15   just missed it.  There's a '98 Chevy 1500 that didn't have

16   a VIN number identified on the Exhibit 21; and then an

17   Intrepid, a 2004 on the last, the last one that didn't have

18   a VIN number, as well.

19   Q.  I'll ask you to take a look at the first page of

20   Exhibit 3 there and see if you don't find the Chevy 2500

21   and the Intrepid anywhere.

22   A.  I'm sorry, which exhibit was that again?

23   Q.  On the blowup there.  Do you see the first page of

24   the --

25   A.  Oh, okay, yeah.  I'm sorry.  It's right here.

1    Q.   And which one was that?

2    A.   176243, a 2002 Chevy 2500.

3    Q.   Okay.  Is the Intrepid also on there?

4    A.   602 -- (inaudible, out of range of microphone.)  Yeah,

5    that's actually right here.

6    Q.   Now, referring back to Exhibit 21, the 1998 Chevy 1500

7    with no VIN number showing, were you able to find that on

8    the debtor's schedules?

9    A.   No, I wasn't.

10   Q.   Okay.  Are you also aware that in this case, First

11   Interstate Bank filed a motion for relief from stay on two

12   vehicles, a Daewoo and a Regal?

13   A.   Yes, I am.

14   Q.   As you review Exhibit 15, do you see the Daewoo on that

15   list anywhere?

16   A.   No, I did not.

17   Q.   How about the 2001 Regal?

18   A.   Yeah, I believe I did see that one.

19   Q.   Okay.  Will you take a look at the third page of the

20   enlargement there and just confirm that we've got the First

21   Interstate Regal marked off?

22   A.   Yes, it's there.

23   Q.   Okay.  Now, we still have page 3 up there?

24   A.   Yes.

25   Q.   Would you take a look -- do you see in the middle of

1    page 3 where -- oh, about a third of the way down, there's

2    a 2005 Spectra.  Do you see that?

3    A.  Yes.

4    Q.  Do you recall whether this 2005 Spectra is the vehicle

5    that Mr. Steve Marks (phonetic) picked up from the body

6    shop?

7    A.  Yes, that is the one.

8    Q.  Okay.  Would you make a notation next to that vehicle,

9    please?

10       And while you're up there, if you see the notations in

11   the middle of that page that say "BAA" or "SSAA" -- do you

12   see those?

13   A.  Yes.

14   Q.  Okay.  Is it your understanding that those are all

15   vehicles that the auto auctions in this case have claimed

16   an interest in?

17   A.  Yes.

18   Q.  Okay.  Would you please make a notation down the row

19   there that shows which vehicles we're talking about?

20       Okay, that's all I want to talk on that for now.  If

21   you would have a seat, please.

22       Did you at any time when you were at Incredible Auto

23   get photocopies of titles that were in the deal jackets?

24   A.  Yes, I did.

25   Q.  Okay.  Under what circumstances would you have gotten

1    photocopies of those titles?  Why would you have gotten

2    them?

3    A.  They appeared to be unusual.  They were changes from an

4    original to a copy in there.

5    Q.  Okay.  I'll ask you to look at Exhibit 23, please.

6    A.  Okay.

7    Q.  Exhibit 23 consisting of 35 pages, are those

8    photocopies of title information that was in the deal

9    jackets you looked at at Incredible Auto Sales?

10   A.  Yes, they are.

11   Q.  Are they true, correct, and complete copies of what you

12   saw there?

13   A.  Yes.

14           MR. COLEMAN:  Your Honor, we would move the

15   admission of Exhibit 23.

16           THE COURT:  Any objection?

17           MR. PATTEN:  No objection.

18           UNIDENTIFIED SPEAKER:  No objection.

19           UNIDENTIFIED SPEAKER:  No objection.

20           MR. NEEDLER:  No objection.

21           THE COURT:  Exhibit 23-1 through -15, I believe

22   it is, is admitted.

23           MR. COLEMAN:  We believe it's 23-1 to 23-35.

24           THE COURT:  I'm sorry, yes, 35.

25     HMFC'S EXHIBIT NOS. 21-1 - 21-35 ADMITTED INTO EVIDENCE

1              MR. COLEMAN:  We will only be referring to the

2      first 20 pages of that, though.

3      BY MR. COLEMAN:

4      Q.  I'll ask you first, Mr. Ueno, to look at the grouping

5      of titles listed as Exhibits 23-1 through 23-3.  Do you see

6      those?

7      A.  Yes, I do.

8      Q.  Okay.  And tell me why you took photocopies of these

9      titles.

10     A.  23-1 is a photocopy of the actual original title that

11     was in the deal -- or in the jacket.  The reason I took a

12     photocopy of this one is:  When you look about

13     three-quarters of the way down, the signatures are

14     different than on a photocopy that was included in that

15     jacket, as well.  So there was a -- the original title was

16     in there, and then there was a photocopy of the original

17     title in there, and the photocopy of the title has a

18     different signature on it than the original title itself.

19     Q.  So in the -- if I understand you correctly, in the

20     Incredible Auto Sales deal jacket for this vehicle, there

21     was both an original title as well as a photocopy of the

22     original title.

23     A.  Yes, there was.

24     Q.  Okay.  And there was, in your opinion, anyway,

25     different information on those photo -- on the photocopy?

1    A.   Yes.

2    Q.   Okay.  And are you referring to the differences between

3    page 23-1 and 23-3?

4    A.   Yes, I am.

5    Q.   Okay.  Specifically, what differences are you looking

6    at?

7    A.   On 23-1, it shows the printed name of agent signing for

8    company as Steve's Auto Sales with a signature above that.

9    On 23-3, it now reads "Incredible Auto Sales" with a

10   different signature above it.

11   Q.   On the photocopy, do you recall whether there was an

12   original ink that you saw?

13   A.   On this one here, no, I don't.

14   Q.   Okay.  Where we see on page 23-1 in the upper-left

15   corner "copy of original title", whose handwriting is that?

16   A.   That's mine.

17   Q.   That's a notation you made?

18   A.   Yeah.

19   Q.   Okay.  And, likewise, on 23-3 where it says "photocopy

20   of title in file" --

21   A.   That's my writing, as well.

22   Q.   Do you know which of these titles, the original or the

23   photocopy, was sent to Hyundai in order to obtain -- in

24   order to advance funding on this vehicle?

25   A.   It would be the photocopy.

56

1    Q.   Okay.  Tell me why you say that.

2    A.   It shows Incredible Auto Sales as the purchaser of the

3    vehicle.

4    Q.   I'll next ask you to look at pages 23-4 through 23-8.

5    Are these again examples of a copy of an original title --

6    or let me try that again.

7         Is this another example of an original title where

8    you've written "original" and a photocopy both in the same

9    file?

10   A.   Yes, it is.

11   Q.   Okay.  Why did you take photocopies of this?

12   A.   On this particular title, the back of the title

13   reflects a different signature and a different name on it

14   than the photocopy did.

15   Q.   Okay.  Page 23-5, is that a copy of the original that

16   you took, or is that a copy of the photocopy in the file?

17   A.   23-5 is a copy of the original.

18   Q.   Okay.  And 23-7, is that a copy of the photocopy?

19   A.   Yes, it is.

20   Q.   Okay.  What is the notation on the side of page 23-7?

21   A.   The notation I made there was that on the photocopy of

22   the back, there was original ink on there with the

23   signatures.

24   Q.   What is the significance of that to you?

25   A.   With, with that on there and this being faxed over to

1    Hyundai Motor Finance Company, this is what we would need

2    to floor the vehicle on the floor-plan line.

3    Q.   And the original ink, as you looked at it, was only on

4    the photocopy and not on the original title; is that

5    correct?

6    A.   That's correct.

7    Q.   Okay.  Did you notice a difference in the signatures on

8    23-5 and 23-7?

9    A.   Yes.  There were actually different names on there.

10   23-5 reflects the name of M. Bradley, is what it appears to

11   be.  And 23-7, it -- I can't read the signature that

12   replaces it; but below, there's also another signature on

13   there, and I believe that's Lalonna Seymour.

14   Q.   Who is Lalonna Seymour?

15   A.   Lalonna works for Incredible Kia.

16   Q.   Have you met her?

17   A.   I have.

18   Q.   Okay.  Is she in charge of title work there, as far as

19   you know?

20   A.   I believe that's her title; I'm not 100 percent certain

21   of her title, though.

22   Q.   Oh, okay.  I'll ask you to next look at Exhibits 23-9

23   through 23-12.  Tell us what the significance of these

24   documents is.

25   A.   Again, this is a copy of an original title that was in

1    the file, and a photocopy of that title, as well.  The

2    backs of the title are different again.

3    Q.  How are they different, as you noticed them?

4    A.  The back of the original actually shows Incredible Auto

5    Sales on there with a signature of an M. Bradley next to

6    Steve's Auto Sales.  The photocopy actually doesn't show

7    any signature at all.

8    Q.  Okay.  Yet this photocopy was in the same deal jacket

9    as the original?

10   A.  Yes.

11   Q.  Okay.  How about Exhibits 23-13 through 23-16?  What

12   were the significance of these, in your mind?

13   A.  Again, a photocopy of the actual original title -- or a

14   copy -- yeah, a photocopy of the original title and a

15   photocopy of that title.  And the backs of the titles,

16   again, are different.

17   Q.  Did this one also have original ink on the photocopy?

18   A.  This one appears to have.  I made a note on there that

19   said it was original ink --

20   Q.  Okay.

21   A.  -- on the photocopy.

22   Q.  But it wasn't signed in that particular spot on the

23   original title?

24   A.  No.

25   Q.  And do you know which of these was sent from Incredible

1    Auto Sales to Hyundai Motor Finance in order to obtain
2    flooring?
3    A.   I'm going to say it was the photocopy because it has
4    the original signatures on it, but I would have to refer
5    back to all those documents.
6    Q.   And that document that would have been faxed, is that
7    something Hyundai would rely upon in order to extend
8    financing?
9    A.   Yes.
10   Q.   How about one last one here, exhibit pages 23-17
11   through 23-20, do you see those?
12   A.   Yes.
13   Q.   Tell me why you took a photocopy of these titles.
14   A.   This one here, it appears that I took a photocopy of it
15   just because there was an original Montana, state of
16   Montana certificate of title in there; and a photocopy of a
17   state of South Dakota title.
18   Q.   And they again appear to have Ms. Seymour's signature
19   on them.  Do you see that?
20   A.   Yes.
21   Q.   Did you have occasion to talk to Ms. Seymour about
22   these titles?
23   A.   I didn't discuss these titles with her, no.
24   Q.   When did you get photocopies of these titles?
25   A.   I believe I made these on an audit conducted in

1    November.

2    Q.   Okay.  I want to turn to another subject now.  Since

3    the bankruptcy was filed, are you aware of certain vehicles

4    that were supposedly sold to a Mr. Ed Graham?

5    A.   Yes, I am.

6    Q.   Okay.  What are the circumstances of those vehicles?

7    A.   There are three vehicles in question.  We had actually

8    viewed or physically inspected these vehicles on audits,

9    multiple audits conducted throughout the month of October.

10   I believe DataScan conducted an audit for us sometime in --

11   if I can refer to my notes, I can probably refresh my

12   memory on that.

13   Q.   Please do.  Or I think we've already admitted

14   Exhibits 7 through 12, approximately, which were inventory

15   audits on particular days, if that helps.

16   A.   These three units in question were inspected on audits

17   conducted through the month of October on the 2nd, the 7th,

18   11th, 13th, 16th, and 23rd.  On the 30th of October,

19   DataScan performed an audit for us, and they were told at

20   that time -- well, that unit was missing during that audit,

21   and they were told at that time that the unit had been sold

22   to a Mr. Ed Graham on September 7th of '06.

23   Q.   And I want you to refer back now to the blown-up

24   exhibit, 15, and I'll ask you to look at page 2 of that.

25        Would you make a notation next to -- well, first off,

1    did you see any vehicles -- were these Ed Graham vehicles

2    listed on the debtor's schedules, Exhibit 15?

3    A.   Yes.   One is, one is this Grand Am right here.

4    Q.   Okay.   Make a notation next to that, please, if you

5    would.

6    A.   I don't see any of the other two in question on this,

7    this sheet here.

8    Q.   Do you recall whether one of them was a Stratus?

9    A.   One was a Stratus, yes.

10   Q.   Okay.   I'll ask you to take a look again.   Is it the

11   one -- is it the Stratus that's listed about, oh, a third

12   to a half of the way down from the top?

13   A.   Yes, actually, it is this one right here.

14   Q.   Okay.   So now if we look back at the inventory audits

15   that we've admitted, would we have seen those two

16   particular vehicles that you've marked on Exhibit 15 on

17   Hyundai's inventory audits as of the day of filing the

18   bankruptcy?

19   A.   Yes.

20   Q.   They've been physically on the lot since bankruptcy

21   filing?

22   A.   Yes, they would have been.

23   Q.   Are they on the lot right now?

24   A.   Two of them are not; one of them, I understand, is back

25   on the lot.

1   Q.   Okay.  Did it -- did they all leave the lot at some

2   point?

3   A.   Yes.

4   Q.   Okay.  Have you reviewed any of the sales information

5   to a Mr. Ed Graham?

6   A.   No, there was no information available on those.

7   Q.   Did DataScan inquire as to what happened to these

8   vehicles?

9   A.   Yes, they did.

10  Q.   Okay.

11  A.   Their explanation to us was that it was typical of

12  Mr. Graham to purchase vehicles and leave them on the lot

13  for a period of time and come and pick them up at his

14  discretion.

15  Q.   Did they -- in DataScan's reports that they gave to you

16  in the ordinary course of business, did they indicate when

17  these vehicles had supposedly been sold?

18  A.   Yeah, they -- yes, they provided a sold date of -- I

19  believe it was 9/27.

20  Q.   So, supposedly, they were sold prepetition.

21  A.   Yes.

22  Q.   Okay.  In your understanding now, if I heard your

23  testimony right a minute ago, is that the Stratus is back

24  on the lot; is that correct?

25  A.   That's correct.

1  Q.  Do you understand how it came that the Stratus is back

2  but the other vehicle shown on 15 is not back?

3  A.  I was told that the Stratus was a sale to Incredible

4  Chevy, and the deal unwound, and it was back on the Kia

5  lot.

6  Q.  Incredible Chevy, is that the same as Graham-Staunton

7  Chevrolet?

8  A.  We believe it is, yeah.  We later learned that those

9  are Graham-Staunton Chevrolet.

10  Q.  Transactions between Mr. Gutierrez's two companies?

11  A.  Yes.

12  Q.  Okay.  When did you first discover that this vehicle or

13  both of these vehicles at one point, anyway, had left the

14  lot?

15  A.  On the audit conducted on October 30th.

16  Q.  Since the bankruptcy, are you aware of transactions

17  that have gone on, sales by Incredible Auto to Nick

18  Gutierrez's other company, Incredible Chevrolet or

19  Graham-Staunton Chevrolet?

20  A.  Yes.

21  Q.  Okay.  Tell us what you know about those.

22  A.  My understanding is that these vehicles from Incredible

23  Kia are sold to Incredible Chevy and then sold to retail

24  customers through Incredible Chevy.

25  Q.  Please look at Exhibit 13.

1    A.   Okay.

2    Q.   Do you recognize these pages, these documents in

3    Exhibit 13?

4    A.   Yes.

5    Q.   Okay.   What are they?

6    A.   Wholesale sales orders; units that were on Incredible

7    Kia's lot, some of which were floored by us that were sold

8    to Incredible Chevy.

9    Q.   Okay.   Were these sold before or after the bankruptcy

10   was filed?

11   A.   These were after the bankruptcy.

12   Q.   Are these documents that Hyundai got from the debtor in

13   this case?

14   A.   They were obtained from Incredible Kia, yes, during one

15   of the floor-plan audits.

16           MR. COLEMAN:   Your Honor, we'd move the admission

17   of Exhibit 13.

18           THE COURT:   Any objection to Exhibit 13?

19           MR. PATTEN:   No objection.

20           UNIDENTIFIED SPEAKER:   No objection.

21           UNIDENTIFIED SPEAKER:   No objection.

22           THE COURT:   Exhibit 13 is admitted.

23        HMFC'S EXHIBIT NO. 13 ADMITTED INTO EVIDENCE

24   BY MR. COLEMAN:

25   Q.   Have you had occasion to discuss with anyone at

1   Incredible Auto Sales why vehicles would be sold from

2   Incredible Auto Sales wholesale to Incredible Chevrolet?

3   A.   Personally, I have not; one of my colleagues has.

4   Q.   Okay.  I'll ask you to take a look at Exhibit 14.  Do

5   you see that document?

6   A.   Yes.

7   Q.   What is this document?

8   A.   This is a bill of sale showing a unit that was sold --

9   well, this is for a unit that was sold from Kia to Chevy

10   and then retailed through the Chevy store to a retail

11   customer.

12   Q.   And what do you mean sold from one company to another

13   and then retailed?

14   A.   It was a vehicle that was on Hyundai's floor-plan line

15   at the Kia dealership.  The vehicle was sold to Incredible

16   Chevy and then sold to a customer through Incredible

17   Chevrolet.

18   Q.   So if I understand you correctly, it gets wholesaled to

19   Incredible Auto Sales' sister company and then immediately

20   resold to a customer?

21   A.   Correct.

22   Q.   Okay.  Have you discussed this transaction with anyone

23   at Incredible Auto Sales?

24   A.   This particular one here I did discuss briefly with

25   Nick Gutierrez.

1    Q.   Okay.  Did he explain to you what he was doing in

2    transferring one vehicle to his other company that he owns?

3    A.   He had basically told me that he had a customer that --

4    through Chevy that was looking for this particular vehicle,

5    and, you know, that's the reason that this one took place.

6    Q.   Okay.  Do you see a signature at the bottom of

7    Exhibit 14?

8    A.   Yeah, several -- a couple different signatures there.

9              MR. COLEMAN:  Actually, Your Honor, I'd better

10   move the admission of this exhibit before I forget.

11             THE COURT:  Exhibit 14, any objection?

12             MR. PATTEN:  No objection.

13             UNIDENTIFIED SPEAKER:  No objection.

14             UNIDENTIFIED SPEAKER:  No, no objection.

15             THE COURT:  Exhibit 14 is admitted.

16          HMFC'S EXHIBIT NO. 14 ADMITTED INTO EVIDENCE

17   BY MR. COLEMAN:

18   Q.   Now, turning to the bottom of it, do you see a

19   signature at -- on the lower-left side?

20   A.   Yes, I do.

21   Q.   Okay.  Is it your understanding -- whose signature is

22   this, as far as you know?

23   A.   There's a signature there of Crista Davis, and then

24   there's also one from Starla Shotgun (phonetic).

25   Q.   Okay.  Did you discuss Ms. Davis with Mr. Gutierrez

1   when you talked to him about this transaction?

2   A.   I did.

3   Q.   Okay.  What was the nature of that discussion?

4   A.   On the last hearing that I attended, I thought I

5   understood Mr. Gutierrez to say that Crista Davis no longer

6   worked for him.  And I noticed her signature on here, and

7   that's why I had asked him about that.

8   Q.   Okay.  And, and what did he say about whether she still

9   works for the company?

10  A.   His explanation was that Crista Davis no longer works

11  for the Kia store but, but works for Chevrolet, his other

12  entity.

13  Q.   How many lots do you understand Incredible Auto Sales

14  to have right now?

15  A.   Two.

16  Q.   Two.  And is it your understanding -- or tell me --

17  we've talked about a primary lot, and I believe that's the

18  1800-something address at King Avenue.

19  A.   I believe that's correct, yeah.

20  Q.   Okay.  Where is the other lot physically located?

21  A.   The other lot is about a mile down King Avenue.  I

22  don't know the exact address of it.

23  Q.   Is there a building on that lot or near that lot?

24  A.   There's a building on the lot.

25  Q.   Okay.  And does that building have a name?  Is it a car

1   dealership?

2   A.  I believe it's New Beginnings.

3   Q.  Have you discussed with Nick or anybody else what New

4   Beginnings is?

5   A.  Nick had stated to me that that was his second lot,

6   that he retailed used cars out of that, that particular

7   location.

8   Q.  Okay.

9   A.  He had a lot previously on First Avenue, and his

10  explanation to me was that he no longer has that lot but

11  has leased this additional lot on King Avenue.

12  Q.  Okay.  When he said "he" leased the New Beginnings --

13  A.  I'm referring to Nick.

14  Q.  Nick.

15  A.  Hm-hmm.

16  Q.  Did he tell you whether that was -- whether the

17  building was being occupied at that lot by Incredible Auto

18  Sales people or Incredible Chevrolet people?

19  A.  It was my understanding at the time of the conversation

20  that it was Incredible Auto Sales, the Kia, Kia dealership.

21  Q.  Do you since have a different understanding?

22  A.  I've heard that, that that's now part of the Chevrolet

23  entity.

24  Q.  Okay.  As far as you know, are there still Incredible

25  Auto Sales lot out front of that Incredible Chevrolet

1   dealership?

2   A.  I didn't understand that quite fully.  When you say

3   "lots" --

4   Q.  I'm sorry.  We talked about -- I think I meant "cars".

5       Is it your understanding that Incredible Auto Sales

6   still maintains vehicles at both of its lots --

7   A.  Yes.

8   Q.  -- even though Incredible Chevrolet --

9   A.  Yes.

10  Q.  -- has its office on one lot?

11  A.  Yes.

12  Q.  I'll ask you to take a look at Exhibit 9, please, the

13  first page.  This is the one that's the inventory run dated

14  10/13 of '06.

15  A.  Okay.

16  Q.  There's a notation under the very first vehicle which

17  is under:  Service loaner.

18      Do you see that?

19  A.  Yes, I do.

20  Q.  It says -- do you see where it's written:  Blair

21  marketing?

22  A.  Yes.

23  Q.  Do you know who Blair and marketing is?

24  A.  I understand Blair to be Mr. Gutierrez's cousin.

25  Q.  Okay.  Was this vehicle physically on the lot on 10/13?

1   A.  No.  According to the audit here, it looks like it was

2   unseen at that date.

3   Q.  Do you know whether Mr. Gutierrez's cousin still works

4   for the company?

5   A.  I don't know for certain.  All I know is that he's

6   referred to as a marketing person.

7   Q.  Okay.  Please look at Exhibit 12.  Again, I'll ask you

8   to look at the very first line of Exhibit 12.  This is an

9   inventory run dated 11/24 of 2006; is that correct?

10  A.  That's correct.

11  Q.  Okay.  And, again, what's the significance of the

12  notation for that 2004 Kia Amanti?

13  A.  It appears that Blair is driving that vehicle.

14  Q.  At least as of the date --

15  A.  As of 11/24, as of the audit conducted that date.

16  Q.  Okay.

17          MR. COLEMAN:  That's all the questions I have

18  right now, Your Honor.

19          THE COURT:  Mr. Needler, do you wish to

20  cross-examine?

21          MR. NEEDLER:  Yes.

22                      CROSS-EXAMINATION

23  BY MR. NEEDLER:

24  Q.  Mr. Ueno, you discussed various dates of being out at

25  the dealership.

1    A.   Yes.

2    Q.   And I think, mainly, you talked about inspections on

3    around 10/6 or 10/7, something like that; is that correct?

4    A.   That's correct.

5    Q.   Am I not correct that on September 5th, without any

6    notice to the dealership, you shut off the floor line?

7    A.   I know the lines have been shut off.  I couldn't give

8    you the exact date that they were shut off.

9    Q.   So you don't have the exact dates when they were shut

10   off?

11   A.   I don't have the exact date of when they were shut off.

12        As far as your comment about without notice, you know,

13   when the lines were shut off, it was discussed with

14   Mr. Gutierrez.

15   Q.   Okay.  So you don't know the dates?  If I said to you

16   that for September 5th to September 25th all floor lines

17   were cut off by Hyundai Financial, would you disagree with

18   that?

19   A.   I wouldn't disagree with it.

20   Q.   Okay.  Do you know, as a matter of fact, whether any

21   notice was sent to the dealer, any written notice sent to

22   the dealer?

23   A.   I don't know if there was written notice.  I know there

24   were verbal discussions with him.

25   Q.   Okay, okay.  And that continued for quite a period of

1    time.  And then you opened it back up on sometime around

2    October 5th, etc., etc.  So there's a period of at least 20

3    days when this dealer had no floor lines at all.

4    A.  I wouldn't say he didn't have floor lines.  He had

5    floor lines; he wasn't able to take new inventory.

6    Q.  Okay.  So to put it in your vernacular, for a period of

7    20 days, it is true that he didn't have access to any

8    flooring, new flooring.

9    A.  If, in fact, those dates are correct that you just gave

10   me, yes.

11   Q.  Okay, okay.  And are you familiar with the dealer

12   agreement, which is your Exhibit 1?

13   A.  Yes.

14   Q.  And doesn't it provide for that if there's a suspension

15   and termination of flooring, that there's a 90-day notice?

16   A.  I don't know.  I'd have to take a look at it right now.

17   Q.  Well, I ask -- I invite you to look at your own

18   exhibit, which is Exhibit 1.

19   A.  Okay.  Which --

20   Q.  I think it's Paragraph 4.  (Quoted as recorded):

21   (Inaudible) -- operating dealer - (inaudible) - with his

22   floor plan for at least 20 days."

23   A.  Okay.

24   Q.  With no notice.

25   A.  In the event of default, we have the authority and the

1    ability to shut off his lines.

2    Q.  Well, on September 5th, did you determine there was a

3    default?

4         MR. COLEMAN:  Objection; asked and answered.

5    He's already testified he doesn't know who made the

6    decision to shut off the floor line; he just knows it

7    happened.

8         THE COURT:  I'll overrule.  Go forward.

9    Q.  (By Mr. Needler)  Let me restate it.  I think my

10   question was pretty simple.  Are you aware that the floor

11   lines were suspended or terminated on those dates?

12   A.  The floor lines were suspended; they weren't

13   terminated.

14   Q.  Okay.  And then they went back on at another date --

15   A.  Okay.

16   Q.  -- and then were suspended or terminated.

17   A.  Okay.

18   Q.  Now, were they terminated for cause?

19   A.  Being out of trust is an event of default.

20   Q.  No.  My question was:  At the time a floor plan was

21   discontinued, suspended, or whatever term you want to

22   use --

23   A.  Okay.

24   Q.  -- was it, was it done for cause?

25   A.  Yes, it was, based on the double-flooring.

```
 1   Q.  I see.  And, and was the dealer notified that it was --
 2   pursuant to your agreement, was he notified that there was
 3   no -- going to be no flooring?
 4   A.  He was notified verbally.  We had conversations with
 5   him.
 6   Q.  But not by notice.
 7   A.  I can't, I can't say for certain.
 8   Q.  Now, since, since that time, the floor line was never
 9   reinstated, was it, after those two shutoffs?
10   A.  After the second shutoff, is that what you're referring
11   to?
12   Q.  That's correct.
13   A.  No, it hasn't been opened.
14   Q.  So that was a suspension, was it not?
15   A.  Yes.
16   Q.  And was there any 90-day notice given to the dealer at
17   that time?
18   A.  I don't believe it reads that it has to be a 90-day
19   notice to suspend the lines.
20   Q.  Now, did you, during the month -- did you review the
21   financial statement of the debtor during the month of
22   September?
23   A.  I can't say that I personally reviewed it, no.
24   Q.  Isn't that your job, the supervision of this debtor?
25   A.  That's part of my duties, but I don't know --
```

1   Q.   But you didn't look at the September statement?

2   A.   I don't believe we received a September statement from

3   them.   I believe the last statement we received from them

4   was August.

5   Q.   I see.   But do you have any idea what happens to a

6   dealer when the floor lines are suspended or stopped.

7   Financially, do you understand what happens?

8   A.   Yes.

9   Q.   And wouldn't that be a good reason, since there's a

10   lack of cash, that they couldn't pay off their, their,

11   their liens?

12   A.   I don't know.

13   Q.   Well, you're concerned about the unpaid liens, but

14   didn't you have -- weren't your actions the proximate cause

15   of not paying off these liens?

16   A.   I don't know if that's the case or not.   The new-car

17   lines were suspended.

18   Q.   And they've never been put back on.

19   A.   We were advancing periodically on used cars.

20   Q.   So you suspended for 10 days, another 10 days, and the,

21   and the new-car line never came back on.

22   A.   No, it didn't.

23   Q.   So they haven't bought a new car since back prior to

24   September.

25   A.   That's likely.

1    Q.  And yet they're a new-car dealer, which you basically

2    -- Hyundai basically put out of business at this time.

3    A.  I don't know.

4    Q.  But you didn't look at the financial statements of

5    September to, to figure out why the financial situation was

6    such a disaster, did you?

7    A.  I couldn't look at it if I didn't have it.

8    Q.  Well, do you know, as a matter of fact, that you did

9    not have it?

10   A.  I don't have it.

11   Q.  Okay.  So you would, you would, you would determine

12   that, in your mind, that the discontinue of a floor line

13   was for cause.  Is that it?

14   A.  It was done for a reason.  The suspension of the line

15   was done for a reason.

16   Q.  Okay.  And at the same time, you were acting upon a

17   tip, quote, and you were acting on the information from

18   GMAC.  GMAC never cut off the floor line for the Chevrolet

19   store, did it?

20   A.  I can't answer that.

21   Q.  You don't know?

22   A.  I don't know.

23   Q.  So the same information that you had with regard to the

24   double-flooring GMAC had, did they not -- or the allegation

25   of double-flooring?

1   A.   Yes.

2   Q.   And if I told you that GMAC didn't react the way you

3   did, would you have any comment as to that?

4   A.   I can't, I can't answer to how GMAC manages their

5   accounts.

6   Q.   Now, did you attend the 341 meeting in this case?

7   A.   Is that the one that was conducted in Billings via

8   video conference?

9   Q.   No, that's a meeting of creditors that's held pursuant

10  to notice.

11  A.   I did attend one hearing.  I'm not sure if it was the

12  341 meeting.

13  Q.   Well, it's not a hearing; it's a meeting.

14  A.   Okay.  Then if it --

15  Q.   So you don't know whether you attended the --

16  A.   I was at a --

17  Q.   -- the creditor meeting or not?

18  A.   I was at a hearing in Billings.  That's the only thing

19  I attended --

20  Q.   Okay.

21  A.   -- prior to this, this here.

22  Q.   Did you review the schedules filed by the debtor in

23  this case?

24  A.   I reviewed them.  The decisions were made by our

25  attorneys and our upper management.

1    Q.   Well, I didn't ask you that.

2    A.   Okay.

3    Q.   I asked you if you reviewed the schedules.

4    A.   I looked at them.

5    Q.   Do you recall reading in the schedules or statement of

6    affairs that there was a lease of a building that was --

7    prior to this time was a used-car lot, and it had been

8    terminated --

9    A.   No, I don't recall.

10   Q.   -- and that the building had been turned over to

11   Incredible Chevrolet?  Did you look at that?

12   A.   I didn't see that.  I don't recall seeing it.

13   Q.   Okay.  Now, you talked about wholesale sales.  Is there

14   something wrong with one dealer selling wholesale to

15   another dealer?  Is there something wrong with that?

16   A.   Generally, no.

17   Q.   The problem you have is because of the checks that were

18   in the folder; is that correct?

19   A.   The problem I have is, is during the bankruptcy, it

20   appears that the vehicles are being wholesaled to Chevy and

21   then retailed out of Chevy.  We lose contact with that --

22   we lose the ability to monitor that because we can't review

23   the deal jackets now.  So when we go in there and do our

24   audits, we're able to review deal jackets on sales through

25   Kia; we can't review the deal jackets on sales through

1    Chevy.

2    Q.  Why would you have to?

3    A.  We don't know when it was sold.

4    Q.  If I, as a dealer, sell to another dealer and put the

5    money in the trust account for this dealer, what's wrong

6    with that?

7    A.  We don't know when it was sold, who it was sold to.  We

8    received those --

9    Q.  Well, you can certainly ask, can't you?  It's like any

10   other sale.

11   A.  We can certainly ask, but we like to see documents.

12   Q.  Are you saying that the sales between -- are you trying

13   to say here before this Court that the sales between the

14   Kia store and the Chevrolet store were without

15   documentation?

16   A.  No, that's not what I'm trying to say.

17   Q.  You showed an exhibit here that's a document.  I saw

18   it.

19   A.  Okay.  But on a normal sale, we review the entire, the

20   entire jacket, which includes a contract to who the

21   customer --

22   Q.  But wholesale doesn't, doesn't --

23              THE COURT:  Well, let him --

24              MR. NEEDLER:  I'm sorry.

25              THE COURT:  Mr. Needler, let him finish.

1          MR. NEEDLER:  I'm sorry.  I'm sorry, Judge.

2          THE WITNESS:  On a typical deal, a retail sale,

3     we review the entire jacket, which includes the retail

4     contract, the date it was sold, who it was sold to -- or I

5     mean, you know, there's credit apps, there's title

6     applications in there, retail funding notices, if

7     applicable.

8     Q.  (By Mr. Needler)  Either I'm kind of dumb, or

9     something, but in a wholesale sale, I don't see what

10    jurisdiction there is or why you are concerned about a

11    retail contract, because this is a wholesale sale.

12    A.  We're concerned about it because in the bankruptcy now,

13    they're being sold to his other store.

14    Q.  And what's wrong with that?

15    A.  It appears that it could be sold to his other store at

16    a wholesale amount, it could be retailed at a different

17    amount.  We can't see that.  We just know the wholesale

18    amount.

19    Q.  All right.  So I guess what you're saying is:  You

20    understand the industry has wholesale sales.

21    A.  Hm-hmm.

22    Q.  But God forbid if you're in a Chapter 11 that you do a

23    wholesale sale.  Is that it?

24    A.  That's not what I'm --

25    Q.  This changes the character?

1   A.  Well, we look at this -- we're looking at this a lot

2   closely -- you know, a lot more closely right now.  It is a

3   situation for us.

4   Q.  Okay.  We talked about Exhibit 15, which was the

5   exhibit that was admitted into evidence, which was one of

6   our exhibits.  And that's a list of the used cars --

7   A.  Okay.

8   Q.  -- that weren't on the lot.  And you talked at some

9   length here about the lien payoffs like it was something

10  new.

11          MR. NEEDLER:  And yet -- could I approach the

12  witness, Your Honor?

13          THE COURT:  You may.

14  Q.  (By Mr. Needler)  You were in court, Mr. Ueno, when all

15  these --

16          THE COURT:  You're going to have to be at a

17  microphone, though, if you're talking.

18  Q.  (By Mr. Needler)  I show you what has been marked as

19  Debtor's Exhibit 3, which was admitted without objection in

20  the cash collateral hearings.  Do you recall that exhibit?

21  A.  Yes.

22  Q.  Okay.  Look down at Exhibit 3 there.  And it has --

23  under assets, it has, it has lien payoffs.  Do you see that

24  figure there?

25  A.  Under assets or liabilities?  Where is it at?

1  Q.  Well, it's got cash on hand, new vehicles, List A, and

2  then List B.

3  A.  Okay.

4  Q.  It's got an amount there, 1.3 million less the lien

5  payoffs.

6  A.  Okay, I see it.

7  Q.  So I think what you were trying to indicate to the

8  Court is that the debtor hadn't disclosed there were lien

9  payoffs.  But that's not true, is it?

10  A.  I'm sorry, what was that again?  I'm trying to admit --

11  Q.  Okay.

12  A.  -- what again?

13  Q.  Your counsel prepared this tremendous exhibit here, 15,

14  which is on the board, and we went through all the

15  different lien payoffs.  And I guess I misunderstood what

16  the purpose of this was, but I think one of the purposes is

17  that you were trying to indicate that somehow the debtor

18  had not disclosed the lien payoffs on this asset sheet.

19  A.  No, that's not what I was trying to --

20  Q.  Okay, okay.  So the lien payoffs were shown on our

21  Exhibit No. 3.  Do you see it there?

22  A.  I see them there, yeah.

23  Q.  Okay.  Do you dispute that figure?

24  A.  No, I don't dispute that.

25  Q.  Okay.

1    A.   I see it there, too.

2    Q.   Okay, okay.  Because you didn't dispute it when it was

3    here before.

4         Now, there was a big question of whether you were owed

5    2.1 million on the date of filing or whether you're owed

6    2.2 million.

7    A.   Correct.

8    Q.   And you explained the difference of the $100,000.

9    Question:  You spent all this time talking about

10   prepetition out-of-trust.  Please explain to the Court, if

11   you would, how that out-of-trust amount affects the claim

12   amount.

13   A.   "The claim amount", are you -- you're referring to the

14   2.1 million or the 2.2 million?

15   Q.   Yeah.

16   A.   Okay.  On certain vehicles that were sold, we received

17   an ACH authorization for payment of certain vehicles.  We

18   received it on a certain day.  At a later date -- okay, let

19   me back up a little bit.

20        We received ACH authorization to pay off certain

21   vehicles, to take money out of the account, the dealer's

22   bank account, and pay off certain vehicles.  At that time,

23   those vehicles are taken off the inventory, so they're off

24   of our inventory.

25   Q.   I don't think you answered my question.

1   A.   Okay.  Let me --

2   Q.   You claim that in this Chapter 11 on 10/17, your

3   client, Hyundai Motor Finance, is owed 2.2 million.  We

4   showed proof here of 2.1 million, but we're not going to

5   argue with that because I guess you later corrected the

6   amount.  So we kind of agree with you it's 2.2 million.

7   A.   Okay.

8   Q.   You went through all this litany with regard to these

9   out-of-trust prepetition vehicles.  How, sir, does that

10  out-of-trust amount affect your claim in this bankruptcy?

11  A.   I'm not understanding where you're going -- what you're

12  asking me, then.

13  Q.   It's pretty --

14  A.   Where I was going --

15  Q.   It's pretty simple.

16  A.   Well, where I was going with it was the --

17  Q.   All right.  Let me ask you another question.

18  A.   Okay.

19  Q.   What effect does an out-of-trust prepetition vehicle

20  have on your bankruptcy claim in this proceeding?

21  A.   It's part of what is owed to us.

22  Q.   That's correct.

23  A.   Okay.

24  Q.   So it doesn't change anything, does it?

25  A.   I'm not sure I referred to changing any figures.

1   Q.  I'm just trying to clarify your, your -- what you're

2   testifying to.

3   A.  Okay.

4   Q.  In other words, if I said to this judge, "Judge, the

5   out-of-trust amount does not affect the claim that Hyundai

6   has in this proceeding," would you disagree?

7   A.  No.  It's still, it's still what's owed.

8   Q.  The claim's still there, isn't it?

9   A.  Okay.

10  Q.  Okay.  So the unsecured -- the unfunded amount or the

11  out-of-trust doesn't change the claim that you and I are

12  talking about.  We owe you 2.2.

13  A.  You us 2.2 million --

14  Q.  Okay.

15  A.  -- and change.

16  Q.  And you're aware of all the assets that we discussed

17  when we were in court before --

18  A.  Yes.

19  Q.  -- which are on that exhibit:  The service loaners, the

20  parts, the machinery, all that information, receivables,

21  lawsuit, franchise.  And we get down to the bottom line,

22  there's 1.3 million surplus.

23  A.  Okay.

24  Q.  So the out-of-trust hasn't changed any of that.

25  A.  No, the out-of-trust has not changed.

1   Q.   The double-flooring hasn't changed any of that.

2   A.   No.

3   Q.   Okay.  It may affect your confidence in the debtor, I

4   can agree with that.

5        Now, are you aware that in the discussions that

6   Incredible Auto Sales, LLC, has had with your counsel, that

7   we have agreed under this cash collateral order and going

8   forward on cash collateral that Nick Gutierrez is not going

9   to be a part of this management?

10             MR. COLEMAN:  Objection, Your Honor, relevance to

11   what the discussions between counsel were.  First off, he

12   has no idea, and so any response --

13             THE COURT:  Well, I'm going to overrule and allow

14   him to answer to the extent he has personal knowledge.

15   Q.   (By Mr. Needler)  Are you aware that in the stipulation

16   that we filed with the Court, which was signed off by all

17   creditors here, the auction creditors except for yourself,

18   that we agreed in there that Nick Gutierrez was not going

19   to be involved in the management?  Are you aware of that?

20   A.   I'm not aware because I haven't reviewed it.

21   Q.   You're not aware of that, okay.  That's good enough.

22        Are you also aware of the fact that Nick Gutierrez has

23   resigned and is not a part of the debtor anymore?

24   A.   No.

25   Q.   And that he has assigned his interest and is not a part

1   of the debtor anymore?

2   A.  No.

3   Q.  Are you also aware in the stipulation that this man

4   here is the acting general manager?

5   A.  I am aware of that.

6   Q.  Are you aware that this man here is the one who signs

7   all the checks?

8   A.  I'm aware that he's one of the signers.  I believe

9   there's someone else on there, too.

10  Q.  There's two, yeah.  Mrs. Gutierrez --

11  A.  Yes.

12  Q.  -- and him, you're correct.

13      Are you also aware that my co-counsel presently holds

14  all the MSOs?

15  A.  No, I'm not aware that that's being done right now.

16  Q.  Okay.  So if I told you he's got all the MSOs, if you

17  want to inspect them, you can go over to his office and

18  inspect them.

19  A.  Okay.

20  Q.  Okay.  So if the debtor controls the MSOs and he

21  handles them correctly and the management handles the

22  management of the dealership correctly, then we shouldn't

23  have any follow-up, should we?

24  A.  I would hope not.

25  Q.  There shouldn't be any double-flooring.

1    A.   Okay.

2    Q.   There shouldn't be any out-of-trusts.

3    A.   You're talking about additional out-of-trusts, right?

4    He's already out of trust.   Additional --

5    Q.   Well, I understand that.

6    A.   Okay.

7    Q.   We decided that's part of the claim.

8    A.   All right.

9    Q.   Okay.   And then if you look at the trust accounts and

10   the sales and compare them with the trust accounts, you can

11   determine whether Mr. Cornelison and/or my co-counsel are

12   handling your postpetition paperwork correctly, can't you?

13   A.   With review of the bank accounts, yes, we can.

14   Q.   Okay.   And since we filed this motion to use cash

15   collateral, we have religiously reported the bank balances;

16   is that correct?

17   A.   We've received copies, yes.

18   Q.   Okay.   Have you ever not received copies?

19   A.   We have.   But we've called, and we've been able to get

20   them.

21   Q.   Okay.   So the reporting is going okay.

22   A.   That part of it is, yes, correct.

23   Q.   Okay, okay.   And if you had a copy of the September

24   report and saw a large loss where there's 20 days of no

25   floor plan, I think you would understand why the debtor had

1   a large loss during that period of time, would you not?

2   A.   I don't know.   I don't know what --

3   Q.   Okay.

4   A.   -- what that statement would tell me right now.

5   Q.   Now, is it my understanding, Mr. "Ueno" -- and is that

6   correct --

7   A.   "Ueno".

8   Q.   -- "Ueno", that you're asking this Court to appoint a

9   trustee?  Is that what my understanding is?

10  A.   I go through what my legal counsel is asking our, our

11  representation --

12  Q.   Yeah, but you're representing for Hyundai here.

13  A.   I'm not --

14  Q.   Have you requested the appointment of a trustee?

15  A.   I'm not the decision-maker.  It goes through them.  I'm

16  here to explain the facts of what I've seen on the audits.

17  Q.   So you didn't read the motion for relief at all?

18  A.   I haven't read it.

19  Q.   Okay.  And your motion for relief asks the Court for

20  relief from the automatic stay even though there's a large

21  equity interest here of cushion.  You're not aware of that?

22  A.   I haven't reviewed everything, no.

23  Q.   Okay.  And you're not aware that your own motion says

24  that this judge should appoint a trustee?

25  A.   I've heard that.

90

1   Q.   You've heard that.

2   A.   Yeah.

3   Q.   Have you been familiar with any dealer that's ever

4   operated with a trustee?

5   A.   Personally, no.

6   Q.   Now, you are aware that the dealer, the debtor, the

7   dealer is selling its franchise -- is trying to sell its

8   franchise.

9   A.   Yes.

10   Q.   You're aware that we have it down at a value here of

11   $800,000.

12   A.   That's the figure I believe I've heard, yes.

13   Q.   Which, which we may or may not be able to achieve.

14   That is one of your assets, is it not?

15   A.   Yes.

16   Q.   If a trustee were appointed, do you have any idea what

17   would happen to the value of that franchise?

18   A.   No, I don't.

19   Q.   You have no personal experience in that?

20   A.   I don't.

21   Q.   Is the value of the franchise important to Hyundai?

22   A.   Yes.

23   Q.   Okay.  And if I told you that there were different

24   offers out there, people that were interested in buying

25   franchises - one of whom is listening to this case today in

1    Billings - that, in my estimation, that this argument over

2    franchises and the fact we don't have cash collateral is

3    going to materially affect your collateral, would you say

4    that I'm not correct or would you argue with me on that?

5    A.  I wouldn't argue with you because I don't know if it

6    would affect the collateral on the lot.

7    Q.  Okay, okay.  It might affect the franchise, though,

8    mightn't it?

9    A.  Possibly.

10            THE COURT:  Mr. Needler, just a moment.  It looks

11   like we just lost Billings here.  Just a minute.

12            Mr. Patten, can you hear us?

13            MR. PATTEN:  Yes, we can now, Your Honor.

14            THE COURT:  Did we lose you?

15            MR. PATTEN:  Yes.

16            THE COURT:  What, an hour ago?

17            MR. PATTEN:  No, a couple hours ago.  Mr. Needler

18   was asking --

19            MR. FAIN:  Your Honor, he was asking about the

20   value of the franchise under the mistaken impression that

21   somebody that's made an offer - (inaudible) - that

22   franchise is in this courtroom right now.  That's about

23   where we were.

24            THE COURT:  Okay.  I think you may have only

25   missed one comment, then, made after that.  So I'll just

1  ask Mr. Needler to proceed where he was at.

2        MR. NEEDLER:  Thank you, Judge.

3  Q.  (By Mr. Needler)  You appeared, you appeared in the, in

4  the hearing on cash collateral, and there was a question

5  about the budget; pro forma, the budget, whatever.

6  A.  Okay.

7  Q.  Are you aware that I submitted a new budget, a revised

8  budget to your counsel --

9  A.  No, I'm not.

10 Q.  -- the last couple of days --

11 A.  No.

12 Q.  -- with the revised figures, etc.?  Because, obviously,

13 we're, we're not at 10/17; we're at whatever this day is

14 now 49 days later, so --

15 A.  No, I'm not aware of that.

16 Q.  Okay, all right.

17        MR. NEEDLER:  Judge, I have no further questions

18 of this witness.

19        Mr. Patten, do you have questions for this

20 witness?

21        MR. PATTEN:  I do, Your Honor.

22                CROSS-EXAMINATION

23 BY MR. PATTEN:

24 Q.  Mr. Ueno, if I understand it right, you received notice

25 from GMAC on or about September 5th of double-flooring --

```
1    A.   That's correct.

2    Q.   -- is that correct?

3              THE COURT:  Mr. Patten?

4              MR. PATTEN:  Your Honor, did he hear me?

5              THE WITNESS:  Oh, I'm sorry.  Yes, I did.

6    Q.  (By Mr. Patten)  Okay, I'm sorry.

7    A.   Yes, yes.

8              THE COURT:  He answered the question.  Maybe you

9    didn't hear him.

10             MR. PATTEN:  Okay.

11             THE COURT:  Okay.

12             MR. PATTEN:  I guess I didn't hear it.  I'm

13   sorry, Your Honor.

14   Q.  (By Mr. Patten)  And, Mr. Ueno, did I understand it

15   correctly, then, that you suspended the flooring on

16   September 5th?

17   A.   Yes, we suspended the new-car line and the used at that

18   time.

19   Q.   Okay.  And then at some point in time, the used-car

20   line was reinstated, correct?

21   A.   It wasn't reinstated completely.  We had, at our

22   discretion, advanced, you know, here and there on it.

23   Q.   Can you tell me when -- the first time you advanced on

24   the used-car line after September the 5th?

25   A.   I couldn't tell you offhand, no.  I don't know that
```

1    date.

2    Q.   Do you remember ballpark when it was?  Was it shortly

3    thereafter, or was it sometime into October?

4    A.   It would probably be closer to the end of September or

5    beginning of October, I would say.

6    Q.   Okay.  And then in October 2nd, you made a trip to

7    Billings and did a physical inspection?

8    A.   That's correct.

9    Q.   And then your Exhibits 7, 8, 9, 10, and 11 show that

10   there were continuing audits or inspections on October 7th,

11   October 11th, October 13th, October 16th, and October 23rd?

12   A.   Correct.

13   Q.   Were you here for any of those audits?

14   A.   I believe I was here for several of those, yes.

15   Q.   Do you remember which ones?

16   A.   I think I was here through about October 14th.

17   Q.   And were you in Billings at the time that Hyundai Motor

18   Finance was providing -- making advances on used cars?

19   A.   I can't recall if I was in Billings when those were

20   made -- and, I'm sorry, you know what?  I think I may have

21   been here after the 14th because I believe I was here the

22   date that they presented us with the bankruptcy.

23   Q.   Okay.  Was it -- did you participate in the decisions

24   to make advances on used cars after the -- September 5th?

25   A.   The decisions generally come from our upper management,

1    the national manager of our commercial credit group.

2    Q.   But does that mean, Mr. Ueno, that you did not

3    participate in those decisions?

4    A.   I had input to the extent of, you know, our audits were

5    reviewed at the time the decisions were made.  The decision

6    is not mine, though.

7    Q.   Did you have the documents available to -- let me

8    strike that and let me back up.

9        If I understood your testimony correctly, in order for

10   you -- for Hyundai to make an advance, you would have

11   needed a faxed copy of a title, correct?

12   A.   Correct.

13   Q.   And then based on that faxed copy, then, Hyundai would

14   make an advance?

15   A.   Correct.

16   Q.   Did you, after September 5th, look at the copies of the

17   titles when advances were made on used cars?

18   A.   The titles were reviewed by our person in our office,

19   our, our administrative person and the dealer credit

20   analyst who with handles the account for review.

21   Q.   Okay.  Does that mean, sir, that you did not look at

22   the titles?

23   A.   I did not look at them, no.

24   Q.   Okay.  How is it determined how much to advance on the

25   used cars when all you've received is the title, or a copy

1    of the title?

2    A.  Well, along with the title, we'll receive a copy of the

3    block ticket from the auction.  The dealer would provide us

4    a copy of that block ticket.

5    Q.  What's a block ticket?

6    A.  I believe that's what shows how much was paid for the

7    unit.

8    Q.  Okay.  And would that block ticket show that, in fact,

9    payment was made?

10   A.  It wouldn't show a payment was made; it would show that

11   a payment -- how much the unit was purchased for.

12   Q.  Okay.  So when you advance, do you -- does Hyundai have

13   any way to know if, in fact, payment had been made on

14   the -- on a used vehicle?

15   A.  No, no.  That's why the title was reviewed.

16   Q.  Okay.  Because you wouldn't get the title, would you,

17   unless you had made the payment?

18   A.  Correct.

19        MR. PATTEN:  Thank you, sir.  That's all I have.

20        THE COURT:  Mr. Birkle, maybe I'll go with

21   Mr. Fain since he's there at the podium.

22        MR. FAIN:  Thank you.

23                     CROSS-EXAMINATION

24   BY MR. FAIN:

25   Q.  Mr. Ueno, unfortunately, I didn't have Exhibit 3,

1    Debtor's Exhibit 3 with me.  And Mr. Needler was talking

2    about the lien payoffs.  Can you locate that for me,

3    please?

4    A.  Yes, I have it here in front of me.

5    Q.  What is the amount that's disclosed on that?  I'm just

6    curious.

7    A.  65,125.

8    Q.  65,125?

9    A.  Correct.

10   Q.  Would you find, I believe it's Exhibit 15 -- no, I'm

11   sorry, it's not, it's not -- oh, it's Exhibit 21.  I'm

12   sorry.

13   A.  Twenty-one, okay.

14   Q.  Now, on the first page of Exhibit 21, on the far

15   right-hand side, it has a figure under the payoffs.  What

16   is that amount?

17   A.  $228,940.58.

18   Q.  And, now, to clarify for the Court, Exhibit 21, do you

19   understand, was a document prepared and provided by

20   debtor's counsel?

21   A.  Yes.

22   Q.  And then now if you'll look in the middle, you'll see

23   where it says:  In stock.

24   A.  Yes.

25   Q.  Do you see that?

1    A.   Hm-hmm.

2    Q.   What's that, what is that figure?

3    A.   That figure, I believe, represents units that, that are

4    still in the dealer's stock that have not been sold to

5    another customer.

6    Q.   But that have lien payoffs --

7    A.   That have payoffs, yeah.

8    Q.   -- that need to be --

9    A.   Payoff amounts on vehicles that are still on the

10   dealer's lot.

11   Q.   Okay.  So on -- now, to the left of that is another

12   figure.

13   A.   Yes.

14   Q.   And that appears to be what -- and that says:  Total

15   sold.

16        Is that right?

17   A.   Yes.

18   Q.   Now, does it look like to you that the number of lien

19   payoffs or the value of the lien payoffs disclosed on the

20   Debtor's Exhibit 3 is the amount of liens that still need

21   to be paid for vehicles that are still in stock?  Is that

22   what it looks like to you?

23   A.   It looks closer to the in-stock figure.

24   Q.   Okay.  So then there were -- there are approximately

25   $160,000 worth of liens for vehicles that have been sold

99

 1   but still have to be paid?  Is that how you would

 2   understand 15?

 3   A.   Yes.

 4   Q.   And the used flooring, it was suspended September the

 5   5th, right?

 6   A.   Yeah, somewhere around that date, I believe.

 7   Q.   Can you tell me right now what day you turned the

 8   spigot back on --

 9   A.   No, I couldn't.

10   Q.   -- for used flooring?

11   A.   No, I couldn't tell you.

12   Q.   Okay.  But in any event, that was, that was still in a

13   sort of a case-by-case, if-they-could-get-it-approved

14   basis, right?

15   A.   It was a case-by-case basis, correct.

16   Q.   So it was a little bit different than the way you

17   normally did business with them; is that right?

18   A.   Yeah, yeah.

19   Q.   Okay.

20   A.   They had to get it approved through us.  It wasn't --

21   the lines weren't freely open.

22   Q.   Okay.  Now, there was -- also on Exhibit 21, there had

23   been testimony that Mr. Gutierrez said that it was common

24   for dealers to make payments on liens.

25   A.   Yes.

1    Q.  And Mr. Needler later on was talking about the liens

2    needing to be paid off relating to the shutoff of

3    financing, I believe is how he was putting it.

4    A.  Okay.

5    Q.  Does that -- is that what you recall --

6    A.  Yes.

7    Q.  -- how it was being presented?

8        On Exhibit 21, there are a significant number of liens

9    that predate even the shutoff of the financing for used

10   vehicles; isn't that right?

11   A.  That's correct.

12   Q.  In fact, isn't it true there's one of them that goes

13   back to April of 2006?

14   A.  Yes.

15   Q.  Now, the last area I would like to ask you about -- and

16   it was something that you discussed earlier, and I believe

17   it was the Colbrese transaction.  Do you recall that one?

18   A.  Yes, I do.

19   Q.  Okay.  Now, you said that when you did your inspection,

20   it showed that it was floored on August the 2nd, 2006; it

21   was paid off on August the 16th, 2006; it was floored again

22   on September the 15th, 2006; and then paid off again on

23   October the 15th, 2006.  Is that correct?

24   A.  It was --

25   Q.  Do I have those dates correct?

1    A.   It was paid off the first time on August the 18th.

2    Q.   Oh, August the 18th.  Okay, I'm sorry.

3         Can you explain to the Court how something like that

4    can happen?  Mr. Colbrese didn't turn in the vehicle, did

5    he?

6    A.   No.

7    Q.   Okay.  How does it -- is it merely a paper transaction?

8    A.   Yes.  They submitted the, the paperwork to us in this

9    case here basically twice to floor the same unit.

10   Q.   Is it usual to shred the funding documents per dealers?

11   A.   In my experience, I haven't heard that before.

12              MR. FAIN:  No further questions.

13              THE COURT:  Mr. Birkle.

14                      CROSS-EXAMINATION

15   BY MR. BIRKLE:

16   Q.   Good afternoon.  I apologize for my voice ahead of

17   time.  I'm suffering from a bit of a sore throat.  So if

18   you don't understand something, just let me know.

19   A.   Okay.

20   Q.   I would direct you to Hyundai's Exhibit 22.

21   A.   Okay.

22   Q.   There's a date floored column.  Do you see that?

23   A.   Yes, I do.

24   Q.   What does that "date floored" mean?

25   A.   That represents the date that the, the vehicle was

1    floored on Hyundai's floor-plan line, the date that the

2    advance was made on it.

3    Q.  The date the advance was made; is that right?

4    A.  That's correct.

5    Q.  I would also direct your attention to Exhibit 7,

6    Hyundai's Exhibit 7 through 12, I believe.

7    A.  Okay.

8    Q.  It's, it's my understanding that you testified earlier

9    that every car on that list would have been -- that has

10   been audited by Hyundai would have been floored with

11   Hyundai; is that correct?

12   A.  That's correct.  Everything on this list is floored by

13   Hyundai.

14   Q.  Okay.  So it's possible that if a vehicle is on the lot

15   and is not on this list, it's floored through another

16   lender or some other way of financing?

17   A.  Owned free and clear -- I don't know if it would be

18   floored through another lender.

19   Q.  But it wouldn't have been floored through Hyundai?

20   A.  It's not floored through Hyundai if it's not on the

21   list.

22   Q.  Okay.  I would next direct your attention to Hyundai's

23   Exhibit 23, the copies of the titles.

24   A.  Okay.

25   Q.  Are these all the, I'm going to use the term "suspect

1  titles" that you photocopied or detected in your audit?

2  Were there other titles involved that you didn't photocopy?

3  A.  Yes.

4  Q.  About how many other titles that you did not -- that

5  you photocopied and did not attach to this exhibit did you

6  make?

7  A.  As a guess, I would say maybe between 60 and 80.

8  Q.  Now, do you have the ability to audit the -- what I'll

9  call the "second lot", Incredible Chevy, I believe?

10  A.  Yes, we do.

11  Q.  Do any of these exhibits -- are any of these

12  exhibits -- do they include the, the lot, the Incredible

13  Chevrolet lot, or --

14  A.  Yes, they include vehicles that are on that lot, as

15  well.

16  Q.  Okay.  Would you have possession of South Seattle

17  Auction's titles that you received from the dealer, or

18  copies of them?

19  A.  We would have copies of them, yes.

20  Q.  Okay.  You mentioned that you don't have the authority

21  to, to give the go-ahead for advance, for advancing on a

22  particular car; is that correct?

23  A.  Correct.

24  Q.  And your national manager is the one who does that; is

25  that correct?

1    A.   In a situation like this, yes --

2    Q.   Okay.

3    A.   -- the decision comes from him.

4    Q.   And what's his name?

5    A.   Sam Frobe, F-R-O-B-E.

6    Q.   I'm sorry, I didn't catch that.  Would you, would you

7    repeat that, please?

8    A.   Sure.  It's F-R-O-B-E.

9    Q.   And you also mentioned that there is an administrator

10   who takes a look at all the titles, copies of the title

11   that is comes in.  What's her name or his name?

12   A.   Her name is Barbara Wood.

13            MR. FAIN:  That's all the questions I have.

14   Thank you.

15            THE COURT:  Any other questions from Billings?

16            MR. PATTEN:  No, Your Honor.

17            THE COURT:  Okay.  Mr. Coleman, would you like to

18   redirect?

19            MR. COLEMAN:  Very briefly, Your Honor.

20                     REDIRECT EXAMINATION

21   BY MR. COLEMAN:

22   Q.   Mr. Ueno, I'll ask you to please look at Exhibit 21

23   once again, the lien payoff list.

24   A.   Okay.

25   Q.   And I thought I heard you agree with Mr. Needler that

1    this was a correct calculation of the lien payoff list.  Do
2    you remember testifying about these amounts?
3    A.  Yes.
4    Q.  Okay.  Actually, have you had the opportunity to add up
5    the numbers that are on Exhibit 21?
6    A.  I have.
7    Q.  Okay.  I want to refer first to the total number of
8    228.  When you did this basic addition, wasn't the number,
9    in fact, 228?
10   A.  I actually came up with a figure closer to 242, between
11   242 - 243.
12   Q.  Okay.  And how about the representation here that the
13   total in stock is 67,000 or, as we see on one of the other
14   exhibits Mr. Fain mentioned, roughly 65,000?
15       Did you have the opportunity to add up the debtor's own
16   numbers on this exhibit?
17   A.  I did.
18   Q.  Okay.  And did you come up with the same 67,000 that
19   they've shown us here?
20   A.  I actually came up with a figure of about 82,600,
21   roughly.
22   Q.  In doing that, were you adding up the numbers that are
23   right in front of us on Exhibit 21?
24   A.  I did.
25            MR. COLEMAN:  That's all I have, Your Honor.

1          THE COURT:  Okay.  You may step down.  Thank you.

2          Next witness?

3          MR. COLEMAN:  I call Ken Cornelison, Your Honor.

4          THE COURT:  Okay.  If you could come forward to

5   be sworn, please.

6                 KEN CORNELISON, WITNESS, SWORN

7                      DIRECT EXAMINATION

8   BY MR. COLEMAN:

9   Q.  Please state your name and address for the record.

10  A.  Kenneth C. Cornelison.

11  Q.  And your address?

12  A.  3405 Castle Pines Drive; Billings, Montana 59101.

13  Q.  What is your title at Incredible Auto Sales?

14  A.  General manager.

15  Q.  How long have you been with Incredible Auto Sales?

16  A.  Since June 1st.

17  Q.  What were you doing before that?

18  A.  I ran a Honda store in Portland.

19  Q.  In Portland?  I'm sorry, I couldn't hear you.

20  A.  Portland, Oregon.

21  Q.  Okay.  Are you familiar with the current operations,

22  then, at Incredible Auto Sales?

23  A.  Hm-hmm, yes.

24  Q.  Where are your offices located?

25  A.  In the showroom.

```
 1    Q.   I'm sorry, where?

 2    A.   In the showroom.

 3    Q.   The showroom, is that the --

 4    A.   At the Kia store.

 5    Q.   What's the address of the Kia store?

 6    A.   1832 King Avenue West.

 7    Q.   I'll ask you to please look at Exhibit 9, if that's

 8  hopefully still in front of you there.  And you may have to

 9  just thumb through at the bottom there until you find it.

10  Hopefully it's still in order.

11    A.   Is that the one on 10/11?

12    Q.   10/13.

13    A.   I'm getting closer.

14    Q.   It has a big sticker, "Exhibit 9", on the bottom.  Do

15  you see that exhibit?

16    A.   Yes, here it is.

17    Q.   Who is Blair -- is it "Deary"?

18    A.   Our advertisement agency.

19    Q.   Is Blair the name of a person?

20    A.   Yes.

21    Q.   Okay.  Is Blair related to Nick Gutierrez?

22    A.   He is not personally.

23    Q.   Okay.  Is -- how is he related, then, to Nick

24  Gutierrez?

25    A.   His wife is related to Nick Gutierrez.
```

1   Q.   Okay.  What is his wife's relation to Mr. Gutierrez?

2   A.   Cousin.

3   Q.   Does Mr. Deary work for Incredible Auto Sales?

4   A.   Yes -- well, we subcontract to his company.

5   Q.   Is he an employee of the company?

6   A.   He is the advertising agency --

7   Q.   Okay.  Has he ever worked --

8   A.   -- that we employ.

9   Q.   -- on the payroll of Incredible Auto Sales?

10   A.   I don't know.

11   Q.   Does he work on the payroll of Incredible Auto Sales

12   right now?

13   A.   No.

14   Q.   And on 10/13 or 10/14, thereabouts, just before the

15   bankruptcy was filed, this 2004 Kia Amanti is reported as

16   being in his possession.  Is that true, as far as you know?

17   A.   Yes.

18   Q.   It's still in his possession today, isn't it?

19   A.   No.

20   Q.   Where is it?

21   A.   It's parked on the lot.

22   Q.   Okay.  Is it offered for sale?

23   A.   Yes -- it's a loaner car, though, so actually, no, I

24   take that back.  It's not offered for sale.

25   Q.   Who else -- when was the last time Mr. Deary used this

```
 1   vehicle for personal use?
 2   A.  Probably a couple weeks ago.
 3   Q.  How often does he use it for personal use?
 4   A.  Well, he doesn't use it at all now.
 5   Q.  Okay.  And why not?  Did you tell him he didn't -- he
 6   couldn't use it anymore?
 7   A.  It needed some repairs.
 8   Q.  Okay.  Where is it getting those repairs?
 9   A.  At our shop.
10   Q.  Okay.  Will the vehicle be going back to Mr. Deary
11   after those repairs are made?
12   A.  Probably not.
13   Q.  Okay.  Why not?
14   A.  Because we'll keep it at the, at the lot --
15   Q.  Okay.
16   A.  -- try to sell it once we do the repairs.
17   Q.  Mr. Deary did have it, though, on the date the
18   bankruptcy was filed, correct?
19   A.  That's correct.
20   Q.  And he did have it, according to our audit, as recently
21   as the 24th of November, correct?
22   A.  Today's the -- yeah, that would have been a couple
23   weeks ago; yeah, that's probably correct.
24   Q.  Around Thanksgiving?
25       I'll ask you to please take a look at Exhibit 20 in
```

1    front of you.  Tell me when you've got it there, please.

2    A.  The DataScan -- it doesn't say 20 -- (inaudible, out of

3    range of microphone.)

4    Q.  It should say "Exhibit 20" at the bottom.  It is an

5    Incredible Kia payroll from September 17th, it says at the

6    top; and then it says "revised 11/24" on the left-hand

7    upper side.

8    A.  Well, they're out of order.  Just a second here.  I'm

9    not seeing it.

10   Q.  I can show you my copy.

11          MR. COLEMAN:  If I may approach, Your Honor.

12          THE COURT:  You may approach.

13   Q.  (By Mr. Coleman)  I've handed you what's been marked as

14   Exhibit 20.  Do you see that?

15   A.  Yeah.

16   Q.  What is this document?

17   A.  It's a payroll report I was requested to make.

18   Q.  Okay.  Did you prepare this?

19   A.  Yes, I did.

20   Q.  Is it true and accurate?

21   A.  To the best of my knowledge, yes.

22   Q.  Okay.  When did you prepare it?

23   A.  11/24.

24          MR. COLEMAN:  Your Honor, we'd move the admission

25   of Exhibit 20, please.

1          THE COURT:  Any objection?

2          MR. NEEDLER:  No.

3          UNIDENTIFIED SPEAKER:  No objection.

4          UNIDENTIFIED SPEAKER:  No objection.

5          THE COURT:  Exhibit 20 is admitted.

6          HMFC'S EXHIBIT NO. 20 ADMITTED INTO EVIDENCE

7    BY MR. COLEMAN:

8    Q.  Who is Crista Davis who's listed as an employee there?

9    A.  She's an employee of the Chevrolet store.

10   Q.  Okay.  Tell me, what is -- what's shown in Exhibit 20,

11   then?  Is this a payroll for Incredible Kia or Incredible

12   Chevrolet?

13   A.  Incredible Kia.

14   Q.  Okay.

15   A.  If she did some -- well, go ahead.

16   Q.  That's my next question, which you've accurately

17   guessed, is:  Why is Ms. Davis being paid in November if

18   she works at a different store that Mr. Gutierrez owns?

19   A.  She had commissions earned that we still owed to her.

20   Q.  When did she earn these commissions that were paid, I

21   believe it says 11/22?

22   A.  I don't know.

23   Q.  Do you know whether they were before or after the

24   bankruptcy?

25   A.  I don't know.

1  Q.  How long --

2  A.  I believe they were after, but I don't know.

3  Q.  How long has Ms. Davis worked for the Incredible

4  Chevrolet store rather than the Incredible Kia store?

5  A.  It's been over a month.

6  Q.  Who with is Lalonna Seymour?

7  A.  She's the title clerk.

8  Q.  Okay.  Does she work for Incredible Kia or Incredible

9  Chevrolet?

10  A.  Kia.

11  Q.  Where is she located?  Is she in your building, or is

12  she at the secondary lot?

13  A.  In my building.

14  Q.  Is she still employed by Incredible Kia?

15  A.  Yes.

16  Q.  Now, I'll represent to you:  At the last hearing we

17  had, we understood Mr. Gutierrez to tell us that Ms. Crista

18  Davis had been involved in some falsifying of documents.

19  Do you know anything about that?

20  A.  I don't know exactly what documents you're talking

21  about or referring to.

22  Q.  Are you aware of her falsifying any documents?

23  A.  I'm not aware of her -- well, let's see, how can I put

24  this -- I'm aware there's an allegation that she falsified

25  documents.

1   Q.   Okay.  Have you investigated that allegation?

2   A.   No.

3   Q.   Who made that allegation?

4   A.   I think Nick did.

5   Q.   Nick did?

6   A.   At the last hearing.

7   Q.   Okay.  Did he make that -- have you ever spoken to him

8   about Ms. Davis's -- the allegations against her?

9   A.   Only to the point of -- I don't recall if I talked to

10  him about it -- or when we did.

11  Q.   What is Mr. Gutierrez's role at Incredible Auto right

12  now?

13  A.   He doesn't have a role.

14  Q.   Okay.  Is he -- I think I understood your counsel to

15  say awhile ago that he doesn't even own an interest

16  anymore.  Is that correct?

17  A.   That's what I understand, yes.

18  Q.   What happened to his shares or units in this

19  corporation?

20  A.   They've been transferred to his wife.

21  Q.   To his wife.  What is her name?

22  A.   Shawnese.

23  Q.   He's living with his wife presently?

24  A.   Yes.

25  Q.   And when were his shares transferred to his wife?

1    A.  I don't know the exact date.

2    Q.  Okay.  Does his wife have a role in the company other

3    than that of shareholder?

4    A.  Yes, she's a check signer.

5    Q.  She signs checks?

6        Does she have an office in your building?

7    A.  No.

8    Q.  How often does she come into the office to sign checks?

9    A.  Well, whenever I'm not there.

10   Q.  Which is approximately how often?

11   A.  Well, I mean there's going to be times when I'm going

12   to be gone, so -- we haven't had many checks to sign

13   lately, so there hasn't been a lot for her to do.

14   Q.  Mr. Gutierrez, then, no longer holds any officer title

15   within the company?  Is that what I'm given to understand?

16   A.  That's correct.

17   Q.  When did he give up his officer titles in the company?

18   A.  Within the last couple weeks.  I don't know the exact

19   date.

20   Q.  Okay.  And I apologize if I just asked you this a

21   second ago:  When did he transfer the shares to his wife?

22   A.  You answered -- you asked that before.  I didn't know.

23   Q.  Didn't know.  Within the last week, or so?

24   A.  Within the last couple of weeks, yes.

25   Q.  Who are the other officers of the company?

1    A.   I think I'm the only one at this point.

2    Q.   Nick's wife is not an officer of the company?

3    A.   Well, I take that back.  She is, yes.

4    Q.   We heard testimony about a Jody who is the office

5    manager.

6    A.   She's a member of the LLC.  I don't know what her title

7    is as far as an officer goes, because I don't think she is

8    an officer.

9    Q.   Okay.  Now, in your previous cash collateral motions

10   and in budgets, we've seen a request for $5,000 a month to

11   be paid to Mr. Gutierrez as an owner's draw or as an

12   owner's compensation.  Are you still seeking that in view

13   of the fact he's no longer with the company?

14   A.   Not for him.

15   Q.   Are you seeking 5,000 a month for his wife now?

16   A.   Yes.

17   Q.   Okay.  And for that 5,000 a month, she signs checks

18   when you're not there?

19   A.   She will also review the bills with me and go over the

20   financials.

21   Q.   Okay.  How did you come to that amount of money, $5,000

22   a month, for her to perform those functions?

23   A.   It was half of what Nick, you know, what was previously

24   being paid.

25   Q.   Half of what Nick was being paid?

1    A.   Hm-hmm.

2    Q.   What were Nick's job duties before, though?  How did

3    those compare to what his wife is now going to do?

4    A.   Well, he -- they're basically doing the same thing.

5    Nick reviewed financials and reviewed bills and signed

6    checks.

7    Q.   Okay.  How many hours a week did Nick previously work

8    at Incredible Auto Sales?

9    A.   In the last month, there hasn't been very many hours.

10   Q.   How about --

11   A.   In the last two months.

12   Q.   How about before the bankruptcy was filed?

13   A.   He probably spent 25 to 30 hours a week in there.

14   Sometimes more; sometimes less.

15   Q.   And for her $5,000 a month that you've proposed, how

16   many hours will you be expecting Nick's wife to work?

17   A.   I don't know.  I haven't thought about it.

18           MR. COLEMAN:  If I may approach, Your Honor, to

19   get my exhibit back.

20           THE COURT:  You may.

21           THE WITNESS:  Sorry.

22   Q.   (By Mr. Coleman)  Please look at Exhibit 21 in front of

23   you.  This is the list of lien payoffs.

24   A.   I'm familiar with the form.

25   Q.   There's a couple entries I want you to look at

1    specifically --

2    A.   Okay.

3    Q.   -- so I want to make sure that you have that in front

4    of you.

5    A.   Okay.

6    Q.   Do you have that there?

7    A.   I do.

8    Q.   Okay.  First off, let me ask you:  Is this a complete

9    and accurate summary of all of the liens other than what I

10   think we've identified as some mathematical errors?

11   A.   To the best of my knowledge, yes.

12   Q.   Who prepared this?

13   A.   I did.

14   Q.   Okay.  What information did you use to prepare this?

15   A.   A list of lien payoffs.

16   Q.   Was it Incredible Auto Sales' practice to pay directly

17   on these liens to the trade-in company -- or trade-in

18   customer's banks?

19   A.   Well, we would pay the whole -- yes, we want to pay the

20   whole thing off; yeah.

21   Q.   But I mean before -- I know you want to pay the whole

22   thing off, but before this bankruptcy was filed, Incredible

23   Auto Sales was paying amounts due under the trade-in

24   customer's previous financing arrangement, correct?

25   A.   That's my understanding.

1  Q.  I mean in other words, if I'm a customer and I trade in

2  a car and I've got a great zero percent financing rate and

3  I trade it in to Incredible Auto Sales, Incredible Auto

4  Sales is going to find out who my lender is and keep making

5  my own payments.  Is that how that worked?

6  A.  Apparently so.  I don't know.  I mean I wasn't -- I

7  didn't have -- in my role before, I was not in charge of,

8  you know, deciding who got paid and who didn't.

9  Q.  Okay.  In your role before, are you talking about your

10  previous job in Portland?

11  A.  No, here.

12  Q.  Okay.  What did you do in your role before?  I guess

13  I'm not clear what you're talking about.

14  A.  Well, before the bankruptcy, my role was not so much

15  the financial end of the dealership; it was more the sales

16  end and generating retail sales.

17  Q.  Okay.  I think we talked a moment ago about Lalonna

18  Seymour.  We looked at a number of titles that have her

19  name on them.  Do you recall that?

20  A.  Yeah, I looked at them.

21  Q.  Okay.  And is it your understanding that Ms. Seymour

22  would, from time to time, sign -- instead of the original

23  titles, sign photocopies of titles?

24  A.  I have no knowledge of that other than what I saw

25  today.

```
 1   Q.   Okay.  You're the general manager, though.  What have

 2   you done to investigate the ostensible signing of titles by

 3   Ms. Seymour?

 4   A.   Again, that was all postpetition.

 5   Q.   Have you done anything to -- I think you meant

 6   "prepetition" --

 7   A.   Prepetition, I'm sorry.

 8   Q.   -- just so we're clear.  Have you done anything to

 9   investigate what Ms. Seymour might have been doing before

10   the bankruptcy was filed?

11   A.   I have not.

12   Q.   She's still employed there today, right?

13   A.   That's correct.

14   Q.   Has anybody at Incredible Auto Sales investigated what

15   Ms. Seymour was previously doing with respect to the

16   signing of titles?

17   A.   I don't know.

18   Q.   Have you ever talked to Nick about Ms. Seymour signing

19   titles?

20   A.   I can't recall conversations with him, but I'm sure

21   we've had.

22   Q.   How often do you talk to Ms. Seymour?

23   A.   I say "good morning" every morning.

24   Q.   Do you see her every day?

25   A.   Yes.
```

1   Q.   She drives a blue Vitara, doesn't she?

2   A.   That's correct.

3   Q.   Okay.  I'll ask you to take a look at Exhibit 21, the

4   very -- second-to-last of the customer-sold vehicles.

5   There's one to Seymour on 10/6 for a Vitara.  Is that

6   Ms. Seymour's vehicles?

7   A.   Yes, it is.

8   Q.   So you've got an employee at Incredible Auto Sales

9   driving around with a vehicle she purchased from a company

10  with an unpaid lien on it.

11  A.   That appears what -- yes.

12  Q.   Okay.  Now, as we look at this list of people who

13  bought these vehicles with these unpaid liens, is there

14  anybody else on this list who is an employee of Incredible

15  Auto Sales?

16  A.   Nobody else on that list that I recall.

17  Q.   Okay.  Is there anybody else in this list who is a

18  former employee of Incredible Auto Sales?

19  A.   That, I wouldn't know.

20  Q.   Is there anybody on this list, as far as you know, who

21  is a relative of an employee at Incredible Auto Sales?

22  A.   I wouldn't know that, either.

23  Q.   Okay.  As far as you know, the only one on this list

24  driven by an employee is Ms. Seymour?

25  A.   That's correct, on this list.

1   Q.   Okay.  Graham-Staunton, is that the name of the Chevy

2   dealer, or is it Incredible Chevy?

3   A.   It's Graham-Staunton d/b/a --

4   Q.   Graham-Staunton?

5   A.   It's Graham-Staunton, Inc., d/b/a Incredible Chevrolet.

6   Q.   Who owns that corporation today?

7   A.   Nick Gutierrez.

8   Q.   All of it?

9   A.   I own part of it.

10  Q.   Okay.  What percent of that corporation do you own?

11  A.   Ten percent.

12  Q.   Do you work for that corporation?

13  A.   I don't draw a salary from that corporation.

14  Q.   Okay.  Do you -- how long have you owned 10 percent of

15  Graham-Staunton?

16  A.   Since June.

17  Q.   When you were brought on board of Incredible Kia?

18  A.   That's correct.

19  Q.   If you're working only for -- well, let me ask you this

20  question:  What did you pay for your shares of stock in

21  Graham-Staunton?

22  A.   I paid $125,000.

23  Q.   And what did you pay for your shares of stock in

24  Incredible Kia?

25  A.   One hundred twenty-five thousand.

1   Q.  Graham-Staunton is a much smaller dealership than

2   Incredible Auto, isn't it?

3   A.  Hm-hmm, yes.

4   Q.  But you pay the same amount for your interest in both?

5   A.  That's correct.

6   Q.  Do you own interest in any other auto dealers,

7   wholesale or retail?

8   A.  Not at this time.

9   Q.  Okay.  Have you within the last two years?

10  A.  No.

11  Q.  Now, we've talked at length this morning -- or this

12  afternoon, I guess, about transactions between

13  Graham-Staunton and Incredible Kia.  Do you recall that?

14  A.  Yes, sir.

15  Q.  And Incredible Kia has two lots.  We've talked about it

16  as a primary lot and a secondary lot.

17  A.  That's correct.

18  Q.  On the secondary lot, the only building on that lot is

19  occupied by Graham-Staunton employees; is that correct?

20  A.  That's correct.

21  Q.  How many of those Graham-Staunton employees are former

22  Incredible Kia employees such as Ms. Davis?

23  A.  All three of them.

24  Q.  All of the employees at Graham-Staunton on the

25  secondary lot for Kia are former Kia employees?

1    A.  That's correct.

2    Q.  Okay.  What vehicles do they sell at the

3    Graham-Staunton -- out of that building?

4    A.  They sell cars from the Chevrolet store.  They're a

5    phone operation.

6    Q.  Okay.  Now, there is the, the -- and it's called "New

7    Beginnings"; is that correct?

8        It is directly across the street from the Denny Menholt

9    Chevrolet dealer; is that correct?

10   A.  That's correct.

11   Q.  Is Graham-Staunton permitted to sell new Chevys off of

12   that lot?

13   A.  No.

14   Q.  Are any of vehicles on the lot at New Beginnings owned

15   by Incredible Chevrolet as opposed to Incredible Kia?

16   A.  No.

17   Q.  Are there any Incredible Kia employees on the secondary

18   lot where the Graham-Staunton employees are?

19   A.  Only when we're called.

20   Q.  I'm sorry, who?

21   A.  Only when we're called.

22   Q.  Okay.  So who sells -- who's watching the cars on

23   Incredible Auto's secondary lot if there are no employees

24   around there?

25   A.  We have cameras up.  And when a customer comes on the

1   lot, they'll go greet them.  And then if it gets to a point

2   where they want to demo-drive, we send somebody up to go

3   help them out.

4   Q.  At some point, was Incredible Auto Sales leasing that

5   building?

6   A.  Hm-hmm.

7   Q.  Okay.

8   A.  Well, renting it.

9   Q.  It rented it.  It rented the building, the New

10  Beginnings building --

11  A.  Right.

12  Q.  -- out front of -- or next to the Incredible Kia

13  secondary lot?

14  A.  Rented the building out front --

15  Q.  I phrased that horribly.  I apologize.  You've got a

16  New Beginnings building with nothing but Graham-Staunton

17  employees in it.

18  A.  That's correct.

19  Q.  And the only car lot out front of that -- or next to it

20  is an Incredible Kia lot.

21  A.  That's correct.

22  Q.  And there are no Incredible Kia employees around to

23  sell the Incredible Kia cars.

24  A.  Again, except when we're called.

25  Q.  Okay.  At some point, did Incredible Kia occupy the

1    building that Graham-Staunton is now in?

2    A.   Yes.

3    Q.   When was that lease switched from Incredible Kia to

4    Graham-Staunton?

5    A.   Again, it was rental.  And it was done on about the

6    15th of - trying to cut expenses - the 15th of October.

7    Q.   Okay.  So two days before bankruptcy, that lease was

8    transferred from -- the lease on the --

9    A.   It's not a lease.

10   Q.   It's not a lease.

11   A.   It's not a lease.

12   Q.   You called it a "rental"?

13   A.   Yes.

14   Q.   Okay.  The rental of that building was transferred two

15   days before the filing of bankruptcy from Incredible Kia to

16   Graham-Staunton?

17   A.   That's correct.

18   Q.   And at that time, Mr. Gutierrez owned 85 percent of the

19   shares of both companies?

20   A.   Approximately.

21   Q.   Okay.  How does Graham-Staunton decide that it needs to

22   purchase vehicles on wholesale from Incredible Kia?

23   A.   We have copies of both inventories.

24   Q.   Okay.  The people at Graham-Staunton have the inventory

25   of Incredible Kia.  So if they want a vehicle, they call up

1    Incredible Kia, and Incredible Kia sells it to them at

2    wholesale?

3    A.   That's correct.

4    Q.   Okay.  When do they call up?  Only when they've got a

5    customer that wants to buy it?

6    A.   Typically.

7    Q.   So if I understand you correctly, at the secondary Kia

8    lot, we have only Kia cars, new and used inventory of the

9    debtor --

10   A.   There's some other cars there, too.

11   Q.   Are there?  Who own the other cars?

12   A.   They're on consignment from Vince Wright, Kalispell

13   Auto Liquidators.

14   Q.   Okay.  So other than the consignment cars that are up

15   on the Kia lot, we've got this lot with only Kia vehicles,

16   and we've got only Graham-Staunton employees present on

17   that lot.  And when Graham-Staunton employees want to sell

18   one of the cars out front of their building, Incredible

19   Auto Sales wholesales it to Graham-Staunton so that it can

20   then be resold to the buyer.

21   A.   Chevy buyer.

22   Q.   The Chevy buyer.  It seems like an awful lot of work

23   instead of just selling them from Incredible Auto Sales,

24   who owns them in the first place.  Why do you do that?

25   A.   Typically, the buyers -- the walk-in buyers we sell

1   here at Kia; the ones that are over the phone are sold

2   through Chevrolet.

3   Q.  I know you don't work at Graham-Staunton, but do you

4   know whether the retail price they're selling those

5   vehicles to customers at is the same as the wholesale price

6   that Incredible Auto Sales is first selling them to

7   Graham-Staunton at?

8   A.  I don't.  No, I don't know, but I would assume not.

9   Q.  You assume not?  Tell me why you assume not.

10  A.  Well, I hope they're selling them for more money.

11  Q.  So Nick's other company is selling the vehicles at

12  retail for more money than he's paying Incredible Auto

13  Sales?

14  A.  Right.

15  Q.  And this is happening postpetition?

16  A.  Yes, but we have -- we made a profit on it, Kia did.

17  Q.  And are the vehicles -- who pays the sales commissions

18  for these former Kia employees that --

19  A.  Chevrolet.

20  Q.  -- became Chevrolet employees?

21  A.  Chevrolet.

22  Q.  So they're -- in other words, their sales commissions

23  come out of the retail price rather than selling the car

24  through Incredible Auto Sales --

25  A.  Right.

1    Q.   -- and rather than having to get the Court's permission

2    to use cash collateral to pay those employees.

3    A.   No.   If in the --

4              MR. NEEDLER:   Your Honor, I would object.

5              THE COURT:   What, Mr. Needler?

6              MR. NEEDLER:   I'm going to object to that comment

7    about rather than using cash collateral.   There's no

8    indication that cash collateral is at all involved in this

9    transaction.

10              THE COURT:   Well, Mr. Needler, I'm finding this

11   whole arrangement a little cozy, Incredible Kia and

12   Incredible Chevy.   I'll be honest.

13              MR. NEEDLER:   Okay.

14              THE COURT:   And I think it impacts how this

15   Court's going to consider how viable Incredible Auto is.

16   Because it appears to me this -- this deal on the wholesale

17   to retail is very troubling to me because I see the profit

18   going out the door from Kia and going over to Chevy.

19              MR. NEEDLER:   He just testified that they

20   still -- we still -- Kia still makes a profit on the

21   wholesale sale.

22              THE COURT:   Well, but they're not making the

23   profit on the retail, Mr. Needler.

24              MR. NEEDLER:   No, because he's doing a wholesale

25   sale.

1          THE COURT:  Yeah.  But he's got a buyer already

2     at Chevy.  All he has to do is say, "Go down to Kia, and

3     there's a car right there for you."

4          MR. NEEDLER:  I didn't set it up.  I mean I don't

5     see that it's a cozy deal.

6          THE WITNESS:  Right after --

7          THE COURT:  Well, it's a cozy deal because of the

8     inter-ownership.

9          MR. NEEDLER:  Well --

10          THE COURT:  I mean I've got, I've got some

11     questions of my own off of the statement of financial

12     affairs here as soon as we get to that point.  I'm a little

13     troubled by the arrangement of this and how it impacts

14     management to have viable and feasible Chapter 11.  And I

15     think it's interesting that Mr. Gutierrez is now departed.

16          MR. NEEDLER:  Well, that was part of the

17     agreement we made with, with Hyundai.  We made that

18     agreement with them.  They didn't want him involved.  He's

19     not involved.

20          THE COURT:  Well, I want to have the testimony

21     develop, but I'm just telling you my concerns.

22          MR. NEEDLER:  But I think you would find that

23     dealer trades are rather standard in the industry.  That's

24     what this is.  This is a wholesale --

25          THE COURT:  Well, but Mr. Needler, here's the

1    scenario I could see, is you could wholesale all the cars

2    to Chevy and sell them at retail and basically gut Kia.

3              MR. NEEDLER:  And skim the profit.

4              THE COURT:  Absolutely.

5              MR. NEEDLER:  That's -- (inaudible.)  I think we

6    need to talk to the general manager, but I don't think

7    there's any intent here to be skimming, okay, or

8    transferring --

9              THE COURT:  Well, I don't know.  I don't know.

10             MR. NEEDLER:  I appreciate the fact that you're

11   concerned -- (inaudible, out of range of microphone.)

12             THE COURT:  I am.  I'm very concerned.

13             MR. NEEDLER:  Okay.

14             THE WITNESS:  Can I address it?

15             THE COURT:  No.  You'll need to address the

16   questions.

17             THE WITNESS:  Okay.

18   Q.  (By Mr. Coleman)  I want to follow up with something, a

19   comment the Court just made.  Did you understand the judge

20   to say where if some -- a Chevy dealer's customer needs to

21   buy a vehicle, they can just send him down the street to

22   Kia.  Did you hear that?

23   A.  Yes, I did.

24   Q.  In fact, they don't even have to go down the street, do

25   they?  They've just got to go to the only lot out front of

1    the Chevy store.

2    A.  No, no, no.  The Chevy store's out in Hardin.  It's 40

3    miles away.

4    Q.  But the New Beginnings lot in Billings is only occupied

5    by Chevy employees, right?

6    A.  That's correct.

7    Q.  All of whom were former Kia employees?

8    A.  Right.  But if -- (pause.)

9    Q.  And we've got a number of transactions between

10   Incredible Chevrolet -- or Incredible Kia to Incredible

11   Chevrolet at wholesale.  Has Incredible Kia wholesaled any

12   other vehicles to other companies?

13   A.  Not at this time.

14   Q.  Have you run any vehicles through auction just to --

15   A.  Not at this time.

16   Q.  -- get some money?

17       On a list - that I won't make you look at - but you've

18   valued the blue sky of this dealership at $800,000.  Do you

19   recall that?

20   A.  Yes.

21   Q.  Did you have any involvement in setting that price?

22   A.  Yes, I was involved.

23   Q.  Okay.  Do you think that's the value of the dealership?

24   A.  I guess we'll see when the highest bidder comes in.

25   Q.  Do you have a -- I understand you've been using a

 1   broker.

 2   A.   Yes.

 3   Q.   Who is that?

 4   A.   Jappy Dickson.

 5   Q.   How long have you had the broker on board?

 6   A.   I don't know the exact date, but he's been -- we've

 7   been talking to him for a number of months.

 8   Q.   Before the filing of the bankruptcy, even?

 9   A.   Hm-hmm.

10   Q.   And last night for the first time at about 10 o'clock,

11   you filed a motion to employ Mr. Dickson; is that correct?

12   A.   That would be up to my attorney.

13   Q.   Okay.  In fact, the only offer you have for this

14   dealership so far is for 400,000, correct?

15   A.   To the best of my knowledge.

16   Q.   That's from the Rimrock Auto Group or its principals?

17   A.   Yes.

18   Q.   They're the dealership located -- one of their lots,

19   anyway, is across the street from you?

20   A.   That's correct.

21   Q.   And so that we're clear, that $400,000 isn't just for

22   the blue sky, is it?

23   A.   I don't believe so.

24   Q.   The 400,000 would also buy up the parts inventory?

25   A.   Part of it.

1    Q.  It would also buy up the signage?

2    A.  Okay.

3    Q.  Is that true?

4    A.  I believe so.

5    Q.  It would also buy up the equipment.

6    A.  Not all of it; just special tools.

7    Q.  Not all; some of it.  But these are each items that

8    you've valued on that same list where you've called this an

9    $800,000 blue sky.  You valued the parts inventory, for

10   instance, alone at over $153,000, didn't you?

11   A.  That's correct.

12   Q.  So when we back these numbers out, the only offer you

13   have right now on the table is for blue sky of less than

14   $200,000.

15   A.  Okay.

16   Q.  That's true, right?

17   A.  I believe so, yeah.

18   Q.  Okay.  And you've countered that offer, haven't you?

19   A.  Yes, we have.

20   Q.  You didn't counter with 800,000 for blue sky, did you?

21   A.  I believe somewhere in between.

22   Q.  You've countered for 575, didn't you?

23   A.  That's correct.

24   Q.  And that would still include the parts, the equipment,

25   the signage that we've talked about.

1    A.   Yes, I believe so.

2    Q.   So, in other words, you raised their offer 175,000.   If

3    we had that to the roughly 180, you're looking at a

4    blue-sky value of approximately $355,000.

5    A.   Yes, that's correct.

6    Q.   What's Mr. Dickson's proposed fee on this or any other

7    transaction?

8    A.   I believe a minimum of $25,000.

9    Q.   You're familiar with the Daewoo vehicle that First

10   Interstate Bank repossessed?

11   A.   Yes, I am.

12   Q.   Okay.   That's in First Interstate Bank's physical

13   possession right now, right?

14   A.   I believe so, yes.

15   Q.   And that's done pursuant to this Court's order

16   modifying the stay?

17   A.   Yes.

18   Q.   Okay.   That vehicle is not the listed anywhere on

19   Exhibit 15, is it?

20   A.   No.

21   Q.   But it was on your lot when they went to go pick it up?

22   A.   That's correct.

23   Q.   And we've talked about the title problems on some of

24   these titles that were faxed.   And it's my understanding

25   you didn't investigate any of those problems.   Have you

1    personally investigated any allegations that some of the

2    dates for funding information were falsified?

3    A.  No, I did not.

4    Q.  What have you done to investigate the unpaid liens in

5    the way that the company was previously going about paying

6    liens?

7    A.  I put the list together, and hopefully we'll get it

8    approved to pay them.

9    Q.  Have you contacted any of the individuals who are out

10   driving around with liens on their cars?

11   A.  Yes, some of them.

12   Q.  Whom have you contacted?

13   A.  I don't know off the top of my head.

14   Q.  Did you personally contact them?

15   A.  I talked to a few of them.

16   Q.  Did you call them, or did they call you?

17   A.  They -- I've called some of them.  I don't know if

18   there are liens driving around on cars that are sold, but I

19   have talked to them -- some of them.

20   Q.  Okay.  Do you know whether Crista Davis or Lalonna

21   Seymour were at work yesterday?

22   A.  Not while I was there.

23   Q.  You were there?

24   A.  Not while I was there.

25   Q.  Not while -- you understand that we subpoenaed them as

1   well as Mr. Gutierrez.

2   A.  That's what my counsel says.

3   Q.  And you understand that your local counsel at one point

4   agreed to accept service of those subpoenas.

5   A.  I believe that's true.

6   Q.  In advance of a meeting at our office last Friday at

7   two o'clock.

8   A.  I believe that's true, yeah.

9   Q.  Okay.  You also understand that we've been unable to

10  find either Ms. Seymour or Ms. Davis at work either on

11  Friday or on Monday?

12  A.  Okay.

13          MR. COLEMAN:  That's all I have, Your Honor.

14          THE COURT:  Mr. Needler, would you like to ask

15  some questions?

16                  CROSS-EXAMINATION

17  BY MR. NEEDLER:

18  Q.  Mr. Cornelison, you came in as a -- basically as an

19  investor in June; is that correct?

20  A.  That's correct.

21  Q.  And you put in a total of, what, $225,000?

22  A.  Two hundred fifty thousand.

23  Q.  And do you recall where that money went?

24  A.  It was deposited in Kia's account and used for cash to

25  run the business.

1  Q.  Okay.  And at the same time, am I correct that

2  Mr. Gutierrez deposited some additional funds into, into

3  the dealership?

4  A.  That's correct.

5  Q.  Do you remember the figure on that?

6  A.  His was 125,000.

7  Q.  Okay.  So at that point, there was 350,000 that was

8  injected into the dealership, roughly?

9  A.  Three seventy-five, but, yeah.

10  Q.  Now, you heard the judge in his discussions with me say

11  that he is concerned about these wholesale sales between

12  the Kia entity and the Chevrolet entity, did you not?

13  A.  Yes, I did.

14  Q.  Would you agree that we've -- if that -- if there's

15  concern about that with the creditor group, that we'd just

16  stop it?

17  A.  No, that would be fine.

18  Q.  That wouldn't be a problem, would it?

19  A.  No, that would be fine.

20  Q.  Okay.  It's handled, is it not, as a normal wholesale

21  sale, is it not?

22  A.  Yes, normal.

23  Q.  Okay.  So if the, if the -- if it became an issue, we

24  would discontinue it.

25  A.  That's correct.

```
 1   Q.  Yeah.  The offer which I sent to Hyundai, a copy of the

 2   offer, do you recall that as far as the parts are

 3   concerned, they only wanted 50,000 of the parts?

 4   A.  That's correct.

 5   Q.  Excuse me.  So that left a large number of the parts

 6   still available?

 7   A.  Yeah.

 8   Q.  So that when you back out the blue sky, it isn't quite

 9   as small as a figure as stated here.

10   A.  That's correct.

11   Q.  Do you recall from our Exhibit 3 how many -- what the

12   dollar value was on the parts?

13   A.  153,510.

14   Q.  Okay.  So it's conceivable that with a sale with only

15   50 gone with the parts, there would be another 100,000 of

16   parts that could be liquidated.

17   A.  That's correct.

18   Q.  So the sale could, could be 575, let's say, plus

19   another 100, which would be 675.

20   A.  That's correct.

21   Q.  Right.  You met Jappy Dickson?

22   A.  Yes, I have.

23   Q.  You hired Jappy Dickson before you ever met me, didn't

24   you?

25   A.  Well, Jappy Dickson was involved in my, in my
```

1    arrangement.

2    Q.   Okay.  Jappy Dickson was the one that found you, that

3    brought you here?

4    A.   That's correct.

5    Q.   Right.  At that time, you didn't know Bill Needler.

6    You didn't know my name, did you?

7    A.   No.

8    Q.   Okay.  And you're aware that Jappy Dickson at one point

9    was my client way back in 1991.

10   A.   Yes.

11   Q.   Yes, okay.  You read his resume, Mr. Dickson's resume?

12   A.   Yes.

13   Q.   It's rather -- use the term, an "incredible resume",

14   isn't it?

15   A.   Yes.

16   Q.   He has other potential buyers, does he not?

17   A.   That's what he's told me.

18   Q.   And some of them are potential -- are present Kia

19   dealers.

20   A.   That's correct.

21   Q.   Now, tell the Court, if you would, about your opinion

22   of the Kia, the Kia line of cars today.  You're a former

23   Honda dealer, so you've got to have some idea of the value

24   of imports.  How do you rate Kia and its product today in

25   the market?

1    A.   I think they're moving up quite well.  I mean they have

2    some good product, and they're coming out with some new

3    product that's making a difference.

4    Q.   And they're very competitive, are they not?

5    A.   Yes, they are.

6    Q.   And they have a very competitive warranty?

7    A.   Very good.

8    Q.   So the car line has, has value.

9    A.   Yes.

10   Q.   Somebody told me that the Kia line today is like Toyota

11   was about five - six years ago, it's growing.  Would you

12   say that's true?

13   A.   Yes.

14   Q.   So it would be your opinion that the Kia franchise

15   would have some, some good value in this market?

16   A.   Yeah.

17   Q.   How important is it to the value of the Kia franchise

18   that there isn't another Kia dealer for hundreds of miles

19   here?

20   A.   It's very important.

21   Q.   Who is the closest Kia dealer to your store?

22   A.   It's either Missoula, which is --

23   Q.   Which is how many miles away?

24   A.   Approximately 300 - 400.

25   Q.   Okay.  So a lot of the sales for Kias come from outside

1    of the state?

2    A.  There's a few.

3    Q.  Okay.  So when you came to the Kia store, you were

4    involved mainly in sales.

5    A.  That's correct.

6    Q.  You were interested in ownership, which you have

7    participated in?

8    A.  Yes.

9    Q.  And now that Mr. Gutierrez is no longer in the

10   management, you are the manager.

11   A.  That's correct.

12   Q.  You call the shots.

13   A.  Yeah.

14   Q.  And is it true that all the titles and MSOs now are

15   held by Clarke Rice?

16   A.  Yes.

17   Q.  Do you know of any titles or MSOs that he doesn't have?

18   A.  Not to my knowledge.

19   Q.  Okay.  Do you see any way that the routine that's been

20   worked out here of depositing money, then the proof of

21   title furnishing the information to Hyundai should have

22   any, any problems in, in operations or in tracing and in

23   providing assurance to Hyundai that we're doing a good job?

24   A.  I think everything's been working fine.

25   Q.  Okay.  Now, are you in charge of the people in your

1   office so that nothing untoward can happen in the future?

2   A.  Yes.

3   Q.  And you testified that, that Mr. Gutierrez is no longer

4   getting a salary from the debtor.

5   A.  That's correct.

6   Q.  And Mr. Gutierrez is not making any decisions for the

7   debtor anymore.

8   A.  That's correct.

9   Q.  We've been in this Chapter 11 for 49 days; is that

10  correct?

11  A.  That's correct.

12  Q.  You haven't been able to pay any rent.

13  A.  That's correct.

14  Q.  You haven't been able to pay off any trade-ins.

15  A.  That's correct.

16  Q.  You haven't been able to perfect any customer liens

17  because you don't have any money to pay for the title.

18  A.  That's correct.

19  Q.  You can't pay any warranty premiums because you don't

20  have use of collateral.

21  A.  That's correct.

22  Q.  You can't pay any gap insurance premiums because you

23  don't have use.

24  A.  Right.

25  Q.  You can't pay any service contract premiums because you

1    don't have use.  And at this point, you can't pay any

2    postpetition utilities.

3    A.  That's correct.

4    Q.  Some of the parts, oil and gas, some of those things

5    have been charged on company employee credit cards.  You

6    can't reimburse those, correct?

7    A.  No, we haven't been able to.

8    Q.  You haven't been able to buy any office supplies, you

9    haven't been able to pay any premiums do you on insurance,

10   and you pay a used-car lot rent.

11       We were talking about this used-car lot.  You haven't

12   been able to pay any rent on that --

13   A.  That's correct.

14   Q.  -- plus all the other expenses.

15       So all you paid is a couple of -- you've been

16   authorized a couple of payrolls --

17   A.  That's correct.

18   Q.  -- and the insurance, and you've got another payroll

19   that was due yesterday for approximately 29,000 --

20   A.  That's correct.

21   Q.  -- is that correct?

22       You were asked about what vehicles were at the rental

23   lot.  You were asked what vehicles those were, and you said

24   those are Kia -- I'm sorry, that they're Incredible used

25   cars plus a couple of consignment cars.

1    A.  That's correct.

2    Q.  But also in the back of that lot are all the auction

3    cars turned against the fence, are they not?

4    A.  That's correct.

5    Q.  Okay.

6            MR. NEEDLER:  I have no further questions, Your

7    Honor.

8            THE COURT:  Okay.  Thank you, Mr. Needler.

9            Mr. Patten?

10                       CROSS-EXAMINATION

11   BY MR. PATTEN:

12   Q.  Mr. Cornelison, would you please look at Exhibit 21?

13   Do you have that there, sir?

14   A.  Is that the payroll?

15   Q.  No, these are the lien payoffs.

16   A.  Okay, just a sec.  These aren't in order.  Twenty-one,

17   okay.

18   Q.  Mr. Coleman asked you about the cars sold to Seymour,

19   who was an employee of Incredible Auto Sales.

20   A.  Yes.

21   Q.  Look at the list of customers sold to.  Are any of

22   those individuals employees of Incredible Chevrolet?

23   A.  I don't know.  I didn't recognize any of the names.

24   Q.  Okay.  Do you know if the bankruptcy schedules identify

25   the individuals whose liens have not been paid off as

```
 1    creditors or claimants in this case?
 2              MR. NEEDLER:  Could I answer that?
 3              THE WITNESS:  I don't know.
 4              MR. NEEDLER:  I don't know that he has the
 5    knowledge.
 6              THE COURT:  I'd like the witness to answer it if
 7    he, if he knows.
 8              THE WITNESS:  I don't know at this point.
 9              THE COURT:  Mr. Needler, what did you wish to
10    volunteer?
11              MR. NEEDLER:  Here's what I was going to
12    volunteer:  It has now been determined by me that the
13    unpaid lien payoffs are unsecured creditors.  And probably
14    by tomorrow afternoon, we'll have an amendment to the
15    schedules file which lists all the lien-payoff parties with
16    their names and addresses and amounts.  So that will be
17    added to the schedules.
18              THE COURT:  Okay.  Thank you.
19    Q.  (By Mr. Patten)  Mr. Cornelison, you've been the
20    general manager of Incredible Auto since June of 2006,
21    correct?
22    A.  Yes; yes, that's correct.
23    Q.  Okay.  And are -- your duties as general manager are --
24    you're responsible for sales?
25    A.  That's correct.
```

1   Q.   Are you also responsible for buying used cars to put

2   out on the lot?

3   A.   I am now.

4   Q.   Have you been since June of 2006?

5   A.   No.

6   Q.   Who had that responsibility?

7   A.   Nick Gutierrez, Shane Walker, and Steve -- (inaudible.)

8   Q.   Okay.  Are you knowledgeable about the acquisition of

9   cars that have been put out onto the lot since you've

10  become the general manager?

11  A.   Yeah, I know most of the cars.

12  Q.   Okay.  Do you know where they come from?

13  A.   Most of the time.  I mean I couldn't walk out on the

14  lot and tell you every car, but --

15  Q.   Has Incredible Auto purchased any cars wholesale other

16  than through an auto auction since you've been the general

17  manager?

18  A.   Yes.

19          THE COURT:  Mr. Patten, he answered "yes".

20          MR. PATTEN:  Oh, I'm sorry.  I don't think that

21  microphone's picking up everything, Your Honor, because I

22  didn't hear that.

23          THE COURT:  Okay.

24  Q.   (By Mr. Patten)  So there have been wholesale purchases

25  other than to auto auctions?

```
 1   A.   Yes.

 2   Q.   How many?

 3   A.   I don't know.  I couldn't answer with any kind of

 4   correct number.

 5   Q.   Can you give me a ballpark how many relative to the

 6   numbers purchased through the auctions?

 7   A.   I mean it could have been 10, 20, 30 cars.

 8   Q.   And how many were purchased through the auction,

 9   ballpark?

10   A.   Well, from what time period are you talking about?

11   Q.   Since you've been general manager.

12   A.   Oh, no, we've purchased hundreds of cars.

13   Q.   Wholesale?

14   A.   Hm-hmm, wholesale from auctions and from wholesalers

15   and trade-ins.

16   Q.   Is there any reason in particular why you buy cars

17   wholesale through an auction?

18   A.   The ease.  Most of the stuff we buy is late-model cars,

19   so they're -- it's easier to get them through the auctions.

20   Q.   So that's where the cars are available?

21   A.   Yes.

22            MR. PATTEN:  Okay, thank you.

23            THE COURT:  Mr. Fain?

24            MR. FAIN:  Thank you, Your Honor.

25                  CROSS-EXAMINATION
```

```
 1    BY MR. FAIN:
 2    Q.  Mr. Cornelison, Ms. Gutierrez, what is her background
 3    in the automobile industry?
 4    A.  She has some accounting experience in the past, and
 5    she's been around for a number of years now.
 6    Q.  Has she always been involved in Incredible Auto?
 7    A.  I don't know about that.
 8    Q.  Okay.  Do you know if she brings anything in particular
 9    of value as an employee to the business for her $5,000 a
10    month?
11    A.  Some accounting expertise.  You know, it is nice to
12    have a backup.
13    Q.  Is she aware of how the service contracts are
14    structured?
15    A.  I don't know.
16    Q.  Now, Mr. Needler talked about you being the man in
17    charge at this point; is that correct?
18    A.  That's correct.
19    Q.  And during that time, even though you're in charge, you
20    haven't really done much to investigate the lien payoffs,
21    have you?
22    A.  Well, as far as?
23    Q.  As far as how it happened.
24    A.  Well, they didn't pay them.
25    Q.  Mr. Cornelison, on Exhibit 21, it shows that this has
```

1    been going on with monthly payments on some vehicles since

2    April of 2006.

3    A.   That's what I found out after the -- when I prepared

4    this document.

5    Q.   Okay.  Where did you get that information as to

6    determine when the sale was done and how long the payments

7    had been made?

8    A.   Off the jacket of the person that traded it in.

9    Q.   Okay.  So that information was readily available when

10   you started to look at it; is that right?

11   A.   Well, it took a little digging, but I had to find it,

12   yeah.

13   Q.   Okay.  How long have you been involved in the car

14   industry?

15   A.   Twenty-two years.

16   Q.   -- yourself personally?

17   A.   Twenty-two years.

18   Q.   Is it common practice for a car dealer to make monthly

19   payments for this period of time on automobiles?

20   A.   Not in my experience.

21   Q.   Okay.  So have you done anything to investigate how

22   something that out of the ordinary could occur at a

23   business?

24   A.   Well, I didn't become aware of this until after we

25   filed, that it was this extensive.

1    Q.   Okay.

2    A.   Going to investigate it now is kind of a moot point.

3    Q.   Well, wouldn't, wouldn't one method of ensuring that it

4    doesn't ever happen again be to figure out how it happened

5    in the first place?

6    A.   Well, since now I'm in charge of writing the checks and

7    getting them out, as soon as I get authorization to pay off

8    the cars that we've taken in since then, I track that

9    myself now.  So it won't happen again.

10    Q.   Okay.  And so -- and why, why -- you didn't bother to

11    investigate the employees that may have been involved in

12    this activity, correct?

13    A.   Well, it basically took somebody telling them to pay

14    them off, that's correct.

15    Q.   Okay.  Did you investigate how the titles got signed by

16    somebody who is still an employee at Incredible Auto Sales

17    that were forwarded to Hyundai?

18    A.   I did not.

19    Q.   And you don't believe that that's necessary at this

20    time to determine how one of your employees could be

21    involved in a situation that is, at least potentially,

22    assuming the facts prove true, engaged in a fraud?

23    A.   I haven't investigated it.

24    Q.   It's not significant for you to investigate it right

25    now even though you're the man in charge?

1   A.  After the bankruptcy, I have been in charge.  And there

2   has not been any instance of this happening when I've been

3   in charge.

4   Q.  But the employees that may have been involved are still

5   there, aren't they?

6   A.  That's correct.

7   Q.  Now, were you involved in the business at the time that

8   Hyundai shut off the financing for used vehicles?

9   A.  Yes.

10  Q.  Were you?

11  A.  Yes.

12  Q.  Mr. Cornelison, if you said "yes", I apologize --

13          THE COURT:  Mr. Fain, he said "yes".

14          MR. FAIN:  Okay.  Your Honor, whatever it is,

15  it's on the real short answers that we're getting that we

16  don't hear a thing.

17          THE COURT:  Okay.

18          MR. FAIN:  Just so you're aware.

19          THE COURT:  Okay.  Well, just stand there like

20  you're expecting an answer, and I'll notice that and tell

21  you what the answer is.

22          MR. FAIN:  Thank you, Your Honor.

23          THE WITNESS:  I'll nod my head.

24  Q.  (By Mr. Fain)  So, so you were involved and you were

25  aware that Hyundai had shut off the financing for used cars

1    in September --

2    A.  For a short period --

3    Q.  -- of 2006?

4    A.  Yes.

5    Q.  Okay.  Do you know when they started their

6    discretionary financing again?

7    A.  Toward the end of September.

8    Q.  Do you know a date?

9    A.  I do not, the exact date.

10   Q.  Did you sign any of the checks, or were you involved in

11   the issuance of any of the checks to any of the auto

12   auctions that were returned for NSF funds during this basic

13   time frame?

14   A.  I may have.

15            MR. FAIN:  No further questions.

16            THE COURT:  Mr. Birkle.

17            MR. BIRKLE:  No questions.

18            THE COURT:  No questions.  Anyone else in

19   Billings?  I think that's it.

20            MR. PATTEN:  That's it, Your Honor.

21            THE COURT:  Mr. Coleman --

22            MR. COLEMAN:  Brief redirect, Your Honor.

23            THE COURT:  -- redirect.

24            MR. NEEDLER:  Judge, is it possible to take a

25   five-minute break?

1          THE COURT:  Certainly.  We'll be in recess for

2     five minutes.

3          MR. NEEDLER:  Thank you.

4          (A brief recess was taken.)

5          THE COURT:  You may proceed.

6                    REDIRECT EXAMINATION

7     BY MR. COLEMAN:

8     Q.  Mr. Cornelison, I just want to follow up with a handful

9     of matters you were asked on cross-examination.

10         First off, with respect to the $375,000 that you and

11    Nick have contributed, first off, do you recall explaining

12    that, that you put -- you and Nick together have put

13    $375,000 into the company?

14    A.  Yes.

15    Q.  Okay.  So we're clear, that's $375,000 into both the

16    debtor, Incredible Kia; as well as this other company,

17    Incredible Chevrolet, right?

18    A.  I bought stock from Nick.

19    Q.  From Nick.

20    A.  From Nick.  And Nick deposited the total amount into

21    Incredible Kia.

22    Q.  The total -- so do you have an interest in

23    Graham-Staunton Chevrolet?

24    A.  Yes.

25    Q.  And you paid $125,000 for that interest?

```
 1   A.   Yes.
 2   Q.   Okay.  And you also paid $125,000 for your interest in
 3   Incredible Kia?
 4   A.   That's correct.
 5   Q.   Okay.  So when we add up, though, to the 375 that you
 6   and Nick put into the companies, this is -- that's in
 7   between both companies, right?
 8   A.   That's incorrect.  The money was deposited into Kia.
 9   Q.   So you put $250,000 into Incredible Kia.
10   A.   Well, I paid the money to Nick, and Nick put it into
11   the -- into Kia.
12   Q.   You paid all 250,000 of your dollars to Nick?
13   A.   Yes.
14   Q.   Okay.  And Nick put the money as cash into Incredible
15   Kia only?
16   A.   Yes.
17   Q.   But he gave you an equity interest in both companies?
18   A.   That's correct.
19   Q.   Okay.  And to be clear, Nick, during the same time
20   period has also taken out over $233,000 from the company in
21   salary and owner's draw, according to your schedules,
22   right?
23   A.   Okay, if that's what they say.
24   Q.   I mean we can rely on what's in your schedules, right?
25   A.   Hm-hmm.
```

1   Q.   You talked about rent briefly.  Who does Incredible Kia

2   pay rent to directly?

3   A.   We pay it to The Networks.

4   Q.   What is The Networks?

5   A.   It's another company.

6   Q.   It's a company owned by Nick Gutierrez, isn't it?

7   A.   That's correct.

8   Q.   And that's true on both lots?

9   A.   Both lots?  Which lot are you talking about?

10  Q.   Both the Incredible, the primary lot; as well as the

11  secondary lot.

12  A.   No, that's incorrect.

13  Q.   You pay rent on The Networks only to -- or to The

14  Networks only for the primary lot?

15  A.   No, the secondary lot.

16  Q.   Okay.  On the secondary lot, you're paying rent to The

17  Networks?

18  A.   That's correct.

19  Q.   Okay.  And along --

20  A.   Or they go to -- or it goes directly to the landowner

21  itself.

22  Q.   Okay.  So the lease, if there is one, is in the name of

23  The Networks --

24  A.   That's correct.

25  Q.   -- which is Nick Gutierrez's other company that he

1    owns?

2    A.   That's correct.

3    Q.   Okay.  In your schedules, along those same lines, I

4    also see reference to Auto Pro.  I specifically see a

5    couple of different loans listed as a creditor.  Is Auto

6    Pro the same as The Networks?

7    A.   Yes, it's a d/b/a.

8    Q.   Okay.  So when we talk about Auto Pro, we're talking

9    about Nick?

10   A.   Yes.

11   Q.   Are there any other entities listed in the schedules

12   that you know about that are owned by Nick at all?

13   A.   I think the only two I know of is Graham-Staunton and

14   The Networks.  I don't know of any other -- maybe the --

15   there's a production company, I believe.

16   Q.   Do you know the name of that company?

17   A.   It is Access Media, I believe, or Access Production.

18   Q.   And does Incredible Kia pay any money to this other

19   company Nick owns?

20   A.   Yes.

21   Q.   Okay.  What does it pay money to that one of Nick's

22   companies for?

23   A.   Media that they -- they produce our TV commercials.

24   Q.   Okay.  One final question I -- you'll recall

25   Exhibit 21, the list of liens?

1    A.  Yes.

2    Q.  I see on here, for the vehicles with liens that have

3    been resold, I see a date sold to the new buyer who's now

4    driving around with a lien on their car.  Do you have any

5    information or did you do any investigation as to when

6    these vehicles were taken in on trade?

7    A.  I'm sure the information was there, but I just

8    didn't --

9    Q.  For instance, that first one where the vehicle was

10   resold to somebody on 4/17 of '06, that would have been

11   taken in on trade obviously sometime before then, right?

12   A.  That's a good indication, yes.

13   Q.  It could have been months before then.

14   A.  I don't know.

15   Q.  And you haven't done anything to investigate that, have

16   you?

17   A.  Well, I pulled all the files, but I didn't document it

18   on this form, so I don't know what the answer to that would

19   be.

20            MR. COLEMAN:  That's all I have, Your Honor.

21            THE COURT:  Okay, thank you.

22            MR. NEEDLER:  A couple more questions, Judge.

23            THE COURT:  Mr. Needler.

24            MR. NEEDLER:  Thank you.

25                    RECROSS-EXAMINATION

BY MR. NEEDLER:

Q.  The employees of Incredible Auto Sales understand today that you are the boss.

A.  Yes.

Q.  And they take their instructions from you.

A.  Yes.

Q.  Had you thought about discharging these two parties that are alleged to have acted wrongfully?  Have you thought about firing them?

A.  Yes, but there's not a lot of people to replace them with in the Billings market.  And so to go without versus keeping them was the lesser of the two evils.

Q.  Jody is one of, one of the parties involved; is that correct?

A.  Yes.

Q.  And, and she is -- her title is office manager?

A.  Yes.

Q.  And do you have any idea how many years in the car business she's got behind her?

A.  I believe it's over 20.

Q.  And how about Lalonna?  Is that the other person?

A.  Yeah, I don't know how long -- how much experience she has.

Q.  Okay.  But you made the conscious decision, they report to you, and at this point you can't afford to fire them

1    because there's nobody to replace them.

2    A.   That's correct.

3              MR. NEEDLER:  Can I approach the witness, Your

4    Honor?

5              THE COURT:  You may.

6    Q.   (By Mr. Needler)  Mr. Cornelison, we prepared some

7    exhibits for today's hearing, did we not?

8    A.   Yes, we did.

9              MR. NEEDLER:  Okay.  Our exhibit -- and I would

10   ask, Judge, that the prior exhibits that were approved by

11   the Court at the last hearing also be --

12             THE COURT:  Just for the record, would you

13   identify those?

14             MR. NEEDLER:  Sure, sure.  Well, as a matter of

15   fact, in my exhibit list, I did identify them.

16             THE COURT:  Okay.

17             MR. NEEDLER:  The current exhibit list which is

18   filed with the Court.

19             THE COURT:  Okay.

20             MR. NEEDLER:  Exhibit 1 was admitted.  That's on

21   my list.

22             Exhibit 2, used vehicles, was admitted.

23             Exhibit 3, the analysis of assets, which Mr. Ueno

24   testified to today, and so did Mr. Cornelison, that, that,

25   that was admitted.

1              Four, projection at that time was admitted.

2              Procedures for adequate protection were admitted.

3              The DIP cash collateral at that time was

4     admitted.

5              THE COURT:  What was the number?  We're talking

6     about five and six?

7              MR. NEEDLER:  Yes.

8              THE COURT:  Okay.

9              MR. NEEDLER:  Five and six were admitted.

10             Seven, was partially admitted.  There were a

11    couple of these pages that were not.  It had to do with

12    blue sky.

13             The financing statements were admitted; the

14    article from the paper was not.

15             And so what we are going to talk about real fast

16    here today is Exhibit 10, 11, and 12.

17    Q.   (By Mr. Needler)  Can you tell the Court,

18    Mr. Cornelison, what Exhibit 10 is and what it's intended

19    to portray?

20    A.   That is hour expenses for the month -- or from October

21    17th to November 30th.  The numbers with the -- indicated

22    on the left-hand -- or right-hand side that have a "one" on

23    them are the ones we've already paid --

24    Q.   Okay.

25    A.   -- with Court's permission.

1   Q.  Okay.  And the bottom line is, it's your, it's your

2   feeling that 17,200 is, is the negative position for this

3   period, October 17th to the 30th?

4   A.  That's correct.

5   Q.  And the reason it's not more is that you haven't been

6   able to really actively sell.

7   A.  That's correct.

8   Q.  Can you actively sell without having advertising

9   available?

10  A.  Well, it's very difficult.

11  Q.  And can you tell the Court why it's difficult?

12  A.  Well, our traffic is not consistent.  I mean from going

13  from a -- before we filed bankruptcy and were advertising,

14  we were getting -- traffic count was, you know, 10 - 20

15  people a day.  And now we're lucky to get two or three

16  without advertising.

17  Q.  Now, is part, is part of that, though, the road

18  construction?

19  A.  Part of that's the road construction.

20  Q.  Judge, I would ask that Exhibit 10 for

21  identification -- oh, tell the Court what the second page

22  of Exhibit 10 is.

23  A.  That is the list of vehicles that have been sold since

24  we have filed.  And that is the gross profit that has been

25  determined on the vehicles based on how we put the

1    stipulation into the --

2    Q.  Right.

3    A.  -- the Court.

4    Q.  Okay.  So the total of gross profit over there ties in

5    with the gross profit on page 1?

6    A.  That's correct.

7    Q.  And this is, this is a report which you, you did

8    yourself?

9    A.  That's correct.

10   Q.  And it's true and correct, as far as you know?

11   A.  Yes.

12            MR. NEEDLER:  I would ask that Exhibit 10 for

13   identification be accepted into evidence today.

14            THE COURT:  Any objection?

15            MR. COLEMAN:  No objection, Your Honor.

16            UNIDENTIFIED SPEAKER:  No objection.

17            THE COURT:  Exhibit 10 is admitted.

18         DEBTOR'S EXHIBIT NO. 10 ADMITTED INTO EVIDENCE

19   BY MR. NEEDLER:

20   Q.  All right.  Now Exhibit 11 --

21            MR. PATTEN:  Your Honor?

22            THE COURT:  What?

23            MR. PATTEN:  Were the exhibits prefiled?

24            MR. NEEDLER:  Yes.

25            THE COURT:  Well, let's look.  I just found them.

1   They were filed on 12/3 at Docket 105.

2            MR. NEEDLER:  They were prefiled.

3   Q.  (By Mr. Needler)  Tell the Court, if you would, what

4   Debtor's Exhibit 11 is, which is a two-page document.

5   A.  It is a revised budget for November, December, and then

6   January and February.

7   Q.  Okay.  And the number for November is revised because

8   there's a number of matters that weren't -- obviously,

9   weren't spent.

10       The budget for November has been changed by you --

11  A.  Yes.

12  Q.  -- to reflect those expenses that are not going to be

13  paid and were not accrued.

14  A.  Right.

15  Q.  Okay.  And so we are asking the Court to approve cash

16  collateral up through February; is that correct?

17  A.  That's correct.

18            MR. NEEDLER:  I would ask that Debtor's

19  Exhibit 11, a two-page document outlining gross profit, a

20  budget for November 6, December, January, February be

21  accepted into evidence.

22            THE COURT:  Any objection?

23            UNIDENTIFIED SPEAKER:  No objection.

24            MR. COLEMAN:  Your Honor, we don't object, but we

25  will object to further questioning on this point.  This

1    request that cash collateral be extended through February

2    was just filed, I want to say, Sunday night.  The time for

3    us to object to that new motion has not even come or gone.

4    And at this point, we're well beyond the scope of redirect.

5            THE COURT:  We certainly are.  Well, I'm going to

6    admit 11, not from the standpoint that that's what it's

7    going to be, but just that it's been filed and submitted.

8    And I want to make it very clear that I have not approved

9    this revised budget for this time period.

10           MR. NEEDLER:  I understand.

11           THE COURT:  Okay.

12         DEBTOR'S EXHIBIT NO. 11 ADMITTED INTO EVIDENCE

13   BY MR. NEEDLER:

14   Q.  Exhibit 12, can you tell the Court what Exhibit 12 is?

15   A.  Twelve is just a recap of our bank account at this

16   point.

17   Q.  So the present cash on hand at this point is

18   $267,027.29?

19   A.  Thirty-nine, that's correct.

20   Q.  Thirty-nine.

21           THE COURT:  Are you offering it?

22           MR. NEEDLER:  Pardon -- yes, I'm offering 10.

23           THE WITNESS:  Twelve.

24           THE COURT:  Twelve.  Any objection to 12?

25           UNIDENTIFIED SPEAKER:  No objection, Your Honor.

1          UNIDENTIFIED SPEAKER:  No objection.

2          THE COURT:  Exhibit 12 is admitted.

3      DEBTOR'S EXHIBIT NO. 12 ADMITTED INTO EVIDENCE

4          MR. NEEDLER:  I have no further questions.

5          THE COURT:  Okay, thank you.  I guess I have

6   some -- Mr. Coleman.

7          MR. COLEMAN:  I was just going to say I have no

8   further questions, Your Honor.

9          THE COURT:  Okay.  I guess I just need some

10  clarification here.  I appreciate your help.

11         When I look at the schedules down through the

12  ownership in the LLC, it's like Mr. Gutierrez has 95 -- or

13  80 percent --

14         THE WITNESS:  Okay.

15         THE COURT:  -- you have 10 percent, and I think

16  Jody has 5 percent.  Who has the other five?

17         THE WITNESS:  There was people that were under

18  5 percent --

19         THE COURT:  Okay.

20         THE WITNESS:  -- that apparently we didn't have

21  to list.

22         THE COURT:  Okay.  So now Mr. Gutierrez is no

23  longer an owner, right?

24         THE WITNESS:  That's correct.

25         THE COURT:  And his wife acquired his 80 percent

1    interest?

2              THE WITNESS:  Yes.

3              THE COURT:  What did she pay for it?

4              THE WITNESS:  I don't know if -- what she paid

5    for it.

6              THE COURT:  Okay.  And then on the other -- and

7    Incredible Chevy, you have a 10 percent ownership interest,

8    I think your testimony was.

9              THE WITNESS:  Yes.

10             THE COURT:  Okay.  And Mr. Gutierrez has an 80

11   percent in that, too, do you think, or do you know?

12             THE WITNESS:  You know, it's 80 or -- I think

13   it's just me and him, so it might be even 90.

14             THE COURT:  Okay, okay.  And then I noticed and

15   there was some testimony and questioning regarding the

16   draws.  I see Mr. Gutierrez drew out about 233,000 during a

17   one-year period.  You drew out about 51,000?

18             THE WITNESS:  That's correct.

19             THE COURT:  Okay.

20             THE WITNESS:  But I wasn't there the whole year,

21   either.

22             THE COURT:  Right, right.  Now, in this budget

23   that you just filed -- that the debtor just filed --

24             THE WITNESS:  Yes.

25             THE COURT:  -- there's salaries for - let me get

1    to it here - there's owner's salary for like $15,000.  Does

2    that include, then -- well, what does that include?

3            THE WITNESS:  That's myself.

4            THE COURT:  Okay.  For how much?

5            THE WITNESS:  For $10,000.

6            THE COURT:  Okay.

7            THE WITNESS:  Plus Shawnese, Mrs. Gutierrez.

8            THE COURT:  Okay.

9            THE WITNESS:  Because I work more than she does,

10   I get paid more than she does.

11           THE COURT:  Why is she getting anything at this

12   point as a salary?

13           THE WITNESS:  Well, she has some management

14   duties.  And when I'm not there, she has to sign all the

15   checks; and she reviews the bills; and --

16           THE COURT:  Why couldn't she just be paid on an

17   hourly rate?

18           THE WITNESS:  I don't know.

19           THE COURT:  Okay.  Oh, I guess I never

20   understood, then:  Who does Incredible Auto Sales pay rent

21   to at their main, primary lot?

22           THE WITNESS:  It's King Avenue Properties.

23           THE COURT:  Okay.  And who is that?  I does that

24   involve -- is Mr. Gutierrez involved in that?

25           THE WITNESS:  No, not at all.

1        THE COURT:  Okay.  You may step down.  Thank you.

2

3                    *  *  *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

    I certify that the foregoing is a correct transcript
from the electronic recording of the partial proceedings in
the above-entitled matter, all done to the best of my skill
and ability.


_____   _____

Jonny B. Nordhagen